### *APPENDIX TO*

**RESPONDENT'S MOTION FOR SUMMARY JUDGMENT
(COUNTS I-VIII), MOTION FOR PARTIAL DISMISSAL
FOR FAILURE TO EXHAUST ADMINISTRATIVE
REMEDIES (COUNTS X-XI),  MOTION FOR PARTIAL DISMISSAL
FOR FAILURE TO STATE A CLAIM (COUNT IX),
AND  MOTION FOR PARTIAL DISMISSAL OF PETITIONER
FARMERS MUTUAL FOR FAILURE TO EXHAUST
ADMINISTRATIVE REMEDIES**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ACE PROPERTY & CASUALTY INSURANCE COMPANY (f/k/a CIGNA PROPERTY & CASUALTY INSURANCE CO.) 9200 Northpark Drive Suite 300 Johnston, Iowa 50131, )))))))) | |
| ALLIANCE INSURANCE COMPANIES 1122 North Main McPherson, Kansas 67460, )))) | |
| AMERICAN AGRICULTURAL INSURANCE COMPANY 1501 E. Woodfield Road Suite 300W Schaumburg, Illinois 60173, ))))))) | Civil Action No. 1:06CV01430 (RMU) |
| AMERICAN GROWERS INSURANCE COMPANY IN LIQUIDATION )) | |

c/o Director                                          )
Nebraska Department of Insurance                      )
941 O Street, Suite 400                               )
Lincoln, Nebraska 68508,                              )
                                                      )
COUNTRY MUTUAL INSURANCE COMPANY                      )
1701 Towanda Avenue                                   )
Bloomington, Illinois 61702,                          )
                                                      )
FARM BUREAU MUTUAL INSURANCE                          )
COMPANY OF IOWA                                       )
5400 University Avenue                                )
West Des Moines, Iowa 50266,                          )
                                                      )
FARMERS ALLIANCE MUTUAL INSURANCE                     )
COMPANY                                               )
1122 North Main                                       )
McPherson, Kansas 67460,                              )
                                                      )
FARMERS MUTUAL HAIL INSURANCE                         )
COMPANY OF IOWA                                       )
6785 Westown Parkway                                  )
West Des Moines, Iowa 50266                           )
                                                      )
GREAT AMERICAN INSURANCE COMPANY                      )
49 East 4th Street                                    )
Cincinnati, Ohio 45201,                               )
                                                      )
HARTFORD FIRE INSURANCE COMPANY,                      )
690 Asylum Avenue                                     )
Hartford, Connecticut 06115,                          )
                                                      )
NAU COUNTRY INSURANCE COMPANY                         )
7333 Sunwood Drive                                    )
Ramsey, Minnesota 55303,                              )
                                                      )
PRODUCERS LLOYDS INSURANCE COMPANY                    )
2025 S. Hughes Street                                 )
Amarillo, Texas 79105,                                )
                                                      )
RURAL COMMUNITY INSURANCE COMPANY                     )
3501 Thurston Avenue                                  )
Anoka, Minnesota 55303,                               )
                                                      )
                      Petitioners,                    )

|  | ) |  |
|---|---|---|
| v. | ) | Civil Action No. |
|  | ) | 1:06CV01430 (RMU) |
| FEDERAL CROP INSURANCE CORPORATION, | ) |  |
| A CORPORATION WITHIN THE UNITED | ) |  |
| STATES DEPARTMENT OF AGRICULTURE, | ) |  |
| c/o U.S. Department of Agriculture | ) |  |
| Office of the General Counsel | ) |  |
| South Building, Room 2449 | ) |  |
| 14th & Independence Avenue, S.W. | ) |  |
| Washington, D.C. 20250, | ) |  |
|  | ) |  |
| Respondents. | ) |  |
|  | ) |  |

PETER D. KEISLER
Assistant Attorney General


DAVID M. COHEN
Director, Commercial Litigation Branch


Of Counsel:
JEFFREY A. TAYLOR                         JANE W. VANNEMAN
D.C. Bar #498610                          D.C. BAR # 257121
PETER S. SMITH
D.C. BAR #465131                          Senior Trial Counsel
Assistant U.S. Attorney                    United States Department of Justice,
Judiciary Center Building                  Civil Division,
555 Fourth St., N.W.                       Commercial Litigation Branch
   Room E4224                              1100 L Street, N.W.
Washington, D.C. 20530                     Room 12010
(202) 307-0372                             Washington, D.C.  20005
                                           (202) 616-8283

KIMBERLEY ARRIGO
Senior Counsel
United States Department of Agriculture
Office of the General Counsel
Washington, D.C.


January 25, 2007

APPENDIX

Page

Order, United States Court of Appeals for the Eighth Circuit,
    June 6, 2006 (denial of appellants' petition for rehearing)     1

Barnhill v. Davidson, No. 4:02-CV-159-H(4) (N.D. Car., July 22, 2004)     2

Tom Clements v. Davidson, No.2:03cv352 (E.D. Va., April 9, 2004)     51

Complaint, Ace Property et al v. United States, No. 03-470C (Fed. Cl.)     56

Complaint, Ace Property & Casualty Insurance Company et al
    v. Federal Crop Insurance Corporation and Risk Management Agency,
      No. 1:04-cv-40036 (D.C. S.D. Iowa)     106

American Growers Insurance Company v. Federal Crop
    Insurance Corporation, No. 1-01-CV-10059
      (S.D. Iowa, Dec. 11, 2003)     157

# UNITED STATES COURT OF APPEALS

## FOR THE EIGHTH CIRCUIT

No.    05-2321

Ace Property and Casualty         *
Insurance Company, etc., et al.,  *
                                  *
        Appellants,               *    Appeal from the United States
                                  *    District Court for the
            v.                    *    Southern District of Iowa.
                                  *
Federal Crop Insurance Corporation,*
etc., et al.,                     *
                                  *
        Appellees.                *

Appellants' motion to stay the disposition of the petition for rehearing has been considered by the court and is denied. The petition for rehearing by the panel filed by appellants is denied.

(5193-010199)

June 8, 2006

Order Entered at the Direction of the Court:

*Michael E. Gans*

Clerk, U.S. Court of Appeals, Eighth Circuit

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:02-CV-159-H(4)

MARVIN TAYLOR BARNHILL, et
al.,

     Plaintiffs,

     v.

ROSS J. DAVIDSON,
ADMINISTRATOR, RISK
MANAGEMENT AGENCY, et al.,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER**

This matter is before the court on the plaintiffs' motion for class certification pursuant to Fed. R. Civ. P. 23, filed June 18, 2003, and on the parties' cross-motions for summary judgment, filed June 6, 2003, and January 2, 2004. The court conducted a full hearing in this matter on May 20, 2004, at which the parties addressed all pending issues and motions. Thus, this matter is ripe for adjudication.

## STATEMENT OF THE CASE

Plaintiffs in this action are 461 peanut farmers from Virginia, North Carolina, and South Carolina,[1] who applied for and obtained Multiple Peril Crop Insurance ("MPCI"), pursuant to the Federal Crop Insurance Act, 7 U.S.C. § 1508(h), for their peanut

---

[1] Of the 461 plaintiffs, 274 are from North Carolina, 185 are from Virginia, and 2 are from South Carolina.

crops for the 2002 crop year.[2]    Defendants administer the federal crop insurance program and include the Risk Management Agency (RMA); Ross Davidson, the Administrator for the RMA; the United States Department of Agriculture (USDA); Ann Veneman, the Secretary of Agriculture for the United States; and, the United States.[3]

Plaintiffs expected to receive federal crop insurance coverage at the quota price election level of $0.31 per pound of peanuts grown for 2002.  However, on May 13, 2002, Congress passed the Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 ("the Farm Security Act"), which eliminated the quota system for peanuts.[4]  As a result, all insurance claims for peanut crop losses were paid at the non-quota price election rate of $0.1775 per pound.  Plaintiffs claim that defendants breached the insurance contract by reducing the coverage payments from $0.31 to $0.1775 per pound of peanuts.

Plaintiffs' complaint, filed on November 19, 2002, includes six claims: a breach of contract claim, three claims for denial of

---

[2] The court is aware that similarly situated peanut farmers have filed complaints in the Court of Federal Claims and in federal district courts in Virginia, Texas, Alabama, Georgia, Florida, and South Carolina.  Additionally, the plaintiffs have filed documents with the Judicial Panel on Multidistrict Litigation.  However, as pendency before the panel does not affect pretrial jurisdiction of this court, this court will currently decide the motions before it.

[3] The court will collectively refer to the defendants as "the government."

[4] The sections of the Farm Security Act that relate to peanuts are codified at 7 U.S.C. 7951-7960.

3

due process, and two claims for violation of various statutes requiring notice of policy changes.  Plaintiffs currently seek class certification and request summary judgment on the breach of contract and due process claims.

On January 2, 2004, defendants filed a motion to dismiss, or alternatively for summary judgment.  Because defendants' motion references documents outside the pleadings, the court will consider it as a motion for summary judgment.  Defendants' motion for summary judgment requests the court to dismiss the plaintiffs' claims for lack of standing and for failure to exhaust administrative remedies.

## STATEMENT OF THE FACTS

The parties agree on the following facts.[5]  The peanut quota system had been in place, in various versions, since 1938, when Congress enacted the Agricultural Adjustment Act of 1938 ("the 1938 Act"), currently codified at 7 U.S.C. § 1281 (2000).  The 1938 Act "terminated the free market production and sale of agricultural commodities within the United States, including peanuts."  See Members of the Peanut Quota Holders Ass'n v. United States, 60 Fed. Cl. 524, 525 (2004) (discussing history of peanut quota

---

[5]  Though defendants dedicate a section of their response to plaintiffs' motion for summary judgment to "disputed facts," defendants do not actually dispute any of the dispositive facts, but merely the legal conclusions that may follow from them.

3

𝜑

regulation).  It provided assistance to farmers through direct payments and restrictions on competition.  Id.  The peanut quotas were initially based solely on acreage, but the Food and Agriculture Act of 1977, Pub. L. No. 95-113, §§ 801-807, 91 Stat. 913, instituted quotas based on the weight of peanuts produced. Id.  These poundage quotas applied to domestic edible peanuts, but not those grown for export or for crushing into oil.  Id.  In 1981 Congress terminated acreage quotas, leaving only poundage quotas. Id. (citing the Agriculture and Food Act of 1981, Pub. L. No. 97-98, §§ 701-707, 95 Stat. 1213, 1248).

In 1996, Congress passed the Federal Agriculture Improvement and Reform Act of 1996, Pub. L. No. 104-127, § 155(I)(2), 110 Stat. 888, 928 ("the 1996 Act").  This Act ended direct payments to peanut farmers but gave them price supports in the form of marketing loans.  The 1996 Act set the loan rate for quota peanuts at $610 per ton (approximately $0.31 per pound) for the years 1996 through 2002.  In contrast, the loan rate originally set for non-quota peanuts for the 2002 crop year was only $132 per ton ($0.16 per pound).

On May 13, 2002, Congress passed the Farm Security Act.  The Farm Security Act took the drastic step of eliminating the quota system for peanuts,  so that "anyone could now grow and market unlimited quantities of peanuts without penalty or restriction." Members of the Peanut Quota Holders Ass'n v. United States, 60 Fed.

4

Cl. at 525. The Farm Security Act included a "buyout" for quota holders under which quota holders would receive a total of $0.55 per pound. This buyout did not affect the crop insurance agreements. The federal peanut program is managed by the Farm Service Agency (FSA), an agency of the USDA.

The federal crop insurance program also began in 1938, with the passage of the Federal Crop Insurance Act of 1938. See H. R. Rep. No. 103-649, reprinted in 1994 U.S.S.C.A.N. 2516, 2518. "From its origin, the stated purpose of the federal crop insurance program has been 'to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance.'" Wiley v. Glickman, No. CIV A3-99-32, 1999 WL 33283312, at *1 (D.N.D. Sept. 3, 1999) (discussing history of federal crop insurance program) (quoting 7 U.S.C. § 1502(a)). The crop insurance program was amended in 1980 and again in 1994 to increase farmers' participation in the program and to make federal crop insurance "the farmers' primary source of risk management." Id. (citing 1994 U.S.S.C.A.N. at 2517, 2519).

The federal MPCI policies are contracts of insurance between private insurers and eligible farms. The Federal Crop Insurance Corporation ("FCIC"), an agency of the USDA, reinsures these contracts through separate contracts between the insurers and the FCIC. The Risk Management Agency is also an independent agency of the USDA and is responsible for overseeing the FCIC and

5

administering the MPCI program.

For the 2002 crop year, plaintiffs obtained MPCI policies on their peanut crops. The MPCI policies consisted of the basic provisions, the peanut provisions, the special provisions and actuarial documents, the applicable regulations in 7 CFR chapter IV and the accepted insurance application. (MPCI policy, basic provisions § 1.) The amount of MPCI coverage available to peanut farmers was tied to the federal peanut program as it then existed. Under the MPCI policy provisions, any changes to the policy provisions, price elections, amounts of insurance, premium rates, and program dates must be made prior to the contract change date. (Id. § 4(b).) For the 2002 crop year, the contract change date was November 30, 2001. (MPCI policy, peanut provisions § 4.) On November 30, 2001, an addendum to the insurance policies provided that the price election would be $0.31 per pound for quota peanuts and $0.16 per pound for non-quota peanuts. (MPCI policy, special provisions.)

The MPCI policies also contained other key dates. The cancellation and termination date and the sales closing date for North Carolina policies was February 28, 2002. (Peanut provisions § 5; N.C. Special Provisions.) After this date, the farmers were bound by the insurance contract and were not allowed to rescind or change the contract. (Basic provisions § 1.) The initial planting

6

7

date for North Carolina farmers was April 16, 2002.[6] (N.C. Special Provisions.) Farmers in North Carolina could plant their peanut crops only between this date and the final planting date, May 31, 2002. (Basic provisions § 1.)

The method for settling crop loss claims was set forth in the peanut crop provision, § 14. Under that method, the amount of insured non-quota peanuts is equal to the insured acreage multiplied by the production guarantee per acre, minus the insured effective poundage marketing quota. (Peanut provisions § 14(c)(1)-(2)). For settling the claim, the effective poundage marketing quota is the lesser of:

1) The amount of the effective poundage marketing quota reported on the acreage report;

2) The amount of the FSA effective poundage marketing quota; or

3) The amount determined at the final settlement of your claim.

(Id. § 14(b)). Similarly, the peanut provisions define the term "[e]ffective poundage marketing quota" as "[t]he number of pounds reported on the acreage report as eligible for the average support

---

[6] The cancellation and termination date for Virginia, New Mexico, and Oklahoma, and some Texas counties was March 15, 2002. (Peanut provisions § 5.) Some other Texas counties were subject to a January 15, 2002, cancellation and termination date, and the February 28, 2002, cancellation and termination date also applied to some counties in Texas and to all other states. (Id.) The sales closing date in Virginia was March 15, 2002. For Virginia peanut farmers, the initial planting date was April 11, 2002, and the final planting date was June 10, 2002. (V.A. Special Provisions.)

7

price per pound..., not to exceed the Marketing Quota established by FSA for the farm serial number." (Id. § 1.)

Each year between 1996 and 2002, the Secretary of Agriculture would establish a national poundage quota by December 15 of the year preceding the marketing year, pursuant to former 7 U.S.C. § 1358-1. See 7 U.S.C. § 1358-1(a)(2) (2001) (requiring Secretary to announce national peanut poundage quota for a marketing year not later than December 15 preceding the marketing year). The national poundage quota would later be apportioned to the states, and the FSA would then assign farm poundage quotas to individual farms. See 7 U.S.C. § 1358-1(a)(3) (2001) (stating that the national poundage quota shall be apportioned among the states); 7 U.S.C. § 1358-1(b) (2001) (providing for allocation of farm poundage quotas to individual farms). On December 14, 2001, the USDA announced a national poundage quota for peanuts for the 2002 crop year. (Admin. Record at Vol. 2 p. 3.) The 2002 quota was at the same level as the 2001 quota. When the USDA allocated the national poundage quota to the states on January 15, 2002, it stated that "[t]he 2002 national poundage quota ... will be allocated to eligible quota and nonquota farms according to 1-PN, paragraph 140." (FSA Notice PN-649, Record at Vol. 2 p. 5.)

However, the FSA never allocated the 2002 national poundage quota to individual farms. In fact, on May 3, 2002, the FSA directed the county offices not to allocate the current year peanut

9

quota, and it informed them that the software that the offices would soon receive would be disabled from allocating the quotas to individual farms. (FSA Notice PN-652, Record at Vol. 2 p. 8; see also RMA Bulletin MGR-01-016, Record at Vol. 1 p. 28.)

The December 14, 2001, announcement alerted the farmers to the possibility that the quota system might be eliminated. Specifically, it stated that:

> The Farm Bill currently being considered by Congress would dramatically change the peanut program. Poundage quotas would be eliminated and price support would be replaced with a target price and deficiency payment plan. If pending legislation is enacted as Law for 2002, the 2002 poundage quota announced according to this notice will be altered or rescinded.

(Record at Vol. 2 p. 3.) The notice allocating the quota to the states also contained a warning that the new Farm Bill, if passed, might eliminate the quota system for peanuts. (FSA Notice PN-649, Record at Vol. 2 p. 5.)

Congress passed the Farm Security Act on May 13, 2002, eliminating the quota system of price supports for peanuts in the middle of the 2002 crop year, after peanuts had been planted and after the last date farmers could cancel or change their crop insurance. The Farm Security Act raised the price election for non-quota peanuts from $0.16 to $0.1775 per pound and effectively eliminated the $0.31 per pound price election for quota peanuts. Because the Farm Security Act eliminated all quota peanuts, the

9

USDA sent a bulletin to the insurance companies stating that all peanuts were to be treated as non-quota peanuts. (RMA Bulletin MGR-02-006.1, Record at Vol. 1 p. 25.) At least some farmers then received an insurance declaration from their insurance company, which stated that "the price election for your peanut crop has been corrected to $0.1775/MPCI....  We apologize for any confusion." (Ex. 9-C to Pls.' Mot. for Partial Summ. J.)

The year 2002 was a disastrous year for the peanut crops. Plaintiffs characterize it as "the worst drought in thirty to forty years."  (Pls.' Mot. for Summ. J. at p. 12.)  According to the North Carolina Department of Agriculture and Consumer Services, drought reduced peanut production in North Carolina by 41 percent from the 2001 levels. N.C. Dept. Of Agr. & Consumer Servs., N.C. Agriculture Overview -- Field Crops, available at http://www.ncagr.com/stats/general/crop_fld.htm.

The peanut farmers now argue that the insurance contracts had provided coverage for their peanut crops at the price election level of $0.31 per pound for quota peanuts.  They argue that the defendants changed the terms of the contract after the contract change date and after the farmers had planted their crops in reliance on this historical program. The farmers have now received loss payments at the election rate of $0.1775 per pound, and they are currently suing for the difference of about $0.13 per pound, which they contend was reasonable to rely upon.

10

11

**COURT'S DISCUSSION**

## I.    Class Certification

A district court passing on a motion for class certification is accorded broad discretion in deciding whether to certify a class. In re American Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996). However, the court must exercise this discretion within the strictures of Rule 23, which outlines the requirements a plaintiff must meet in order to bring a representative action. See id.; Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 146 (4th Cir. 2001). The four threshold requirements for class certification are (1) numerosity, (2) commonality, (3) typicality, and (4) representativeness. Fed. R. Civ. P. 23(a). In addition to these requirements, a plaintiff seeking certification must also satisfy one of the three concepts embodied in Rule 23(b).

Plaintiffs have proposed the following definition of the class:

> Peanut farmers in North Carolina and in eligible counties in Virginia and South Carolina who contracted during the period from November 30, 2001 through March 15, 2002 for the 2002 Multiple Peril Crop Insurance policy for peanuts, the terms and conditions of which were published in the Federal Register. The class includes peanut farmers who had automatically applied by virtue of having a contract in 2001 (the Multiple Peril Crop Insurance policy) with continuous coverage who did not cancel the insurance contract. The class does not include farmers who had initially applied for Peanut Multiple Peril Crop Insurance Policy coverage, but who had withdrawn that application before March 15,

11

12

> 2002, nor does it include farmers who never applied for Peanut Multiple Peril Crop Insurance coverage.

(Pls.' Mot. for Class Certification at p. 2.)

Defendants object to certification of the class as defined by plaintiffs on the grounds that it is overly broad and that it fails to meet the requirements of Rule 23(a) and (b). Defendants have several specific objections. First, they object to the inclusion in class of peanut farmers from outside the Eastern District of North Carolina.[7] They point to 7 U.S.C. § 1508(j)(2)(a), which states that "an action on the [crop insurance] claim may be brought against the Corporation or Secretary only in the United States district court for the district in which the insured farm is located." Defendants also note that the provisions of the MPCI policy provide that any legal action must be brought in accordance with the provisions of 7 U.S.C. § 1508(j). (Basic provisions § 25.) Because this court has no jurisdiction over peanut farmers whose farms are located outside the Eastern District of North Carolina, the court agrees that the plaintiff class should be limited to those farmers whose farms are located in this district.

---

[7] The Eastern District of North Carolina consists of the forty-four counties east of Raleigh, including Wake County. Most of the peanuts grown in North Carolina are grown in these counties; the only county outside the Eastern District which grows a significant amount of peanuts (more than fifty acres) is Scotland County, in the Middle District of North Carolina. See The Peanut Farmer, Acreage Map, available at http://www.peanutfarmer.com/acreage/pfmap.pdf.

13

Defendants also object that the class definition improperly includes peanut farmers who "(i) never had insurance coverage on peanuts for various reasons (e.g. never planted or did not file acreage reports); (ii) did not have any loss in the 2002 crop year; or, (iii) had claims for losses which were denied for reasons wholly unrelated to the loss of peanut quota." Plaintiffs do not take issue with the defendants' objections, but instead respond that the court can tailor the definition of the class to meet the objections raised by the defendant. Indeed, the plaintiffs seem to acknowledge that even though 1,848 peanut producers contracted for crop insurance as of the sales closing date, only the 735 producers who have been paid claims at the rate of $0.1775 would be eligible to recover under this suit. Thus, the court must further limit the class to those peanut producers who actually recovered $0.1775 under the insurance policy for their losses.

Defendants also argue that the plaintiffs' class definition is overly broad in that it does not limit the class of peanut farmers to those who operated farms to which a quota was assigned in previous years by the Farm Service Agency. Defendants contend that only those farmers who had "lost" their quotas due to the 2002 Farm Bill were impacted by the elimination of the quota.

Plaintiffs do not address this argument, but they imply elsewhere in their briefs that because the price election level for growing peanuts was below the cost to the farmers for growing

13

14

peanuts, many if not all of the farmers only grew peanuts that they believed would be quota peanuts. (Pls.' Reply at p. 11.) Under the 2001 version of 7 U.S.C. § 1358-1(b)(1)(B), the quota for each farm would be "the same as the farm poundage quota for the farm for the immediately preceding marketing year," subject to adjustments that could increase or decrease the quota amount. Because the peanut quotas for each year were based on the quota assigned the previous year, only those peanut farmers who had been assigned a quota in 2001 had an expectation of receiving a quota for the 2002 crop year and "lost" the quota for 2002. Accordingly, the court concludes that the class should include only those farmers who had been assigned a quota for the 2001 crop year.

As limited by the court, the new definition of the class is as follows:

> Peanut farmers whose farms are located in the Eastern District of North Carolina, who had insurance coverage on peanuts under the 2002 Peanut Multiple Peril Crop Policies, who had losses for the 2002 crop year, who settled those losses for $0.1775 per pound, and who had been assigned farm poundage quotas for the 2001 crop year.

The court will now turn to the requirements of Federal Rule of Civil Procedure 23(a) and 23(b).

### A.    Numerosity

Numerosity requires that a class be so large that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Seven hundred and thirty-five North Carolina peanut farmers have settled

their insurance claims at the rate of $0.1775 per pound.
Potentially all of these farmers would be included in the plaintiff
class.[8] Currently, 274 North Carolina farmers have joined in this
lawsuit; therefore, the plaintiff class would include about 461
additional eastern North Carolina farmers. Plaintiffs argue that
they have met the numerosity requirement under Rule 23(a)(1), and
defendants concede this point. The court believes that judicial
economy is best served by handling these matters as a class action,
and finds that the numerosity threshold is satisfied.

**B.    Commonality**

Commonality requires that there are "questions of law or fact
common to the class." Fed. R. Civ. P. 23(a)(2); see Stott v.
Hawsworth, 916 F.2d 134, 145 (4th Cir. 1990). Plaintiffs argue
that the commonality requirements are met because all the insurance
contracts had the exact same terms and were subject to the same
rates, rules, and regulations provided by the FCIC or the RMA.
Plaintiffs note that the changes in the peanut quota system
affected all farmers in the exact same manner and that the
defendants' defenses are the same for all class members.

Defendants note that the requirements of commonality and

---

[8] While the plaintiffs did not specify in their filings how
many of these North Carolina farmers are from the Eastern District
of North Carolina, they later indicated that only the Lassiters,
from Moore County, are from another North Carolina district. As
stated above, the court has subject matter jurisdiction only over
plaintiffs from the Eastern District of North Carolina, and the
court will dismiss all farmers from outside this district.

15

/6

typicality tend to merge with adequacy of representation. Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 337 (4th Cir. 1998). Defendants argue that the class, as originally defined by plaintiffs, includes many peanut producers who would not be entitled to recover at all, including those who never had or perfected a loss claim, who had never grown quota peanuts, and who had not filed the required acreage report. However, as the court has defined the class more narrowly, most of defendants' concerns disappear.[9]

Defendants argue that even when the class is more narrowly defined, some commonality issues would remain. Specifically, defendants argue that because no quotas were ultimately assigned to individual farms for the 2002 crop year due to the 2002 Farm Bill, plaintiffs' damages can be determined only by first making an individualized determination as to what quota might have been assigned to each farm. Defendants point out that under the applicable regulations, former 7 C.F.R. § 729.210, enacted in 1996 under the 1996 Act, the quota assigned to an individual farm could change from year to year.

Plaintiffs agree that there are certain variables among the

---

[9] The court believes that it is better to address defendants' concern that most or all of the plaintiffs have not exhausted their administrative remedies as a substantive inquiry rather than a certification issue. Furthermore, the court believes that the argument that some farmers have assigned their insurance proceeds to banks is more appropriately addressed at the damages stage.

16

17

plaintiffs -- the level of insurance coverage (e.g. 70% or 85%), the actual production histories, and the number of acres -- that are necessary to calculate damages for individual plaintiffs. Plaintiffs contend that class treatment is nevertheless warranted because class issues predominate. Plaintiffs assert that the issue of damages could be handled as a matter of administration and would impose no burden on the court.

The court believes that this case is an ideal prospect for class action litigation, as the basic facts of this case are the same for each plaintiff. Each plaintiff had the exact same crop insurance contract, each plaintiff had previously been assigned a quota by the FSA in 2001, each plaintiff expected to have coverage at the price election level of $0.31 per pound for their peanut crop, and each plaintiff received only $0.1775 per pound in insurance proceeds for the 2002 crop year because Congress eliminated the quota system for peanuts. The determination of damages for each plaintiff is a mathematical determination that can be easily calculated based on each farmer's percentage of coverage and the like. Because these facts are the same for each plaintiff, each plaintiff has the same claims for breach of contract and violation of due process.

Furthermore, class certification in this case is proper even though the individual amounts of damage will differ. "Individual questions of damages are typical in class actions, and they are

17

18

rarely a barrier to certification." <u>DeLoach v. Philip Morris Cos.,</u> <u>Inc.</u>, 206 F.R.D. 551, 566 (M.D.N.C. 2002). Accordingly, the court finds that this case involves questions of law and fact common to all plaintiffs.

### C.  Typicality

Typicality requires that the claims of the named class representatives be typical of those of other members of the class. In short, a named class member who satisfies the typicality requirement "must be part of the class and possess the same interest and suffer the same injury as the class members." <u>General</u> <u>Tel. Co. of Southwest v. Falcon</u>, 457 U.S. 147, 156 (1982).

In the plaintiffs' proposed order for class certification, plaintiffs suggest that the class representatives should consist of only the original fourteen plaintiffs named in the complaint.[10] As some of these plaintiffs are Virginia farmers, not all of the proposed representatives would be part of the class, which is restricted to farmers with farms located in the Eastern District of North Carolina.

The first four of these plaintiffs -- Barnhill, Hamill, Branham, and Jenkins -- farm and reside in the Eastern District of

---

[10] On the same day that they filed their complaint, the named plaintiffs moved to join over 400 additional plaintiffs. The court allowed the joinder of these additional plaintiffs previous to this order, and so there are currently 461 named plaintiffs. Exhibit A to plaintiffs' motion lists the North Carolina plaintiffs to be added and Exhibit B lists the Virginia plaintiffs.

19

North Carolina. Of the next four plaintiffs, Clements resides in Virginia and has farms in Virginia and North Carolina, and Grant, Phelps, and Flythe reside in North Carolina and have farms in Virginia and North Carolina. The remaining farmers reside and farm only in Virginia.[11]

As the court has already indicated, the court has no subject matter jurisdiction over plaintiffs from other North Carolina districts, Virginia districts, and the District of South Carolina. 7 U.S.C. § 1508(j). The court therefore will dismiss all plaintiffs, including the proposed class representatives, who do not have farms in the Eastern District of North Carolina. These farmers and others similarly situated must address these issues within their own district. The farmers who have farms in both the Eastern District of North Carolina and Virginia will not be dismissed, but may only recover as to their farms in North Carolina.

The remaining eight proposed class representatives are peanut farmers who farm in the Eastern District of North Carolina and who had perfected insurance contracts on their crops for the 2002

---

[11] Although the complaint indicates clearly that the first four farmers farm and reside in the Eastern District of North Carolina, it did not specify whether the remaining ten plaintiffs farmed in Virginia, North Carolina, or both because farms in both Virginia and North Carolina, as well as a small section in South Carolina, were part of the Virginia-Carolina growing region and were all subject to regulation by the Raleigh, North Carolina, Regional RMA office.

20

growing season.   The FSA had assigned a farm poundage quota to these proposed representatives for crop years prior to 2002.   The proposed representatives all sustained losses on their crops from the unusually poor weather during the summer of 2002.   Their peanut crop losses were covered by their crop insurance, and their claims were settled at the non-quota price election amount of $0.1775 per pound.

The elimination of the peanut quota system affected the rights of the proposed class representatives in the same manner as the rest of the plaintiff class.   These proposed representative plaintiffs suffered the same injury as the rest of the class.   The court therefore finds that the claims of the remaining proposed class representatives are typical of the class, and will appoint those eight farmers as class representatives.

**D.    Representativeness**

Representativeness requires that the named class members "will fairly and adequately protect the interests of the class." Fed. R. Civ. P.  23(a)(4).   The class representatives have the same claims and are subject to the same defenses as the entire plaintiff class. The representative plaintiffs do not appear to have any interests antagonistic to the class interests.   The court finds that the representatives will fairly and adequately protect the interests of the class from the Eastern District of North Carolina.

The court finds that plaintiffs' current counsel, Philip R.

20

2-/

Isley, G. Eugene Boyce, and R. Daniel Boyce, will adequately represent the plaintiff class within the Eastern District of North Carolina.  Counsel is currently representing peanut farmers in similar cases in other federal district courts, and counsel has had previous experience in class action litigation.

This court therefore concludes that the class, as defined by the court, satisfies the requirements of numerosity, commonality, typicality, and representativeness under Rule 23(a).

**E.    Rule 23(b)**

For a plaintiff class to be certified, the class must satisfy all the requirements of 23(a), and one of the one of the following subsections of Rule 23(b):

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
> > (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> > (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only

21

22

> individual members, and that a class action is
> superior to other available methods for the
> fair and efficient adjudication of the
> controversy. ...

Plaintiffs argue that classification is appropriate under Rule 23(b)(2) because defendants' actions are generally applicable to the class and because plaintiffs seek injunctive relief and/or recovery of insurance proceeds at $0.31 per pound. In the complaint, plaintiffs request a declaratory judgment that the defendants breached the insurance contract and violated plaintiffs' due process and statutory rights. Plaintiffs also seek an injunction compelling the defendants to honor the contract. Alternatively, plaintiffs seek recovery of money damages.

Class certification under Rule 23(b)(2) is appropriate only when "the relief sought is exclusively or predominantly injunctive or declaratory." Lukenas v. Bryce's Mountain Resort, Inc., 538 F.2d 594, 595 (4th Cir. 1976). Defendants argue that although the requested relief is couched in terms of declaratory and injunctive relief, plaintiffs essentially seek monetary damages. The court agrees and finds that the appropriate final relief is predominantly monetary. "[A]n action seeking a declaration that certain conduct constitutes a breach of conduct would not qualify under Rule 23(b)(2) because the effect simply is to lay the basis for a damage award rather than injunctive relief." Wright & Miller, Fed. Prac. & Proc. § 1775. Accordingly, the court finds that the plaintiff class may not be certified pursuant to 23(b)(2).

23

Plaintiffs alternatively argue that the court may certify the class pursuant to 23(b)(1) or 23(b)(3). "[W]here certification is appropriate under both Rule 23(b)(1) and Rule 23(b)(3), the Court must certify the class under the former so that any resulting judgment will have <u>res judicata</u> effect as to the entire class." <u>Peoples v. Wendover Funding, Inc.</u>, 179 F.R.D. 492, 500 (D. Md. 1998) (citing <u>In re A.H. Robins Co., Inc.</u>, 880 F.2d 709, 728 (4th Cir. 1989)).

Wright and Miller have indicated that certification under Rule 23(b)(1)(B) is appropriate for cases involving breach of contract. Wright & Miller, <u>Fed. Prac. & Proc.</u>, § 1774. In this case, individual class members would present the same facts and claims and would be subject to the same defenses. Furthermore, although the court believes that any monetary relief would predominate the requested declaratory relief, any declaratory or injunctive relief would affect the entire class. See <u>id.</u> (stating that "[a]lthough suits in which injunctive or declaratory relief is sought most frequently are brought under Rule 23(b)(2), Rule 23(b)(1)(B) also may be applicable since an individual action seeking relief of that type clearly would affect the interests of all class members"). Accordingly, this suit may proceed as a class action under Rule 23(b)(1)(B) because an "adjudication[] with respect to individual members of the class ... would as a practical matter be dispositive of the interests of the other members not parties to the

24

adjudications...."  Fed. R. Civ. P. 23(b)(1)(B).

II.  **Summary Judgment**

    A.  **Standard of Review**

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  As this court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues.  Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993).  Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial.  Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party.  United States v. Diebold, Inc.,

24

25

369 U.S. 654, 655 (1962) (per curiam).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment.  Anderson, 477 U.S. at 247-48.  Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion.  Faircloth, 837 F. Supp. at 125.

In this case, this court must review the general policy of the agency.  As such, this court's focus will be on the administrative record.  Review of the administrative record is primarily a legal decision, readily resolvable by summary judgment.  Citizens for Scenic River Bridge, Inc. v. Skinner, 802 F. Supp. 1325, 1332 (D. Md. 1991).

### B.   Analysis

In this case, both parties have moved for summary judgment. In their motion, defendants argue that the court should dismiss this case for the following two reasons: first, because plaintiffs have failed to exhaust their administrative remedies; second, because plaintiffs lack standing because they suffered no injury to a legally protectable interest.   Plaintiffs move for partial summary judgment on their breach of contract and due process claims.  The court will first discuss the issue of exhaustion and will then turn to the breach of contract and standing issues, which are connected.  The court will then address the violation of due process claim.

25

26

## 1.  Exhaustion of administrative remedies

Defendants allege that plaintiffs were required to exhaust their administrative remedies before bringing suit against the USDA in federal court.  Defendants argue that the failure to exhaust administrative remedies is a jurisdictional bar to suit.

Plaintiffs respond that: 1) the agency's administrative appeal procedures were not available here; 2) plaintiffs attempted to exhaust their remedies but were repeatedly rebuffed by the USDA; and 3) plaintiffs are willing to continue to attempt to exhaust their remedies, but to do so would be futile.

Defendants assert that under 7 U.S.C. § 6912(e), plaintiffs were required to exhaust their administrative remedies.  Section 6912(e) states:

> (e) Exhaustion of administrative appeals
> Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against--
> (1) the Secretary;
> (2) the Department; or
> (3) an agency, office, officer, or employee of the Department.

However, unlike instances in which the challenged agency conduct is personally "adverse to the individual participant," if the agency determines that the challenged agency conduct is "a matter of general applicability," the issue is not appealable.  7 C.F.R. § 780.2(c) (providing that "[n]o reconsideration or appeal may be

27

sought under this part of any general program or provision or program policy, or any statutory or regulatory requirements that is applicable to all similarly situated applicants"). Nevertheless, a plaintiff may appeal the issue of whether the matter is appealable by asking the Director of NAD for a final decision. 7 U.S.C. § 6992(d); 7 C.F.R. § 11.6(a)(2). This appeal must be made within thirty days after the agency determines that the matter is not appealable. 7 C.F.R. § 11.6(a)(1). If the Director upholds the non-appealability decision, that decision becomes the final decision of the agency. Id.

Plaintiffs' repeated and voluminous contact with the RMA shows that they attempted to exhaust their administrative remedies. On November 12, 2002, a week before filing their suit in this court, plaintiffs first wrote the NAD director, asking him for a ruling that the farmers' claims were not appealable because they involved a matter that was applicable to all similarly situated petitioners. (Record at Vol. 3 pp. 10-46.) In the ensuing letters between the two, the RMA stated that the disputes over the crop insurance contracts were between the farmers and their individual insurance companies. (Record at Vol. 1 pp. 1055, 1040.) The RMA denied the farmers' request for a hearing on the matter. (Record at Vol. 3 p. 83.) On April 15, 2003, the RMA sent a letter to plaintiffs stating that "no reconsideration or appeal may be sought because [Bulletin MGR-02-016] is a general program provision that is

27

28

applicable to all similarly situation participants." (Record at Vol. 1 p. 1055.) However, this letter did not inform plaintiffs of their right to appeal the appealability determination. Id.; see Parker v. USDA, No. 1:01CV00057 LMB, at 7 (E. D. Mo. March 12, 2003) (stating that "[e]xhaustion is not required where a plaintiff is not apprised of appeal procedures") (citing Conley v. Pitney Bowes, 34 F.3d 714, 717-18 (8th Cir. 1994)). The government later informed plaintiffs of their right to appeal the appealability determination, by letter dated July 10, 2003. (Record at Vol. 1 p. 1040.) The July 10, 2003, letter stated that "[i]f you disagree with this determination that the matter in dispute is not appealable, you can have this determination reviewed by the Director of [NAD] in accordance with 7 C.F.R. § 11.6." (Id.) As plaintiffs did not dispute that the matter was one of general applicability and thus not appealable, they did not immediately ask to have the determination reviewed by the Director of NAD. When plaintiffs later sought reconsideration of the decision, the RMA replied, "To the extent that you seek to appeal NAD determinations concerning appealability, 7 C.F.R. § 11.6(a)(2) and (3) provide that such determinations are not appealable, whether issued by the Director or his delegate." (Record at Vol. 3 p. 143.) Defendants now argue that plaintiffs should have requested a review of the

July 10, 2003, letter.[12]

Defendants argue that plaintiffs' failure to exhaust administrative remedies deprives this court of subject matter jurisdiction. They point to cases from outside the Fourth Circuit which have held that the exhaustion requirement in 7 U.S.C. § 6912(e) is jurisdictional. See Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 94 (2d Cir. 1998) (stating that "plaintiffs' argument that their broad challenges to FCIC calculations could not adequately have been presented within normal administrative channels is itself an argument that was required to be tested and exhausted before being presented in federal court."); Utah Shared Access Alliance v. Wagner, 98 F. Supp. 2d 1323, 1333 (D. Utah 2000) (concluding that "[p]laintiffs' failure to exhaust existing administrative remedies deprives this court of competent subject matter jurisdiction" but also stating that "[a] court may excuse exhaustion if administrative remedies would be futile, when administrative remedies would provide inadequate relief, or when the agency has adopted a policy or practice of general

---

[12] As a side note, the court believes that the guidance that the agency gave to the farmers as to whether the farmers should appeal the ruling was at best confusing, and at worst positively misleading. It makes no sense for an agency to tell a petitioner that his issue is non-appealable, and then in the next sentence tell him that he can -- and must -- appeal the decision. See Parker v. USDA, No. 1:01CV00057 LMB, at 6-7 (stating that "the government is attempting to 'have its cake and eat it too,' by informing plaintiffs that their claims were not appealable to the NAD and then asserting exhaustion for failure to appeal to the NAD when plaintiffs bring those claims in federal court").

applicability which is contrary to law"); <u>Calhoun v. USDA Farm Serv. Agency</u>, 920 F. Supp. 696, 700 (N.D. Miss. 1996) (stating that "[w]hen the requirement is mandated by statute, exhaustion becomes a jurisdictional prerequisite to maintaining an action"). However, other courts have held that a failure to exhaust administrative remedies under § 6912(e) does not deprive a court of jurisdiction. <u>See</u> <u>McBride Cotton & Cattle Corp. v. Veneman</u>, 290 F.3d 973, 980 (9th Cir. 2002) (holding that "7 U.S.C. § 6912(e) does not limit the district court's subject matter jurisdiction over the plaintiffs' claims"), <u>cited in</u> <u>Rain & Hail Ins. Serv., Inc. v. Fed. Crop Ins. Corp.</u>, 229 F. Supp. 2d 710, 714 n.4 (S. D. Tex. 2002); <u>Parker v. USDA</u>, No. 1:01CV00057 LMB, at 9 (stating that "a plaintiff's failure to exhaust administrative remedies under § 6912(e) does not divest the court of subject matter jurisdiction"). The Fourth Circuit has not directly addressed whether the requirements in § 6912(e) are jurisdictional.

In <u>Gold Dollar Warehouse, Inc. v. Glickman</u>, 211 F.3d 93 (4th Cir. 2000), the Fourth Circuit addressed the petitioners' challenges to USDA regulations. The court found that the petitioners were required to exhaust their "as-applied" challenges to the regulations through the agency's appeal procedures but were not required to exhaust their facial challenges to the regulations. <u>Gold Dollar Warehouse, Inc. v. Glickman</u>, 211 F.3d at 99-101. The court stated that "a direct facial challenge to the regulations ...

30

3/

cannot be brought within the agency's appellate process because, as noted, 7 C.F.R. § 11.3(b) precludes agency review of USDA regulations." Id. at 99.

Similarly, under 7 C.F.R. § 780.2, the plaintiffs' challenge to the agency's generally applicable program provision could not be brought within the agency's appellate process. Like the facial challenges in Gold Dollar Warehouse, this case involves a legal challenge to agency action and does not involve underlying factual disputes. The District of North Dakota has concluded that where a plaintiff challenges a generally applicable agency action, 7 U.S.C. § 6912(e) does not require exhaustion. Wiley v. Glickman, No. CIV A3-99-32, 1999 WL 33283314, at *2 (D.N.D. Apr. 7, 1999). In that case, the court stated that "[s]ince this claim features purely legal questions which require no agency fact-finding, none of the purposes of the exhaustion requirement would be served by requiring plaintiffs to submit the claim to NAD." Id.; see also Kuster v. Veneman, 226 F. Supp. 2d 1190, 1192 (D.N.D. 2002) (stating that it would be fruitless to require exhaustion in a case involving a purely legal challenge to a generally applicable agency action). In accordance with Gold Dollar Warehouse and Wiley v. Glickman, this court concludes that because agency review was not available for plaintiffs' challenge to generally applicable program policies, administrative exhaustion is not required.

32

### 2.    Breach of contract

The most hotly contested issues in this case are whether the insurance contracts guaranteed coverage at the quota price election of $0.31 and whether the government breached those contracts. Defendants frame these issues as standing issues.  They point to Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992), for the proposition that in order to have standing, plaintiffs must show an actual injury to a legally-protected interest.  Defendants contend that plaintiffs had no legally-protected interest in receiving $0.31 per pound in insurance coverage.  Specifically, defendants argue that the policies did not guarantee the farmers that they would receive coverage at the $0.31 election level and that the farmers had no constitutionally-protected interest in the continuation of the quota system.  The court believes that the issue of whether the plaintiffs have a contractual right to insurance coverage at $0.31 is not merely a standing issue, but will ultimately determine whether plaintiffs have established their claim for breach of contract.

For the court to find that the government breached its contracts, the court must first find a prima facie breach, that is, it must find that the government violated the express provisions of the contract.  If a prima facie breach is shown, the court must then consider whether the government has a valid defense under the

33

sovereign acts doctrine or the unmistakability doctrine.[13] <u>Cuyahoga</u>
<u>Metro. Hous. Auth. v. United States</u>, 57 Fed. Cl. 751, 762 (2003)
(framing government's breach of contract as two separate issues --
"[w]as there a <u>prima facie</u> breach here?" and "[d]oes the
unmistakability doctrine shield defendant from liability?"). "Only
if [the government's actions are not covered by these doctrines]
can the court then say, with confidence, that defendant[s] actually
breached the contracts in question." <u>Id.</u>

### a.    **Prima facie** breach of contract

Government contracts are subject to the general rule that
"when the United States enters into contract relations, its rights
and duties therein are governed generally by the law applicable to
contracts between private individuals." <u>Lynch v. United States</u>,
292 U.S. 571, 579 (1934). Accordingly, the court must use general
contract principles to determine whether the government has
breached the insurance contracts.

Defendants' primary argument is that the government did not

_____

[13] Neither plaintiffs nor defendants have fully briefed the
issues of whether the sovereign acts doctrine or the
unmistakability doctrine are valid defenses under the current
facts.    The plaintiffs noted that in <u>United States v. Winstar</u>
<u>Corp.</u>, 518 U.S. 839 (1996), the Supreme Court rejected these
defenses. Defendants stated in a footnote that they did not brief
these issues because they believed that discussion of any "special
defense" on the merits was premature. The court believes that the
government should have raised both defenses in its response to the
plaintiffs' motion for summary judgment. Nevertheless, because the
application of these doctrines to this case is a purely legal issue
and does not require any further facts from the parties, the court
will address these defenses.

34

contractually promise or guarantee insurance coverage at $0.31 per pound. Defendants argue that in order to receive insurance coverage and proceeds at the $0.31 election level, a farm must have been assigned a farm poundage quota by the FSA. Because the Farm Security Act eliminated the quota system, they argue, the FSA did not establish poundage quotas for individual farms for the 2002 crop season, and as a result, the farmers did not have insurance at the election level for quota peanuts.

Defendants point to language in the insurance policy to support their position. Section 3 of the Peanut Crop Provisions provides, in pertinent part:

> **Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities.**
> ...
> (b) The maximum pounds that may be insured at the quota price election are the lesser of:
> (1) The effective poundage marketing quota; or
> (2) The insured acreage multiplied by the production guarantee. If the insured acres multiplied by the production guarantee exceeds the effective poundage marketing quota, the difference will be insured at the non-quota peanut price election.

In turn, the policy defines the term "effective poundage marketing quota" as:

> The number of pounds reported on the acreage report as eligible for the average support price per pound ..., not to exceed the Marketing Quota established by FSA for the farm serial number.

(Peanut provisions § 1, emphasis added.) According to defendants,

34



under the definition of "effective poundage marketing quota", an individual farm did not have any peanuts eligible to be quota peanuts unless and until the FSA assigned a marketing quota to that farm.    That is, the assignment of a farm poundage quota was a condition that must be met for the farmers to receive coverage at the quota price election.  Because the farms had not been assigned a farm poundage quota by the FSA, defendants argue, the farmers' insurance coverage defaulted to coverage at the non-quota price election.    Furthermore, defendants argue, the contract never guaranteed that the FSA would assign a marketing quota to each farm serial number.

The government's argument overlooks the fact that in some instances a contractual condition may be excused.  Specifically, the Restatement (First) of Contracts § 295 provides that a condition is excused if 1) a promisor prevents or hinders the occurrence of a condition, and 2) the condition would have occurred except for such prevention or hindrance.[14]  Restatement (First) of

---

[14] The full text of § 295 is as follows:

§ 295. Excuse Of Condition By Prevention Or Hindrance

If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened nonperformance of the return promise does not

36

Contracts § 295 (1932), quoted in Powers v. Sims and Levin, 542 F.2d 1216, 1226 (4th Cir. 1976) (Winter, J., concurring and dissenting).

The Farm Security Act repealed 7 U.S.C. § 1358-1, which had provided that "[a] farm poundage quota for each marketing year shall be established...." 7 U.S.C. § 1358-1(b)(1)(A) (2001) (emphasis added). Thus, prior to the passage of the Farm Security Act, the FSA was under a statutory duty to assign quotas to individual farms. The FSA instructed its county offices not to allocate the current year peanut quota and pointed to the Farm Security Act, which had not yet been passed, as the reason. (Notice PN-652, Record at Vol. 2 p. 8, stating that "[b]ecause of pending legislation, rollover of peanut files will be completed without allocating 2002 peanut quota holders.") As the FSA would have assigned the farm poundage quotas had the Farm Security Act not prevented or hindered it from doing so, the second prong of § 295 is met.

The first prong of § 295 is also met. The government not only

---

discharge the promisor's duty, unless

(a) the prevention or hindrance by the promisor is caused or justified by the conduct or pecuniary circumstances of the other party; or

(b) the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party.

36

37

was a promisor on the insurance contract and was bound by its terms, but also is responsible for the actions of the FSA, as the FSA, like the RMA, is an agency of the United States Department of Agriculture.  By passing the Farm Security Act, which repealed 7 U.S.C. § 1358-1 and thus eliminated the FSA's duty to allocate the peanut quota to individual farms, the government "prevent[ed] or hinder[ed] the occurrence of a condition."

The facts of this case fall squarely into the language of the Restatement § 295.  Section 295 provides the following illustration on its application:

> A promises to build a house for B who, in consideration therefor, promises A to pay him $10,000 on condition that A presents a certificate from C, an architect, showing that the work has been properly done.  The work is properly done, but B induces C to refuse to give a certificate.  The condition is excused.

This illustration is almost identical to the peanut farmers' situation. Peanut farmers (A) bought insurance from the government (specifically, the FCIC) (B), which promised to pay them $0.31 per pound of peanuts, provided that the FSA (another branch of the government) (C) said that the peanuts grown are quota peanuts.  The farmers performed all their obligations, but the government (Congress this time) caused the FSA to refuse to assign the quotas. As in the illustration, the condition will be excused.[15]

---

[15] Under § 295(b), the condition is not excused if "the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party."  This

37

38

The court agrees with the reasoning behind the Restatement (First) of Contracts § 295.  The court believes that it was fundamentally wrong for the government to tell the farmers that they would have insurance coverage at $0.31 per pound for as many peanuts as the FSA declared to be quota peanuts, and then, after the farmers had planted their crops, to tell the FSA not to declare any quota peanuts.  Under general contract law principles as expressed in the Restatement of Contracts § 295, the court finds that the condition is excused, and that the government breached its contract by refusing to pay the farmers' insurance claims at the rate of $0.31 per pound.

---

subsection does not apply here.  The terms of the contract nowhere indicate that the peanut farmers were to bear the risk of regulatory change.  Indeed, the insurance program was set up in such a way as to provide a measure of reliability and stability for a way of life which is by nature unreliable.  "From [the] origin [of the Federal Crop Insurance Act of 1938], the stated purpose of the federal crop insurance program has been 'to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance.'"  Wiley v. Glickman, 1999 WL 33283312, at *1 (citing 7 U.S.C. § 1502(a)).  Furthermore, the goal of the Federal Crop Insurance Act of 1980 was to make federal crop insurance "the farmers' primary source of risk management."  Id. (citing 1994 U.S.S.C.A.N. at 2519).  In furtherance of these goals, the crop insurance and peanut quota systems provided deadlines that the farmers could rely on in making planting decisions for the upcoming crop year.  The insurance contract guaranteed that the price election could not be decreased after the contract change date, which for the 2002 crop year was November 30, 2001.  (Peanut provisions §§ 4b, 3e.)  Also, by law, the U.S.D.A. was required to announce the national peanut quota by December 15 of the year preceding the crop year.  7 U.S.C. § 1358-1(a)(3) (2001).

39

b.    **Sovereign act and unmistakability doctrines**

In the case of <u>United States v. Winstar Corp.</u>, 518 U.S. 829 (1996), the Supreme Court discusses the sovereign acts doctrine and the unmistakability doctrine at length.  Several subsequent cases have analyzed and interpreted <u>Winstar</u> and preceding cases on these doctrines.  See <u>Yankee Atomic Elec. Comp. v. United States</u>, 112 F.3d 1569 (Fed. Cir. 1997) (discussing the sovereign acts doctrine and the unmistakability doctrine); <u>Cuyahoga Metro. Hous. Auth. v. United States</u>, 57 Fed. Cl. 751 (2003) (discussing the unmistakability doctrine); <u>Gen. Dynamics Corp. v. United States</u>, 47 Fed. Cl. 514 (2000) (discussing the sovereign acts doctrine and the unmistakability doctrine).

In <u>General Dynamics Corp. v. United States</u>, the Court of Federal Claims provided the following overview of these doctrines:

> In analyzing whether a particular exercise of sovereign authority breaches a contract between the government and a private party, two longstanding doctrines applicable to contracts with the sovereign come into play. One is the sovereign acts doctrine, which excuses the government from performing a contractual obligation if performance is rendered impossible by a public and general sovereign act. ... The doctrine was recognized by the Supreme Court in <u>Horowitz v. United States</u>, 267 U.S. 458, 461 (1925), which noted that '[i]t has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.' More recently, the Federal Circuit reiterated this principle in similar language: 'Under the

39



> sovereign act doctrine, the United States as
> contractor will not be held responsible for
> the acts of the United States as sovereign.'
> Hughes Communications Galaxy, Inc. v. United
> States, 998 F.2d 953, 958 (Fed. Cir. 1993).

Gen. Dynamics Corp. v. United States, 47 Fed. Cl. at 533-34. Under

the unmistakability doctrine, "a government will not be deemed in

a contract to surrender a sovereign power unless it does so

unmistakably." Id.

This court will follow the following framework set forth by

Yankee Atomic, as explained by General Dynamics:

> [T]he analytical approach set forth by the
> Federal Circuit in deciding Yankee Atomic ...
> was a two-step analysis which first explored
> the question of whether the governmental
> action preventing performance of a contract
> was a 'public and general' act within the
> meaning of the sovereign acts doctrine. After
> an affirmative conclusion on that issue, the
> second question to explore was whether the
> contract contained an unmistakable promise
> that the Government would refrain from
> exercising its sovereign power in a way that
> could block performance of the contract. If
> the answer to that question was also yes, then
> the governmental action at issue would
> constitute a breach of contract.

Gen. Dynamics Corp. v. United States, 47 Fed. Cl. at 541. If,

under the first step, the governmental action in question was not

a 'public and general' act, then the sovereign acts doctrine would

not constitute a valid defense to the breach of contract claim and

the court would not need to proceed to the second step of the

analysis. Id. (stating that "[i]f the Federal Circuit had meant to

decide Yankee Atomic on the basis of the unmistakability doctrine

regardless of whether the legislation at issue in that case was a 'public and general' act, there would have been no reason for the court to apply, and discuss at length, the sovereign acts doctrine for the purpose of determining the nature of the act"); see also Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. at 774 (stating that authorities agree that "at least in the context of legislation, the unmistakability doctrine applies only when the Congress invokes one of the sovereign power protected by the doctrine").

The plurality opinion in Winstar stated that "the sovereign acts doctrine ... balances the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor." United States v. Winstar, 518 U.S. at 896. The application of the sovereign acts doctrine, then, is "not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." Yankee Atomic Elec. Comp. v. United States, 112 F.3d at 1575.

Under Winstar, acts that are "public and general" are acts of the sovereign and are not attributable to the government as contractor. United States v. Winstar, 518 U.S. at 895-96. Winstar provides further guidance as to what constitutes a "public

41

42

and general" act.  If the action's "impact upon public contracts is ... merely incidental to the accomplishment of a broader governmental objective," then the act is "public and general." Id. at 898.  Conversely, "a governmental act will not be public and general if it has the substantial effect of releasing the Government from its contractual obligations." Id.

Under the framework created by the Federal Circuit in Yankee Atomic, the court must first decide whether the government, in enacting the relevant provisions of the Farm Security Act of 2002, was (i) acting for the purpose of retroactively decreasing the amount of coverage of its insurance contracts with the peanut farmers, or (ii) acting for a more general purpose, for the benefit of the public.  For the reasons that follow, the court concludes it was for the former.

The Farm Security Act had a very broad scope, occupying 406 pages in the Statutes at Large and containing more than 400 numbered sections.  See Pub. L. No. 107-171, 116 Stat. 134.  The stated purpose of the Act was very general, "[t]o provide for the continuation of agricultural programs through fiscal year 2007, and for other purposes."  116 Stat. 134.  The Act dealt with, among other topics, direct and counter-cyclical payments to farmers, peanuts, sugar, dairy, wetlands conservation, grasslands conservation, environmental quality incentives, agricultural trade development, the food stamp program, child nutrition programs, farm

42

73

loans, farm and rural development, rural electrification, various
research programs, forestry assistance, and animal health and
welfare. However, the length and breadth alone do not make the act
"public and general" -- "any act of repudiation can be buried in a
larger piece of legislation, and if that is enough to save it then
the Government's contracting power will not count for much."
<u>Winstar</u>, 518 U.S. at 903 n.52. Rather, the court must look at the
relevant provisions of the Farm Security Act.

The provisions of the Farm Security Act that relate to peanuts
are found in sections 1301 through 1310. Section 1309 terminates
the quota program for peanuts and provides compensation for peanut
quota holders for the loss of the quotas. Sections 1301 through
1308 contain other various changes for peanut farmers, including
the availability of counter-cyclical payments for farmers. Section
1310(a) repealed the authority for the price supports for quota
peanuts found in 7 U.S.C. § 7271. Section 1310(c) stated as
follows:

> (C)  TREATMENT OF CROP INSURANCE POLICIES FOR 2002 CROP YEAR.--
> (1)  APPLICABILITY.-- This subsection shall apply for the 2002 crop year only notwithstanding any other provision of law or crop insurance policy.
> (2)  PRICE ELECTION.-- The nonquota price election for segregation I, II, and III peanuts shall be 17.75 cents per pound and shall be used for all aspects of the policy relating to the calculations of premium, liability, and indemnities.
> (3)  QUALITY ADJUSTMENT.-- For the purposes of quality adjustment only, the average

support price per pound of peanuts shall
be a price equal to 17.75 cents per
pound.  Quality under the crop insurance
policy for peanuts shall be adjusted
under procedures issued by the Federal
Crop Insurance Corporation.

Section 1310(c) directly stated that the nonquota price
election, which it raised to $0.1775 from $0.16, would be used for
all calculations of coverage under the insurance contracts,
"notwithstanding any other provision of law or crop insurance
policy." (Emphasis added.)  This provision of the Farm Security
Act obviously and specifically targeted the contractual obligations
under the peanut farmers' pre-existing crop insurance policies for
the 2002 crop year.  Thus, the reduction of insurance coverage was
direct, not "merely incidental to the accomplishment of a broader
governmental objective."

This provision is similar to the legislation involved in
Cuyahoga Metropolitan Housing Authority and General Dynamics Corp.,
in which Congress specifically targeted pre-existing contracts in
order to save money.  It also similar to the legislation in
question in Winstar, in which Congress, in passing legislation
attempting to resolve the crisis in the savings and loan industry,
caused the government to breach its contracts with banks that had
allowed banks to count supervisory goodwill as core capital.  In
Winstar, the Court noted that opponents of the legislation
complained that "[i]n its present form, [FIRREA] would abrogate
written agreements made by the U.S. government to thrifts that

44



acquired failing institutions by changing the rules in the middle of the game." <u>United States v. Winstar</u>, 518 U.S. at 900.

Most of the comments surrounding the peanut provisions in the Farm Security Act note that the new peanut rules bring treatment of peanuts into parity with the treatment of other crops.  Senator Miller, from Georgia, noted that the changes in the peanut program were painful to but ultimately beneficial for farmers.  148 Cong. Rec. S3922, S3933 (May 7, 2002) (statement of Sen. Miller). However, an opponent of the Farm Security Act, who was concerned not with peanuts but with wheat, stated that he had introduced legislation that would have addressed some of the problems with the Farm Security Act.  He stated:

> I introduced this package for two reasons: Our producers and our lenders needed some kind of certainty on the assistance they would receive for this crop year, and second, virtually all planting and lending decisions had already been made for the 2002 crop, this year's crop, and <u>it did not make sense to change the rules of the game in the middle of the 2002 crop year</u>. It made more sense to do an assistance package this year and have the new bill apply to the 2003 crop after our producers and the Department of Agriculture had time to digest the details of the new bill.

148 Cong. Rec. S3979, 3980 (May 8, 2002) (statement of Sen. Roberts) (emphasis added).

The statutory text makes it clear that § 1310(c) of the Farm Security Act specifically targeted coverage under existing crop insurance contracts.  By including this provision in the Act,

45

46

Congress was indeed "changing the rules in the middle of the game."
As the Court of Federal Claims explained in <u>General Dynamics</u>,

> While there is no question that the Government
> had the sovereign right to enact a prospective
> [reduction in contractual benefits] -- <u>i.e.</u>,
> applicable to any and all government contracts
> executed after the act was passed – the
> application of the [reduction] to pre-existing
> contracts ... constituted an abrogation of the
> Government's contractual obligations.  Thus,
> it is a classic example of legislation
> 'attributable to the Government as contractor'
> and 'tainted by a governmental object of self-
> relief.'

<u>Gen. Dynamics Corp. v. United States</u>, 47 Fed. Cl. at 542 (<u>quoting</u>
<u>United States v. Winstar</u>, 518 U.S. at 896).

In conclusion, the court finds that the congressional act
reducing crop insurance coverage on peanuts for the 2002 crop year
was not a "public and general" act; therefore, the sovereign acts
doctrine does not allow the government to escape its contractual
obligations under the 2002 crop insurance policies.  Furthermore,
because the governmental act was not "public and general", the
unmistakability doctrine does not apply.  <u>See</u> <u>Gen. Dynamics Corp.</u>
<u>v. United States</u>, 47 Fed. Cl. at 541.

The plaintiffs have satisfied their burden of showing a <u>prima</u>
<u>facie</u> breach of contract and the defendants do not have a valid
defense.  Therefore, the court finds that the reduction of coverage
under the insurance contracts from $0.31 per pound to $0.1775 per
pound was not in accordance with law.  5 U.S.C. § 706(1)(A).
Accordingly, the court will grant plaintiffs' motion for summary

47

judgment as to the breach of contract claim and will deny defendants' motion on the same.

### 3.   Violation of due process

Plaintiffs point to the Supreme Court case of Lynch v. United States for support for their argument that defendants violated their due process rights.  The court in Lynch described due process as it relates to government contracts in the following way:

> The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment.  When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.

Lynch v. United States, 292 U.S. at 579 (citations omitted).  The court emphasized that:

> The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen.

Id. at 580 (citing The Sinking Fund Cases, 99 U.S. 700, 719 (1878)).

As in Lynch, plaintiffs' due process claims are based on contracts with the government that were granted and later taken away by statute.  As in Lynch, then, the plaintiffs' due process

47

Y 8

arguments are primarily based on their contract claims. Defendants acknowledge that "in the end analysis, in evaluating whether the defendants' erred in their interpretation of the MPCI policy, 'ordinary principles governing contracts and their interpretation remain applicable.'" (Defs.' Response at 16.)

As the court has already discussed the plaintiffs' contract claim at length and found for the plaintiffs as to this claim, the court need not reach plaintiffs' due process claims.[16]

## CONCLUSION

The court hereby orders that this case shall proceed as a class action and hereby certifies the following class:

> Peanut farmers whose farms are located in the Eastern District of North Carolina, who had insurance coverage on peanuts under the 2002 Peanut Multiple Peril Crop Policies, who had losses for the 2002 crop year, who settled those losses for $0.1775 per pound, and who had been assigned farm poundage quotas for the 2001 crop year.

The court hereby appoints the following plaintiffs as class representatives: Marvin Taylor Barnhill, Jerry Hamill, John Branham, Clark Jenkins, Tom Clements, David Grant, Tim Phelps, and

---

[16] The court notes that the Court of Federal Claims has recently ruled that the peanut quota is not a property right sufficient to support a takings claim under the Fifth Amendment. See Members of the Peanut Quota Holders Ass'n v. United States, 60 Fed. Cl. 524, 525 (2004). This decision is irrelevant to the current plaintiffs' claim, as the Federal Claims Court's decision was based solely on the claimed statutory entitlement to the peanut quotas whereas the current plaintiffs' claim is based on the insurance contracts.

48

49

Tommy Flythe. Philip R. Isley, G. Eugene Boyce, and R. Daniel Boyce shall represent the certified class.

For lack of subject matter jurisdiction, the court hereby dismisses all plaintiffs who do not have peanut farms in the Eastern District of North Carolina, including Jim Ferguson, Glen Hawkins, Billy Bain, Glen Moore, R. L. Smith, H. Steven Allen, and all plaintiffs listed in Exhibit B to plaintiffs' motion to join additional plaintiffs, filed November 19, 2002.

For the foregoing reasons, the court grants the plaintiffs' motion for summary judgment on its breach of contract claim and denies the defendants' motion for summary judgment.

Class representatives shall have fifteen (15) days from the date of this Order to file a proposed notice for class members.

This _22ⁿᵈ_ day of July, 2004.

MALCOLM J. HOWARD
United States District Judge

At Greenville, NC
#1

49

50

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

APR - 9 2004

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

TOM CLEMENTS, et. al.,

      Plaintiffs,

v.

Case No. 2:03cv352

ROSS J. DAVIDSON, et. al.,

      Defendants.

### ORDER

Plaintiffs have filed a Complaint for Declaratory Judgment and Injunctive Relief against the defendants. Plaintiffs are peanut farmers in Virginia who have applied for and received multiple peril crop insurance policies for the 2002 growing season; they assert that they have brought this action "to challenge the unlawful and unilateral contract modification and impairment that Defendants made on or after May 13, 2002 to the Multiple Peril Crop Insurance Policy which changed the price guarantee of their insurance protection by reducing it from $.31 to $.1775 per pound of peanuts." See ¶ 3, Part I (Introduction), Complaint for Declaratory Judgment and Injunctive Relief. Plaintiffs set out six claims, including the following: breach of contract; violation of due process by impairment of contract; denial of due process; violation of the statutory requirement that policy changes by published in the Federal Register; violation of the statutory requirements that policy changes be made before November 30, 2004;

51

and violation of plaintiffs' statutory and due process rights by failing to notify plaintiffs of their right to appeal.

The Court has before it the Plaintiffs' Renewed Motion to Compel Production of Documents ("the Motion").[1] Relying on Rule 78 of the Federal Rules of Civil Procedure and Local Civil Rule 7J, the Court has decided that a hearing on this Motion is not necessary.[2] For the following reasons, the Motion is DENIED.

The Court has considered the following:

1.   Plaintiffs' Complaint for Declaratory Judgment and Injunctive Relief (Document #1), filed on May 8, 2003;

2.   The Motion and Supporting Memorandum (Document #51), filed on February 23, 2004;

3.   Defendants' Response to the Motion (Document #52), filed March 5, 2004; and

4.   The Plaintiffs' Rebuttal to Defendants' Response (Document #53), filed March 12, 2004.

---

[1]The Court held a hearing on January 20, 2004 in order to decide a number of matters, including plaintiffs' original motion to compel limited production of documents. During that hearing, the Court ordered the Defendants to produce the administrative record to the Plaintiffs within ten days after receipt. (Transcript of Jan. 20 hearing at 45).

[2]Counsel for plaintiffs has not requested a hearing and the Court understands that this motion has been submitted for consideration without oral argument. See Local Civil Rule 7(E). Motions may be determined without an oral hearing. See Local Civil Rule 7(J) ("in accordance with Fed. R. Civ. P. 78, the Court may rule upon motions without an oral hearing.")

52

Under the Administrative Procedure Act (APA), judicial review of federal agency decisions is generally limited to the administrative record. 5 U.S.C. § 706(2)(A); <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743 (1985); <u>Trinity Am. Corp. v. U.S. Envtl. Prot. Agency</u>, 150 F.3d 389, 401 n.4 (4th Cir. 1998). In their rebuttal, the plaintiffs suggest that the APA does not apply to this case. The Complaint, however, sets forth six claims for relief, including five that specifically invoke the APA as the basis for relief. Therefore, the Court FINDS that the APA applies to each of these five claims.

Plaintiffs' first claim for relief, breach of contract, does not specifically invoke the APA. Nevertheless, the Court FINDS that this claim is a <u>de facto</u> request for review of an agency decision and that the APA therefore applies. In reaching this conclusion, the Court notes that the Plaintiffs seek relief from the Department of Agriculture, the Risk Management Agency, and from their respective administrators. The alleged breach of contract arises from a general agency policy established pursuant to an act of Congress. In addition, the claim concerns a contract for federal crop insurance, and the APA applies to such claims. <u>See Hammitt v. Fed. Crop Ins. Corp.</u>, 712 F.Supp. 832, 833 (D. Colo. 1989); <u>cf</u>. <u>Old Republic Ins. Co. v. Fed. Crop Ins. Corp.</u>, 947 F.2d 269 (7th Cir. 1991) (applying APA standard of review to recovery of overpayments arising under Federal Crop Insurance Act). The Court

S3

therefore FINDS that the APA applies to all six of the Plaintiffs'
claims for relief.

The -Fourth Circuit has recognized three exceptions that
justify discovery beyond the administrative record in APA cases:
(1) when necessary to explain agency action; (2) when the agency's
decision relied on documents or materials not included in the
record; or (3) when supplementation is necessary to explain or
clarify technical subject matter involved in the agency action
under review.  Fort Sumter Tours v. Babbitt, 66 F.3d 1324, 1336
(4th Cir. 1995); see also Pub. Power Council v. Johnson, 674 F.2d
791 (9th Cir. 1982).

The Plaintiffs have not shown that any of these exceptions
applies in this case.  Although the Motion identifies a number of
documents not included in the record, the Plaintiffs have not shown
that these were before the agency at the time of its decision.[3]
The Plaintiffs have also failed to show that further discovery is
necessary to explain the agency's action or to clarify technical
matters.

If in the future the Plaintiffs can identify relevant
documents that were before the agency at the time of its decision
and have not been included in the administrative record, the

---

[3]In fact, the dates of these documents (attached to the Motion
as Exhibits 1-10) suggest that they were created after the agency
had already issued its decision.  Post-decisional information is
not relevant to judicial review of an agency decision.  United
States v. Amtreco, Inc., 806 F. Supp. 1004, 1007 (M.D. Ga. 1992).

54

Plaintiffs may move this Court to order the Defendants to produce such documents.  See Exxon Corp. v. Dep't of Energy, 91 F.R.D. 26 (N.D. Tex. 1981).

Finally, to the extent that the Plaintiffs believe that the agency should have considered other documents in reaching its decision, they are free to argue this at trial in order to show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

For the above reasons, the Plaintiffs' Renewed Motion to Compel Production of Documents is DENIED. The clerk is DIRECTED to mail copies of this Order to counsel of record for the plaintiff and defendant.

United States Magistrate Judge

Norfolk, Virginia
April 9 , 2004

5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ACE PROPERTY & CASUALTY
INSURANCE COMPANY (f/k/a CIGNA
PROPERTY & CASUALTY INSURANCE
COMPANY), ALLIANCE INSURANCE
COMPANIES, AMERICAN
AGRICULTURAL INSURANCE
COMPANY,  COUNTRY MUTUAL
INSURANCE COMPANY, FARM BUREAU
MUTUAL INSURANCE COMPANY
OF IOWA, FARMERS ALLIANCE MUTUAL
INSURANCE COMPANY, GREAT
AMERICAN INSURANCE COMPANY,
HARTFORD FIRE INSURANCE COMPANY,
NAU COUNTRY INSURANCE COMPANY,
PRODUCERS LLOYDS INSURANCE
COMPANY, AND RURAL COMMUNITY
INSURANCE COMPANY,

        Plaintiffs,

v.

UNITED STATES OF AMERICA,

        Defendant.

Case No. **03 - 470C** _____

## COMPLAINT

FILED FEB 2 7 2003

Plaintiffs ACE Property & Casualty Insurance Company (f/k/a Cigna Property &

Casualty Insurance Company), Alliance Insurance Companies, American Agricultural Insurance

Company, COUNTRY Mutual Insurance Company, Farm Bureau Mutual Insurance Company of

Iowa, Farmers Alliance Mutual Insurance Company, Great American Insurance Company,

Hartford Fire Insurance Company, NAU Country Insurance Company, Producers Lloyds

Insurance Company, and Rural Community Insurance Company (collectively, "plaintiffs"), for

their claims for relief against the United States of America, state as follows:



## Nature of the Case

1.    Plaintiffs sell and service crop insurance under the federal crop insurance program. Plaintiffs insure hundreds of thousands of agricultural producers across the nation against various potential losses associated with their respective crops.

2.    Plaintiffs claim damages arising from the United States' unlawful breaches of the 1998 Standard Reinsurance Agreement ("1998 SRA"), a written, binding contract between the Federal Crop Insurance Corporation ("FCIC") and each plaintiff. The 1998 SRA, a copy of which is attached as Exhibit A, is incorporated by reference in this complaint. The 1998 SRA has been in continuous effect since July 1, 1997.

## The Federal Crop Insurance Program

3.    In 1938, the United States Congress passed the Federal Crop Insurance Act, 7 U.S.C. § 1501 et seq. ("FCIA"), "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance." *Id.* at § 1502(a). Subsequent amendments to the FCIA have made federal crop insurance a significant risk management device for America's agricultural producers.

4.    Pursuant to 7 U.S.C. § 1503, the FCIC was created as an agency of and within the United States Department of Agriculture ("USDA") to carry out the purposes of the FCIA.

5.    FCIC is mandated to offer catastrophic risk protection insurance ("CAT") through approved insurance providers in order to protect agricultural producers from the full extent of their losses arising when drought, flood, or other natural disasters cause losses in the yield from insured crops. 7 U.S.C. §§ 1508(b)(1), 1508(b)(4).

57

6.     At all times material to this action, FCIC did not write CAT coverage as a direct insurer. Instead, using its authority under 7 U.S.C. § § 1508(a) and (k), it reinsured private insurers, such as plaintiffs, who wrote CAT coverage and serviced all CAT policies issued to America's agricultural producers, and who continue to do so.

7.     When quoting premiums for coverage, approved insurance providers must quote rates determined by FCIC. 7 U.S.C. § 1508(d). Approved insurance providers also must make available in all states where they do business all crop insurance plans approved by the Secretary of USDA for all crops designated by the Secretary for coverage in those states (or counties or other portions thereof), and such providers must make such coverages available on a non-discriminatory basis. 7 C.F.R. § § 400.168(b), 400.168(f). Therefore, approved insurance providers must accept the underwriting risks mandated by FCIC at premium rates which it sets.

8.     Pursuant to 7 U.S.C. § 1508(k)(1), approved insurance providers also must offer coverage on the terms and conditions established by FCIC.

### The Standard Reinsurance Agreement

9.     Each plaintiff is an approved insurance provider as defined by the FCIA, 7 U.S.C. § 1502(b)(2), and each writes CAT and other federal crop insurance coverages approved by FCIC.

10.     FCIC reinsures a defined portion of the underwriting risk of these private insurers. Pursuant to regulations it promulgated in 1987, the FCIC enters into a binding contract, called the Standard Reinsurance Agreement ("SRA"), with eligible insurance companies to reinsure the policies which those companies issue to producers of agricultural commodities. 7 C.F.R. § 400.164.

3

$5$ $8$

11.    FCIC's reinsurance agreements are continuous contracts, subject to cancellation once per year at the election of FCIC.  For instance, the 1998 SRA (initially covering the reinsurance year July 1, 1997, through June 30, 1998) specifically provides in Section V.M.:

> This Agreement will continue in effect from year to year with an annual renewal date of July 1 of each succeeding year unless FCIC gives at least 180 days advance notice in writing to the [contracting private insurance provider] that the Agreement will not be renewed.    This Agreement will automatically terminate if the [contracting private insurance provider] fails to submit a Plan of Operations by the date such Plan of Operations is due unless such other date is approved by FCIC in writing.

12.    Each plaintiff entered into a reinsurance contract with FCIC in the form of the 1998 SRA effective as of July 1, 1997.

13. .    FCIC did not give written notice to any plaintiff 180 days or more before July 1, 1998 (i.e., by December 31, 1997) that FCIC was terminating the 1998 SRA.  Therefore, under the explicit terms of the 1998 SRA, it automatically renewed between FCIC and each plaintiff for the reinsurance year July 1, 1998 through June 30, 1999.

14.    FCIC did not give written notice to any plaintiff 180 days or more before July 1, 1999 (i.e., by December 31, 1998) that FCIC was terminating the 1998 SRA.  Therefore, under the explicit terms of the 1998 SRA, it automatically renewed between FCIC and each plaintiff for the reinsurance year July 1, 1999 through June 30, 2000.

15.    FCIC did not give written notice to any plaintiff 180 days or more before July 1, 2000 (i.e., by December 31, 1999) that FCIC was terminating the 1998 SRA.  Therefore, under the explicit terms of the 1998 SRA, it automatically renewed between FCIC and each plaintiff for the reinsurance year July 1, 2000 through June 30, 2001.

16.    FCIC did not give written notice to any plaintiff 180 days or more before July 1, 2001 (i.e., by December 31, 2000) that FCIC was terminating the 1998 SRA.  Therefore, under

the explicit terms of the 1998 SRA, it automatically renewed between FCIC and each plaintiff for the reinsurance year July 1, 2001 through June 30, 2002.

17.    FCIC did not give written notice to any plaintiff 180 days or more before July 1, 2002 (i.e., by December 31, 2001) that FCIC was terminating the 1998 SRA. Therefore, under the explicit terms of the 1998 SRA, it automatically renewed between FCIC and each plaintiff for the reinsurance year July 1, 2002 through June 30, 2003.

18.    When FCIC and plaintiffs executed the 1998 SRA, the FCIA required insured producers to pay an administrative fee for CAT coverage, as follows:

> Producers shall pay an administrative fee for catastrophic risk protection. The administrative fee for each producer shall be $50 per crop per county, but not to exceed $200 per producer per county up to a maximum of $600 per producer for all counties in which a producer has insured crops. The administrative fee shall be paid by the producer at the time the producer applies for catastrophic risk protection.

7 U.S.C. § 1508(b)(5)(A).

19.    Section III.B.1. of the 1998 SRA authorized plaintiffs, as approved insurance providers, to retain $50 of the administrative fee for each eligible CAT crop insurance contract, not to exceed $200 per county and $600 for all counties combined for each eligible producer. Accordingly, all CAT fees collected by plaintiffs were retained by them.

20.    Under the terms of the 1998 SRA, plaintiffs may not refuse to offer CAT coverage to producers.

21.    When FCIC and plaintiffs executed the 1998 SRA, FCIC agreed to pay to approved insurance providers CAT loss adjustment expenses pursuant to the provisions of Section IV.A. of the 1998 SRA, which provides, in pertinent part:

> For eligible CAT crop insurance contracts, FCIC will pay to the Company an amount equal to 4.7% of the total net book premium for eligible CAT crop insurance contracts

5

computed at 65% of the recorded or appraised average yield indemnified at 100% of the projected market price, all equivalent coverage, for loss adjustment expense.

22.    The formula in Section IV.A. of the 1998 SRA for CAT loss adjustment expense payments to plaintiffs was equivalent to approximately fourteen percent of the premium for CAT coverage.

23.    For each year of operation under the continuously effective 1998 SRA, plaintiffs have performed all of their contractual obligations.

### Legislative Actions Purporting To Affect the Crop Insurance Program

24.    As explained below, FCIC has breached the 1998 SRA, causing substantial damages to plaintiffs, as a result of three legislative actions.

**A.    The Agricultural Research, Extension, and Education Reform Act of 1998**

25.    The United States Congress wrote, debated, and passed the Agricultural Research, Extension, and Education Reform Act of 1998 ("AREERA").

26.    President Clinton signed AREERA into law on June 23, 1998.

27.    Section 532 of AREERA amended 7 U.S.C. § 1508(b) by striking paragraph (5), which had permitted plaintiffs and other approved insurance providers the right to retain administrative fees as compensation for selling and servicing CAT coverage crop insurance policies, and substituted a new paragraph (5) in 7 U.S.C. § 1508(b), which explicitly deprived plaintiffs of this compensation and instead directed deposit of all administrative fees in FCIC's crop insurance fund:

SEC. 532. BUDGETARY OFFSETS

(a)    Administrative Fee for Catastrophic Risk Protection. Section 508(b) of the Federal Crop Insurance Act (7 U.S.C. 1508(b)) is amended by striking paragraph (5) and inserting the following:

(5) Administrative Fee.

(A) Basic fee. Each producer shall pay an administrative fee for catastrophic risk protection in an amount equal to 10 percent of the premium for catastrophic risk protection or $50 per crop per county, whichever is greater, as determined by [FCIC].

(B) * * *

(C) * * *

(D) Use of fees.

(i) In general. The amounts paid under this paragraph shall be deposited in the crop insurance fund established under section 516(c) to be available for the programs and activities of the [FCIC].

(ii) Limitation. No funds deposited in the crop insurance fund under this subparagraph may be used to compensate an approved insurance provider or agent for the delivery of services under this section.

28.    Section 532 of AREERA also amended 7 U.S.C. § 1508(b) by adding a new paragraph (11), providing as follows:

The rate for reimbursing an approved insurance provider or agent for expenses incurred by the approved insurance provider or agent for loss adjustment in connection with a policy of catastrophic risk protection shall not exceed 11 percent of the premium for catastrophic risk protection that is used to define loss ratio.

29.    The effect of the foregoing amendment to the FCIA was to reduce the level of CAT loss adjustment expenses payable to approved insurance providers from approximately fourteen percent to eleven percent of an imputed CAT premium.

B.    The Agricultural Risk Protection Act of 2000

30.    The United States Congress wrote, debated, and passed the Agricultural Risk Protection Act of 2000 ("ARPA").

31.    President Clinton signed ARPA into law on June 20, 2000.

32.    ARPA amended the recently added 7 U.S.C. § 1508(b)(11), to reduce further the level of loss adjustment expenses payable to approved insurance providers under the FCIA from 11% to 8%:

SEC. 103. CATASTROPHIC RISK PROTECTION.

* * *

(d)    Reimbursement Rate Change. – Section 508(b)(11) of the Federal Crop Insurance Act (7 U.S.C. 1508(b)(11)) is amended by striking "11 percent" and inserting "8 percent."

### The United States' Unlawful Implementation of AREERA and ARPA

33.    To implement AREERA, FCIC unilaterally sought to amend the 1998 SRA despite the fact that its contractual right to terminate and renegotiate the SRA had expired. On June 30, 1998, FCIC sent plaintiffs a mandatory Amendment No. 1, which purportedly altered SRA § III.B. and § IV. to read:

III.B    The [approved insurance provider] shall remit to FCIC . . . the following administrative fees collected from eligible producers:

1.    For CAT:

a.    Basic fee:  the greater of $50 or 10 percent of the net book premium for each eligible crop insurance contract; and

b.    Additional fee:  $10 for each eligible crop insurance contract.

IV.    FCIC will pay to the [approved insurance provider] an amount equal to 11.0 percent of the total net book premium for eligible CAT insurance contracts. ....

When FCIC forwarded execution copies of Amendment No. 1 at the end of July 1998 and demanded them to be returned within ten business days, it stated to plaintiffs:  "Failure to

execute the amendment will terminate your [SRA] as of the end of the 1998 reinsurance year (June 30, 1998)."

34.    FCIC, in short, gave plaintiffs a "take it or leave it" proposition: either relinquish the right to retain CAT fees or exit the federal crop insurance program immediately.

35.    Faced with FCIC's non-negotiable demand and unlawful threat to refuse to reinsure any crop insurance policies, plaintiffs executed the unilaterally imposed Amendment No. 1 to the 1998 SRA with a reservation of rights to seek compensation as promised in the original SRA.

36.    To implement ARPA, FCIC unilaterally sought to amend the 1998 SRA despite the fact that its contractual right to terminate and to renegotiate the SRA had expired. On June 22, 2000, and then on June 30, 2000, FCIC sent plaintiffs a mandatory Amendment No. 3, which purportedly altered SRA § IV. to read:

> FCIC will pay to the [approved insurance provider] an amount equal to 8.0 percent of the total net book premium for eligible catastrophic risk protection crop insurance contracts.    The loss adjustment expense specified in the section will be included in the monthly summary report containing the data obtained from acreage reports that have met the processing provisions specified in Manual 13.

When FCIC forwarded execution copies of Amendment No. 3 at the end of June 2000 and demanded them to be returned via facsimile or overnight mail by close of business on June 30, 2000, it stated to plaintiffs: "Failure to execute the amendment by the requested submission date may terminate your [SRA] as of the end of the 2000 reinsurance year (June 30, 2000)."

37.    FCIC, in essence, gave plaintiffs the same "take it or leave it" ultimatum that it pronounced in 1998 when seeking execution of Amendment No. 1 to the SRA.

38.    Faced with FCIC's non-negotiable demand and unlawful threat to refuse to reinsure any crop insurance policies, plaintiffs executed the unilaterally imposed Amendment

No. 3 to the 1998 SRA with a reservation of rights to seek compensation as promised in the original SRA.

39.     Subsequent to enactment of AREERA, the United States, through FCIC, has refused and continues to refuse to honor portions of its contractual agreements with plaintiffs (the SRA) that require payment of certain CAT fees and loss adjustment expenses to plaintiffs.

40.     Subsequent to enactment of ARPA, the United States, through FCIC, has refused and continues to refuse to honor portions of its contractual agreements with plaintiffs (the SRA) that require payments of certain loss adjustment expenses for CAT coverage to plaintiffs.

41.     As a result of these unlawful acts, plaintiffs have not received the CAT fees to which they are contractually entitled under the SRA.

42.     As a result of these unlawful acts, plaintiffs have not received the CAT loss adjustment expenses to which they are contractually entitled under the SRA.

43.     The United States' unlawful breaches of the SRA have denied, and will continue to deny, plaintiffs millions of dollars due under the explicit terms of the 1998 SRA.  For instance, damages resulting from deprivation of CAT administrative fees for the 1999 and 2000 reinsurance years exceed $32,900,00, damages resulting from AREERA's reduction in CAT loss adjustment expenses for the 1999 and 2000 reinsurance years exceed $14,000,000, and damages resulting from reduced CAT loss adjustment expenses for the 2001 and 2002 reinsurance years exceed $14,700,000.

## Jurisdiction and Venue

44.     This Court has jurisdiction pursuant to 28 U.S.C. § 1491.

45.     Venue is proper pursuant to 28 U.S.C. § 1391.

### The Parties

46.    Plaintiff ACE Property & Casualty Insurance Company ("ACE"), f/k/a Cigna Property and Casualty Insurance Company, executed the 1998 SRA. At all times material to this Complaint, Rain and Hail L.L.C. acted as ACE's managing general agent with respect to the 1998 SRA and matters arising thereunder.

47.    Plaintiff Alliance Insurance Companies ("Alliance") executed the 1998 SRA. At all times material to this Complaint, North Central Crop Insurance, Inc. acted as Alliance's managing general agent with respect to the 1998 SRA and matters arising thereunder.

48.    Plaintiff American Agricultural Insurance Company ("American Agricultural") executed the 1998 SRA. At all times material to this Complaint, American Far Bureau Insurance Services, Inc. acted as American Agricultural's managing general agent with respect to the 1998 SRA and matters arising thereunder.

49.    Plaintiff COUNTRY Mutual Insurance Company ("Country") executed the 1998 SRA.

50.    Plaintiff Farm Bureau Mutual Insurance Company of Iowa ("Farm Bureau of Iowa") executed the 1998 SRA.

51.    Plaintiff Farmers Alliance Mutual Insurance Company ("Farmers Alliance") executed the 1998 SRA. At all times material to this Complaint, Blakely Crop Hail, Inc. acted as Farmers Alliance's managing general agent with respect to the 1998 SRA and matters arising thereunder.

52.    Plaintiff Great American Insurance Company ("Great American") executed the 1998 SRA.

53.    Plaintiff Hartford Fire Insurance Company ("Hartford") executed the 1998 SRA.

11  66

54.    Plaintiff NAU Country Insurance Company ("NAU") executed the 1998 SRA.

55.    Plaintiff Producers Lloyds Insurance Company ("Producers Lloyds") executed the 1998 SRA.

56.    Plaintiff Rural Community Insurance Company ("Rural Community") executed the 1998 SRA.

57.    Plaintiffs ACE, Alliance, American Agricultural, Country, Farm Bureau of Iowa, Farmers Alliance, Great American, Hartford, NAU, Producers Lloyds, and Rural Community have been injured in their business and property, and therefore sustained damages, as a result of the acts about which they complain herein.

58.    FCIC is a body corporate under the auspices of the government of the United States, with its principal office in the District of Columbia.  7 U.S.C. § 1503.

59.    FCIC was created pursuant to 7 U.S.C. § 1503 as an agency of and within USDA to carry out the purposes of the FCIA.

60.    FCIC is authorized to enter into and carry out contracts and agreements, binding the government of the United States.  7 U.S.C. § 1506(l).

## COUNT I -- BREACH OF CONTRACT

61.    Plaintiffs reallege and incorporate paragraphs 1 through 60.

62.    Plaintiffs are each signatories to the 1998 SRA with the United States, acting through FCIC.

63.    At all times pertinent to this suit, plaintiffs have each performed their obligations to sell and service CAT policies to producers of agricultural commodities under the continuously effective 1998 SRA.

64.     The United States has breached the 1998 SRA by its refusal to allow plaintiffs to retain the compensation, under Section III.B.1, as promised to them for selling and servicing CAT policies to producers of agricultural commodities.

65.     The United States has breached the 1998 SRA by its refusal to pay to plaintiffs the loss adjustment expenses to which they are entitled under Section IV, as promised to plaintiffs for selling and servicing CAT policies to producers of agricultural commodities.

66.     By its refusal to honor the terms of the 1998 SRA, the United States has also breached the implied covenant of good faith and fair dealing contained in the 1998 SRA.

67.     As a direct, proximate, and legal result of the United States' breaches, plaintiffs have suffered substantial damages, and additional costs that they would not have suffered but for these breaches.

## COUNT II – UNJUST ENRICHMENT

68.     Plaintiffs reallege and incorporate paragraphs 1 through 60.

69.     Plaintiffs are each signatories to the 1998 SRA with the United States, acting through FCIC.

70.     At all times pertinent to this suit, plaintiffs have each performed their obligations to sell and service CAT policies to producers of agricultural commodities under the continuously effective 1998 SRA.

71.     The United States has breached the 1998 SRA by its refusal to allow plaintiffs to retain the compensation, under Section III.B.1, as promised to them for selling and servicing CAT policies to producers of agricultural commodities and by its requirement that this compensation be paid, instead, to FCIC.

SANITY

72.    The United States has breached the 1998 SRA by its refusal to pay to plaintiffs the loss adjustment expenses to which they are entitled under Section IV, which is due to plaintiffs for selling and servicing CAT policies to producers of agricultural commodities.

73.    By its refusal to honor the terms of the 1998 SRA, the United States has been unjustly enriched.

74.    As a direct, proximate, and legal result of the United States' breaches, plaintiffs have suffered substantial damages, and additional costs that they would not have suffered but for these breaches, and are entitled to restitution of all benefits which they have conferred upon the United States through the 1998 SRA.

WHEREFORE, plaintiffs ACE, Alliance, American Agricultural, Country, Farm Bureau of Iowa, Farmers Alliance, Great American, Hartford, NAU, Producers Lloyds, and Rural Community demand judgment against the United States:

1.    Awarding plaintiffs compensatory damages in the amounts to be proved at trial;

2.    Awarding plaintiffs their attorneys' fees and costs; and

3.    Granting plaintiffs any and all other such relief that the Court deems proper and just.

Respectfully submitted this 26th day of February, 2003.

STINSON MORRISON HECKER LLP

By: _____
Michael Tucci (Bar # 430470)
1150 18th Street, N.W., Suite 800
Washington, D.C. 20036
(202) 785-9100
Fax: (202) 785-9163

P. JOHN OWEN

By: _____

P. John Owen (KS Bar #11835; MO Bar #22523)
National Crop Insurance Services, Inc.
7201 West 129th Street, Suite 200
Overland Park, KS  66213
(913) 685-2767
Fax:  (913) 685-3080

Counsel for All Plaintiffs


MICHAEL J. DAVENPORT

By: _____

Michael J. Davenport (Bar # 45345)
Rain and Hail L.L.C.
9200 Northpark Drive, Suite 300
Johnston, IA  50131-3006
(515) 559-1000
Fax:  (515) 559-1001

Additional Counsel for Plaintiff ACE Property &
Casualty Insurance Company

WDCDOCS 58135v1

15

Exhibit A

71

EXHIBIT A

# STANDARD REINSURANCE AGREEMENT
(July 1, 1997)

between the

## FEDERAL CROP INSURANCE CORPORATION

and the

_____

(Insurance Company Name)

_____

(City and State)

This Agreement establishes the terms and conditions under which FCIC will provide subsidy and reinsurance on eligible crop insurance contracts sold or reinsured by the above named insurance company. This Agreement is authorized by the Act and regulations promulgated thereunder codified in 7 C.F.R. chapter IV. Such regulations are incorporated into this Agreement by reference. The provisions of this Agreement that are inconsistent with provisions of State or local law or regulation will supersede such law or regulation to the extent of the inconsistency. This is a cooperative financial assistance agreement between FCIC and the Company to deliver eligible crop insurance under the authority of the Act. For the purposes of this Agreement, use of the plural form of a word includes the singular and use of the singular form of a word includes the plural unless the context indicates otherwise. The headings in this Agreement are descriptive only and have no legal effect on FCIC or the Company.

## SECTION I. DEFINITIONS

"Act" means the Federal Crop Insurance Act, as amended (7 U.S.C. 1501 et seq.).

"Actuarial data master file" means the hard copy and EDP compatible information distributed by FCIC that contains premium rates, program dates, and related information concerning the crop insurance program for a crop year.

"Additional coverage" means a plan of crop insurance providing a level of coverage equal to or greater than 65 percent of the recorded or appraised average yield indemnified at 100 percent of the projected market price, or a comparable insurance plan as determined by FCIC.

"A&O subsidy" means the subsidy for the administrative and operating expenses authorized by the Act and paid by FCIC on behalf of the producer to the Company.

"Administrative fee" means the processing fee the policyholder must pay in accordance with the Act and 7 C.F.R. chapter IV.

72

"Agency" means the person or entity with a contract or agreement with the Company or its MGA to sell and service eligible crop insurance contracts under the Federal crop insurance program.

"Agent" means an individual licensed by the State in which the agent does business under contract with a Company, its managing general agent, or any other entity, to sell and service eligible crop insurance contracts.

"Agreement" means this Standard Reinsurance Agreement, all Appendices, all referenced documents including Manual 13 and the Approved Manual 14.

"Annual Settlement" means the settlement of accounts between the Company and FCIC for the reinsurance year, beginning with the February monthly transaction cutoff date following the reinsurance year and continuing monthly thereafter as necessary.

"Approved Manual 14" means the Guidelines and Expectations for the delivery of the Federal Crop Insurance Program (Manual 14) as it exists 30 days prior to the date on which the Plan of Operation must be submitted to FCIC with respect to such reinsurance year.

"Billing date" means the date specified in the actuarial data master file as the date by which policyholders are billed for premium due on eligible crop insurance contracts.

"Board" means the FCIC Board of Directors.

"Book of business" means the aggregation of all eligible crop insurance contracts in force between the Company and its policyholders that have a sales closing date within the reinsurance year and are eligible to be reinsured under this Agreement.

"Cancellation date" means the date by which the Company or policyholder must notify the other that coverage under an eligible crop insurance contract issued by the Company is canceled for a succeeding crop year. The day following this date is considered as the date a continuous eligible crop insurance contract carried over from the previous crop year is renewed for the subsequent crop year.

"Carryover crop insurance contract" means eligible crop insurance contract that has been in force for at least one crop year term and continues in force for another crop year term after the cancellation date.

"Catastrophic risk protection (CAT)" means an eligible crop insurance contract that is in accordance with section 508(b) of the Act.

73

"Cede" means to pass to FCIC all or part of the net book premium and associated liability for ultimate net losses on eligible crop insurance contracts written by a Company under this Agreement.

"Claims supervisor" means any person having immediate day-to-day supervisory control (e.g., assigning and reviewing work of Company employees or exercising appropriate management of contractors) over the activities of loss adjusters or other persons who determine whether an indemnity will be paid and the amount.

"Code of Federal Regulations (C.F.R.)" means the code published annually in accordance with the Federal Register Act (44 U.S.C. chapter 15) by the Office of the Federal Register that contains each published Federal regulation of general applicability and legal effect.

"Company" means the private insurance Company named on this Agreement.

"Company payment date" means the last business day of the month.

"Competing agency" means an agency selling or servicing any eligible crop insurance contract in any county (including all counties adjoining such county) in which another agency has sold or is in the process of selling any eligible crop insurance contract.

"Contract change date" means the date specified in the crop insurance contract by which FCIC must publish all changes to the crop insurance contract in order to make such changes binding on the Federal Crop Insurance Corporation, the Company, and the policyholder.

"Crop insurance contract" means an agreement (with the terms in effect as of the contract change date) to insure the insurable interest of an eligible producer in a single crop in a single county as provided by the application, the General, or Common Crop Insurance Policy, the Crop Endorsements, the Basic Provisions, the Crop Provisions, the Special Provisions, the Catastrophic Risk Protection Endorsement, as applicable, the Actuarial Table, and any other instrument or endorsement as approved by FCIC.

"Data Acceptance System (DAS)" means the EDP system that receives, and accepts or rejects the Company submitted data upon which all payments to FCIC and the Company are based.

"Electronic data processing (EDP)" means the electronic process by which information is digitally transferred, used, and stored.

"Electronic fund transfer (EFT)" means the process by which funds are electronically transferred between FCIC's account and the Company's account.

74

"Eligible crop insurance contract" means a crop insurance contract that is sold and serviced consistent with the Act, 7 C.F.R. chapter IV, FCIC approved regulations and procedure, at applicable rates, terms, and special conditions; having a sales closing date within the reinsurance year; to an eligible producer, covering a crop in an area approved by FCIC; and on forms approved in writing by FCIC.

"Eligible producer" means a person who meets all the conditions for eligibility specified in 7 C.F.R. chapter IV.

"Employer identification number (EIN)" means the identification number for an individual, business entity, or a foreign entity obtained from the Internal Revenue Service pursuant to section 6109 of the Internal Revenue Code of 1986.

"Federal Crop Insurance Corporation (FCIC)" means the wholly-owned government Corporation within the United States Department of Agriculture authorized to carry out all actions and programs authorized by the Act.

"FCIC payment date" means the first banking day following the 14th calendar day after FCIC receives the monthly summary or annual settlement report and supporting data from the Company upon which any payment is based.

"Group risk plan (GRP)" means crop insurance coverage based upon the average yield realized by a group of producers as determined by FCIC.

"Insurable interest" means the portion of an insured crop a person has at risk in the event of an insurable loss.

"Insurance Plan" means the type of insurance coverage provided on a crop. For example, a crop may be insured under the GRP plan, a revenue insurance plan, or a guaranteed-yield plan. Differences in levels of coverage do not create different plans.

"Limited coverage" means an insurance plan offering coverage that is equal to or greater than 50 percent of the recorded or appraised average yield indemnified at 100 percent of the projected market price but less than 65 percent of the recorded or appraised average yield indemnified at 100 percent of the projected market price, or a comparable insurance plan as determined by FCIC.

"Loss ratio" means the ratio calculated by dividing the ultimate net loss by the net book premium, expressed as a percentage. For example, the ratio of $1 ultimate net loss to 50 cents net book premium would be expressed as 200 percent.

"Managing general agent (MGA)" is an entity that meets the definition of managing general agency under the laws of the State in which it is incorporated, or in the absence of such State law or regulation, meets the definition of a managing general agency in the National Association of Insurance Commissioners' Model Act.

"Manual 13" means the Data Acceptance System Handbook for the reinsurance year for which this Agreement is effective.

"Net book premium" means the total premium calculated for all eligible crop insurance contracts, less A&O subsidy, cancellations, and adjustments.

"Person" means any individual or legal entity possessing the capacity to contract.

"Plan of Operations" means the information and documents required from the Company under Appendix 2 of this Agreement.

"Policyholder" means an eligible producer who has been issued one or more eligible crop insurance contracts.

"Producer premium" means that portion of the FCIC approved insurance premium for the risk of loss that the policyholder must pay.

"Records" means original documents, including original signed documents that may have been recorded, copied, or reproduced in the original form by any photographic, photostatic, microfilm, microcard, miniature photographic, optical disk, electronic imaging, electronic data processing, or electronically transmitted facsimile technology: Provided, That any signature contained on the original is preserved.

"Reinsurance account" means an account maintained by FCIC by which a portion of the Company's underwriting gains may be held for future distribution.

"Reinsurance year" means the period from July 1 of any year through June 30 of the following year and identified by reference to the year containing June. All eligible crop insurance contracts with sales closing dates within the reinsurance year are subject to the terms of the Agreement applicable to that reinsurance year.

"Retained" as applied to ultimate net losses, net book premium, or book of business, means the remaining liability for ultimate net losses and the right to associated net book premiums after all reinsurance cessions to FCIC under this Agreement.

"Revenue insurance" means plans of insurance providing protection against loss of income which are designated as such by FCIC.

"Risk subsidy" means that portion of the FCIC approved insurance premium for the risk of loss paid by FCIC on behalf of the policyholders.

"Sales closing date" means the date established by FCIC as the last date on which a producer may apply for an eligible crop insurance contract on a crop in a specific county.

"Sales supervisor" means any person having immediate or day-to-day supervisory control (e.g., assigning and reviewing work of Company employees or exercising appropriate management of contractors) over the activities of sales agents, competing agencies or sales agency employees on behalf of the Company.

"Satisfactory performance record" means a record of performance that demonstrates substantial conformity with all requirements of this Agreement. The Company or its MGA, if applicable, shall be deemed to have a satisfactory performance record if any deficiency was caused by circumstances beyond its control and where, as soon as it was made aware of the deficiency, it took timely and appropriate corrective action. Material misconduct on the part of any employee, agent, loss adjuster, or any other contractor will not be considered as a deficiency beyond its control. Nothing contained herein affects the Company's liability under any other provision of this Agreement. Continued failure to meet requirements of the Agreement is a significant factor considered in determining satisfactory performance.

"Social security number" ("SSN") means the identification number provided for an individual by the Social Security Administration, and may be the tax identification number (TIN).

"Transaction cutoff date" for weekly data reporting is 6 p.m. central time on Saturday of each week. The transaction cutoff date for the monthly summary reports is 6 p.m. central time on the Saturday occurring within the first full week (i.e., Sunday through Saturday) of the month.

"Ultimate net loss" means the amount paid by the Company under any eligible crop insurance contract reinsured under this Agreement in settlement of any claim and in satisfaction of any judgment or arbitration award rendered on account of such claim, less any recovery or salvage by the Company. Ultimate net loss may include interest and policyholder's court costs related to the eligible crop insurance contract provisions or procedures that are contained in a final judgment against the Company by a court of competent jurisdiction if FCIC determines: (1) that such interest or court costs resulted from the Company's substantial compliance with FCIC procedures or instructions in the handling of the claim or in the servicing of the policyholder or that the actions of the Company were in accordance with accepted loss adjustment procedures; and (2) that the award of such interest or court costs did not involve negligence or culpability on the part of the Company. Ultimate net loss may also include interest or policyholder's court costs related to the crop insurance provisions or procedures that are included in the settlement of any claim if FCIC, in addition to the determinations included above, is advised of the terms of and the basis for the settlement and determines that the settlement should be approved. Under no circumstance are any punitive or consequential damages included in the calculation of ultimate net loss.

"Underwriting" means the acceptance or rejection of individual insurance risk, and determining the amounts and the terms by which the Company will accept the risk for an eligible crop insurance contract.

"Underwriting gain" means the amount by which the Company's share of retained net book premium exceeds its retained ultimate net losses.

"Underwriting loss" means the amount by which the Company's share of retained ultimate net losses exceeds its retained net book premium.

## SECTION II.  REINSURANCE

### A.  General Terms

1. Only eligible crop insurance contracts will be reinsured and subsidized under this Agreement.

2. Except as specified below, the Company must offer all approved plans of insurance for all approved crops in any State in which it writes an eligible crop insurance contract and must accept and approve all applications from all eligible producers. The Company may not cancel the crop insurance contract held by any policyholder so long as the policyholder remains an eligible producer and the Company continues to write eligible crop insurance contracts within the State. The Company is not required to offer such plans of insurance as may be approved by FCIC under the authority of section 508(h) of the Act. However, if the Company chooses to offer any such plan, it must offer the plan in all approved states in which it writes an eligible crop insurance contract and it must comply with all provisions of this paragraph as to such plan unless the Board determines that a separate and complete reinsurance agreement will be issued for the reinsurance of such plan.

3. In exchange for the reinsurance premiums provided by the Company pursuant to this Agreement, FCIC will provide the Company with reinsurance pursuant to the provisions of this Agreement.

4. All eligible crop insurance contracts reinsured and subsidized under this Agreement must conform to the regulations published at 7 C.F.R., chapter IV or as approved in writing by FCIC.

5. FCIC will not provide reinsurance, A&O subsidy, or risk subsidy for any eligible or ineligible crop insurance contract that is sold or serviced in violation of the terms of this Agreement, 7 C.F.R., chapter IV, FCIC approved procedures or any written instructions of FCIC.

6. No portion of the net book premium or the A&O subsidy may be rebated in any form to policyholders, except as authorized by the Act and approved in writing by FCIC. Neither the Company nor its agents shall assess service fees or additional charges on eligible crop insurance contracts reinsured and subsidized under this Agreement except as authorized by the Act and approved in writing by FCIC.

7. Only the amount of net book premium authorized by FCIC in the approved Plan of Operations may be reinsured and subsidized under this Agreement. Whenever the Company reports an amount of net book premium greater than FCIC authorized as the maximum reinsurable net book premium, FCIC may, at its sole discretion, cause the net underwriting gain or loss for all States as defined in section II.D.3. payable to or by the Company to be reduced according to the ratio of the excess net book premium to the total reported net book premium. The excess will then be reinsured under this Agreement. The Company agrees to pay FCIC an additional reinsurance premium equal to 5 percent of the excess net book premium whenever this provision applies.

8. To be eligible for an Agreement, or continue to hold an Agreement:

   a. The Company must have adequate financial resources at the beginning of the reinsurance year as required by 7 C.F.R. part 400, subpart L. If at any time during the reinsurance year the Company no longer has adequate financial resources, the Company must timely obtain such resources.

   b. The Company, and any managing general agent that it appoints or proposes to appoint must:

      i. Have a satisfactory performance record;

      ii. Have the necessary organization, experience, accounting and operational controls, and technical skills to fulfill its obligations under the Agreement, or the ability to obtain them;

      iii. Have the necessary equipment to fulfill its obligations under the Agreement, including, but not limited to, EDP resources and facilities or the ability to obtain such equipment; and

      iv. Perform under a written contract or agreement with each other.

B. **Proportional Reinsurance**

   Within each State, the Company, in accordance with its Plan of Operations, may designate eligible crop insurance contracts to a: (1) Assigned Risk Fund; (2) Developmental Fund; or (3) Commercial Fund.

--- Page 8 ---

79

1.  Assigned Risk Fund

    a.  The Company may designate eligible crop insurance contracts, including those
        previously designated to a Developmental Fund, that have an aggregate net book
        premium not greater than the maximum cession limits specified in section
        II.B.1.d. to the Assigned Risk Fund for each State. The Company must retain
        20 percent of the net book premium and associated liability for ultimate net
        losses on these designated eligible crop insurance contracts, except as provided
        in sections II.B.1.c. and II.B.4. The liability for ultimate net losses not retained
        by the Company within each State will be ceded to FCIC in exchange for an
        equal percentage of the associated net book premium included in the Assigned
        Risk Fund in that State.

    b.  The Company must designate eligible crop insurance contracts to the Assigned
        Risk Fund not later than the transaction cutoff date for the week including the
        30th calendar day after the sales closing date for the eligible crop insurance
        contract unless:

        i.   FCIC determines that conditions exist that would permit the policyholder
             to plant crops that are alternatives to the crops listed on the application for
             insurance, or there are eligible crop insurance contracts transferred from
             the Farm Service Agency after the sales closing date. The Company may
             designate such alternative or transferred crop insurance contracts to the
             Assigned Risk Fund not later than the transaction cutoff date for the week
             containing the 30th calendar day after the acreage reporting date; or

        ii.  FCIC approves a written agreement for limited or additional coverage
             contracts of insurance after the sales closing date. The Company may
             designate such eligible crop insurance contracts to the Assigned Risk Fund
             not later than the transaction cutoff date for the week containing the 30th
             calendar day after FCIC approval.

    c.  Unless otherwise specified in the Agreement, in the event the aggregate net book
        premium for all such eligible crop insurance contracts exceeds the maximum
        allowable cession for any individual State, the amount ceded for each eligible
        crop insurance contract in such State will be reduced pro-rata to the maximum
        allowable cession for that State. The net book premium and associated liability
        for ultimate net losses that exceed the maximum allowable cession for an
        individual State will be placed in the appropriate Developmental Funds for that
        State on a *pro rata* basis.

    d.  The Assigned Risk Fund maximum cession limits for each State are:



| State | Maximum Cession | State | Maximum Cession |
|---|---|---|---|
| Alabama | 50% | Montana | 75% |
| Alaska | 75% | Nebraska | 20% |
| Arizona | 55% | Nevada | 75% |
| Arkansas | 50% | New Hampshire | 10% |
| California | 20% | New Jersey | 50% |
| Colorado | 20% | New Mexico | 55% |
| Connecticut | 35% | New York | 40% |
| Delaware | 30% | North Carolina | 20% |
| Florida | 40% | North Dakota | 45% |
| Georgia | 75% | Ohio | 25% |
| Hawaii | 10% | Oklahoma | 50% |
| Idaho | 45% | Oregon | 30% |
| Illinois | 20% | Pennsylvania | 25% |
| Indiana | 20% | Rhode Island | 75% |
| Iowa | 15% | South Carolina | 55% |
| Kansas | 20% | South Dakota | 30% |
| Kentucky | 25% | Tennessee | 35% |
| Louisiana | 50% | Texas | 75% |
| Maine | 75% | Utah | 75% |
| Maryland | 20% | Vermont | 15% |
| Massachusetts | 45% | Virginia | 30% |
| Michigan | 50% | Washington | 30% |
| Minnesota | 20% | West Virginia | 75% |
| Mississippi | 50% | Wisconsin | 35% |
| Missouri | 20% | Wyoming | 35% |

e.   All eligible crop insurance contracts, including CAT, all revenue insurance plans, and all other insurance plans, that are designated to the Assigned Risk Fund will be placed in a single fund in each state, which is shown under "B" in sections II.C. and D.

2.   Developmental Funds

a.   The Company may designate eligible crop insurance contracts to any of three Developmental Funds as follows:

Fund C    CAT;
Fund R    Revenue insurance plans; or
Fund B    All other crop insurance plans.

81

b.  If the Company declares in its Plan of Operations that it will forgo the use of the Commercial Fund in all States, then all eligible crop insurance policies not designated to the Assigned Risk Fund will be placed in the appropriate Developmental Fund.

c.  Designations to Developmental Funds must be made:

   i.  For carryover crop insurance contracts insured with the Company the previous year that have contract change dates occurring on or after July 1, not later than the transaction cutoff date for the week containing the 30th calendar day after the contract change date for the applicable crop and insurance plan for each reinsurance year;

   ii.  For carryover crop insurance contracts insured with the Company the previous year that have contract change dates occurring before July 1, not later than the transaction cutoff date for the week containing August 1 of the reinsurance year; and

   iii.  For all other eligible crop insurance contracts, not later than the transaction cutoff date for the week containing the 30th day after the sales closing date for the eligible crop insurance contract.

d.  The Company must retain at least 35 percent of the net book premium and associated liability for ultimate net losses on eligible crop insurance contracts placed into each of the Developmental Funds within each State. The Company may retain a greater percentage of the net book premium and associated liability for ultimate net losses within any State whenever it designates percentages greater than 35 percent in its Plan of Operations for any reinsurance year. Such percentage designations must be in 5 percent increments. The three Developmental Funds' retention percentages may differ within a State. The liability for ultimate net losses not retained by the Company within each State will be ceded to FCIC in exchange for an equal percentage of the associated net book premium included in the Developmental Funds in that State.

3.  Commercial Funds

a.  Any eligible crop insurance contract not designated by the Company to the Assigned Risk Fund or a Developmental Fund will be placed in one of three Commercial Funds as follows:

   Fund C  CAT;
   Fund R  Revenue insurance plans; or
   Fund B  All other crop insurance plans.

   b.   The Company must retain at least 50 percent of the net book premium and associated liability for ultimate net losses on eligible crop insurance contracts designated to each of the Commercial Funds within each State. The Company may retain percentages of the net book premiums and associated liability for ultimate net losses within any State whenever it designates percentages greater than 50 percent in its Plan of Operations for any reinsurance year. Such percentage designations must be made in 5 percent increments. The three Commercial Funds' retention percentages may differ within a State. The liability for ultimate net losses not retained by the Company within each State will be ceded to FCIC in exchange for an equal percentage of the associated net book premium included in the Commercial Funds in that State.

4.   Company Minimum Retention

   a.   After all proportional reinsurance cessions under this Agreement, the Company must retain a percentage of net book premium and associated liability for ultimate net losses that equals or exceeds 35 percent of its book of business. However, if more than 50 percent of the Company's book of business is in the Assigned Risk Fund or the Company designates eligible crop insurance contracts only to the Assigned Risk Fund and Developmental Funds, the Company must retain a percentage of net book premium and associated liability for ultimate net losses of at least 22.5 percent of its book of business.

   b.   In the event that the Company fails to retain the required minimum percentage of its book of business under this Agreement, the percent of net book premiums and associated liability for ultimate net losses for all eligible crop insurance contracts included in the Assigned Risk Fund in all States will be increased on a pro-rata basis from the 20 percent retention stated in section II.B.1.a. to the retention necessary to meet the minimum retention stated in section II.B.4.a.

## C.  Non-Proportional Reinsurance

1.   Company's Responsibility for Ultimate Net Losses

The non-proportional reinsurance provided hereunder applies to the Company's retained book of business in each individual Fund and State after proportional cessions under subsection II.B. For each Fund and State, the Company's responsibility for ultimate net losses will be determined as follows:

   a.   The Company will retain the following percentages of the amount by which its retained ultimate net losses in each individual State and Fund exceed 100 percent but are less than or equal to 160 percent of the Company's retained net book premium in that State and Fund for the reinsurance year.

- - - Page 12 - - -

83 -

|   |   | (B) | (C) | (R) |
|---|---|---|---|---|
| i. | Commercial Fund | 50.0 percent | 50.0 percent | 57.0 percent |
| ii. | Developmental Fund | 25.0 percent | 25.0 percent | 30.0 percent |
| iii. | Assigned Risk Fund | 5.0 percent | - - - | - - - |

b.    In addition to the amount determined under section II.C.1.a., the Company will retain the following percentages of the amount by which its retained ultimate net losses in each individual State and Fund exceed 160 percent but are less than or equal to 220 percent of the Company's retained net book premium in that State and Fund for the reinsurance year.

|   |   | (B) | (C) | (R) |
|---|---|---|---|---|
| i. | Commercial Fund | 40.0 percent | 40.0 percent | 43.0 percent |
| ii. | Developmental Fund | 20.0 percent | 20.0 percent | 22.5 percent |
| iii. | Assigned Risk Fund | 4.0 percent | - - - | - - - |

c.    In addition to the amounts determined under paragraphs II.C.1.a. and b., the Company will retain the following percentages of the amount by which its retained ultimate net losses in each individual State and Fund exceed 220 percent but are less than or equal to 500 percent of the Company's retained net book premium in that State and Fund for the reinsurance year.

|   |   | (B) | (C) | (R) |
|---|---|---|---|---|
| i. | Commercial Fund | 17.0 percent | 17.0 percent | 17.0 percent |
| ii. | Developmental Fund | 11.0 percent | 11.0 percent | 11.0 percent |
| iii. | Assigned Risk Fund | 2.0 percent | - - - | - - - |

d.    FCIC will assume ultimate net losses in excess of the Company's retained ultimate losses as determined under paragraphs II.C.1.a., b., and c. In addition, FCIC will assume 100 percent of the amount by which the Company's retained ultimate net losses in each individual State and Fund exceed 500 percent of the Company's retained net book premium in that State and Fund for the reinsurance year.

D.    Company's Retention of Underwriting Gain

1.    The amount of underwriting gain retained by the Company will be calculated separately for each Fund within each State as follows:

a.    When the loss ratio equals or exceeds 65 percent but is less than 100 percent of the Company's retained net book premium in a Fund and State for the reinsurance year, the Company will retain the following percentages of the underwriting gain:

|                          | (B)           | (C)           | (R)           |
|--------------------------|---------------|---------------|---------------|
| i.   Commercial Fund     | 94.0 percent  | 75.0 percent  | 94.0 percent  |
| ii.  Developmental Fund  | 60.0 percent  | 45.0 percent  | 60.0 percent  |
| iii. Assigned Risk Fund  | 15.0 percent  | - - -         | - - -         |

b.   In addition to the amounts of underwriting gain determined in the range of loss ratios under section II.D.1.a., when the loss ratio equals or exceeds 50 percent but is less than 65 percent of the Company's retained net book premium in a Fund and State for the reinsurance year, the Company will retain in that Fund and State the following percentages of the underwriting gain:

|                          | (B)           | (C)           | (R)           |
|--------------------------|---------------|---------------|---------------|
| i.   Commercial Fund     | 70.0 percent  | 50.0 percent  | 70.0 percent  |
| ii.  Developmental Fund  | 50.0 percent  | 30.0 percent  | 50.0 percent  |
| iii. Assigned Risk Fund  | 9.0 percent   | - - -         | - - -         |

c.   In addition to the amounts of underwriting gain determined in the range of loss ratios under sections II.D.1.a. and b., when the loss ratio is less than 50 percent of the Company's retained net book premium in a Fund and State for the reinsurance year, the Company will retain in that Fund and State the following percentages of the underwriting gain:

|                          | (B)           | (C)           | (R)           |
|--------------------------|---------------|---------------|---------------|
| i.   Commercial Fund     | 11.0 percent  | 8.0 percent   | 11.0 percent  |
| ii.  Developmental Fund  | 6.0 percent   | 4.0 percent   | 6.0 percent   |
| iii. Assigned Risk Fund  | 2.0 percent   | - - -         | - - -         |

2.   The underwriting gain or loss for each individual Fund will be totaled for each State to determine the net underwriting gain or loss for that State.

3.   The Company's net underwriting gain or loss will be determined by totaling the net underwriting gains or losses for all States. Any net underwriting gain will be paid by FCIC to the Company at annual settlement except as provided in section II.D.4. Any net underwriting loss of the Company will be paid to FCIC by the Company with each monthly summary report.

4.   Reinsurance Account

a.   All calculations described in this section are only applicable to the annual settlement. The balance in the Company's reinsurance account is subject to the provisions of section V.U.

85

b.    If the Company's overall gain for all States in any reinsurance year exceeds 17.5 percent of its retained net book premium for that reinsurance year, 60 percent of the amount above 17.5 percent will be held by FCIC in a Company reinsurance account.

c.    If the Company retains an overall loss or an overall gain less than 17.5 percent of its retained net book premium in any reinsurance year, any balances in the Company's reinsurance account will be paid to the Company to the extent needed to obtain an overall gain of 17.5 percent of retained net book premium, or a lesser amount if the balance in the account is not adequate to achieve this percentage.

d.    Except only for those funds that are the subject to the provisions of section V.X. or to litigation or arbitration between the Company and FCIC, or set-off in accordance with section V.U., funds from a reinsurance year that have been placed in this account for any one reinsurance year will be returned to the Company 2 years after the first annual settlement for such reinsurance year. Payments will be made on a first in, first out basis. (For example, any balance remaining from the 1998 reinsurance year will be paid in February 2001.)

e.    In the event of termination or nonrenewal of this Agreement, balances in the reinsurance account will be paid, less those funds that are subject to a claim by FCIC, as follows:

    i.    If terminated by the Company, 50 percent of the balance will be paid at the date of the annual settlement that would have occurred for the first reinsurance year after termination, and 50 percent will be paid 1 year later, provided neither the Company nor any other company associated with the Company (as determined by FCIC) has applied for reinsurance under the Act.

    ii.    Whenever FCIC terminates this Agreement or does not renew this Agreement or offer any subsequent Agreement, any remaining balance shall be paid 1 year after the first annual settlement of the reinsurance year terminated.

f.    Notwithstanding any provision of any earlier Standard Reinsurance Agreement, any balance in the reinsurance account accumulated from the 1997 or prior reinsurance years will be paid out in accordance with section II.D.4. This provision will be implemented at the time of the annual settlement for the Agreement in effect for the 1997 reinsurance year. No interest will be paid on such amounts.

86

E.    Commercial Reinsurance

The Company may reinsure commercially its liability for ultimate net losses remaining after all cessions under this Agreement. When commercial reinsurance is required in order for the Company to meet the Standards for Approval (7 C.F.R. part 400, subpart L), the Company must describe in the Plan of Operations its commercial reinsurance plan and provide the documentation required by FCIC to assure that the potential liability for premiums retained after such commercial reinsurance meets the requirements contained in the Standards for Approval.

## SECTION III. SUBSIDIES AND ADMINISTRATIVE FEES

A.    FCIC will provide risk subsidy and A&O subsidy on behalf of producers as follows:

1.    Risk subsidy shall be determined as provided by the Act and will be provided to the Company on the monthly summary report.

2.    A&O subsidy for eligible crop insurance contracts will be determined as set forth below and will be paid to the Company on the monthly summary report after the Company submits, and FCIC accepts, the information needed to accurately establish the premium for such eligible crop insurance contracts. Notwithstanding the provisions of this section, under no circumstances will A&O subsidy be paid in excess of the amount authorized by statute.

a.    For any eligible CAT crop insurance contract, 0 percent of net book premium.

b.    For revenue insurance plans that can not increase liability whenever the market price at harvest exceeds the market price at the time of planting, 27.0 percent of the net book premium attributed to such eligible crop insurance contracts, not to exceed the amount that would have been paid had each eligible producer purchased limited or additional coverage under an insurance plan that insures loss of individual yield.

c.    For revenue insurance plans that can increase liability whenever the market price at the time of harvest exceeds the market price at the time of planting, 23.25 percent of the net book premium attributed to such eligible crop insurance contracts.

d.    For eligible crop insurance contracts that provide coverage under the GRP, 25.0 percent of the net book premium attributed to such eligible crop insurance contracts.

e.    For limited or additional coverage not included in sections III.A.2. b., c., and d., 27.0 percent of net book premium attributed to such eligible crop insurance contracts.

    f.    The amounts payable under sections III.A.2.b., c., d., and e., will be reduced by the amount of administrative fees applicable to such policies retained by the Company.

    g.    If the amount of A&O subsidy payable to the Company for any limited coverage eligible crop insurance contract is less than the administrative fee retained by the Company on such contract, the administrative fee will be considered payment in full for the A&O subsidy on such contract.

B.    The Company shall collect administrative fees from producers and may retain only such amounts as set forth herein:

    1.    For CAT, $50 for each eligible crop insurance contract, not to exceed $200 per county and $600 for all counties combined for each eligible producer. The Company shall retain not more than $100 per county for each eligible producer as compensation for the costs of selling and servicing the eligible CAT crop insurance contracts. In the event the eligible producer is a limited resource farmer as defined in the regulations, the Company shall submit the required evidence to FCIC and FCIC shall pay the Company the appropriate fee on the monthly summary report.

    2.    For limited coverage, $50 per eligible crop insurance contract, not to exceed $200 per county and $600 for all counties combined for each eligible producer. The Company shall retain not more than $100 per county for each eligible producer. Any fees retained by the Company will be offset against the A&O subsidy.

    3.    For additional coverage, $10 per eligible crop insurance contract to be paid to FCIC by the Company.

C.    The amount of A&O subsidy may be adjusted to a level that FCIC determines to be equitable if issuing or servicing eligible crop insurance contracts involve expenses that vary significantly from the basis used to determine the A&O subsidy under this section: Provided: That such A&O subsidy does not exceed the maximum amount specified by statute.

D.    In the event the Company determines that it can deliver eligible crop insurance contracts for less than the A&O subsidy paid under this section, it may apply to FCIC for approval to reduce the amount of producer premium charged to policyholders by an amount corresponding to the value of the efficiency.

E.    With the exception of raisins, the Company may not submit estimated data for the purpose of establishing premium, liability, or indemnity. For raisins, the Company may submit estimated reports not to exceed 2 tons per acre, which will be used to determine the estimated A&O subsidy for eligible raisin crop insurance contracts. In the event the actual raisin net book premium is less than this estimate, the Company will include the excess A&O

--- Page 17 ---

subsidy as an amount owed to FCIC in the first monthly summary report after the actual raisin tonnage is known. Interest on this amount, at the rate set forth in section V.C.2. calculated from the date of payment by FCIC to the date of the monthly summary report upon which the actual tonnage is reported, must be included as an amount owed to FCIC.

F.   The billing statement provided to the policyholder will contain the following information:

   1.   The total premium calculated by adding 2 and 3 below;

   2.   The risk subsidy and A&O subsidy paid or provided by FCIC to the Company on behalf of the policyholder; and

   3.   The amount of premium and any administrative fees due the Company from the policyholder.

G.   All data on which liabilities and premiums are based must be reported by the Company and accepted by FCIC not later than the transaction cut-off date for the twelfth week after the week that includes the latest acreage reporting date specified in the actuarial data master file for any eligible crop insurance contract insured by the policyholder. The A&O subsidy for eligible crop insurance contracts under this Agreement will be reduced if the data are delayed, unless the delay is caused in whole or in part by FCIC, as follows:

| Data Received During Weeks | Reduction |
|---|---|
| 13th through 15th | 1.5 percent |
| 16th through 17th | 3.0 percent |
| 18th or more | 4.5 percent |

H.   No A&O subsidy for eligible crop insurance contracts under this Agreement will be paid if the agent or loss adjuster SSN is not submitted and accepted by FCIC.

I.   A&O subsidy will be paid to the Company beginning with the October monthly summary report. It will be paid in one installment based on the data obtained from accepted acreage reports (preliminary tonnage report for eligible raisin crop insurance contracts) in accordance with processing provisions contained in Manual 13.

## SECTION IV.  LOSS ADJUSTMENT EXPENSES

A.   For eligible CAT crop insurance contracts, FCIC will pay to the Company an amount equal to 4.7 percent of the total net book premium for eligible CAT crop insurance contracts computed at 65 percent of the recorded or appraised average yield indemnified at 100 percent of the projected market price, or equivalent coverage, for loss adjustment expense. The loss adjustment expense specified in this section will be included in the monthly summary report containing the data obtained from acreage reports that have met the processing provisions specified in Manual 13. In addition to the amounts stated in this

subsection:

1.  If the actual loss ratio on the Company's net book premium of all eligible CAT crop insurance contracts for the reinsurance year exceeds 60 percent but is not greater than 160 percent, FCIC will pay to the Company, as loss adjustment expense, an additional 0.017 percent of the net book premium on all eligible CAT crop insurance contracts reinsured under this Agreement for each full point between a 60 percent and 160 percent loss ratio. The loss adjustment expense payable to the Company under this paragraph will not exceed 1.7 percent. The loss adjustment expense payable to the Company under this paragraph for such eligible CAT crop insurance contracts shall be computed on premium determined at 65 percent of the recorded or appraised average yield indemnified at 100 percent of the projected market price, or equivalent coverage.

2.  In addition to the amounts stated in section IV.A.1, if the actual loss ratio on the Company's net book premium of all eligible CAT crop insurance contracts for the reinsurance year exceeds 160 percent but not greater than 260 percent, FCIC will pay to the Company, as excess loss adjustment expense, an additional 0.007 percent of the net book premium on all eligible CAT crop insurance contracts reinsured under this Agreement for each full point between a 160 percent and 260 percent loss ratio. The excess loss adjustment expense payable under this paragraph will not exceed 0.7 percent. The excess loss adjustment expense payable under this paragraph for such eligible CAT crop insurance contracts shall be computed on premium determined at 65 percent of the recorded or appraised average yield indemnified at 100 percent of projected market price, or equivalent coverage.

B.  Loss adjustment expenses under section IV.A. will be included in the monthly summary report that contains losses exceeding the thresholds specified in section IV.A. and that meet the processing provisions specified in Manual 13.

## SECTION V.  GENERAL PROVISIONS

A.  Collection of Information and Data

The Company is required to collect and provide to FCIC the SSN or the EIN as authorized and required by the Food, Agriculture, Conservation, and Trade Act of 1990 (Pub. L. 101-624), and the regulations promulgated thereunder, as codified in 7 C.F.R. part 400, subpart Q.

B.  Reports

1.  The Company must submit accurate and detailed contract data to FCIC through the DAS in accordance with the requirements of Manual 13. The DAS will only accept, and the Company will only be required to submit data through the automated system for 3 years following the first annual settlement for the reinsurance year. Settlement of claims still in litigation, arbitration, or any administrative proceeding 3 years after the first annual settlement for such reinsurance year must be reported to FCIC and will be processed manually following final resolution of such action.

2.  All reports submitted for reimbursement must be certified by an authorized officer or authorized employee of the Company. The required certification statements are contained in Manual 13.

3.  Failure of the Company to comply with the provisions of this Agreement, including timely submission of the monthly and annual settlement data and reports, or any other report required by this Agreement does not excuse or delay the requirement to pay any amount due to FCIC by the dates specified herein. Failure of the Company to make payment in accordance with the provisions of this Agreement is a default of this Agreement by the Company. In addition to the payment of applicable interest, such actions may be a basis to suspend or terminate this Agreement.

4.  Producer premiums and administrative fees collected by the Company must be reported on the monthly summary report submitted in the next calendar month after collection. Producer premiums and administrative fees that are uncollected for each billing date must be reported by the Company on the monthly summary report for the month following the month containing the billing date.

5.  All payments due FCIC from the Company will be netted on the monthly and annual settlement reports with amounts due the Company from FCIC. Any amount due FCIC as a result of the netting effect must be deposited on or before the Company's payment date directly into FCIC's account in the U. S. Treasury by EFT. FCIC will remit amounts due the Company by EFT on or before the FCIC payment date. Any amounts due FCIC or the Company that are not timely remitted are subject to the interest rate provisions contained in section V. C., with such interest accruing from the date such payment was due to the date of payment.

6.  In the event that a payment would be due to the Company except for the erroneous rejection of data by FCIC, the Company shall be entitled to interest accrued on these amounts for the period of such delay, at the rate provided in section V. C.1.

9/

7. In addition to the reporting requirements contained in Manual 13, the Company will provide other information relating to policies reinsured hereunder as may be requested by FCIC.

8. All payments and reports are subject to post audit by FCIC in accordance with section V. X.

C. Interest

1. Any interest that FCIC is required to pay the Company under the terms of this Agreement will be paid in accordance with the interest provisions of the Contract Disputes Act (41 U.S.C. 601 *et seq.*).

2. Any interest that the Company is required to pay FCIC under the terms of this Agreement will be paid at the simple interest rate of 15 percent per annum.

3. The Company will repay with interest any amount paid to the Company by FCIC that FCIC or the Company subsequently determines was not due.

4. FCIC will repay with interest any amount paid by the Company to FCIC which FCIC subsequently determines was not due.

D. Escrow Account

1. At the Company's request, FCIC will allow the Company to establish an escrow account in the name of FCIC at a bank designated by the Company, and approved by FCIC, to reimburse the Company for payment of losses to eligible producers by the Company. The Company's bank must pledge collateral as required by 31 C.F.R. 202 in the amount determined by FCIC. The requirements for funding the escrow account and monthly balancing are contained in Manual 13 and the Escrow Agreement.

2. Any Company that elects not to utilize escrow funding will be reimbursed for paid losses validated and accepted on the monthly summary report.

3. For the purpose of this Agreement, any loss will be considered paid by the Company when the instrument or document issued as payment of the indemnity has cleared the Company's bank account.

E. Form Approval

The Company must submit for FCIC's approval all forms incorporated by reference into the eligible crop insurance contracts reinsured under this Agreement. Any such forms must not be used by the Company until approved or otherwise authorized in writing by FCIC.

9 2

F.   Supplemental Insurance

1.   The Company must not sell any contract of insurance or similar instrument that may shift risk to or otherwise increase the risk of any eligible crop insurance contract sold or reinsured by FCIC. The Company must submit any contracts of insurance or similar instruments to FCIC for review and approval prior to selling them. FCIC will not reimburse the Company for any loss occurring on an eligible crop insurance contract if the Company sold a contract of insurance that FCIC determines to have shifted risk to or increases the risk of such eligible crop insurance contract reinsured under this Agreement, or if the Company administers the contract of insurance in a manner inconsistent with its submission and the FCIC approval.

2.   The Company must maintain and make available to FCIC the SSN and EIN and underwriting information pertaining to any contract of insurance written in conjunction with eligible crop insurance contracts reinsured under this Agreement, including the contract number of the related eligible crop insurance contract.

G.   Insurance Operations

1.   Plan of Operations

a.   This Agreement becomes effective with respect to any reinsurance year upon approval of the Company's Plan of Operations by FCIC. The Plan of Operations must be submitted to FCIC by April 1 preceding the reinsurance year.

b.   The Plan of Operations must meet the requirements and be in the format as contained in appendix 2.

c.   The Company may submit a request to amend an approved Plan of Operations at any time to reflect changing business considerations and sales expectations. Such amendments must be in writing and must be approved by FCIC in writing before implementation by the Company. The request will be evaluated following the procedures applicable to a timely filed original plan, except that FCIC will also consider whether FCIC's risk is materially increased. Requests for amendment where the risk has materially increased will only be considered if FCIC, at its sole discretion, determines that its actions or those of USDA have substantially increased the risk of underwriting loss on eligible crop insurance contracts previously written by the Company.

d.   The Plan of Operations is incorporated in this Agreement by reference. Material failure to follow the Plan of Operations may be a basis for FCIC to terminate this Agreement.

2.    General Operations

a.    All eligible crop insurance contracts reinsured under this Agreement must be sold by properly trained and licensed agents. Employees, agents, brokers, solicitors, or any other sales representatives of the Company who quote premium rates and coverages or provide other information in the sale of eligible crop insurance contracts to current or prospective policyholders must be licensed or certified in crop insurance if available, or in the property and casualty line of insurance if a crop insurance license or certification is not available.

b.    The Company shall not permit its sales agents, agency employees, sales supervisors, or any spouse or family member residing in the same household as any such sales agent, agency employee, or sales supervisor to be involved in any way with the following activities in any county or adjoining county where the sales agent, agency employee, any competing agency or sales supervisor performs any sales functions:

   i.    The supervision, control, or adjustment of any loss;

   ii.   A determination of a claim or cause of loss; or

   iii.  Verification of yields for the purpose of establishing any insurance coverage or guarantee.

c.    The Company shall not permit its claims supervisors or any employee or contractor involved in the determination of the amount or cause of any loss to be involved in any way with the sales of any eligible crop insurance contract in any county or adjoining county in which they perform any loss adjustment or claims services.

d.    The Company shall not permit its sales agents, the owners or employees of its sales agencies, its sales supervisors, or any spouse or family member residing in the same household as any such person, to be involved in underwriting any eligible crop insurance contract written by any such person.

e.    Any person employed by the Company for the general supervision of the crop insurance program in an area may supervise activities associated with the general administration of the crop insurance program in that area, which may include training, servicing, underwriting, and loss adjusting. However, all quality control reviews must be conducted by objective and unbiased persons who were not involved in establishing the guarantee or adjusting the loss, or the sales or supervision of sales for the policies reviewed.

f.   The Company must verify all yields and other information used to establish insurance guarantees and indemnity payments in accordance with the procedures approved by FCIC. Guarantees must be verified in accordance with the requirements of the approved Manual 14 and applicable procedures.

g.   The Company must use crop insurance contracts, standards, procedures, methods, and instructions as issued or approved by FCIC in the sales, service, and loss adjustment of eligible crop insurance contracts.

3.   Managing General Agents

If the Company will perform its responsibilities under this Agreement through a MGA, the Company must certify to FCIC in the Plan of Operations that such MGA is in full compliance with the laws and regulations of the State in which such MGA is incorporated or, in the absence of such laws and regulations, with the National Association of Insurance Commissioners' Model Act governing MGAs.

H.   Access to Records and Operations

Upon written request, unless otherwise authorized by the Manager of FCIC, the Company must provide FCIC reasonable access to its offices, personnel (including agents and loss adjusters), and all records that pertain to the business conducted under this Agreement at any time during normal business hours for the purpose of investigation, audit or examination, including access to records on the operation of the Company. The Company must designate in its Plan of Operations each location where records and documents are retained. Records pertaining to premium or liability must be retained until 3 years after the annual settlement date for the respective reinsurance year. FCIC may require on a case-by-case basis the Company to retain certain specified records for a longer period if it so notifies the Company in writing at any time before disposal of the record. The Company should be aware that the statute of limitations for bringing a suit for any breach of this Agreement is 6 years. For the purpose of this section the term "FCIC" includes all U.S. Government agencies including but not limited to USDA Office of Inspector General, the General Accounting Office, and the Department of Labor.

I.   Compliance and Corrective Action

1.   The Company must be in compliance with the provisions of this Agreement, the laws and regulations of the United States, the laws and regulations of the States and locales in which the Company is conducting business under this Agreement, unless such State and local laws and regulations are in conflict with this Agreement, and all bulletins, handbooks, instructions, and procedures of FCIC.

2.   The Company must cooperate with FCIC in the review of Company operations.

3. If FCIC finds that the Company has not complied with any provision of this Agreement, and the Company has not taken appropriate steps to correct the reported act of non-compliance, FCIC may at its discretion, require that the Company take corrective action within 45 days of the date of such written demand. The Company must provide FCIC with satisfactory documentary evidence of the corrective action taken to address the reported act of non-compliance.

4. Whenever an act or omission by the Company materially affects the existence or amount of the indemnity or premium paid (including but not limited to incorrect APH calculations; improper adjustment of loss; sales agents or sales supervisors involved in the adjustment of losses; failure to verify eligibility for insurance, acreage planted or prevented from planting, insurable shares, insurable causes of loss, unit divisions, or nonstandard classifications) and FCIC is able to determine the correct amount of indemnity or premium that should have been paid:

   a. FCIC shall require the Company to report to FCIC through the DAS system the correct amount of indemnity or premiums, and

   b. FCIC may require the Company to refund any A&O subsidy that exceeds the amount the Company was entitled to receive.

5. The Company provides valuable program delivery services for which payment is made in the form of A&O subsidy. FCIC and the Company agree that FCIC is damaged by a failure of the Company to provide services or to comply with FCIC requirements and procedures and that the value of such service or failure to comply is difficult to determine because damages are uncertain and the amount of services or failure to comply is difficult to quantify. FCIC and the Company agree that in view of the difficulty of determining the exact value of each service, the amounts stated below are reasonable estimates of the value of such services.

   a. If the Company's loss adjustment performance and practices are not carried out in accordance with this Agreement and FCIC assumes the Company's loss adjustment obligations, the Company shall pay FCIC an amount equal to 10 percent of the net book premium on all eligible crop insurance contracts adjusted or readjusted by FCIC.

   b. If this Agreement should be terminated for cause, the Company shall pay FCIC the equivalent of 10 percent of the net book premium for all eligible crop insurance contracts.

   c. In the event of the following failures to comply with the terms and conditions of this Agreement, the Company shall pay FCIC as follows:

96

    i.   For failure to follow approved sales agent training requirements contained in Manual 14, 1 percent of the net book premium for eligible crop insurance contracts written by sales agents not trained in accordance with Manual 14 if, for the purposes of this subparagraph only, the number of such sales agents exceeds 5 percent of all sales agents requiring training;

    ii.  For failure to follow approved loss adjuster training requirements contained in Manual 14, 1 percent of the net book premium for eligible crop insurance contracts adjusted by loss adjusters not trained in accordance with Manual 14 if, for the purposes of this subparagraph only, the number of loss adjusters exceeds 5 percent of the loss adjusters requiring training; and

    iii.  For failure to follow approved quality control review requirements in Manual 14, 1 percent of the net book premium for eligible crop insurance contracts not reviewed in accordance with Manual 14, but which were required to be reviewed, if the number of reviews not performed exceeds 5 percent of the number required.

    d.  For failure to follow FCIC approved procedure that materially impacts the existence or amount of the loss, the Company shall pay to FCIC 3 percent of the net book premium of all eligible contracts for which each failure occurred.

    e.  The total amount payable under sections V. I. 5. c. and d. may not exceed 4.5 percent of the net book premium on each eligible crop insurance contract for which any payment is due FCIC under sections V. I. 5. c. or d.

6.    Any payment due from or paid by the Company under this section shall be in addition to and without prejudice to any other rights of FCIC, or the United States, if the deficiency in compliance with terms and conditions of this Agreement result from the Company's violation of criminal or civil false claims statutes.

    7.    FCIC may, at its sole discretion, waive, reduce or delay repayment.

    8.    Any amounts due from or paid by the Company under this section shall be paid by the Company to FCIC on the next monthly summary or annual settlement report after a final determination by FCIC. Any payment not timely paid will be subject to provisions of section V.C.

    9.    If FCIC collects any amount in accordance with section V. I. 4. or V.I.5.a. or b., then FCIC will not require the Company to pay any amount under section V. I. 5.d. on the same eligible crop insurance contracts.

97

10. Nothing in this subsection prevents FCIC from collecting any amounts due under this subsection from the Company and suspending or terminating this Agreement.

J. Suspension

FCIC may suspend this Agreement for cause due to a material failure to perform or comply with obligations under this Agreement. If this Agreement is suspended for cause:

1. The suspension will remain in effect until FCIC determines that the Company has corrected the failure and has taken steps to prevent its occurrence.

2. While suspended, the Company may not sell any new crop insurance contracts under this Agreement. However, if required by FCIC, the Company must service all eligible crop insurance contracts in effect at the time of the suspension.

3. If the Company does not properly service existing crop insurance contracts as required by section V.J.2. or has not corrected the failure within 45 days of the date the Company is notified of the suspension, this Agreement will automatically terminate at the end of the reinsurance year.

K. Termination

1. FCIC may terminate this Agreement for cause due to a material failure to perform or comply with obligations under this Agreement. If this Agreement is terminated for cause, FCIC will not provide reinsurance for eligible crop insurance contracts issued or renewed after the date of the termination. FCIC will provide reinsurance for eligible crop insurance contracts in effect as of the date of the termination until the next cancellation date.

2. If FCIC terminates this Agreement for the convenience of the government, FCIC will not provide reinsurance for any eligible crop insurance contract renewed or issued after the date of termination. FCIC will continue to provide A&O subsidy, risk subsidy, and reinsurance to the extent allowed under this Agreement for eligible crop insurance contracts in effect as of the date of the termination until the next cancellation date. No additional damages or amounts will accrue to the Company because of such termination.

L. Disputes and Appeals

1. The Company may appeal any actions, finding, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169.

98

2.    FCIC shall generally issue a fully documented decision within 90 days of the receipt of a notice of dispute accompanied by all information necessary to render a decision. If a decision cannot be issued within 90 days FCIC will notify the Company within the 90 day period of the reasons why such a decision cannot be issued and when it will be issued.

## M.  Renewal

This Agreement will continue in effect from year to year with an annual renewal date of July 1 of each succeeding year unless FCIC gives at least 180 days advance notice in writing to the Company that the Agreement will not be renewed. This Agreement will automatically terminate if the Company fails to submit a Plan of Operations by the date such Plan of Operations is due unless such other date is approved by FCIC in writing.

## N.  Appropriation Contingency

The payment of obligations of FCIC under this Agreement are contingent upon the availability of appropriations. Notwithstanding any other provision of this Agreement, FCIC's ability to sustain the Agreement depends upon the FCIC's appropriation. If FCIC's appropriation is insufficient to pay the obligations under this Agreement, and FCIC has no other source of funds for such payments, FCIC will reduce its payments to the Company on a pro rata basis or on such other method as determined by FCIC to be fair and equitable.

## O.  Replacement

This Agreement replaces any previous Standard Reinsurance Agreement between FCIC and the Company, except that any obligations continuing under any previous Agreement will remain subject to the terms and conditions of such previous Agreement.

## P.  Cut-Through and Preemption of State Law

1.    Whenever the Company and its policy issuing company, if applicable, are unable to fulfill their obligations to any policyholder by reason of a directive or order duly issued by any Department of Insurance, Commissioner of Insurance, or by any court of law having competent jurisdiction, or under similar authority of any jurisdiction to which the Company is subject, all eligible crop insurance contracts affected by such directive or order that are in force and subject to this Agreement as of the date of such inability or failure to perform will be immediately transferred to FCIC without further action of the Company by the terms of this Agreement. FCIC will assume all obligations for unpaid losses whether occurring before or after the date of transfer, and the Company must pay FCIC all funds in its possession with respect to all such eligible crop insurance contracts transferred including, but not limited to, premiums collected. The Company hereby assigns to FCIC the right to all uncollected premiums on all such

policies. No assessment for any guarantee funds or similar programs may be computed or levied on the Company by any State for or on account of any premiums payable on eligible crop insurance contracts reinsured under this Agreement.

2. The provisions of 7 C.F.R. part 400, subpart P pertaining to preemption of State or local laws or regulations are specifically incorporated herein and made a part hereof.

Q. Litigation and Assistance

1. The Company's expenses incurred as a result of litigation are covered by the A&O subsidy and the administrative fee paid by the producer for CAT coverage. FCIC has no obligation to provide any other funds to reimburse the Company for litigation costs.

2. FCIC will also provide indemnification, as authorized by the Act, including costs and reasonable attorney fees incurred by the Company, that result solely from errors or omissions of FCIC.

3. The Company may request FCIC to provide non-monetary assistance, including witnesses, documents, and direction or such other assistance as FCIC deems reasonable. FCIC may, at its option, elect to provide such assistance or it may elect to intervene in any legal action. The Company agrees not to oppose such participation. FCIC will only agree to the Company's request for litigation assistance if the Company:

   a. Immediately notifies FCIC in writing of the requested action setting forth the reasons such action would be in the best interests of FCIC;

   b. Presents all legal arguments favorable to its defense including those suggested by FCIC; and

   c. Does not join FCIC as a party to the action unless FCIC agrees in writing to be joined as a party.

4. FCIC will, at its sole discretion, determine if the requested action under this section will be granted. The criteria to determine such action will be whether such action is in the best interest of FCIC and the crop insurance program.

R.    Suspension and Debarment

Any person or business entity who has been debarred or suspended by FCIC or any other U.S. Government Agency, may not be used by the Company in any manner which involves performance under this Agreement.

S.    Member - Delegate

No member of or delegate to Congress nor any resident commissioner will be admitted to any share or part of this Agreement or to any benefit that may arise therefrom, except that this provision will not be construed to apply to a benefit from this Agreement that accrues to a corporation for its general benefit. Members of or delegates to Congress are eligible to purchase a crop insurance contract for any crop in which they have an insurable interest.

T.    Discrimination

The Company must not discriminate against any employee, applicant for employment, insured, or applicant for insurance because of race, color, religion, sex, age, physical handicap, marital status, or national origin.

U.    Set Off

1.    Funds due from the Company may be set off under the provisions of this Agreement or under the provisions of 31 U.S.C. chapter 37.

2.    Any amount due the Company under this Agreement is not subject to any lien, attachment, garnishment, or any other similar process prior to that amount being paid under this Agreement, unless such lien, attachment, or garnishment arises under title 26 of the United States Code.

3.    Set off as provided in this section will not deprive the Company of any right it might otherwise have to contest the indebtedness involved in the set off action by administrative appeal.

4.    In the event a Company fails to pay any amount when due under this Agreement. any further payments to the Company from FCIC will be set off against any amounts due FCIC regardless of reinsurance year until these amounts are paid with appropriate interest.

5.    If an assignment has been made pursuant to the provisions of section V.V. the following provisions will apply with respect to set off:

a.    Notwithstanding the assignment, FCIC may set off:



   i.   Any amount due FCIC under this Agreement;

   ii.   Any amounts for which the Company is indebted to the United States for taxes for which a notice of lien was filed or a notice of levy was served in accordance with the provisions of the Internal Revenue Code of 1954 (26 U.S.C. 6323), or any amendments thereto or modifications thereof, before acknowledgment by FCIC of receipt of the notice of assignment; and

   iii.   Any amounts, other than amounts specified in paragraphs i. and ii. above due to FCIC or any other agency of the United States, if FCIC notified the assignee of such amounts to be set off at or before the time acknowledgment was made of receipt of the notice of assignment.

## V.   Assignment

No assignment by the Company shall be made of the Agreement, or the rights thereunder, unless the Company assigns the proceeds of the Agreement to a bank, trust company, or other financing institution, including any federal lending agency, or to a person or firm that holds a lien or encumbrance at the time of assignment, and the Company receives the prior approval of FCIC to assign the proceeds of this Agreement to any other person or firm: Provided, That such assignment will be recognized only if and when the assignee thereof files with FCIC a written notice of the assignment together with a signed copy of the instrument of assignment, and, Provided further, That any such assignment must cover all amounts payable and not already paid under the Agreement, shall not be made to more than one party and shall not be subject to further assignment, except that any such assignment may be made to one party as agency or trustee for two or more parties.

## W.   Liability for Agents and Loss Adjusters

The Company is solely responsible for the conduct and training of its personnel, agents and loss adjusters within the parameters of this Agreement. Liability incurred, to the extent it is caused by agent or loss adjuster error or omission, or failure to follow FCIC approved policy or procedure, is the sole responsibility of the Company. The assumption of responsibility under this section is only for the purpose of this Agreement and may not be relied upon by any person or entity not a party to this Agreement for any purpose. Reinsurance of eligible crop insurance contracts may only be denied if there exists a pattern of failure to follow FCIC-approved policies or procedures, or allowance of errors or omissions, or the Company knew or should have known of the failure to follow FCIC-approved policies or procedures, or errors or omissions, and failed to take appropriate action to correct the situation.

102

X.    Performance Audit

Notwithstanding any other provision hereunder, FCIC must notify the Company that the Company may be responsible for an error, omission, or failure to follow FCIC approved policy or procedures; and that a debt may be owed; within 3 years of the end of the insurance period during which the error, omission, or failure is alleged to have occurred. The failure to provide timely notice required herein shall only relieve the Company from liability for the alleged debt owed. Three years after the first annual settlement, such reinsurance year shall be deemed finally closed unless there are claims still under investigation or in litigation, including administrative proceedings, or arbitration. Such time frames will not be applicable to errors, omissions or procedural violations that are willful or intentional.

Y.    Resolution of Disagreements

If the Company disagrees with an act or omission of FCIC, except those acts implemented through the rulemaking process. the Company shall provide written notice of such disagreement to the Manager of FCIC. Within 10 business days of receipt of notice, the Manager or a designee will schedule a meeting with the company in an attempt to resolve the disagreement. Notwithstanding any other provision in this section, any subsequent decision by FCIC on the act or omission will be final in the administrative process and, therefore subject only to review by the Board of Contract Appeals in a matter relating to this Agreement or to judicial review. Nothing herein excuses the Company's performance under this Agreement during the attempted resolution of the dispute or constitutes a waiver of the Company's right to any remedy authorized by law.

103

1 - 34

SECTION VI.   Certification

The undersigned acknowledges that the Company's Board of Directors has authorized the Company to enter into this Agreement and the Plan of Operations. The undersigned acknowledges any misrepresentation in the submission of this Agreement and information contained in the Plan of Operations may result in civil or criminal liability against the undersigned or their representatives.

APPROVED AND ACCEPTED FOR

THE FEDERAL CROP
INSURANCE CORPORATION                    THE COMPANY


_____                 _____
       Signature                                Signature


_____                 _____
         Name                                      Name


_____                 _____
         Title                                     Title


_____                 _____
         Date                                      Date


--- Page 33 ---

104 - 105

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | | |
|---|---|---|
| ACE PROPERTY AND CASUALTY INSURANCE COMPANY (f/k/a CIGNA PROPERTY AND CASUALTY INSURANCE COMPANY, et al., | ) ) ) ) ) | Case No.: 1:04-CV-40036 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | PLAINTIFFS' AMENDED AND SUBSTITUTED COMPLAINT |
| FEDERAL CROP INSURANCE CORPORATION, a corporation within the United States Department of Agriculture, and RISK MANAGEMENT AGENCY, an agency within the United States Department of Agriculture, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Pursuant to Federal Rule of Civil Procedure 15(a) and Local Rule 15.1 Plaintiffs hereby amend their complaint by adding Farmers Mutual Hail Insurance Group of Iowa as an additional plaintiff. No responsive pleading has been filed to Plaintiffs' original Complaint and, accordingly, this amendment is made "as a matter of course." A signed amended and substituted First Amended Complaint is attached.

-1-

106

Wade R. Hauser III
Ahlers & Cooney P.C.
100 Court Avenue, Suite 600
Des Moines, IA 50309-2231
Telephone: (515) 243-7611
Telefax: (515) 243-2149

Original and one filed.

Copy mailed to:

Jane W. Vanneman
Commercial Litigation Branch, Civil Division
Department of Justice
Classification Unit
8th Floor
1100 L Street NW
Washington, D.C. 20530

Charles Haywood
Assistant U.S. Attorney
Southern District of Iowa
110 East Court Avenue
U.S. Courthouse Annex, Suite 286
Des Moines, IA 50309

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was served
upon all parties to the above cause to each of the attorneys of record
herein at their respective addresses disclosed on the pleadings, on
June 30, 2004.

By    ☒ U.S. Mail           ☐ Fax

      ☐ Hand Delivery       ☐ Private Carrier

Signature _____

418845.1\21609001

107

-2-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| ACE PROPERTY AND CASUALTY INSURANCE COMPANY (f/k/a CIGNA PROPERTY AND CASUALTY INSURANCE COMPANY), ALLIANCE INSURANCE COMPANIES, AMERICAN AGRICULTURAL INSURANCE COMPANY, AMERICAN GROWERS INSURANCE COMPANY IN REHABILITATION, COUNTRY MUTUAL INSURANCE COMPANY, FARM BUREAU INSURANCE COMPANY OF IOWA, FARMERS ALLIANCE MUTUAL INSURANCE COMPANY, FARMERS MUTUAL HAIL INSURANCE COMPANY OF IOWA; GREAT AMERICAN INSURANCE COMPANY, HARTFORD FIRE INSURANCE COMPANY, NAU COUNTRY INSURANCE COMPANY, PRODUCERS LLOYDS INSURANCE COMPANY, AND RURAL COMMUNITY INSURANCE COMPANY, | Case No.: 1:04-CV-40036 |
| Plaintiffs, | |
| v. | FIRST AMENDED COMPLAINT |
| FEDERAL CROP INSURANCE CORPORATION, A CORPORATION WITHIN THE UNITED STATES DEPARTMENT OF AGRICULTURE, AND RISK MANAGEMENT AGENCY, AN AGENCY WITHIN THE UNITED STATES DEPARTMENT OF AGRICULTURE, | |
| Defendants. | |

Plaintiffs, ACE Property and Casualty Insurance Company (f/k/a CIGNA Property and Casualty Insurance Company), Alliance Insurance Companies, American Agricultural Insurance Company, American Growers Insurance Company in Rehabilitation, COUNTRY Mutual Insurance Company, Farm Bureau Mutual Insurance Company of Iowa, Farmers Alliance Mutual Insurance Company, Farmers Mutual Hail Insurance Company of Iowa, Great American Insurance Company, Hartford Fire Insurance Company, NAU Country Insurance Company, Producers Lloyds Insurance

Company, and Rural Community Insurance Company (collectively "plaintiffs"), for their claims for relief against the Federal Crop Insurance Corporation and Risk Management Agency, collectively referred to hereinafter as "FCIC" unless otherwise stated, state as follows:

## NATURE OF THE CASE

1. Plaintiffs sell and service crop insurance under the federal crop insurance program. Plaintiffs insure hundreds of thousands of agricultural producers across the nation against various potential losses associated with their respective crops.

2. The defendants' actions, as more fully set forth below constituted a violation of the United States Constitutional and legal principles established by the United States Supreme Court in *United States v. Winstar Corporation*, 518 U.S. 839 (1996), and *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000), which allow companies in a regulated industry to recover damages when a governmental agency or Congress either passes a law or publishes a set of rules which violate the terms of valid and binding agreements between a governmental agency and a regulated party.

3. The binding agreements at issue in this case are the 1998 Standard Reinsurance Agreement ("1998 SRA") between the FCIC and each plaintiff. The 1998 SRA, a copy of which is attached as Exhibit A, is incorporated by reference in this Complaint. The 1998 SRA has been in continuous effect since July 1, 1997.

4. On February 27, 2003, the Plaintiffs (except Farmers Mutual Insurance Company of Iowa) filed a substantially identical action against the United States in the Court of Federal Claims. In an order dated March 31, 2004, that Court dismissed plaintiffs' complaint, ruling that United States District Courts had exclusive jurisdiction over the claims presented

-2-

109

herein and that plaintiffs had failed to exhaust their administrative remedies. The plaintiffs have

appealed that ruling to the United States Court of Appeals for the Federal Circuit.

## THE FEDERAL CROP INSURANCE PROGRAM

5. In 1938, the United States Congress passed the Federal Crop Insurance Act, 7

U.S.C. 1501, et seq. ("FCIA"), to promote the national welfare by improving the economic

stability of agriculture through a sound system of crop insurance and providing the means for the

research and experience helpful in devising and establishing such insurance. *Id.* at 1502(a).

Subsequent amendments to the FCIA have made federal crop insurance a significant risk

management device for America's agricultural producers.

6. Pursuant to 7 U.S.C. 1503, the FCIC was created as an agency of and within

the United States Department of Agriculture ("USDA") to carry out the purposes of the FCIA.

7. FCIC is mandated to offer catastrophic risk protection insurance ("CAT")

through approved insurance providers in order to protect agricultural producers from the full

extent of their losses arising when drought, flood, or other natural disasters cause losses in the

yield from insured crops. 7 U.S.C. 1508(b)(1), 1508(b)(4).

8. At all times material to this action, FCIC did not write CAT coverage as a

direct insurer. Instead, using its authority under 7 U.S.C. 1508(a) and (k), it reinsured private

insurers, such as plaintiffs, who wrote CAT coverage and serviced all CAT policies issued to

America's agricultural producers, and who continue to do so.

9. When quoting premiums for coverage, approved insurance provides must

quote rates determined by FCIC. 7 U.S.C. 1508(d). Approved insurance providers also must

110

make available in all states where they do business all crop insurance plans approved by the Secretary of USDA for all crops designated by the Secretary for coverage in those states (or counties or other portions thereof), and such providers must make such coverages available on a non-discriminatory basis.  7 C.F.R. 400.168(b), 400.168(f).  Therefore, approved insurance providers must accept the underwriting risks mandated by FCIC at premium rates which it sets.

10.  Pursuant to 7 U.S.C. 1508(k)(1), approved insurance providers also must offer coverage on the terms and conditions established by FCIC.

### THE STANDARD REINSURANCE AGREEMENT

11.  Each plaintiff is an approved insurance provider as defined by the FCIA, 7 U.S.C. 1502(b)(2), and each writes CAT and other federal crop insurance coverages approved by FCIC.

12.  FCIC reinsures a defined portion of the underwriting risk of these private insurers.  Pursuant to regulations it promulgated in 1987, the FCIC enters into a binding contract, called the Standard Reinsurance Agreement ("SRA"), with eligible insurance companies to reinsure the policies which those companies issue to producers of agricultural commodities.  7 C.F.R. 400.164.

13.  FCIC's reinsurance agreements are continuous contracts, subject to cancellation once per year at the election of FCIC.  For instance, the 1998 SRA (initially covering the reinsurance year July 1, 1997, through June 30, 1998) specifically provides in Section V.M.:

-4-

] ( (

> This Agreement will continue in effect from year to year with an
> annual renewal date of July 1 of each succeeding year unless
> FCIC gives at least 180 days advance notice in writing to the
> [contracting private insurance provider] that the Agreement will
> not be renewed. This Agreement will automatically terminate if
> the [contracting private insurance provider] fails to submit a Plan
> of Operations by the date such Plan of Operations is due unless
> such other date is approved by FCIC in writing.

14. Each plaintiff entered into a reinsurance contract with FCIC in the form of the 1998 SRA effective as of July 1, 1997.

15. FCIC did not give written notice to any plaintiff 180 days or more before July 1, 1998 (i.e., by December 31, 1997) that FCIC was terminating the 1998 SRA. Therefore, under the explicit terms of the 1998 SRA, it automatically renewed between FCIC and each plaintiff for the reinsurance year July 1, 1998, through June 30, 1999.

16. FCIC did not give written notice to any plaintiff 180 days or more before July 1, 1999 (i.e., by December 31, 1998) that FCIC was terminating the 1998 SRA. Therefore, under the explicit terms of the 1998 SRA, it automatically renewed between FCIC and each plaintiff for the reinsurance year July 1, 1999, through June 30, 2000.

17. FCIC did not give written notice to any plaintiff 180 days or more before July 1, 2000 (i.e., by December 31, 1999) that FCIC was terminating the 1998 SRA. Therefore, under the explicit terms of the 1998 SRA, it automatically renewed between FCIC and each plaintiff for the reinsurance year July 1, 2000, through June 30, 2001.

18. FCIC did not give written notice to any plaintiff 180 days or more before July 1, 2001 (i.e., by December 31, 2000) that FCIC was terminating the 1998 SRA. Therefore,

112

under the explicit terms of the 1998 SRA, it automatically renewed between FCIC and each

plaintiff for the reinsurance year July 1, 2001, through June 30, 2002.

19. FCIC did not give written notice to any plaintiff 180 days or more before

July 1, 2002 (*i.e.*, by December 31, 2001) that FCIC was terminating the 1998 SRA. Therefore,

under the explicit terms of the 1998 SRA, it automatically renewed between FCIC and each

plaintiff for the reinsurance year July 1, 2002, through June 30, 2003.

20. When FCIC and plaintiffs executed the 1998 SRA, the FCIA required insured

producers to pay an administrative fee for CAT coverage, as follows:

> Producers shall pay an administrative fee for catastrophic risk
> protection. The administrative fee for each producer shall be $50
> per crop per county, but not to exceed $200 per producer per
> county up to a maximum of $600 per producer for all counties in
> which a producer has insured crops. The administrative fee shall
> be paid by the producer at the time the producer applies for
> catastrophic risk protection.

7 U.S.C. 1508(b)(5)(A).

21. Section III.B.1. of the 1998 SRA authorized plaintiffs, as approved insurance

providers, to retain $50 of the administrative fee for each eligible CAT crop insurance contract,

not to exceed $200 per county and $600 for all counties combined for each eligible producer.

Accordingly, all CAT fees collected by plaintiffs were retained by them.

22. Under the terms of the 1998 SRA, plaintiffs may not refuse to offer CAT

coverage to producers.

-6-

113

23. When FCIC and plaintiffs executed the 1998 SRA, FCIC agreed to pay to approved insurance providers CAT loss adjustment expenses pursuant to the provisions of Section IV.A. of the 1998 SRA, which provides, in pertinent part:

> For eligible CAT crop insurance contracts, FCIC will pay to the Company an amount equal to 4.7% of the total net book premium for eligible CAT crop insurance contracts computed at 65% of the recorded or appraised average yield indemnified at 100% of the projected market price, all equivalent coverage, for loss adjustment expense.

24. The formula in Section IV.A. of the 1998 SRA for CAT loss adjustment expense payments to plaintiffs was equivalent to approximately fourteen percent (14%) of the premium for CAT coverage.

25. For each year of operation under the continuously effective 1998 SRA, plaintiffs have performed all of their contractual obligations.

## LEGISLATIVE ACTIONS PURPORTING TO AFFECT
## THE CROP INSURANCE PROGRAM

26. As explained above and below, FCIC has breached the 1998 SRA and violated the legal principles established in *United States v. Winstar* and *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, causing substantial damages to plaintiffs, as a result of three legislative actions.

A.    The Agricultural Research, Extension, and Education Reform Act of 1998

27. The United States Congress wrote, debated, and passed the Agricultural Research, Extension, and Education Reform Act of 1998 ("AREERA").

−7−

114

28. President Clinton signed AREERA into law on June 23, 1998.

29. Section 532 of AREERA amended 7 U.S.C. 1508(b) by striking paragraph (5), which had permitted plaintiffs and other approved insurance provides the right to retain administrative fees as compensation for selling and servicing CAT coverage crop insurance policies, and substituted a new paragraph (5) in 7 U.S.C. 1508(b), which explicitly deprived plaintiffs of this compensation and instead directed deposit of all administrative fees in FCIC's crop insurance fund:

SEC. 532. BUDGETARY OFFSETS

(a)    Administrative Fee for Catastrophic Risk Protection. Section 508(b) of the Federal Crop Insurance Act (7 U.S.C. 1508(b)) is amended by striking paragraph (5) and inserting the following:

(5)    Administrative Fee.

(A)    Basic fee. Each producer shall pay an administrative fee for catastrophic risk protection in an amount equal to 10 percent of the premium for catastrophic risk protection or $50 per crop per county, whichever is greater, as determined by [FCIC].

(B)    * * *

(C)    * * *

(D)    Use of fees.

(i)    In general.    The amounts paid under this paragraph shall be deposited in the crop insurance fund established under section 516(c) to be available for the programs and activities of the [FCIC].

–8–

115

> > (ii)    Limitation.    No funds deposited in the crop
> > insurance fund under this subparagraph may be
> > used to compensate an approved insurance
> > provider or agent for the delivery of services
> > under this section.

30. Section 532 of AREERA also amended 7 U.S.C. 1508(b) by adding a new

paragraph (11), providing as follows:

> The rate for reimbursing an approved insurance provider or agent
> for expenses incurred by the approved insurance provider or agent
> for loss of adjustment in connection with a policy of catastrophic
> risk protection shall not exceed 11 percent of the premium for
> catastrophic risk protection that is used to define loss ratio.

31. The effect of the foregoing amendment to the FCIA was to reduce the level of

CAT loss adjustment expenses payable to approved insurance providers from approximately

fourteen percent (14%) to eleven percent (11%) of an imputed CAT premium.

**B.    The Agricultural Risk Protection Act of 2000**

32. The United States Congress wrote, debated, and passed the Agricultural Risk

Protection Act of 2000 ("ARPA").

33. President Clinton signed ARPA into law on June 20, 2000.

34. ARPA amended the recently added 7 U.S.C. 1508(b)(11), to reduce further

the level of loss adjustment expenses payable to approved insurance providers under the FCIA

from 11% to 8%:

SEC. 103. CATASTROPHIC RISK PROTECTION.

***

116

(d)     Reimbursement Rate Change - Section 508(b)(11) of the Federal Crop
        Insurance Act (7 U.S.C. 1508(b)(11)) is amended by striking 11 percent
        and inserting 8 percent.

### The United States Unlawful Implementation of AREERA and ARPA

35.  To implement AREERA, FCIC unilaterally sought to amend the 1998 SRA

despite the fact that its contractual right to terminate and renegotiate the SRA had expired. On

June 30, 1998, FCIC sent plaintiffs a mandatory Amendment No. 1, which purportedly altered

SRA III.B. and IV to read:

III.B    The [approved insurance provider] shall remit to FCIC ... the
         following administrative fees collected from eligible
         producers:

         1.    For CAT:

               a.    Basic fee: the greater of $50 or 10 percent
                     of the net book premium for each eligible
                     crop insurance contract; and

               b.    Additional fee: $10 for each eligible crop
                     insurance contract.

IV.    FCIC will pay to the [approved insurance provider] an amount
       equal to 11.0 percent of the total net book premium for eligible
       CAT insurance contracts. . . .

When FCIC forwarded execution copies of Amendment No. 1 at the end of July 1998 and

demanded them to be returned within ten (10) business days, it stated to plaintiffs: Failure to

execute the amendment will terminate your [SRA] as of the end of the 1998 reinsurance year

(June 30, 1998).

-10-

(17

36. FCIC, in short, gave plaintiffs a "take it or leave it" proposition: either relinquish the right to retain CAT fees or exit the federal crop insurance program immediately.

37. Faced with FCIC's non-negotiable demand and unlawful threat to refuse to reinsure any crop insurance policies, plaintiffs executed the unilaterally imposed Amendment No. 1 to the 1998 SRA with a reservation of rights to seek compensation as promised in the original SRA.

38. To implement ARPA, FCIC unilaterally sought to amend the 1998 SRA despite the fact that its contractual right to terminate and to renegotiate the SRA had expired. On June 22, 2000, and then on June 30, 2000, FCIC sent plaintiffs a mandatory Amendment No. 3, which purportedly altered SRA IV to read:

> FCIC will pay to the [approved insurance provider] an amount equal to 8.0 percent of the total net book premium for eligible catastrophic risk protection crop insurance contracts. The loss adjustment expense specified in the section will be included in the monthly summary report containing the data obtained from acreage reports that have met the processing provisions specified in Manual 13.

When FCIC forwarded execution copies of Amendment No. 3 at the end of June 2000 and demanded them to be returned via facsimile or overnight mail by close of business on June 30, 2000, it stated to plaintiffs: "Failure to execute the amendment by the requested submission date may terminate your [SRA] as of the end of the 2000 reinsurance year (June 30, 2000)."

39. FCIC, in essence, gave plaintiffs the same "take it or leave it" ultimatum that it pronounced in 1998 when seeking execution of Amendment No. 1 to the SRA.

118

40. Faced with FCIC's non-negotiable demand and unlawful threat to refuse to reinsure any crop insurance policies, plaintiffs executed the unilaterally imposed Amendment No. 3 to the 1998 SRA with a reservation of rights to seek compensation as promised in the original SRA.

41. Subsequent to enactment of AREERA, the FCIC has refused and continues to refuse to honor portions of its contractual agreements with plaintiffs (the SRA) that require payment of certain CAT fees and loss adjustment expenses to plaintiffs.

42. Subsequent to enactment of ARPA, the FCIC has refused and continues to refuse to honor portions of its contractual agreements with plaintiffs (the SRA) that require payments of certain loss adjustment expenses for CAT coverage to plaintiffs.

43. As a result of these unlawful acts, plaintiffs have not received the CAT fees to which they are contractually entitled under the SRA.

44. As a result of these unlawful acts, plaintiffs have not received the CAT loss adjustment expenses to which they are contractually entitled under the SRA.

45. The FCIC's unlawful acts will result in the continued denial to plaintiffs of millions of dollars due under the explicit terms of the 1998 SRA. For instance, damages resulting from deprivation of CAT administrative fees for the 1999 and 2000 reinsurance years exceed $32,900,000, damages resulting from AREERA's reduction in CAT loss adjustment expenses for the 1999 and 2000 reinsurance years exceed $14,000,000, and damages resulting from reduced CAT loss adjustment expenses for the 2001 and 2002 reinsurance years exceed $14,700,000.

-12-

119

## JURISDICTION AND VENUE

46. This Court has jurisdiction pursuant to 7 U.S.C. 1506(d) and/or 28 U.S.C. 1331.

47. Venue is proper pursuant to 7 U.S.C. 1505(d) since plaintiffs do business in the Southern District of Iowa, Western Division.

48. Plaintiffs have exhausted all applicable administrative remedies that are, or may be, a prerequisite to suit under 7 U.S.C. 6912(e). Additionally, plaintiffs assert that pursuing said remedies would be futile. Out of an abundance of caution, plaintiffs' requested an administrative determination of the claims presented herein by letter dated May 11, 2004. In the event this Court believes plaintiffs must exhaust said futile administrative remedies, this Court should stay the proceedings until plaintiffs' administrative claim is denied.

## THE PARTIES

49. Plaintiff, ACE Property and Casualty Insurance Company ("ACE"), f/k/a CIGNA Property and Casualty Insurance Company, executed the 1998 SRA. AT all times material to this Complaint, Rain and Hail L.L.C. acted as ACE's managing general agent with respect to the 1998 SRA and matters arising thereunder.

50. Plaintiff, Alliance Insurance Companies ("Alliance"), executed the 1998 SRA. At all times material to this Complaint, North Central Crop Insurance, Inc. acted as Alliance's managing general agent with respect to the 1998 SRA and matters arising thereunder.

51. Plaintiff, American Agricultural Insurance Company ("American Agricultural"), executed the 1998 SRA. At all times material to this Complaint, American Farm

120

Bureau Insurance Services, Inc. acted as American Agricultural's managing general agent with respect to the 1998 SRA and matters arising thereunder.

52.    Plaintiff, American Growers Insurance Company in Rehabilitation ("Growers"), executed the 1998 SRA.  Growers also has succeeded to the rights of, but not all of the obligations of, IGF Insurance Company ("IGF") under the 1998 SRA which IGF executed. Therefore, Growers asserts its and IGF's claims with respect to the matters alleged herein.

53.  Plaintiff, COUNTRY Mutual Insurance Company ("Country"), executed the 1998 SRA.

54.  Plaintiff, Farm Bureau Mutual Insurance Company of Iowa ("Farm Bureau of Iowa"), executed the 1998 SRA.

55.  Plaintiff, Farmers Alliance Mutual Insurance Company ("Farmers Alliance"), executed the 1998 SRA.  At all times material to this Complaint, Blakely Crop Hail, Inc. acted as Farmers Alliance's managing general agent with respect to the 1998 SRA and matters arising thereunder.

56.  Plaintiff, Farmers Mutual Hail Insurance Company of Iowa ("Farmers Mutual of Iowa") executed the 1998 SRA.

57.  Plaintiff, Great American Insurance Company ("Great American"), executed the 1998 SRA.

58.  Plaintiff, Hartford Fire Insurance Company ("Hartford"), executed the 1998 SRA.

121

59. Plaintiff, NAU Country Insurance Company ("NAU"), executed the 1998 SRA.

60. Plaintiff, Producers Lloyds Insurance Company ("Producers Lloyds"), executed the 1998 SRA.

61. Plaintiff, Rural Community Insurance Company ("Rural Community"), executed the 1998 SRA.

62. Plaintiffs, ACE, Alliance, American Agricultural, Country, Farm Bureau of Iowa, Farmers Alliance, Farmers Mutual of Iowa, Great American, Growers, Hartford, NAU, Producers Lloyds, and Rural Community have been injured in their business and property and, therefore, sustained damages as a result of the acts about which they complain herein.

63. FCIC is a body corporate under the auspices of the government of the United States, with its principal office in the District of Columbia. 7 U.S.C. 1503.

64. FCIC was created pursuant to 7 U.S.C. 1503 as an agency of and within USDA to carry out the purposes of the FCIA.

65. FCIC is authorized to enter into and carry out contracts and agreements, binding the government of the United States. 7 U.S.C. 1506(l).

66. The Risk Management Agency ("RMA") is an agency of and within the USDA that Congress created in 1996 under 7 U.S.C. 6933 to supervise the FCIC.

### COUNT I - BREACH OF CONTRACT

67. Plaintiffs reallege and incorporate paragraphs 1 through 64.

68. Plaintiffs are each signatories to the 1998 SRA with the FCIC.

-15-

122

69. At all times pertinent to this suit, plaintiffs have each performed their obligations to sell and service CAT policies to producers of agricultural commodities under the continuously effective 1998 SRA.

70. The FCIC breached the 1998 SRA by its refusal to allow plaintiffs to retain the compensation, under Section III.B.1, as promised to them for selling and servicing CAT policies to producers of agricultural commodities.

71. The FCIC breached the 1998 SRA by its refusal to pay to plaintiffs the loss adjustment expenses to which they are entitled under Section IV, as promised to plaintiffs for selling and servicing CAT policies to producers of agricultural commodities.

72. By its refusal to honor the terms of the 1998 SRA, the FCIC also breached the implied covenant of good faith and fair dealing contained in the 1998 SRA.

73. As a direct, proximate, and legal result of FCIC's breaches, plaintiffs have suffered substantial damages, and additional costs that they would not have suffered but for these breaches.

### COUNT II - UNJUST ENRICHMENT

74. Plaintiffs reallege and incorporate paragraphs 1 through 64.

75. Plaintiffs are each signatories to the 1998 SRA with FCIC.

76. At all times pertinent to this suit, plaintiffs have each sold and serviced CAT policies to producers of agricultural commodities under the continuously effective 1998 SRA.

77. The FCIC has refused to compensate plaintiffs for selling and servicing CAT policies to producers of agricultural commodities as contemplated by the 1998 SRA.

123

78. By its refusal to adequately pay plaintiffs, FCIC has been unjustly enriched.

79. As a direct, proximate, and legal result of FCIC's actions, plaintiffs have suffered substantial damages, and additional costs that they would not have suffered but for these breaches, and are entitled to restitution of all benefits which they have conferred upon the FCIC through the 1998 SRA.

WHEREFORE, plaintiffs, ACE, Alliance, American Agricultural, Country, Farm Bureau of Iowa, Farmers Alliance, Farmers Mutual of Iowa, Great American, Growers, Hartford, NAU, Producers Lloyds, and Rural Community demand judgment against the FCIC:

1. Awarding plaintiffs compensatory damages in the amounts to be proved at trial;

2. Awarding plaintiffs their attorney fees and costs; and

3. Granting plaintiffs any and all other such relief that the Court deems proper and just.

Respectfully submitted this 30th day of June, 2004.

Wade R. Hauser III

Wade R. Hauser III
AHLERS & COONEY, P.C.
100 Court Avenue, Suite 600
Des Moines, IA  50309-2231
Telephone:  (515) 243-7611
Facsimile:  (515) 243-2149

AND

-17-

124

MICHAEL TUCCI (D.C. Bar #430470)
STINSON MORRISON HECKER LLP
1150 - 18th Street, N.W., Suite 800
Washington, D.C. 20036
Telephone: (202) 785-9100
Telefax: (202) 785-9163

AND

P. JOHN OWEN (KS Bar #11835)
      (MO Bar #22523)
National Crop Insurance Services, Inc.
8900 Indian Creek Parkway, Suite 600
Overland Park, KS 66210
Telephone: (913) 685-2767
Telefax: (913) 685-3080
ATTORNEYS FOR ALL PLAINTIFFS

AND

*Michael J. Davenport by*

MICHAEL J. DAVENPORT
Rain and Hail L.L.C.
9200 Northpark Drive, Suite 300
Johnston, IA 50131-3006
Telephone: (515) 559-1510
Telefax: (515) 559-1511
ADDITIONAL COUNSEL FOR PLAINTIFFS ACE
PROPERTY AND CASUALTY INSURANCE
COMPANY AND FARMERS MUTUAL HAIL
INSURANCE COMPANY OF IOWA

Original and one filed.

CMILLER/ 418831.1 /MSWord

-18-

125

EXHIBIT A

# STANDARD REINSURANCE AGREEMENT
## (July 1, 1997)

between the

# FEDERAL CROP INSURANCE CORPORATION

and the

---

(Insurance Company Name)

---

(City and State)

This Agreement establishes the terms and conditions under which FCIC will provide subsidy and reinsurance on eligible crop insurance contracts sold or reinsured by the above named insurance company. This Agreement is authorized by the Act and regulations promulgated thereunder codified in 7 C.F.R. chapter IV. Such regulations are incorporated into this Agreement by reference. The provisions of this Agreement that are inconsistent with provisions of State or local law or regulation will supersede such law or regulation to the extent of the inconsistency. This is a cooperative financial assistance agreement between FCIC and the Company to deliver eligible crop insurance under the authority of the Act. For the purposes of this Agreement, use of the plural form of a word includes the singular and use of the singular form of a word includes the plural unless the context indicates otherwise. The headings in this Agreement are descriptive only and have no legal effect on FCIC or the Company.

## SECTION I. DEFINITIONS

"Act" means the Federal Crop Insurance Act, as amended (7 U.S.C. 1501 et seq.).

"Actuarial data master file" means the hard copy and EDP compatible information distributed by FCIC that contains premium rates, program dates, and related information concerning the crop insurance program for a crop year.

"Additional coverage" means a plan of crop insurance providing a level of coverage equal to or greater than 65 percent of the recorded or appraised average yield indemnified at 100 percent of the projected market price, or a comparable insurance plan as determined by FCIC.

"A&O subsidy" means the subsidy for the administrative and operating expenses authorized by the Act and paid by FCIC on behalf of the producer to the Company.

"Administrative fee" means the processing fee the policyholder must pay in accordance with the Act and 7 C.F.R. chapter IV.



126

"Agency" means the person or entity with a contract or agreement with the Company or its MGA to sell and service eligible crop insurance contracts under the Federal crop insurance program.

"Agent" means an individual licensed by the State in which the agent does business under contract with a Company, its managing general agent, or any other entity, to sell and service eligible crop insurance contracts.

"Agreement" means this Standard Reinsurance Agreement, all Appendices, all referenced documents including Manual 13 and the Approved Manual 14.

"Annual Settlement" means the settlement of accounts between the Company and FCIC for the reinsurance year, beginning with the February monthly transaction cutoff date following the reinsurance year and continuing monthly thereafter as necessary.

"Approved Manual 14" means the Guidelines and Expectations for the delivery of the Federal Crop Insurance Program (Manual 14) as it exists 30 days prior to the date on which the Plan of Operation must be submitted to FCIC with respect to such reinsurance year.

"Billing date" means the date specified in the actuarial data master file as the date by which policyholders are billed for premium due on eligible crop insurance contracts.

"Board" means the FCIC Board of Directors.

"Book of business" means the aggregation of all eligible crop insurance contracts in force between the Company and its policyholders that have a sales closing date within the reinsurance year and are eligible to be reinsured under this Agreement.

"Cancellation date" means the date by which the Company or policyholder must notify the other that coverage under an eligible crop insurance contract issued by the Company is canceled for a succeeding crop year. The day following this date is considered as the date a continuous eligible crop insurance contract carried over from the previous crop year is renewed for the subsequent crop year.

"Carryover crop insurance contract" means eligible crop insurance contract that has been in force for at least one crop year term and continues in force for another crop year term after the cancellation date.

"Catastrophic risk protection (CAT)" means an eligible crop insurance contract that is in accordance with section 508(b) of the Act.

127

"Cede" means to pass to FCIC all or part of the net book premium and associated liability for ultimate net losses on eligible crop insurance contracts written by a Company under this Agreement.

"Claims supervisor" means any person having immediate day-to-day supervisory control (e.g., assigning and reviewing work of Company employees or exercising appropriate management of contractors) over the activities of loss adjusters or other persons who determine whether an indemnity will be paid and the amount.

"Code of Federal Regulations (C.F.R.)" means the code published annually in accordance with the Federal Register Act (44 U.S.C. chapter 15) by the Office of the Federal Register that contains each published Federal regulation of general applicability and legal effect.

"Company" means the private insurance Company named on this Agreement.

"Company payment date" means the last business day of the month.

"Competing agency" means an agency selling or servicing any eligible crop insurance contract in any county (including all counties adjoining such county) in which another agency has sold or is in the process of selling any eligible crop insurance contract.

"Contract change date" means the date specified in the crop insurance contract by which FCIC must publish all changes to the crop insurance contract in order to make such changes binding on the Federal Crop Insurance Corporation, the Company, and the policyholder.

"Crop insurance contract" means an agreement (with the terms in effect as of the contract change date) to insure the insurable interest of an eligible producer in a single crop in a single county as provided by the application, the General, or Common Crop Insurance Policy, the Crop Endorsements, the Basic Provisions, the Crop Provisions, the Special Provisions, the Catastrophic Risk Protection Endorsement, as applicable, the Actuarial Table, and any other instrument or endorsement as approved by FCIC.

"Data Acceptance System (DAS)" means the EDP system that receives, and accepts or rejects the Company submitted data upon which all payments to FCIC and the Company are based.

"Electronic data processing (EDP)" means the electronic process by which information is digitally transferred, used, and stored.

"Electronic fund transfer (EFT)" means the process by which funds are electronically transferred between FCIC's account and the Company's account.

128

"Eligible crop insurance contract" means a crop insurance contract that is sold and serviced consistent with the Act, 7 C.F.R. chapter IV, FCIC approved regulations and procedure, at applicable rates, terms, and special conditions; having a sales closing date within the reinsurance year; to an eligible producer, covering a crop in an area approved by FCIC; and on forms approved in writing by FCIC.

"Eligible producer" means a person who meets all the conditions for eligibility specified in 7 C.F.R. chapter IV.

"Employer identification number (EIN)" means the identification number for an individual, business entity, or a foreign entity obtained from the Internal Revenue Service pursuant to section 6109 of the Internal Revenue Code of 1986.

"Federal Crop Insurance Corporation (FCIC)" means the wholly-owned government Corporation within the United States Department of Agriculture authorized to carry out all actions and programs authorized by the Act.

"FCIC payment date" means the first banking day following the 14th calendar day after FCIC receives the monthly summary or annual settlement report and supporting data from the Company upon which any payment is based.

"Group risk plan (GRP)" means crop insurance coverage based upon the average yield realized by a group of producers as determined by FCIC.

"Insurable interest" means the portion of an insured crop a person has at risk in the event of an insurable loss.

"Insurance Plan" means the type of insurance coverage provided on a crop. For example, a crop may be insured under the GRP plan, a revenue insurance plan, or a guaranteed-yield plan. Differences in levels of coverage do not create different plans.

"Limited coverage" means an insurance plan offering coverage that is equal to or greater than 50 percent of the recorded or appraised average yield indemnified at 100 percent of the projected market price but less than 65 percent of the recorded or appraised average yield indemnified at 100 percent of the projected market price, or a comparable insurance plan as determined by FCIC.

"Loss ratio" means the ratio calculated by dividing the ultimate net loss by the net book premium, expressed as a percentage. For example, the ratio of $1 ultimate net loss to 50 cents net book premium would be expressed as 200 percent.

129

"Managing general agent (MGA)" is an entity that meets the definition of managing general agency under the laws of the State in which it is incorporated, or in the absence of such State law or regulation, meets the definition of a managing general agency in the National Association of Insurance Commissioners' Model Act.

"Manual 13" means the Data Acceptance System Handbook for the reinsurance year for which this Agreement is effective.

"Net book premium" means the total premium calculated for all eligible crop insurance contracts, less A&O subsidy, cancellations, and adjustments.

"Person" means any individual or legal entity possessing the capacity to contract.

"Plan of Operations" means the information and documents required from the Company under Appendix 2 of this Agreement.

"Policyholder" means an eligible producer who has been issued one or more eligible crop insurance contracts.

"Producer premium" means that portion of the FCIC approved insurance premium for the risk of loss that the policyholder must pay.

"Records" means original documents, including original signed documents that may have been recorded, copied, or reproduced in the original form by any photographic, photostatic, microfilm, microcard, miniature photographic, optical disk, electronic imaging, electronic data processing, or electronically transmitted facsimile technology: Provided, That any signature contained on the original is preserved.

"Reinsurance account" means an account maintained by FCIC by which a portion of the Company's underwriting gains may be held for future distribution.

"Reinsurance year" means the period from July 1 of any year through June 30 of the following year and identified by reference to the year containing June. All eligible crop insurance contracts with sales closing dates within the reinsurance year are subject to the terms of the Agreement applicable to that reinsurance year.

"Retained" as applied to ultimate net losses, net book premium, or book of business, means the remaining liability for ultimate net losses and the right to associated net book premiums after all reinsurance cessions to FCIC under this Agreement.

"Revenue insurance" means plans of insurance providing protection against loss of income which are designated as such by FCIC.

- - - Page 5 - - -

"Risk subsidy" means that portion of the FCIC approved insurance premium for the risk of loss paid by FCIC on behalf of the policyholders.

"Sales closing date" means the date established by FCIC as the last date on which a producer may apply for an eligible crop insurance contract on a crop in a specific county.

"Sales supervisor" means any person having immediate or day-to-day supervisory control (e.g., assigning and reviewing work of Company employees or exercising appropriate management of contractors) over the activities of sales agents, competing agencies or sales agency employees on behalf of the Company.

"Satisfactory performance record" means a record of performance that demonstrates substantial conformity with all requirements of this Agreement. The Company or its MGA, if applicable, shall be deemed to have a satisfactory performance record if any deficiency was caused by circumstances beyond its control and where, as soon as it was made aware of the deficiency, it took timely and appropriate corrective action. Material misconduct on the part of any employee, agent, loss adjuster, or any other contractor will not be considered as a deficiency beyond its control. Nothing contained herein affects the Company's liability under any other provision of this Agreement. Continued failure to meet requirements of the Agreement is a significant factor considered in determining satisfactory performance.

"Social security number" ("SSN") means the identification number provided for an individual by the Social Security Administration, and may be the tax identification number (TIN).

"Transaction cutoff date" for weekly data reporting is 6 p.m. central time on Saturday of each week. The transaction cutoff date for the monthly summary reports is 6 p.m. central time on the Saturday occurring within the first full week (i.e., Sunday through Saturday) of the month.

"Ultimate net loss" means the amount paid by the Company under any eligible crop insurance contract reinsured under this Agreement in settlement of any claim and in satisfaction of any judgment or arbitration award rendered on account of such claim, less any recovery or salvage by the Company. Ultimate net loss may include interest and policyholder's court costs related to the eligible crop insurance contract provisions or procedures that are contained in a final judgment against the Company by a court of competent jurisdiction if FCIC determines: (1) that such interest or court costs resulted from the Company's substantial compliance with FCIC procedures or instructions in the handling of the claim or in the servicing of the policyholder or that the actions of the Company were in accordance with accepted loss adjustment procedures; and (2) that the award of such interest or court costs did not involve negligence or culpability on the part of the Company. Ultimate net loss may also include interest or policyholder's court costs related to the crop insurance provisions or procedures that are included in the settlement of any claim if FCIC, in addition to the determinations included above, is advised of the terms of and the basis for the settlement and determines that the settlement should be approved. Under no circumstance are any punitive or consequential damages included in the calculation of ultimate net loss.

- - - Page 6 - - -

131

"Underwriting" means the acceptance or rejection of individual insurance risk, and determining the amounts and the terms by which the Company will accept the risk for an eligible crop insurance contract.

"Underwriting gain" means the amount by which the Company's share of retained net book premium exceeds its retained ultimate net losses.

"Underwriting loss" means the amount by which the Company's share of retained ultimate net losses exceeds its retained net book premium.

## SECTION II.  REINSURANCE

A.    General Terms

1.    Only eligible crop insurance contracts will be reinsured and subsidized under this Agreement.

2.    Except as specified below, the Company must offer all approved plans of insurance for all approved crops in any State in which it writes an eligible crop insurance contract and must accept and approve all applications from all eligible producers. The Company may not cancel the crop insurance contract held by any policyholder so long as the policyholder remains an eligible producer and the Company continues to write eligible crop insurance contracts within the State. The Company is not required to offer such plans of insurance as may be approved by FCIC under the authority of section 508(h) of the Act. However, if the Company chooses to offer any such plan, it must offer the plan in all approved states in which it writes an eligible crop insurance contract and it must comply with all provisions of this paragraph as to such plan unless the Board determines that a separate and complete reinsurance agreement will be issued for the reinsurance of such plan.

3.    In exchange for the reinsurance premiums provided by the Company pursuant to this Agreement, FCIC will provide the Company with reinsurance pursuant to the provisions of this Agreement.

4.    All eligible crop insurance contracts reinsured and subsidized under this Agreement must conform to the regulations published at 7 C.F.R., chapter IV or as approved in writing by FCIC.

5.    FCIC will not provide reinsurance, A&O subsidy, or risk subsidy for any eligible or ineligible crop insurance contract that is sold or serviced in violation of the terms of this Agreement, 7 C.F.R., chapter IV, FCIC approved procedures or any written instructions of FCIC.

132

6. No portion of the net book premium or the A&O subsidy may be rebated in any form to policyholders, except as authorized by the Act and approved in writing by FCIC. Neither the Company nor its agents shall assess service fees or additional charges on eligible crop insurance contracts reinsured and subsidized under this Agreement except as authorized by the Act and approved in writing by FCIC.

7. Only the amount of net book premium authorized by FCIC in the approved Plan of Operations may be reinsured and subsidized under this Agreement. Whenever the Company reports an amount of net book premium greater than FCIC authorized as the maximum reinsurable net book premium, FCIC may, at its sole discretion, cause the net underwriting gain or loss for all States as defined in section II.D.3. payable to or by the Company to be reduced according to the ratio of the excess net book premium to the total reported net book premium. The excess will then be reinsured under this Agreement. The Company agrees to pay FCIC an additional reinsurance premium equal to 5 percent of the excess net book premium whenever this provision applies.

8. To be eligible for an Agreement, or continue to hold an Agreement:

   a. The Company must have adequate financial resources at the beginning of the reinsurance year as required by 7 C.F.R. part 400, subpart L. If at any time during the reinsurance year the Company no longer has adequate financial resources, the Company must timely obtain such resources.

   b. The Company, and any managing general agent that it appoints or proposes to appoint must:

      i. Have a satisfactory performance record;

      ii. Have the necessary organization, experience, accounting and operational controls, and technical skills to fulfill its obligations under the Agreement, or the ability to obtain them;

      iii. Have the necessary equipment to fulfill its obligations under the Agreement, including, but not limited to, EDP resources and facilities or the ability to obtain such equipment; and

      iv. Perform under a written contract or agreement with each other.

B. **Proportional Reinsurance**

Within each State, the Company, in accordance with its Plan of Operations, may designate eligible crop insurance contracts to a: (1) Assigned Risk Fund; (2) Developmental Fund; or (3) Commercial Fund.

- - - Page 8 - - -

133

1. Assigned Risk Fund

   a.  The Company may designate eligible crop insurance contracts, including those
       previously designated to a Developmental Fund, that have an aggregate net book
       premium not greater than the maximum cession limits specified in section
       II.B.1.d. to the Assigned Risk Fund for each State. The Company must retain
       20 percent of the net book premium and associated liability for ultimate net
       losses on these designated eligible crop insurance contracts, except as provided
       in sections II.B.1.c. and II.B.4. The liability for ultimate net losses not retained
       by the Company within each State will be ceded to FCIC in exchange for an
       equal percentage of the associated net book premium included in the Assigned
       Risk Fund in that State.

   b.  The Company must designate eligible crop insurance contracts to the Assigned
       Risk Fund not later than the transaction cutoff date for the week including the
       30th calendar day after the sales closing date for the eligible crop insurance
       contract unless:

       i.   FCIC determines that conditions exist that would permit the policyholder
            to plant crops that are alternatives to the crops listed on the application for
            insurance, or there are eligible crop insurance contracts transferred from
            the Farm Service Agency after the sales closing date. The Company may
            designate such alternative or transferred crop insurance contracts to the
            Assigned Risk Fund not later than the transaction cutoff date for the week
            containing the 30th calendar day after the acreage reporting date; or

       ii.  FCIC approves a written agreement for limited or additional coverage
            contracts of insurance after the sales closing date. The Company may
            designate such eligible crop insurance contracts to the Assigned Risk Fund
            not later than the transaction cutoff date for the week containing the 30th
            calendar day after FCIC approval.

   c.  Unless otherwise specified in the Agreement, in the event the aggregate net book
       premium for all such eligible crop insurance contracts exceeds the maximum
       allowable cession for any individual State, the amount ceded for each eligible
       crop insurance contract in such State will be reduced pro-rata to the maximum
       allowable cession for that State. The net book premium and associated liability
       for ultimate net losses that exceed the maximum allowable cession for an
       individual State will be placed in the appropriate Developmental Funds for that
       State on a *pro rata* basis.

   d.  The Assigned Risk Fund maximum cession limits for each State are:

134

| State | Maximum Cession | State | Maximum Cession |
|---|---|---|---|
| Alabama | 50% | Montana | 75% |
| Alaska | 75% | Nebraska | 20% |
| Arizona | 55% | Nevada | 75% |
| Arkansas | 50% | New Hampshire | 10% |
| California | 20% | New Jersey | 50% |
| Colorado | 20% | New Mexico | 55% |
| Connecticut | 35% | New York | 40% |
| Delaware | 30% | North Carolina | 20% |
| Florida | 40% | North Dakota | 45% |
| Georgia | 75% | Ohio | 25% |
| Hawaii | 10% | Oklahoma | 50% |
| Idaho | 45% | Oregon | 30% |
| Illinois | 20% | Pennsylvania | 25% |
| Indiana | 20% | Rhode Island | 75% |
| Iowa | 15% | South Carolina | 55% |
| Kansas | 20% | South Dakota | 30% |
| Kentucky | 25% | Tennessee | 35% |
| Louisiana | 50% | Texas | 75% |
| Maine | 75% | Utah | 75% |
| Maryland | 20% | Vermont | 15% |
| Massachusetts | 45% | Virginia | 30% |
| Michigan | 50% | Washington | 30% |
| Minnesota | 20% | West Virginia | 75% |
| Mississippi | 50% | Wisconsin | 35% |
| Missouri | 20% | Wyoming | 35% |

c.   All eligible crop insurance contracts, including CAT, all revenue insurance plans, and all other insurance plans, that are designated to the Assigned Risk Fund will be placed in a single fund in each state, which is shown under "B" in sections II.C. and D.

2.   Developmental Funds

a.   The Company may designate eligible crop insurance contracts to any of three Developmental Funds as follows:

Fund C     CAT;
Fund R     Revenue insurance plans; or
Fund B     All other crop insurance plans.

--- Page 10 ---

135

b.    If the Company declares in its Plan of Operations that it will forgo the use of the Commercial Fund in all States, then all eligible crop insurance policies not designated to the Assigned Risk Fund will be placed in the appropriate Developmental Fund.

c.    Designations to Developmental Funds must be made:

    i.    For carryover crop insurance contracts insured with the Company the previous year that have contract change dates occurring on or after July 1, not later than the transaction cutoff date for the week containing the 30th calendar day after the contract change date for the applicable crop and insurance plan for each reinsurance year;

    ii.    For carryover crop insurance contracts insured with the Company the previous year that have contract change dates occurring before July 1, not later than the transaction cutoff date for the week containing August 1 of the reinsurance year; and

    iii.    For all other eligible crop insurance contracts, not later than the transaction cutoff date for the week containing the 30th day after the sales closing date for the eligible crop insurance contract.

d.    The Company must retain at least 35 percent of the net book premium and associated liability for ultimate net losses on eligible crop insurance contracts placed into each of the Developmental Funds within each State. The Company may retain a greater percentage of the net book premium and associated liability for ultimate net losses within any State whenever it designates percentages greater than 35 percent in its Plan of Operations for any reinsurance year. Such percentage designations must be in 5 percent increments. The three Developmental Funds' retention percentages may differ within a State. The liability for ultimate net losses not retained by the Company within each State will be ceded to FCIC in exchange for an equal percentage of the associated net book premium included in the Developmental Funds in that State.

3.    Commercial Funds

a.    Any eligible crop insurance contract not designated by the Company to the Assigned Risk Fund or a Developmental Fund will be placed in one of three Commercial Funds as follows:

Fund C     CAT;
Fund R     Revenue insurance plans; or
Fund B     All other crop insurance plans.

136

b.     The Company must retain at least 50 percent of the net book premium and associated liability for ultimate net losses on eligible crop insurance contracts designated to each of the Commercial Funds within each State. The Company may retain percentages of the net book premiums and associated liability for ultimate net losses within any State whenever it designates percentages greater than 50 percent in its Plan of Operations for any reinsurance year. Such percentage designations must be made in 5 percent increments. The three Commercial Funds' retention percentages may differ within a State. The liability for ultimate net losses not retained by the Company within each State will be ceded to FCIC in exchange for an equal percentage of the associated net book premium included in the Commercial Funds in that State.

4.    Company Minimum Retention

a.     After all proportional reinsurance cessions under this Agreement, the Company must retain a percentage of net book premium and associated liability for ultimate net losses that equals or exceeds 35 percent of its book of business. However, if more than 50 percent of the Company's book of business is in the Assigned Risk Fund or the Company designates eligible crop insurance contracts only to the Assigned Risk Fund and Developmental Funds, the Company must retain a percentage of net book premium and associated liability for ultimate net losses of at least 22.5 percent of its book of business.

b.     In the event that the Company fails to retain the required minimum percentage of its book of business under this Agreement, the percent of net book premiums and associated liability for ultimate net losses for all eligible crop insurance contracts included in the Assigned Risk Fund in all States will be increased on a pro-rata basis from the 20 percent retention stated in section II.B.1.a. to the retention necessary to meet the minimum retention stated in section II.B.4.a.

C.   Non-Proportional Reinsurance

1.    Company's Responsibility for Ultimate Net Losses

The non-proportional reinsurance provided hereunder applies to the Company's retained book of business in each individual Fund and State after proportional cessions under subsection II.B. For each Fund and State, the Company's responsibility for ultimate net losses will be determined as follows:

a.     The Company will retain the following percentages of the amount by which its retained ultimate net losses in each individual State and Fund exceed 100 percent but are less than or equal to 160 percent of the Company's retained net book premium in that State and Fund for the reinsurance year.

- - - Page 12 - - -

137

| | | (B) | (C) | (R) |
|---|---|---|---|---|
| i. | Commercial Fund | 50.0 percent | 50.0 percent | 57.0 percent |
| ii. | Developmental Fund | 25.0 percent | 25.0 percent | 30.0 percent |
| iii. | Assigned Risk Fund | 5.0 percent | - - - | - - - |

b. In addition to the amount determined under section II.C.1.a., the Company will retain the following percentages of the amount by which its retained ultimate net losses in each individual State and Fund exceed 160 percent but are less than or equal to 220 percent of the Company's retained net book premium in that State and Fund for the reinsurance year.

| | | (B) | (C) | (R) |
|---|---|---|---|---|
| i. | Commercial Fund | 40.0 percent | 40.0 percent | 43.0 percent |
| ii. | Developmental Fund | 20.0 percent | 20.0 percent | 22.5 percent |
| iii. | Assigned Risk Fund | 4.0 percent | - - - | - - - |

c. In addition to the amounts determined under paragraphs II.C.1.a. and b., the Company will retain the following percentages of the amount by which its retained ultimate net losses in each individual State and Fund exceed 220 percent but are less than or equal to 500 percent of the Company's retained net book premium in that State and Fund for the reinsurance year.

| | | (B) | (C) | (R) |
|---|---|---|---|---|
| i. | Commercial Fund | 17.0 percent | 17.0 percent | 17.0 percent |
| ii. | Developmental Fund | 11.0 percent | 11.0 percent | 11.0 percent |
| iii. | Assigned Risk Fund | 2.0 percent | - - - | - - - |

d. FCIC will assume ultimate net losses in excess of the Company's retained ultimate losses as determined under paragraphs II.C.1.a., b., and c. In addition, FCIC will assume 100 percent of the amount by which the Company's retained ultimate net losses in each individual State and Fund exceed 500 percent of the Company's retained net book premium in that State and Fund for the reinsurance year.

D. Company's Retention of Underwriting Gain

1. The amount of underwriting gain retained by the Company will be calculated separately for each Fund within each State as follows:

a. When the loss ratio equals or exceeds 65 percent but is less than 100 percent of the Company's retained net book premium in a Fund and State for the reinsurance year, the Company will retain the following percentages of the underwriting gain:

--- Page 13 ---

138

|   |                    | (B) | (C) | (R) |
|---|--------------------|-----|-----|-----|
| i. | Commercial Fund | 94.0 percent | 75.0 percent | 94.0 percent |
| ii. | Developmental Fund | 60.0 percent | 45.0 percent | 60.0 percent |
| iii. | Assigned Risk Fund | 15.0 percent | - - - | - - - |

b. In addition to the amounts of underwriting gain determined in the range of loss ratios under section II.D.1.a., when the loss ratio equals or exceeds 50 percent but is less than 65 percent of the Company's retained net book premium in a Fund and State for the reinsurance year, the Company will retain in that Fund and State the following percentages of the underwriting gain:

|   |                    | (B) | (C) | (R) |
|---|--------------------|-----|-----|-----|
| i. | Commercial Fund | 70.0 percent | 50.0 percent | 70.0 percent |
| ii. | Developmental Fund | 50.0 percent | 30.0 percent | 50.0 percent |
| iii. | Assigned Risk Fund | 9.0 percent | - - - | - - - |

c. In addition to the amounts of underwriting gain determined in the range of loss ratios under sections II.D.1.a. and b., when the loss ratio is less than 50 percent of the Company's retained net book premium in a Fund and State for the reinsurance year, the Company will retain in that Fund and State the following percentages of the underwriting gain:

|   |                    | (B) | (C) | (R) |
|---|--------------------|-----|-----|-----|
| i. | Commercial Fund | 11.0 percent | 8.0 percent | 11.0 percent |
| ii. | Developmental Fund | 6.0 percent | 4.0 percent | 6.0 percent |
| iii. | Assigned Risk Fund | 2.0 percent | - - - | - - - |

2. The underwriting gain or loss for each individual Fund will be totaled for each State to determine the net underwriting gain or loss for that State.

3. The Company's net underwriting gain or loss will be determined by totaling the net underwriting gains or losses for all States. Any net underwriting gain will be paid by FCIC to the Company at annual settlement except as provided in section II.D.4. Any net underwriting loss of the Company will be paid to FCIC by the Company with each monthly summary report.

4. Reinsurance Account

a. All calculations described in this section are only applicable to the annual settlement. The balance in the Company's reinsurance account is subject to the provisions of section V.U.

b.  If the Company's overall gain for all States in any reinsurance year exceeds 17.5 percent of its retained net book premium for that reinsurance year, 60 percent of the amount above 17.5 percent will be held by FCIC in a Company reinsurance account.

c.  If the Company retains an overall loss or an overall gain less than 17.5 percent of its retained net book premium in any reinsurance year, any balances in the Company's reinsurance account will be paid to the Company to the extent needed to obtain an overall gain of 17.5 percent of retained net book premium, or a lesser amount if the balance in the account is not adequate to achieve this percentage.

d.  Except only for those funds that are the subject to the provisions of section V.X. or to litigation or arbitration between the Company and FCIC, or set-off in accordance with section V.U., funds from a reinsurance year that have been placed in this account for any one reinsurance year will be returned to the Company 2 years after the first annual settlement for such reinsurance year. Payments will be made on a first in, first out basis. (For example, any balance remaining from the 1998 reinsurance year will be paid in February 2001.)

e.  In the event of termination or nonrenewal of this Agreement, balances in the reinsurance account will be paid, less those funds that are subject to a claim by FCIC, as follows:

i.  If terminated by the Company, 50 percent of the balance will be paid at the date of the annual settlement that would have occurred for the first reinsurance year after termination, and 50 percent will be paid 1 year later, provided neither the Company nor any other company associated with the Company (as determined by FCIC) has applied for reinsurance under the Act.

ii.  Whenever FCIC terminates this Agreement or does not renew this Agreement or offer any subsequent Agreement, any remaining balance shall be paid 1 year after the first annual settlement of the reinsurance year terminated.

f.  Notwithstanding any provision of any earlier Standard Reinsurance Agreement, any balance in the reinsurance account accumulated from the 1997 or prior reinsurance years will be paid out in accordance with section II.D.4. This provision will be implemented at the time of the annual settlement for the Agreement in effect for the 1997 reinsurance year. No interest will be paid on such amounts.

--- Page 15 ---

E.    Commercial Reinsurance

The Company may reinsure commercially its liability for ultimate net losses remaining after all cessions under this Agreement. When commercial reinsurance is required in order for the Company to meet the Standards for Approval (7 C.F.R. part 400, subpart L), the Company must describe in the Plan of Operations its commercial reinsurance plan and provide the documentation required by FCIC to assure that the potential liability for premiums retained after such commercial reinsurance meets the requirements contained in the Standards for Approval.

## SECTION III. SUBSIDIES AND ADMINISTRATIVE FEES

A.    FCIC will provide risk subsidy and A&O subsidy on behalf of producers as follows:

1.    Risk subsidy shall be determined as provided by the Act and will be provided to the Company on the monthly summary report.

2.    A&O subsidy for eligible crop insurance contracts will be determined as set forth below and will be paid to the Company on the monthly summary report after the Company submits, and FCIC accepts, the information needed to accurately establish the premium for such eligible crop insurance contracts. Notwithstanding the provisions of this section, under no circumstances will A&O subsidy be paid in excess of the amount authorized by statute.

a.    For any eligible CAT crop insurance contract, 0 percent of net book premium.

b.    For revenue insurance plans that can not increase liability whenever the market price at harvest exceeds the market price at the time of planting, 27.0 percent of the net book premium attributed to such eligible crop insurance contracts, not to exceed the amount that would have been paid had each eligible producer purchased limited or additional coverage under an insurance plan that insures loss of individual yield.

c.    For revenue insurance plans that can increase liability whenever the market price at the time of harvest exceeds the market price at the time of planting, 23.25 percent of the net book premium attributed to such eligible crop insurance contracts.

d.    For eligible crop insurance contracts that provide coverage under the GRP, 25.0 percent of the net book premium attributed to such eligible crop insurance contracts.

e.    For limited or additional coverage not included in sections III.A.2. b., c., and d., 27.0 percent of net book premium attributed to such eligible crop insurance contracts.

(41)

      f.    The amounts payable under sections III.A.2.b., c., d., and e., will be reduced by the amount of administrative fees applicable to such policies retained by the Company.

      g.    If the amount of A&O subsidy payable to the Company for any limited coverage eligible crop insurance contract is less than the administrative fee retained by the Company on such contract, the administrative fee will be considered payment in full for the A&O subsidy on such contract.

B.    The Company shall collect administrative fees from producers and may retain only such amounts as set forth herein:

    1.    For CAT, $50 for each eligible crop insurance contract, not to exceed $200 per county and $600 for all counties combined for each eligible producer. The Company shall retain not more than $100 per county for each eligible producer as compensation for the costs of selling and servicing the eligible CAT crop insurance contracts. In the event the eligible producer is a limited resource farmer as defined in the regulations, the Company shall submit the required evidence to FCIC and FCIC shall pay the Company the appropriate fee on the monthly summary report.

    2.    For limited coverage, $50 per eligible crop insurance contract, not to exceed $200 per county and $600 for all counties combined for each eligible producer. The Company shall retain not more than $100 per county for each eligible producer. Any fees retained by the Company will be offset against the A&O subsidy.

    3.    For additional coverage, $10 per eligible crop insurance contract to be paid to FCIC by the Company.

C.    The amount of A&O subsidy may be adjusted to a level that FCIC determines to be equitable if issuing or servicing eligible crop insurance contracts involve expenses that vary significantly from the basis used to determine the A&O subsidy under this section: Provided: That such A&O subsidy does not exceed the maximum amount specified by statute.

D.    In the event the Company determines that it can deliver eligible crop insurance contracts for less than the A&O subsidy paid under this section, it may apply to FCIC for approval to reduce the amount of producer premium charged to policyholders by an amount corresponding to the value of the efficiency.

E.    With the exception of raisins, the Company may not submit estimated data for the purpose of establishing premium, liability, or indemnity. For raisins, the Company may submit estimated reports not to exceed 2 tons per acre, which will be used to determine the estimated A&O subsidy for eligible raisin crop insurance contracts. In the event the actual raisin net book premium is less than this estimate, the Company will include the excess A&O

--- Page 17 ---

142

subsidy as an amount owed to FCIC in the first monthly summary report after the actual raisin tonnage is known. Interest on this amount, at the rate set forth in section V.C.2. calculated from the date of payment by FCIC to the date of the monthly summary report upon which the actual tonnage is reported, must be included as an amount owed to FCIC.

F.   The billing statement provided to the policyholder will contain the following information:

1.   The total premium calculated by adding 2 and 3 below;

2.   The risk subsidy and A&O subsidy paid or provided by FCIC to the Company on behalf of the policyholder; and

3.   The amount of premium and any administrative fees due the Company from the policyholder.

G.   All data on which liabilities and premiums are based must be reported by the Company and accepted by FCIC not later than the transaction cut-off date for the twelfth week after the week that includes the latest acreage reporting date specified in the actuarial data master file for any eligible crop insurance contract insured by the policyholder. The A&O subsidy for eligible crop insurance contracts under this Agreement will be reduced if the data are delayed, unless the delay is caused in whole or in part by FCIC, as follows:

| Data Received During Weeks | Reduction |
|---|---|
| 13th through 15th | 1.5 percent |
| 16th through 17th | 3.0 percent |
| 18th or more | 4.5 percent |

H.   No A&O subsidy for eligible crop insurance contracts under this Agreement will be paid if the agent or loss adjuster SSN is not submitted and accepted by FCIC.

I.   A&O subsidy will be paid to the Company beginning with the October monthly summary report. It will be paid in one installment based on the data obtained from accepted acreage reports (preliminary tonnage report for eligible raisin crop insurance contracts) in accordance with processing provisions contained in Manual 13.

SECTION IV.   LOSS ADJUSTMENT EXPENSES

A.   For eligible CAT crop insurance contracts, FCIC will pay to the Company an amount equal to 4.7 percent of the total net book premium for eligible CAT crop insurance contracts computed at 65 percent of the recorded or appraised average yield indemnified at 100 percent of the projected market price, or equivalent coverage, for loss adjustment expense. The loss adjustment expense specified in this section will be included in the monthly summary report containing the data obtained from acreage reports that have met the processing provisions specified in Manual 13. In addition to the amounts stated in this

- - - Page 18 - - -

143

subsection:

1.  If the actual loss ratio on the Company's net book premium of all eligible CAT crop insurance contracts for the reinsurance year exceeds 60 percent but is not greater than 160 percent, FCIC will pay to the Company, as loss adjustment expense, an additional 0.017 percent of the net book premium on all eligible CAT crop insurance contracts reinsured under this Agreement for each full point between a 60 percent and 160 percent loss ratio. The loss adjustment expense payable to the Company under this paragraph will not exceed 1.7 percent. The loss adjustment expense payable to the Company under this paragraph for such eligible CAT crop insurance contracts shall be computed on premium determined at 65 percent of the recorded or appraised average yield indemnified at 100 percent of the projected market price, or equivalent coverage.

2.  In addition to the amounts stated in section IV.A.1, if the actual loss ratio on the Company's net book premium of all eligible CAT crop insurance contracts for the reinsurance year exceeds 160 percent but not greater than 260 percent, FCIC will pay to the Company, as excess loss adjustment expense, an additional 0.007 percent of the net book premium on all eligible CAT crop insurance contracts reinsured under this Agreement for each full point between a 160 percent and 260 percent loss ratio. The excess loss adjustment expense payable under this paragraph will not exceed 0.7 percent. The excess loss adjustment expense payable under this paragraph for such eligible CAT crop insurance contracts shall be computed on premium determined at 65 percent of the recorded or appraised average yield indemnified at 100 percent of projected market price, or equivalent coverage.

B.  Loss adjustment expenses under section IV.A. will be included in the monthly summary report that contains losses exceeding the thresholds specified in section IV.A. and that meet the processing provisions specified in Manual 13.

## SECTION V.  GENERAL PROVISIONS

A.  Collection of Information and Data

The Company is required to collect and provide to FCIC the SSN or the EIN as authorized and required by the Food, Agriculture, Conservation, and Trade Act of 1990 (Pub. L. 101-624), and the regulations promulgated thereunder, as codified in 7 C.F.R. part 400, subpart Q.

144

B.   Reports

1.   The Company must submit accurate and detailed contract data to FCIC through the DAS in accordance with the requirements of Manual 13. The DAS will only accept, and the Company will only be required to submit data through the automated system for 3 years following the first annual settlement for the reinsurance year. Settlement of claims still in litigation, arbitration, or any administrative proceeding 3 years after the first annual settlement for such reinsurance year must be reported to FCIC and will be processed manually following final resolution of such action.

2.   All reports submitted for reimbursement must be certified by an authorized officer or authorized employee of the Company. The required certification statements are contained in Manual 13.

3.   Failure of the Company to comply with the provisions of this Agreement, including timely submission of the monthly and annual settlement data and reports, or any other report required by this Agreement does not excuse or delay the requirement to pay any amount due to FCIC by the dates specified herein. Failure of the Company to make payment in accordance with the provisions of this Agreement is a default of this Agreement by the Company. In addition to the payment of applicable interest, such actions may be a basis to suspend or terminate this Agreement.

4.   Producer premiums and administrative fees collected by the Company must be reported on the monthly summary report submitted in the next calendar month after collection. Producer premiums and administrative fees that are uncollected for each billing date must be reported by the Company on the monthly summary report for the month following the month containing the billing date.

5.   All payments due FCIC from the Company will be netted on the monthly and annual settlement reports with amounts due the Company from FCIC. Any amount due FCIC as a result of the netting effect must be deposited on or before the Company's payment date directly into FCIC's account in the U. S. Treasury by EFT. FCIC will remit amounts due the Company by EFT on or before the FCIC payment date. Any amounts due FCIC or the Company that are not timely remitted are subject to the interest rate provisions contained in section V. C., with such interest accruing from the date such payment was due to the date of payment.

6.   In the event that a payment would be due to the Company except for the erroneous rejection of data by FCIC, the Company shall be entitled to interest accrued on these amounts for the period of such delay, at the rate provided in section V. C.1.

- - - Page 20 - - -

145

7. In addition to the reporting requirements contained in Manual 13, the Company will provide other information relating to policies reinsured hereunder as may be requested by FCIC.

8. All payments and reports are subject to post audit by FCIC in accordance with section V. X.

C. Interest

1. Any interest that FCIC is required to pay the Company under the terms of this Agreement will be paid in accordance with the interest provisions of the Contract Disputes Act (41 U.S.C. 601 *et seq.*).

2. Any interest that the Company is required to pay FCIC under the terms of this Agreement will be paid at the simple interest rate of 15 percent per annum.

3. The Company will repay with interest any amount paid to the Company by FCIC that FCIC or the Company subsequently determines was not due.

4. FCIC will repay with interest any amount paid by the Company to FCIC which FCIC subsequently determines was not due.

D. Escrow Account

1. At the Company's request, FCIC will allow the Company to establish an escrow account in the name of FCIC at a bank designated by the Company, and approved by FCIC, to reimburse the Company for payment of losses to eligible producers by the Company. The Company's bank must pledge collateral as required by 31 C.F.R. 202 in the amount determined by FCIC. The requirements for funding the escrow account and monthly balancing are contained in Manual 13 and the Escrow Agreement.

2. Any Company that elects not to utilize escrow funding will be reimbursed for paid losses validated and accepted on the monthly summary report.

3. For the purpose of this Agreement, any loss will be considered paid by the Company when the instrument or document issued as payment of the indemnity has cleared the Company's bank account.

E. Form Approval

The Company must submit for FCIC's approval all forms incorporated by reference into the eligible crop insurance contracts reinsured under this Agreement. Any such forms must not be used by the Company until approved or otherwise authorized in writing by FCIC.

146

F.   Supplemental Insurance

   1.   The Company must not sell any contract of insurance or similar instrument that may shift risk to or otherwise increase the risk of any eligible crop insurance contract sold or reinsured by FCIC. The Company must submit any contracts of insurance or similar instruments to FCIC for review and approval prior to selling them. FCIC will not reimburse the Company for any loss occurring on an eligible crop insurance contract if the Company sold a contract of insurance that FCIC determines to have shifted risk to or increases the risk of such eligible crop insurance contract reinsured under this Agreement, or if the Company administers the contract of insurance in a manner inconsistent with its submission and the FCIC approval.

   2.   The Company must maintain and make available to FCIC the SSN and EIN, and underwriting information pertaining to any contract of insurance written in conjunction with eligible crop insurance contracts reinsured under this Agreement, including the contract number of the related eligible crop insurance contract.

G.   Insurance Operations

   1.   Plan of Operations

      a.   This Agreement becomes effective with respect to any reinsurance year upon approval of the Company's Plan of Operations by FCIC. The Plan of Operations must be submitted to FCIC by April 1 preceding the reinsurance year.

      b.   The Plan of Operations must meet the requirements and be in the format as contained in appendix 2.

      c.   The Company may submit a request to amend an approved Plan of Operations at any time to reflect changing business considerations and sales expectations. Such amendments must be in writing and must be approved by FCIC in writing before implementation by the Company. The request will be evaluated following the procedures applicable to a timely filed original plan, except that FCIC will also consider whether FCIC's risk is materially increased. Requests for amendment where the risk has materially increased will only be considered if FCIC, at its sole discretion, determines that its actions or those of USDA have substantially increased the risk of underwriting loss on eligible crop insurance contracts previously written by the Company.

      d.   The Plan of Operations is incorporated in this Agreement by reference. Material failure to follow the Plan of Operations may be a basis for FCIC to terminate this Agreement.

147

2.    General Operations

    a.    All eligible crop insurance contracts reinsured under this Agreement must be sold by properly trained and licensed agents. Employees, agents, brokers, solicitors, or any other sales representatives of the Company who quote premium rates and coverages or provide other information in the sale of eligible crop insurance contracts to current or prospective policyholders must be licensed or certified in crop insurance if available, or in the property and casualty line of insurance if a crop insurance license or certification is not available.

    b.    The Company shall not permit its sales agents, agency employees, sales supervisors, or any spouse or family member residing in the same household as any such sales agent, agency employee, or sales supervisor to be involved in any way with the following activities in any county or adjoining county where the sales agent, agency employee, any competing agency or sales supervisor performs any sales functions:

        i.    The supervision, control, or adjustment of any loss;

        ii.    A determination of a claim or cause of loss; or

        iii.    Verification of yields for the purpose of establishing any insurance coverage or guarantee.

    c.    The Company shall not permit its claims supervisors or any employee or contractor involved in the determination of the amount or cause of any loss to be involved in any way with the sales of any eligible crop insurance contract in any county or adjoining county in which they perform any loss adjustment or claims services.

    d.    The Company shall not permit its sales agents, the owners or employees of its sales agencies, its sales supervisors, or any spouse or family member residing in the same household as any such person, to be involved in underwriting any eligible crop insurance contract written by any such person.

    e.    Any person employed by the Company for the general supervision of the crop insurance program in an area may supervise activities associated with the general administration of the crop insurance program in that area, which may include training, servicing, underwriting, and loss adjusting. However, all quality control reviews must be conducted by objective and unbiased persons who were not involved in establishing the guarantee or adjusting the loss, or the sales or supervision of sales for the policies reviewed.

148

  f. The Company must verify all yields and other information to establish insurance guarantees and indemnity payments in accordance with the procedures approved by FCIC. Guarantees must be verified in accordance with the requirements of the approved Manual 14 and applicable procedures.

  g. The Company must use crop insurance contracts, standards, procedures, methods, and instructions as issued or approved by FCIC in the sales, service, and loss adjustment of eligible crop insurance contracts.

 3. Managing General Agents

  If the Company will perform its responsibilities under this Agreement through a MGA, the Company must certify to FCIC in the Plan of Operations that such MGA is in full compliance with the laws and regulations of the State in which such MGA is incorporated or, in the absence of such laws and regulations, with the National Association of Insurance Commissioners' Model Act governing MGAs.

H. Access to Records and Operations

 Upon written request, unless otherwise authorized by the Manager of FCIC, the Company must provide FCIC reasonable access to its offices, personnel (including agents and loss adjusters), and all records that pertain to the business conducted under this Agreement at any time during normal business hours for the purpose of investigation, audit or examination, including access to records on the operation of the Company. The Company must designate in its Plan of Operations each location where records and documents are retained. Records pertaining to premium or liability must be retained until 3 years after the annual settlement date for the respective reinsurance year. FCIC may require on a case-by-case basis the Company to retain certain specified records for a longer period if it so notifies the Company in writing at any time before disposal of the record. The Company should be aware that the statute of limitations for bringing a suit for any breach of this Agreement is 6 years. For the purpose of this section the term "FCIC" includes all U.S. Government agencies including but not limited to USDA Office of Inspector General, the General Accounting Office, and the Department of Labor.

I. Compliance and Corrective Action

 1. The Company must be in compliance with the provisions of this Agreement, the laws and regulations of the United States, the laws and regulations of the States and locales in which the Company is conducting business under this Agreement, unless such State and local laws and regulations are in conflict with this Agreement, and all bulletins, handbooks, instructions, and procedures of FCIC.

 2. The Company must cooperate with FCIC in the review of Company operations.

149

3.  If FCIC finds that the Company has not complied with any provision of this Agreement, and the Company has not taken appropriate steps to correct the reported act of non-compliance, FCIC may at its discretion, require that the Company take corrective action within 45 days of the date of such written demand. The Company must provide FCIC with satisfactory documentary evidence of the corrective action taken to address the reported act of non-compliance.

4.  Whenever an act or omission by the Company materially affects the existence or amount of the indemnity or premium paid (including but not limited to incorrect APH calculations; improper adjustment of loss; sales agents or sales supervisors involved in the adjustment of losses; failure to verify eligibility for insurance, acreage planted or prevented from planting, insurable shares, insurable causes of loss, unit divisions, or nonstandard classifications) and FCIC is able to determine the correct amount of indemnity or premium that should have been paid:

    a.  FCIC shall require the Company to report to FCIC through the DAS system the correct amount of indemnity or premiums, and

    b.  FCIC may require the Company to refund any A&O subsidy that exceeds the amount the Company was entitled to receive.

5.  The Company provides valuable program delivery services for which payment is made in the form of A&O subsidy. FCIC and the Company agree that FCIC is damaged by a failure of the Company to provide services or to comply with FCIC requirements and procedures and that the value of such service or failure to comply is difficult to determine because damages are uncertain and the amount of services or failure to comply is difficult to quantify. FCIC and the Company agree that in view of the difficulty of determining the exact value of each service, the amounts stated below are reasonable estimates of the value of such services.

    a.  If the Company's loss adjustment performance and practices are not carried out in accordance with this Agreement and FCIC assumes the Company's loss adjustment obligations, the Company shall pay FCIC an amount equal to 10 percent of the net book premium on all eligible crop insurance contracts adjusted or readjusted by FCIC.

    b.  If this Agreement should be terminated for cause, the Company shall pay FCIC the equivalent of 10 percent of the net book premium for all eligible crop insurance contracts.

    c.  In the event of the following failures to comply with the terms and conditions of this Agreement, the Company shall pay FCIC as follows:

--- Page 25 ---

150

i.   For failure to follow approved sales agent training requirements contained in Manual 14, 1 percent of the net book premium for eligible crop insurance contracts written by sales agents not trained in accordance with Manual 14 if, for the purposes of this subparagraph only, the number of such sales agents exceeds 5 percent of all sales agents requiring training;

ii.  For failure to follow approved loss adjuster training requirements contained in Manual 14, 1 percent of the net book premium for eligible crop insurance contracts adjusted by loss adjusters not trained in accordance with Manual 14 if, for the purposes of this subparagraph only, the number of loss adjusters exceeds 5 percent of the loss adjusters requiring training; and

iii. For failure to follow approved quality control review requirements in Manual 14, 1 percent of the net book premium for eligible crop insurance contracts not reviewed in accordance with Manual 14, but which were required to be reviewed, if the number of reviews not performed exceeds 5 percent of the number required.

d.   For failure to follow FCIC approved procedure that materially impacts the existence or amount of the loss, the Company shall pay to FCIC 3 percent of the net book premium of all eligible contracts for which each failure occurred.

e.   The total amount payable under sections V. I. 5. c. and d. may not exceed 4.5 percent of the net book premium on each eligible crop insurance contract for which any payment is due FCIC under sections V. I. 5. c. or d.

6.  Any payment due from or paid by the Company under this section shall be in addition to and without prejudice to any other rights of FCIC, or the United States, if the deficiency in compliance with terms and conditions of this Agreement result from the Company's violation of criminal or civil false claims statutes.

7.  FCIC may, at its sole discretion, waive, reduce or delay repayment.

8.  Any amounts due from or paid by the Company under this section shall be paid by the Company to FCIC on the next monthly summary or annual settlement report after a final determination by FCIC. Any payment not timely paid will be subject to provisions of section V.C.

9.  If FCIC collects any amount in accordance with section V. I. 4. or V.I.5.a. or b., then FCIC will not require the Company to pay any amount under section V. I. 5.d. on the same eligible crop insurance contracts.

10.   Nothing in this subsection prevents FCIC from collecting any amounts due under this subsection from the Company and suspending or terminating this Agreement.

J.   Suspension

FCIC may suspend this Agreement for cause due to a material failure to perform or comply with obligations under this Agreement. If this Agreement is suspended for cause:

1.   The suspension will remain in effect until FCIC determines that the Company has corrected the failure and has taken steps to prevent its occurrence.

2.   While suspended, the Company may not sell any new crop insurance contracts under this Agreement. However, if required by FCIC, the Company must service all eligible crop insurance contracts in effect at the time of the suspension.

3.   If the Company does not properly service existing crop insurance contracts as required by section V.J.2. or has not corrected the failure within 45 days of the date the Company is notified of the suspension, this Agreement will automatically terminate at the end of the reinsurance year.

K.   Termination

1.   FCIC may terminate this Agreement for cause due to a material failure to perform or comply with obligations under this Agreement. If this Agreement is terminated for cause, FCIC will not provide reinsurance for eligible crop insurance contracts issued or renewed after the date of the termination. FCIC will provide reinsurance for eligible crop insurance contracts in effect as of the date of the termination until the next cancellation date.

2.   If FCIC terminates this Agreement for the convenience of the government, FCIC will not provide reinsurance for any eligible crop insurance contract renewed or issued after the date of termination. FCIC will continue to provide A&O subsidy, risk subsidy, and reinsurance to the extent allowed under this Agreement for eligible crop insurance contracts in effect as of the date of the termination until the next cancellation date. No additional damages or amounts will accrue to the Company because of such termination.

L.   Disputes and Appeals

1.   The Company may appeal any actions, finding, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169.

152

2.    FCIC shall generally issue a fully documented decision within 90 days of the receipt of a notice of dispute accompanied by all information necessary to render a decision. If a decision cannot be issued within 90 days FCIC will notify the Company within the 90 day period of the reasons why such a decision cannot be issued and when it will be issued.

M.    Renewal

This Agreement will continue in effect from year to year with an annual renewal date of July 1 of each succeeding year unless FCIC gives at least 180 days advance notice in writing to the Company that the Agreement will not be renewed. This Agreement will automatically terminate if the Company fails to submit a Plan of Operations by the date such Plan of Operations is due unless such other date is approved by FCIC in writing.

N.    Appropriation Contingency

The payment of obligations of FCIC under this Agreement are contingent upon the availability of appropriations. Notwithstanding any other provision of this Agreement, FCIC's ability to sustain the Agreement depends upon the FCIC's appropriation. If FCIC's appropriation is insufficient to pay the obligations under this Agreement, and FCIC has no other source of funds for such payments, FCIC will reduce its payments to the Company on a pro rata basis or on such other method as determined by FCIC to be fair and equitable.

O.    Replacement

This Agreement replaces any previous Standard Reinsurance Agreement between FCIC and the Company, except that any obligations continuing under any previous Agreement will remain subject to the terms and conditions of such previous Agreement.

P.    Cut-Through and Preemption of State Law

1.    Whenever the Company and its policy issuing company, if applicable, are unable to fulfill their obligations to any policyholder by reason of a directive or order duly issued by any Department of Insurance, Commissioner of Insurance, or by any court of law having competent jurisdiction, or under similar authority of any jurisdiction to which the Company is subject, all eligible crop insurance contracts affected by such directive or order that are in force and subject to this Agreement as of the date of such inability or failure to perform will be immediately transferred to FCIC without further action of the Company by the terms of this Agreement. FCIC will assume all obligations for unpaid losses whether occurring before or after the date of transfer, and the Company must pay FCIC all funds in its possession with respect to all such eligible crop insurance contracts transferred including, but not limited to, premiums collected. The Company hereby assigns to FCIC the right to all uncollected premiums on all such

policies. No assessment for any guarantee funds or similar programs may be computed or levied on the Company by any State for or on account of any premiums payable on eligible crop insurance contracts reinsured under this Agreement.

2.  The provisions of 7 C.F.R. part 400, subpart P pertaining to preemption of State or local laws or regulations are specifically incorporated herein and made a part hereof.

Q.  Litigation and Assistance

1.  The Company's expenses incurred as a result of litigation are covered by the A&O subsidy and the administrative fee paid by the producer for CAT coverage. FCIC has no obligation to provide any other funds to reimburse the Company for litigation costs.

2.  FCIC will also provide indemnification, as authorized by the Act, including costs and reasonable attorney fees incurred by the Company, that result solely from errors or omissions of FCIC.

3.  The Company may request FCIC to provide non-monetary assistance, including witnesses, documents, and direction or such other assistance as FCIC deems reasonable. FCIC may, at its option, elect to provide such assistance or it may elect to intervene in any legal action. The Company agrees not to oppose such participation. FCIC will only agree to the Company's request for litigation assistance if the Company:

    a.  Immediately notifies FCIC in writing of the requested action setting forth the reasons such action would be in the best interests of FCIC;

    b.  Presents all legal arguments favorable to its defense including those suggested by FCIC; and

    c.  Does not join FCIC as a party to the action unless FCIC agrees in writing to be joined as a party.

4.  FCIC will, at its sole discretion, determine if the requested action under this section will be granted. The criteria to determine such action will be whether such action is in the best interest of FCIC and the crop insurance program.

154

R.  **Suspension and Debarment**

Any person or business entity who has been debarred or suspended by FCIC or any other U.S. Government Agency, may not be used by the Company in any manner which involves performance under this Agreement.

S.  **Member - Delegate**

No member of or delegate to Congress nor any resident commissioner will be admitted to any share or part of this Agreement or to any benefit that may arise therefrom, except that this provision will not be construed to apply to a benefit from this Agreement that accrues to a corporation for its general benefit. Members of or delegates to Congress are eligible to purchase a crop insurance contract for any crop in which they have an insurable interest.

T.  **Discrimination**

The Company must not discriminate against any employee, applicant for employment, insured, or applicant for insurance because of race, color, religion, sex, age, physical handicap, marital status, or national origin.

U.  **Set Off**

1.  Funds due from the Company may be set off under the provisions of this Agreement or under the provisions of 31 U.S.C. chapter 37.

2.  Any amount due the Company under this Agreement is not subject to any lien, attachment, garnishment, or any other similar process prior to that amount being paid under this Agreement, unless such lien, attachment, or garnishment arises under title 26 of the United States Code.

3.  Set off as provided in this section will not deprive the Company of any right it might otherwise have to contest the indebtedness involved in the set off action by administrative appeal.

4.  In the event a Company fails to pay any amount when due under this Agreement, any further payments to the Company from FCIC will be set off against any amounts due FCIC regardless of reinsurance year until these amounts are paid with appropriate interest.

5.  If an assignment has been made pursuant to the provisions of section V.V. the following provisions will apply with respect to set off:

    a.  Notwithstanding the assignment, FCIC may set off:

- - - Page 30 - - -

155

    i.   Any amount due FCIC under this Agreement;

    ii.   Any amounts for which the Company is indebted to the United States for taxes for which a notice of lien was filed or a notice of levy was served in accordance with the provisions of the Internal Revenue Code of 1954 (26 U.S.C. 6323), or any amendments thereto or modifications thereof, before acknowledgment by FCIC of receipt of the notice of assignment; and

    iii.   Any amounts, other than amounts specified in paragraphs i. and ii. above due to FCIC or any other agency of the United States, if FCIC notified the assignee of such amounts to be set off at or before the time acknowledgment was made of receipt of the notice of assignment.

### V.  Assignment

No assignment by the Company shall be made of the Agreement, or the rights thereunder, unless the Company assigns the proceeds of the Agreement to a bank, trust company, or other financing institution, including any federal lending agency, or to a person or firm that holds a lien or encumbrance at the time of assignment, and the Company receives the prior approval of FCIC to assign the proceeds of this Agreement to any other person or firm: Provided, That such assignment will be recognized only if and when the assignee thereof files with FCIC a written notice of the assignment together with a signed copy of the instrument of assignment, and, Provided further, That any such assignment must cover all amounts payable and not already paid under the Agreement, shall not be made to more than one party and shall not be subject to further assignment, except that any such assignment may be made to one party as agency or trustee for two or more parties.

### W.  Liability for Agents and Loss Adjusters

The Company is solely responsible for the conduct and training of its personnel, agents and loss adjusters within the parameters of this Agreement. Liability incurred, to the extent it is caused by agent or loss adjuster error or omission, or failure to follow FCIC approved policy or procedure, is the sole responsibility of the Company. The assumption of responsibility under this section is only for the purpose of this Agreement and may not be relied upon by any person or entity not a party to this Agreement for any purpose. Reinsurance of eligible crop insurance contracts may only be denied if there exists a pattern of failure to follow FCIC-approved policies or procedures, or allowance of errors or omissions, or the Company knew or should have known of the failure to follow FCIC-approved policies or procedures, or errors or omissions, and failed to take appropriate action to correct the situation.

156

X. Performance Audit

Notwithstanding any other provision hereunder, FCIC must notify the Company that the Company may be responsible for an error, omission, or failure to follow FCIC approved policy or procedures; and that a debt may be owed; within 3 years of the end of the insurance period during which the error, omission, or failure is alleged to have occurred. The failure to provide timely notice required herein shall only relieve the Company from liability for the alleged debt owed. Three years after the first annual settlement, such reinsurance year shall be deemed finally closed unless there are claims still under investigation or in litigation, including administrative proceedings, or arbitration. Such time frames will not be applicable to errors, omissions or procedural violations that are willful or intentional.

Y. Resolution of Disagreements

If the Company disagrees with an act or omission of FCIC, except those acts implemented through the rulemaking process, the Company shall provide written notice of such disagreement to the Manager of FCIC. Within 10 business days of receipt of notice, the Manager or a designee will schedule a meeting with the company in an attempt to resolve the disagreement. Notwithstanding any other provision in this section, any subsequent decision by FCIC on the act or omission will be final in the administrative process and, therefore subject only to review by the Board of Contract Appeals in a matter relating to this Agreement or to judicial review. Nothing herein excuses the Company's performance under this Agreement during the attempted resolution of the dispute or constitutes a waiver of the Company's right to any remedy authorized by law.

1 - 34

156 a

SECTION VI.   Certification

The undersigned acknowledges that the Company's Board of Directors has authorized the Company to enter into this Agreement and the Plan of Operations. The undersigned acknowledges any misrepresentation in the submission of this Agreement and information contained in the Plan of Operations may result in civil or criminal liability against the undersigned or their representatives.

APPROVED AND ACCEPTED FOR

THE FEDERAL CROP
INSURANCE CORPORATION                    THE COMPANY

_____                   _____
Signature                                 Signature

_____                   _____
Name                                      Name

_____                   _____
Title                                     Title

_____                   _____
Date                                      Date

1565

15:31 DEC 11, 2003                   TEL NO: 5152846294                    #97229  PAGE: 2/12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

AMERICAN GROWERS INSURANCE )
COMPANY, )
)
       Plaintiff, )    Civil No. 1-01-CV-10059
)
vs. )
)
FEDERAL CROP INSURANCE )    ORDER
CORPORATION, a Corporation )
within the United States Department )
of Agriculture, and RISK MANAGEMENT )
AGENCY, an agency of and within the )
United States Department of )
Agriculture, )
)
       Defendants. )

FILED 12/11/2003 2:20:30 PM, USDC, Southern District of Iowa

THE COURT HAS BEFORE IT defendants' renewed motion for partial summary judgment on count II and motion for partial summary judgment on count V, filed September 3, 2003. Plaintiff resisted the motion September 23, 2003, and defendants filed a reply on September 30, 2003.

In addition, on September 25, 2003, defendants filed a motion to limit review to the administrative record and to strike jury demand. Plaintiff resisted this motion October 9, 2003 and defendants filed a reply on October 17, 2003. The Court held a telephonic hearing on November 18, 2003, and the motions are fully submitted.

157

I.     MOTION FOR PARTIAL SUMMARY JUDGMENT

   A.     Background

   The facts of this matter have been outlined in prior Orders and will be repeated only as

necessary to resolve the present motions.  Briefly, plaintiff, a crop insurance provider, asserts that

errors and omissions committed by defendants with regard to the pricing and implementation of its

Standard Reinsurance Contracts ("SRAs") caused plaintiff to incur increased claims-related expenses in

the 1996 and subsequent crop years.

   In June 1998, plaintiff demanded payment from the Federal Crop Insurance Corporation

("FCIC") for losses it claimed to have incurred due to the FCIC's implementation of prevented planning

insurance changes for the 1996 crop year.  The Federal Crop Insurance Corporation ("FCIC") denied

plaintiff's claim, and plaintiff appealed the matter to the Agriculture Board of Contract Appeals

("AGBCA").  On June 15, 2000, a three member panel of the AGBCA rejected plaintiff's arguments,

and granted summary judgment for the FCIC.

   Plaintiff filed the present action in this Court on November 27, 2001, pleading causes of action

for breach of contract, statutory indemnification and constitutional taking.  On June 26, 2002, this Court

dismissed counts I and III of the original three-count complaint for failure to state a claim upon which

relief can be granted.  *American Growers Ins. Co. v. FCIC*, 210 F. Supp. 2d 1088, 1095-96 (S.D.

Iowa 2002) ("*American Growers I*").  Count II, which sought indemnification pursuant to 7 U.S.C. §

1508(j)(3),  was not dismissed by the Court.[i]

---

   [i] Specifically, the Court noted:

2

Shortly thereafter, plaintiff filed its first amended complaint reasserting the original three counts, and adding a fourth, alternative count seeking administrative review of the AGBCA ruling. Defendants moved to dismiss counts I and III pursuant to the Court's June 26, 2002 Order, and moved for summary judgment on count II. With regard to count II, defendants argued first that 7 U.S.C. § 1508(j)(3) applied only to situations in which an *insured* successfully sues the crop insurer. They further argued that count II was barred by the limitations period contained in § 1508(j)(2)(B), and alternatively, that the claim was barred by the doctrines of res judicata and/or collateral estoppel. *American Growers Ins. Co. v. FCIC*, 2003 WL 1233073 (S.D. Iowa, March 3, 2003) ("*American Growers II*"). This Court granted defendants motion to dismiss counts I and III, but rejected all four arguments regarding count II on the merits. *Id.* at *2-5.

Plaintiff filed its second amended complaint on June 12, 2003. Counts I and III, which were twice dismissed by the Court, were ordered manually stricken by Chief United States Magistrate Judge Ross A. Walters prior to the filing of the second amended complaint. Count II, as in both previous complaints, alleges plaintiff is entitled to indemnification for its losses pursuant to 7 U.S.C. §§ 1508(j)(3). Count IV sets forth an alternative claim for administrative review of a June 15, 2000 decision of the Agriculture Board of Contract Appeals ("ABCA"). Count V pleads a second claim under 7 U.S.C. §§ 1508(j)(3), contending that defendants' continued errors and omissions caused

---

Count II asserts an alleged violation of a federal statute, and it is unclear whether this matter was before the Board or could have been brought before the Board. As this is a motion to dismiss, matters outside of the pleadings – such as the Board's written decision, submitted by defendants as an appendix to their motion – may not be considered by the Court.

*American Growers I*, 210 F. Supp. 2d at 1093.

3

losses into subsequent crop years.

In their present motion for partial summary judgment on counts II and V, defendants urge the Court to reconsider its March 3, 2003 Order denying summary judgment on count II. Defendants also argue that, to the extent count V is not barred by claim preclusion, it is barred by plaintiff's failure to exhaust its administrative remedies before the AGBCA.[2]

> B.      Applicable Law and Discussion

>> 1.      Summary Judgment Standard

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir. 1994). The moving party must establish its right to judgment with such clarity there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir. 1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at

---

[2] In its resistance memorandum, plaintiff notes that defendants raised the same arguments in their motion for protective order, which was denied by Judge Walters on June 12, 2003. Plaintiff claims defendants waived their right to file the present motion based on the fact they did not file a timely appeal of Judge Walters' Order.

This Court disagrees. Judge Walters' June 12, 2003 Order held simply that, on the basis of the record then existing--including this Court's Order of March 3, 2003--it was inappropriate to confine discovery to the administrative record. Judge Walters specifically noted that certain issues were not before him at that time.

4

248.  "As to materiality, the substantive law will identify which facts are material . . . . Factual disputes

that are irrelevant or unnecessary will not be counted." *Id.*

> 2.  Whether Count II is Barred by Claim Preclusion

As set forth above, count II of plaintiff's second amended complaint seeks indemnification from

defendants for increased claims expenses caused by defendants' alleged "errors and omissions" under 7

U.S.C. § 1508(j)(3).  Second Amended Complaint (hereinafter, "Complaint") at § 51.  In denying

defendants' first motion for summary judgment on this count, this Court explained:

> [R]es judicata will bar any subsequent suit if: "(1) the first suit resulted in a final
> judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits
> involve the same parties (or those in privity with them): and (4) both suits are based
> upon the same claims or causes of actions." *Black Clawson Co., Inc. v. Kroenert
> Corp.*, 245 F.3d 759, 763 (8th Cir. 2001).
>          The Court need not go any further than to determine whether the suits are
> based upon the same causes of action.  I conclude that they are not.  American
> Growers' cause of action in Count II arises from 7 U.S.C. 1508(j)(3).  In contrast, its
> appeal to the AGBCA stemmed from the alleged breach of the 1996 SRA of the
> parties.  *In re Am. Growers Ins. Co.*, AGCBA No. 98-200-F at 7-8 (June 15, 2000).
> Indeed, it is doubtful whether the AGBCA even has jurisdiction to entertain a claim
> brought under § 1508(j)(3).  Summary judgment on res judicata grounds will therefore
> be denied.

*American Growers II*, 2003 WL 1233073 at *3-4 .

Defendants argue the Court's holding strayed from "established Eighth Circuit law" on claims

preclusion stating that the "same claims or causes of action" element of the claims preclusion doctrine

"turns on whether its claims arise out of the 'same nucleus of operative facts as the prior claim.'"

*Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998) (quoting *United States v.

Gurley*, 43 F.3d 1188, 1195 (8th Cir. 1994).  Specifically, defendants argue that: "Both Count II and

plaintiff's AGBCA appeal arise from the FCIC's December 7, 1995 final rule, which plaintiff terms the

5

'Prevented Planting Insurance Changes.'" Defendants' Memorandum in Support of Renewed Motion
for Partial Summary Judgment at 17.

This Court is not convinced by defendants' argument. As outlined in this Court's March 3,
2003 Order, the AGCBA proceedings challenged defendants' alleged wrongful conduct in refusing to
compensate plaintiff for increased costs it incurred as a result of the 1996 prevented planting changes.
*American Growers II*, 2003 WL 1233073 at * 4 (citing *In re Am. Growers*, AGCBA No. 98-200-
F at 7-8). Plaintiff's argument stemmed from the FCIC's adoption of a final rule published in the
Federal Register on December 7, 1995, which allegedly allowed farmers to receive 25% more
prevented planning coverage than under previous crop years. Specifically, plaintiffs challenged
defendants' alleged failure to timely implement the prevented planting coverage, which denied plaintiff
and other crop insurers what they consider to be adequate compensation for the 25% additional
coverage.

In contrast, count II of the second amended complaint claims defendants also committed the
following allegedly wrongful acts:

 a. In failing to provide American Growers reinsurance consistent with sound reinsurance
    principles in violation of 7 U.S.C. § 1508(k)(2);

 b. By offering expanded Prevented Planting Coverage when the FCIC lacked sufficient
    actuarial data to offer the same, in violation of 7 U.S.C. § 1508(a);

 . . . .

 f. In failing to indemnify American Growers for the FCIC's errors and omissions
    in violation of 7 U.S.C. § 1508(j)(3).

Second Amended Complaint at ¶ 52. Although the claims brought before the AGBCA and the present

6

action both originate from defendants' conduct in revising its prevented planting coverage policies, the

present action seeks equitable relief unavailable in the action before the AGBCA. Accordingly, the

Court believes it is incorrect to classify this action as "simply a repackaging of prior claims." *Costner*,

153 F.3d at 674.

Regardless of whether plaintiff's statutory claim "arises out of the same nucleus of operative

facts as its contract claim, however, the Court finds the AGBCA was nevertheless without jurisdiction

to hear the statutory claim. The AGBCA's jurisdiction stems from the Contract Disputes Act, ("the

CDA"), 41 U.S.C. §§ 601 *et seq*. When asked during the hearing, counsel for defendants suggested

that jurisdiction was derived from 7 U.S.C. § 6912(e), which states that "A person shall exhaust all

administrative appeal procedures established by the Secretary." 7 U.S.C. § 6912(e). This argument is

circular at best. A litigant cannot be expected to "exhaust appeal procedures" before an administrative

board that lacks jurisdiction to hear the claim being raised. Furthermore, contrary to the argument

raised in defendants' memorandum, the Secretary of Agriculture's regulation purporting to extend the

AGBCA's authority to hear appeals of final agency determinations of the FCIC regarding SRAs is not a

substitute for Congressionally-authorized jurisdiction. *See* 7 C.F.R. § 24.4.

Even assuming the Secretary of Agriculture had the authority to extend the AGBCA's

jurisdiction to hear a majority of SRA disputes, there is no evidence the Board could provide equitable

relief such as indemnification. In fact, the AGBCA itself has ruled that it cannot engage in equitable

analysis. *See Rain and Hail Insurance Service, Inc. v. FCIC*, AGBCA Nos. 2001-127-F and

2001-135-F, included in Plaintiff's App. at Tab 3, pp. 17-34. The Court therefore declines to alter its

earlier ruling denying summary judgment on count II.

7

3.    Whether Plaintiff must Exhaust Administrative Remedies on Count V

Defendants next argue that summary judgment must be granted on count V due to plaintiff's

failure to exhaust its administrative remedies with respect to this count. This Court disagrees.

According to plaintiff's counsel, count V was added to clarify its theories supporting

indemnification in count II, and to update the damages allegations to ensure it could recover not only for

damages attributed to crop year 1996, but also for all subsequent crop years. There is no dispute that

plaintiff did not seek damages for the more recent crop years during the administrative proceedings.

Nevertheless, because count V, like count II, seeks *statutory indemnification*, over which the

AGBCA has no jurisdiction, exhaustion of remedies is not at issue. Defendants' motion is denied. *See*

*National Crop Ins. Services, Inc. v. FCIC*, ___ F.3d ___, ___, 2003 WL 22869188 at * 2 (Dec. 5,

2003) (holding that crop insurers were not required to exhaust administrative remedies prior to filing

federal court action which included claim for indemnification under 7 U.S.C. § 1503(j)).


II.    MOTION TO LIMIT REVIEW TO ADMINISTRATIVE RECORD

The fact plaintiff's statutory claim for indemnification is separate and distinct from its claim for

judicial review of agency action does not necessarily mean the claims must be evaluated under different

legal standards, however. In their alternative motion to limit review to the administrative record,

defendants argue the Court should nevertheless consider the statutory claims as it would an APA claim,

limiting its review to the administrative record and adopting the "arbitrary and capricious" standard of

review set forth in the APA.

As noted by defendants, although 7 U.S.C. § 1506(d) vests this Court with original jurisdiction

8

to hear plaintiff's claim brought pursuant to § 1508(j)(3), the statute is silent as to the standard of review the Court should apply in evaluating plaintiff's claim. In *United States v. Carlo Bianchi & Co., Inc.*, 373 U.S. 709, 715 (1963), the Supreme Court confirmed that: "Indeed, in cases where Congress has simply provided for review [of federal agency conduct], without setting forth the standards to be used or the procedures to be followed, this Court has held that consideration is to be confined to the administrative record and that no *de novo* proceeding may be held." In *Guaranty Savings & Loan Ass'n v. Federal Home Loan Bank Board*, 794 F.2d 1339, 1342 (8th Cir. 1986), the Eighth Circuit relied upon this language to find that the district court had appropriately applied an APA style of review to the Federal Home Loan Bank Board's decision to appoint a receiver. In reaching its conclusion, the court expressly found that language in the federal banking statute directing the district court to review the receiver's conduct "on the merits" did *not* warrant *de novo* review. *Id.* at 1341; *see also Rain & Hail Ins. Serv. v. FCIC*, 229 F. Supp. 2d 710, 716-17 (S.D. Tex. 2002) (applying APA standard of review to suit alleging FCIC breached the plaintiff's SRA, expressly seeking indemnification pursuant to 7 U.S.C. § 1508(j)(3)).

In support of its quest for *de novo* review, plaintiff argues that there is no "administrative record," based on the fact the statutory claim for indemnification has never been heard by the AGBCA. Plaintiff's argument is unpersuasive.

As noted by defendants, counts II and V challenge defendants' conduct surrounding a final rule published by the FCIC on December 7, 1995 that changed the prevented planting insurance rules for 1996 and subsequent years. *See* Second Amended Complaint at ¶ 29-31 (alleging FCIC lacked sufficient actuarial data to make changes, and that rating methodology agency did employ was not

9

disclosed to plaintiff for comment); *see also id.* at ¶¶ 52, 69 (specifically outlining similar allegations into

counts II and V). The fact a formal hearing has not, nor could not have, taken place on plaintiff's claim

for indemnification does not prevent the existence of a reviewable "record." *See Florida Power &*

*Light v. Lorion*, 470 U.S. 729, 744 (1985) ("[A] formal hearing before the agency is in no way

necessary to the compilation of an agency record. . . . The APA specifically contemplates judicial

review on the basis of the agency record compiled in the course of informal agency action in which a

hearing has not occurred.").

Much of the "administrative record" needed to review the agency's conduct in this

regard–including documentation underlying the premium rates established by the FCIC–has already

been produced by defendants.[3] Additional portions of the "record" likely have been produced pursuant

to a series of terms of a discovery rulings entered by Judge Walters. The Court therefore finds

plaintiff's statutory claims for indemnification are appropriately evaluated as to whether defendants'

conduct was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the

law." 5 U.S.C. § 706. Furthermore, this Court's review should be limited to the record before the

FCIC at the time it issued its December 7, 1995 rule. *See Carlo Bianchi*, 373 U.S. at 714-15

(defining administrative record as "decision of the agency . . . and of the evidence on which it was

based").[4]

---

[3] As defendants pointed out in their initial briefing, the 3,000 page administrative record from
the AGBCA proceeding was filed with the Court August 9, 2002.

[4] The Court acknowledges the primary distinction remaining between counts II and IV are the
remedies available under each claim, and because the AGBCA did not consider conduct subsequent to
the 1996 crop year, the time period for which remedies might be available.

10

III.    MOTION TO STRIKE JURY DEMAND

Defendants also move to strike the jury demand made by plaintiff. Although plaintiff has not

expressly conceded the issue, it is unable to identify any statutory language that "affirmatively and

unambiguously" grants it this right. *See, e.g., Lehman v. Nakshian*, 453 U.S. 156, 168 (1981)

("plaintiff in an action against the United States has a right to trial by jury only where Congress has

affirmatively and unambiguously granted that right by statute."). Based on this fact, and in light of the

Court's ruling that the statutory claims are appropriately evaluated under an APA style of review,

defendants' motion to strike jury demand is granted.

IV.    CONCLUSION

For the reasons outlined above, defendants' motion for partial summary judgment on

counts II and V is denied. Defendants' motions to limit review to the administrative record and to strike

demand for jury trial are granted. Within twenty (20) days from the date of this Order, the parties are

directed to contact Judge Walters office at (515) 284-6217 to arrange a scheduling conference for the

purpose of establishing a briefing schedule for final submission of the remaining claims.

IT IS ORDERED.

Dated this 11th day of December, 2003.

RONALD E. LONGSTAFF, Chief Judge
United States District Court

11