IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ACE PROPERTY & CASUALTY | ) | |
| INSURANCE COMPANY (f/k/a CIGNA | ) | |
| PROPERTY & CASUALTY INSURANCE CO.), | ) | |
| ET AL. | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06cv01430 RMU |
| | ) | |
| FEDERAL CROP INSURANCE | ) | |
| CORPORATION, A CORPORATION WITHIN | ) | |
| THE UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Ace Property & Casualty Insurance Co., Inc., *et al.* (hereafter "Insurance Providers") move the Court for partial summary judgment as to certain of their claims against defendants Federal Crop Insurance Corporation ("FCIC"). As demonstrated by Insurance Providers in the accompanying Memorandum of Law, there are no genuine issues of material fact as to any of these claims and the Insurance Providers are therefore entitled to judgment against FCIC as a matter of law.

The Insurance Providers' Motion involves claims in two categories. The Insurance Providers first contend that the Department of Agriculture Board of Contract Appeals ("AgBCA") wrongly decided two issues that now are ripe for review by this Court. The AgBCA improperly concluded that the Insurance Providers' breach of contract claims resulting from 2000 congressional changes to their contract with the FCIC were time-barred. It also erroneously found that the contractual relationship between the Insurance Providers and FCIC

was established in a series of yearly contracts instead of one continuous contract. Once the AgBCA's errors are remedied, the Insurance Providers' claims resulting from those congressional changes should be remanded to the AgBCA. However, the Insurance Providers also contend that the AgBCA lacks jurisdiction to hear the Insurance Providers' dispute with the FCIC and that it lacks authority to award meaningful relief. Should the Insurance Providers' prevail on these claims, all of their claims, including those currently pending before the AgBCA should be heard by this Court.

In accordance with the foregoing, the Insurance Providers move the Court for summary judgment with respect to the following Counts of their Amended Complaint:

1. **Erroneous final decisions of the AgBCA requiring remand of matters back to AgBCA.**

   a. Under Count I of the Amended Complaint, the Insurance Providers request that the Court declare 7 C.F.R. § 400.169 (2000) to be void and of no effect because the regulation was amended without complying with the notice and comment requirements of 5 U.S.C. § 553(b).

   b. Under Count II of the Amended Complaint, the Insurance Providers request that the Court declare that their breach of contract claims based on the passage of the Agricultural Risk Protection Act of 2000 are not time-barred and must be considered by the AgBCA.

   c. Under Count III of the Amended Complaint, the Insurance Providers' request that the Court declare that they have not received a "determination" as required by 7 C.F.R. § 400.169 and that, because no determination has been received, any time period that runs from the receipt of determination could not yet have run.

     d.     Under Count VIII of the Amended Complaint, the Insurance Providers request that the Court declare that the 1998 SRA is a continuous contract or reverse the AgBCA's decision that the SRA was a series of yearly contracts and remand that matter to the AgBCA for evidentiary proceedings.

**2.**     **Allegations establishing that the AgBCA has no jurisdiction or authority to decide the dispute and lack the authority to award money damages.**

     a.     Under Count VI of the Amended Complaint, the Insurance Providers' request that the Court declare that the AgBCA lacks jurisdiction to hear the Insurance Providers' appeal because the delegation of authority from the Secretary of Agriculture wrongly extended the AgBCA's jurisdiction beyond congressionally defined boundaries.

     b.     Under Count VII of the Amended Complaint, the Insurance Providers request that the Court declare that the Insurance Providers are not contractually bound to utilize 7 C.F.R. § 400.169 as a dispute resolution mechanism and that the contract between the parties does not grant jurisdiction to the AgBCA to hear disputes between Plaintiffs and Defendants.

     c.     Under Count IV of the Amended Complaint, the Insurance Providers request that the Court declare that the AgBCA lacks authority to award money damages.

     d.     Under Count IX of the Amended Complaint, the Insurance Providers request that this Court declare that the rulings of the AgBCA have deprived the Insurance Providers of due process and have deprived the

Insurance Providers of their right to an Article III adjudication in violation of the United States Constitution, and its rulings are therefore invalid and of no force or effect.

Each of these areas is discussed in detail in the accompanying Memorandum in Support of Partial Summary Judgment.

Respectfully submitted this 25th day of January, 2007.

STINSON MORRISON HECKER LLP

By: /s/ Michael E. Tucci
    Michael Tucci (Bar # 430470)
    1150 18th Street, N.W., Suite 800
    Washington, D.C. 20036
    (202) 785-9100
    Fax: (202) 785-9163

P. JOHN OWEN

By: /s/ P. John Owen by Michael E. Tucci
    P. John Owen (KS Bar #11835; MO Bar #22523)
     (Pro Hac Vice)
    National Crop Insurance Services, Inc.
    8900 Indian Creek Parkway, Suite 600
    Overland Park, KS  66210
    (913) 685-2767
    Fax:  (913) 685-3080

Counsel for All Plaintiffs

MICHAEL J. DAVENPORT


By: /s/ Michael J. Davenport by Michael E. Tucci
    Michael J. Davenport (IA Bar # 45345)
    Rain and Hail L.L.C.
    9200 Northpark Drive, Suite 300
    Johnston, IA  50131-3006
    (515) 559-1000
    Fax:  (515) 559-1001

Additional Counsel for Plaintiff ACE Property &
Casualty Insurance Company

## CERTIFICATE OF SERVICE

       I hereby certify that on the 25th day of January, 2007, a copy of the foregoing Motion for Partial Summary Judgment was sent via the Court's Electronic Case Filing notification system to the following:


Jane W. Vanneman, Esq.
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Room 12010
Washington, D.C. 20005

Peter Smith
Assistant U.S. Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4224
Washington, D.C. 20530


                               /s/ Michael E. Tucci

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ACE PROPERTY & CASUALTY | ) | |
| INSURANCE COMPANY (f/k/a CIGNA | ) | |
| PROPERTY & CASUALTY INSURANCE CO.), | ) | |
| ET AL., | ) | |
| | ) | |
|      Plaintiffs | ) | |
| v. | ) | Civil Action No. 1:06cv01430 RMU |
| | ) | |
| FEDERAL CROP INSURANCE | ) | |
| CORPORATION, A CORPORATION WITHIN | ) | |
| THE UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE | ) | |
| | ) | |
|      Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

This action results from congressionally mandated changes to the contract under which Plaintiffs ("Insurance Providers") sell federal crop insurance to the Nation's farmers. As defined in the contract between the Insurance Providers and the government, the Insurance Providers retain negotiated levels of risks underwritten in the policies they sell and cede to the government a portion of premiums paid in return for its reinsuring the balance of the risks underwritten. The Federal Crop Insurance Act, 7 U.S.C. § 1501 *et. seq.* ("FCIA"), establishes the structure for this program.[1]

---

[1]   In the parlance of the FCIA, policyholders are called "producers" (7 U.S.C. § 1508(a)), and their insurers are called "approved insurance providers" (*id.* at § 1502(b)(2)). This memorandum uses the more conventional term "farmers" to identify policyholders and the shorter "Insurance Providers" to denote the plaintiff insurers. The underlying statutes and many of the documents use the more technical terms.

After the contract was negotiated and executed by the Insurance Providers and the Federal Crop Insurance Corporation ("FCIC"), each party performed their respective obligations under the contract for nearly a year.  In the twelfth month of the contract, Congress, through the first of two acts, changed the negotiated compensation for the Insurance Providers' services.  As described in Parts II and III, the Insurance Providers have traveled a tortured path to the Department of Agriculture's Board of Contract Appeals ("AgBCA") and now to this Court seeking redress.

The AgBCA improperly dismissed as time barred the Insurance Providers' claims based on the second congressional act and assumed jurisdiction over their claims based on the first act. The Insurance Providers ask this Court to reverse those and other decisions of the AgBCA and to rule on the matters which the AgBCA said it lacked jurisdiction to hear.  Ultimately, this Court should assume plenary jurisdiction over all of the Insurance Providers' claims.

## I.  BACKGROUND.

### A.    The federal crop insurance program.

Federal crop insurance is sold and serviced exclusively by the private sector.  Reliance on the private sector's skills, however, is a relatively new development in the program's history.

Congress enacted the FCIA "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance."  7 U.S.C. § 1502(a). "[R]espond[ing] to the serious need by farmers for protection against losses," H.R. Rep. No. 96-430, at 26 (1979), the FCIA established the FCIC as an agency of and within the Department of Agriculture, 7 U.S.C. §1503, to administer and regulate a comprehensive all-risk federal crop insurance program.  *Id*. §§ 1503, 1507(c)(2).  Congressional action was deemed necessary "because of the magnitude of the problem," H.R. Rep. No. 96-430, at 26, and because

"[n]umerous attempts by the private industry to write all-risk policies [had] failed." S. Rep. No. 96-254, at 9 (1979).

Although federal crop insurance was created in 1938, as late as 1979, federal crop insurance was available in only one-half of the Nation's counties, S. Rep. No. 96-254, at 6, and in most counties only one or two crops were insurable. H.R. Rep. No. 96-430, at 33. Moreover, "[i]n many instances, insurance [was] not available when and where it [was] most needed." S. Rep. No. 96-254, at 6. Even in those areas where federal crop insurance was available, farmer participation in the program remained extremely low. *Id*.

In 1980, Congress sought to change all that by substantially "expand[ing] and revis[ing] the crop insurance program. H.R. Rep. No. 96-430, at 6. Congress recognized that "[w]idespread participation by farmers is critical to the success of the Federal crop insurance program." S. Rep. No. 96-254, at 7. Congress took several steps to ensure increased farmer participation. Among other things, Congress lifted restrictions on the availability of federal crop insurance and expanded the program to "all counties and all crops." *Id*. Congress also provided for federal cost-sharing by directing the FCIC to pay a portion of farmers' premium costs. *See* 7 U.S.C. § 1508(e). Most significantly, however, Congress permitted the FCIC "to use private companies in administering the program." S. Rep. No. 96-254, at 10.

Congress recognized that if its goal of maximum participation were to be achieved, "Federal crop insurance [would] have to be aggressively marketed." H.R. Rep. No. 96-430, at 12. To accomplish that task, the FCIC would have to draw on the resources of the private sector: "[T]he sales talents and experience of private sector commissioned agents and insurance companies * * * are essential to fulfilling the goal of nationwide, generally accepted all-risk

insurance protection." *Id.* at 12 – 13.  In essence, private companies were substituted for federal government employees that previously provided crop insurance.

To encourage private sector participation, Congress lifted a restriction on the FCIC's ability to provide reinsurance, and directed the FCIC to provide reinsurance "to the maximum extent practicable." 7 U.S.C. § 1508(k)(a).[2]  By the early 1990s, more than 85% of the federal crop insurance sold to farmers was provided by reinsured providers.  *Kansas ex. rel. Todd v. United States*, 995 F.2d 1505, 1508 (10th Cir. 1993).  Today, all federal crop insurance is sold and serviced exclusively by the private sector.

> **B.**    **The contract at issue.**

The contract negotiated between the Insurance Providers and the FCIC is called the Standard Reinsurance Agreement ("SRA").  7 C.F.R. § 400.164.  This dispute focuses on the 1998 SRA, which was negotiated in 1997 and in effect from July 1, 1997 through June 30, 2004. The 1998 SRA supplied the terms and conditions under which the Insurance Providers sold and serviced federal crop insurance to farmers, as well as the terms by which the government, through the FCIC, provided reinsurance.

This case involves claims by the Insurance Providers relating to the only financial consideration provided to them for selling and servicing catastrophic risk protection plans of insurance ("CAT" coverage) – the most basic form of federal crop insurance.[3]  The government agreed in the 1998 SRA to provide two categories of financial consideration to the Insurance Providers for selling and servicing CAT policies.  The Insurance Providers were entitled to retain

---

[2]  At the time, the FCIC was authorized to provide reinsurance in only twenty counties.  Because of that restriction, the FCIC had never actually exercised its authority to provide reinsurance. S. Rep. No. 96-254, at 10.

[3]  More extensive coverage levels are available.  *See* 7 U.S.C. § 1508(c).  CAT coverage, authorized by 7 U.S.C. § 1508(b), however, is the only type of insurance plan involved in this litigation.

an administrative expense fee of $50 per crop, up to $100 per county, for each CAT policy sold. Plaintiffs' Statement of Undisputed Facts No. 12 (hereinafter "Plaintiffs' Facts"). For the remainder of their compensation, the Insurance Providers were entitled to receive Loss Adjustment Expenses ("LAE") of approximately 14% of the imputed CAT premium.[4] Plaintiffs' Facts No. 13.

### C.    Congressionally mandated breaches of the CAT compensation provisions.

In June 1998, Congress passed and the President signed the Agricultural Research, Extension, Education, and Reform Act of 1998 ("AREERA"). That legislation specifically prohibited the Insurance Providers from retaining the CAT administrative expense fees to which they were contractually entitled under the 1998 SRA. Plaintiffs' Facts No. 19. AREERA also lowered the amount of LAE that could be paid to the Insurance Providers from the contractually established 14% of the imputed CAT premium to 11%. Plaintiffs' Facts No. 21.

In June 2000, Congress passed and the President signed the Agricultural Risk Protection Act of 2000 ("ARPA"). That legislation further lowered the LAE payable under the 1998 SRA from 11% of the imputed CAT premium, as provided in AREERA, to 8%. Plaintiffs' Facts No. 23. Thus, ARPA and AREERA together reduced the LAE reimbursement established in the 1998 SRA from approximately 14% of the imputed CAT premium to 8%.

Immediately after each act became law, FCIC sent the Insurance Providers unilateral amendments to the 1998 SRA reflecting the legislated changes.[5] See Plaintiffs' Facts, Exhibits B & C. In each case, FCIC demanded that the Insurance Providers execute the amendments and immediately return them to FCIC or be summarily terminated as an approved insurer under the

---

[4] No premium is charged for CAT Coverage. Thus the LAE payment is calculated using an "imputed" premium.
[5] Amendment Number 1 to the 1998 SRA reflected the changes required by AREERA. Amendment Number 3 to the 1998 SRA reflected the ARPA changes.

federal crop insurance program.  *Id.*  Insurance Provider's executed the amendments, but only after expressly reserving their rights to seek the compensation provided for under the express terms of the 1998 SRA.  See Plaintiffs' Facts, Exhibits D & E.

## II.  PRIOR JUDICIAL PROCEEDINGS.

In 2003, the Insurance Providers initiated an action against the United States in the United States Court of Federal Claims alleging that the changes resulting from AREERA and ARPA had breached the 1998 SRA.  Without reaching the merits of the Insurance Providers' claims, the Court of Federal Claims dismissed their suit for want of jurisdiction, holding that the Insurance Providers' claims were in reality claims against FCIC, that 7 U.S.C. § 1506(d) provided for original jurisdiction in the federal district courts over suits against FCIC, and that it lacked jurisdiction because the Insurance Providers had not exhausted their administrative remedies.  *Ace Property & Cas. Ins. Co. v. United States*, 60 Fed. Cl. 175 (Fed. Cl. 2004).  On appeal, the Federal Circuit affirmed the primary jurisdictional holding and refused to consider the second administrative exhaustion conclusion, finding it "superfluous."  *Ace Property & Cas. Ins. Co. v. United States*, 138 Fed. Appx. 308, 309 (Fed. Cir. 2005).

Following the dismissal by the Court of Federal Claims, the Insurance Providers filed identical claims in the United States District Court for the Southern District of Iowa.  There too, FCIC alleged that the court lacked jurisdiction because the Insurance Providers had not yet exhausted their administrative remedies.[6]  The district court agreed, finding that it lacked subject matter jurisdiction because the Insurance Providers failed to exhaust, but the court also held that even if it had jurisdiction, none of the traditional exceptions excusing exhaustion applied.  *Ace Property & Cas. Ins. Co. v. Federal Crop Ins. Corp. & Risk Management Agency*, 357 F.Supp.2d

---

[6] The Insurance Providers also had filed a "claim" with the FCIC, which it summarily denied, and the subsequent appeal to the AgBCA, was pending.  *See* Part III.

1140, 1150-51 (S.D. Iowa 2005).  On appeal, the Eighth Circuit Court of Appeals disagreed and determined that the district court did have subject matter jurisdiction, but it nonetheless affirmed the district court's decision on the grounds that none of the traditional exhaustion exceptions applied.  *Ace Property & Cas. Ins. Co. v. Federal Crop Ins. Corp.*, 440 F.3d 992, 1001 (8th Cir. 2006).

## III.  AgBCA PROCEEDINGS.

On June 23, 2004, the Insurance Providers filed an appeal of FCIC's denial of their claims to the AgBCA.  When the Insurance Providers filed that appeal, they asserted that the AgBCA lacked jurisdiction to hear the dispute and asked that the AgBCA rule on the jurisdictional issue prior to hearing the merits.  Just prior to oral argument in the Eighth Circuit appeal discussed above, the AgBCA ruled that certain SRA provisions gave it jurisdiction to entertain some of the Insurance Providers' claims.  *In re Ace Property & Casualty Ins. Co.*, AgBCA No. 2004-173F, 2005 WL 3485623 (Dec. 21, 2005) (hereinafter "*Ace I*").  The AgBCA also decided the merits of the timeliness of the Insurance Providers' ARPA-based claims.

The Insurance Providers moved for reconsideration of the AgBCA's decision in *Ace I*.  In its decision on the Insurance Providers' Motion for Reconsideration, the AgBCA waded into the facts of the controversy, despite the reality that the matter was before it solely on the question of its jurisdiction to hear the Insurance Providers' claims.  *Ace Property & Casualty Ins. Co.*, AGBCA No. 2006-120-R, 2006 WL 1776561 (June 28, 2006) (hereinafter "*Ace II*").  In fact, when the AgBCA ruled, the FCIC had not filed either an answer or a summary judgment motion, nor had it submitted to the AgBCA the appeal file required by the board's Rule 4.  *See* 7 C.F.R. § 24.22.  Plaintiffs' Facts No. 30.  The Insurance Providers filed this action after the AgBCA denied their Motion for Reconsideration of the jurisdictional ruling.

In *Ace I* and *Ace II*, the AgBCA determined that it had the authority to address the Insurance Providers' claims that changes mandated by AREERA breached the 1998 SRA. Those claims are therefore currently pending before the AgBCA. Conversely, the AgBCA held that it lacked jurisdiction to consider the Insurance Providers' breach of contract claims that resulted from the passage of ARPA, because the AgBCA determined that the changes made in 2000 to the FCIC disputes regulation, 7 C.F.R. § 400.169, required the Insurance Providers to present their ARPA claims within 45 days of the "disputed action." The AgBCA apparently believed, but never directly decided, that the "disputed action" was the transmission to the Insurance Providers of Amendment No. 3 to the 1998 SRA, which allegedly implemented the changes required by ARPA.[7] *See Ace I* at 4, 12.[8] The AgBCA also found that it possessed the authority to award money damages to the Insurance Providers despite the lack of any statutory or contractual basis providing the AgBCA with such powers. *Id.* at 9-10. Most importantly, the Insurance Providers made numerous arguments to the AgBCA that the FCIC disputes regulation, the AgBCA's contract interpretations, and the AgBCA's authority to hear the dispute were directly contrary to existing law and thus invalid. For example, the AgBCA's imposition of a 45 day statute of limitations for breach of contract claims is directly contradicted by 28 U.S.C. § 2401(a). The AgBCA refused to address these arguments, alleging that to do so would go beyond its authority. Proper consideration of the Insurance Providers' claims under all of the applicable law demonstrates that the AgBCA lacks jurisdiction and that its rulings were wrong.

---

[7] As discussed in greater detail below, the event triggering this "mandatory" 45 day timeframe has not been factually determined, and no evidence was taken by the AgBCA by which it could make such a factual determination.

[8] Because Westlaw does not include internal page references for AgBCA decisions, the pin citations used in these decisions are to the page numbers in the upper right corner of the Westlaw printouts.

## IV. SUMMARY JUDGMENT STANDARD.

The Court is familiar with the summary judgment standard. *Kwon v. Billington*, 370 F.Supp.2d 177, 182-83, (D.D.C. 2005). Because this case involves certain final decisions of the AgBCA, this standard operates in conjunction with *de novo* review by this Court. *De novo* review is required in this case for several reasons.

First, the AgBCA's decision responded to the Insurance Providers' challenge to its jurisdiction. Challenges to agency jurisdiction are reviewed *de novo*. *Lin v. Gonzales*, ___ F.3d___, 2007 WL 29242, *2 (9th Cir. 2007) ("[W]e review questions of law, including an agency's determination of its own jurisdiction, *de novo*."); *N.L.R.B. v. Ironworkers Local 505*, 794 F.2d 1474, 1477 (9th Cir. 1986) (holding that challenges to National Labor Relations Board's assertion of jurisdiction are reviewed *de novo*).[9]

Second, the AgBCA's analysis and ruling are based on its interpretation of the 1998 SRA, a contract between the Insurance Providers and FCIC, and contract interpretation is clearly the province of the judiciary. *See Cox v. Commodity Futures Trading Comm'n*, 138 F.3d 268, 272 (7th Cir. 1998) (noting that when the question decided by the administrative agency "is of the sort that courts commonly encounter, de novo review is proper."); *Monex Intern., Ltd. v. Commodity Futures Trading Comm'n*, 83 F.3d 1130, 1133 (9th Cir. 1996)(judicial deference toward agency determination "is not necessarily warranted where courts have experience in area and are fully competent to decide the issue *** In those situations, the more probing de novo standard is appropriate.") As the Supreme Court has held, "[a]rbitrators and courts are still the

___

[9] Although this circuit applies *Chevron* deference to agencies' jurisdictional decisions, *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conference of the U.S.*, 264 F.3d 52, 62 (D.C. Cir. 2001), because the AgBCA rulings did not involve an interpretation of an ambiguous statute, such deference is inapplicable here. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984).

principal sources of contract interpretation." *N.L.R.B. v. Strong,* 393 U.S. 357, 360-361, (1969); *Electrical Workers Local 47  v. N.L.R.B.*, 927 F.2d 635, 640-41 (D.C. Cir. 1991)("We accord no special deference *** to ultimate legal conclusions that rest on the Board's interpretation of a collective bargaining contract. Thus we apply a de novo standard of review when interpreting the contract itself."); *County of Suffolk, N.Y. v. U.S.*, 26 Cl.Ct. 924, 927 (Cl.Ct. 1992) (Court conducts a *de novo* review of agency's determination of breach of contract claim, absent any provision in contract mandating that agency's determination be given particular level of deference).

Third, the AgBCA expressly refused to address many of the issues raised herein, concluding that it had no authority to decide the validity of statutes or regulations.  Clearly, those matters that the AgBCA determined that it was incompetent to hear are subject to *de novo* review in this Court.  *See Schmitt v. Maurer, et al.*, 451 F.3d 1092, 1095 (10th Cir. 2006) (*de novo* review appropriate where opportunity for administrative review is unavailable).

In addition, the Insurance Providers raised certain constitutional infirmities in the AgBCA's handling of the Insurance Providers' claims, and such claims require *de novo* review. *Western Energy Co. v. U.S. Dept. of Interior*, 932 F.2d 807, 809 (9th Cir. 1991)(noting that Court of Appeals reviews claims that administrative agency violated claimant's constitutional rights *de novo*).  Similarly, the Insurance Providers claim that the Secretary of Agriculture lacked authority to expand the AgBCA's jurisdiction is also subject to *de novo* review. *See Bonneville Power Admin. v. Federal Energy Reg. Comm'n*, 422 F.3d 908, 914 (9th Cir. 2005)(noting that the question of whether an agency has exceeded its statutory mandate is reviewed *de novo*).

Finally, *de novo* review is required here because no genuine administrative process ever occurred. Before its rulings in *Ace I* and *Ace II,* the AgBCA held no hearings, took no testimony,

and had no record to consider. *See American Image Corp. v. U. S. Postal Service*, 370 F.Supp. 964, 966 (S.D.N.Y. 1974)(*de novo* review of administrative action is permissible when no hearing was held or testimony taken by agency). The parties have never engaged in discovery, and FCIC only filed an answer in the AgBCA proceeding after the Insurance Providers requested that the AgBCA order it to do so following issuance of the decision in *Ace II*. Plaintiffs' Fact No. 30.

## V. ARGUMENT.

   A.    **As a matter of law, the AgBCA's holding that the Insurance Providers cannot assert their ARPA claims is patently wrong.**

   1.    *There Is No Evidence That FCIC Intended The 45-day Time Period In § 400.169 To Operate As A De-Facto Statute Of Limitations To Bar The Insurance Providers' Claims.*

The AgBCA interpreted the following portion of § 400.169 to require that the Insurance Providers present their ARPA-based claims within 45 days or be forever barred.

> (a)    If the company [insurers] believes that the Corporation [FCIC] has taken an action that is not in accordance with the provisions of the Standard Reinsurance Agreement or any reinsurance agreement with FCIC, except compliance issues, it may request the Deputy Administrator of Insurance Services to make a final administrative determination addressing the disputed action. The Deputy Administrator of Insurance Services will render the final administrative determination of the Corporation with respect to the applicable actions. All requests for final administrative determination must be in writing and submitted within 45 days after receipt after the disputed action.

However, the AgBCA's interpretation is incorrect as a matter of law.

The 1998 SRA provides:

> The [Insurance Provider] should be aware that the statute of limitations for bringing suit for any breach of this Agreement is 6 years.

Plaintiffs' Facts, Ex. A at 24. Despite this unambiguous contractual provision, the FCIC advocated, and the AgBCA adopted, an interpretation of the regulatory scheme that effectively nullified this express contractual term and reduced to 45 days the applicable statute of limitations

for breach of contract claims.  In doing so, the AgBCA also ignored 28 U.S.C. § 2401(a), which gives claimants against the government, such as the Insurance Providers, six years to bring claims against FCIC.  That section provides:

> (a)  Except as provided in the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

Thus, under both the SRA's express language and the statute, the Insurance Providers have six years to present their breach of contract claims.  When confronted with the inconsistency between the regulation's 45 days, the statute's six years, and the contract language, the AgBCA failed to explain how the regulation could override both the contract and the statute.  Instead, the AgBCA stated:

> …to the extent Appellants challenge FCIC's authority (due to a conflict with the statute) to set out time limitations for filing of claims, those matters would require the Board to decide issues of statutory and regulatory authority and not the meaning of the contract.  Challenges to enforceability of statutes or to the propriety or authority of FCIC to issue regulations are beyond the scope of what has been delegated to the Board through FCIC regulations.

*Ace I* at 10.

Clearly, FCIC was powerless to shorten the applicable statute of limitations.  *See Morrill v. Jones*, 106 S.Ct. 466, 466 (1882); *Pedersen v. Benson*, 255 F.2d 524, 529 (D.C. Cir. 1958) (regulation cannot be inconsistent with existing law, and cannot defeat a law enacted by Congress).  But even if the regulation could effectively abrogate § 2401(a), it is clear that it was never intended to operate that way.  Neither the historical revisions to § 400.169, nor the rule-making comments published by the FCIC in relation to these revisions over a twenty year period, reveal any intent on the part of FCIC to affect the Insurance Providers' valid breach of contract claims. *See generally* 52 FR 17540 (May 11, 1987); 53 FR 31825 (August 22, 1988); 60 FR 21035 (May 1, 1995); 61 FR 39268 (July 29, 1996); 61 FR 40952 (August 7, 1996); 65 FR 3781

(January 25, 2000). Not once in this entire time period has FCIC ever stated, suggested, or even hinted that the 45-day time period in § 400.169 was intended as a hidden trump card to eliminate valid claims against the government. In fact, the only reasonable interpretation of § 400.169 that can be gleaned from the history of revisions to § 400.169 and FCIC's comments thereto is that it was never intended to operate in the manner set forth by the AgBCA in its decisions regarding the Insurance Providers' claims.

For example, in the comments to the proposed 1987 version of the dispute provision, the FCIC stated:

> 2. Section 400.149 NAUI takes issue with the determination that the Manager's decision is final in matters arising under this Subpart and the Reinsurance Agreement between the Company and takes the position that FCC is denying a Company redress in the courts. *FCIC, by this determination, does not abrogate the rights of any Company to seek redress in litigation*, it merely exercises it rights under the Agreement and will not change this section.

52 FR 17540 (May 11, 1987)(emphasis added).

Comments to the proposed 1995 version show that § 400.169 was intended to be an informal dispute mechanism rather than a procedural land mine:

> Comment: All three commentors expressed concern with respect to the propriety of permitting the Director of Compliance and the Director of Insurance Services to render final administrative decisions.
>
> Response: *Section 400.169 provides an informal mechanism for companies to challenge decisions rendered by FCIC*. Reconsideration of these decisions allows the division that rendered the decision the opportunity to correct any error prior to an appeal to the BCA. The Directors of Compliance and Insurance Services are persons with the most knowledge of the programs they administer and are most qualified to render final determinations. Therefore, there is no need to amend the rule to have the Deputy Manager make final determinations.

61 FR 39268 (July 29, 1996) (emphasis added). Additional comments to the 1995 version also establish the Insurance Providers' rights to bring suit in federal court following the culmination of the administrative process:

> Comment: One comment suggested that the rule be amended to specify the forum for an appeal of a BCA decision.
>
> Response: An amendment to the rule is not necessary. ***The administrative appeals process ends with a BCA decision***. The Department of Agriculture Reorganization Act provided that ***once the administrative appeals process is complete, persons may bring suit***. Section 506(d) of the Federal Crop Insurance Act, as amended, states that the Federal district court has exclusive original jurisdiction over any suit brought against FCIC.

*Id.* (emphasis added); 61 FR 40952 (August 7, 1996) (emphasis added).

Finally, if the FCIC believed that a change to the dispute process was warranted, it was required to acknowledge its change in policy and give reasons therefore, with direct, reasoned consideration of contrary arguments and positions put forth by the parties. *Greater Boston Television Corp. v. Federal Communications Comm'n*, 444 F.2d 841, 852 (D.C. Cir. 1970). Instead, FCIC has claimed that the watershed changes to § 400.169 adopted in January of 2000 "do not change current requirements as understood by the reinsured companies and FCIC." 65 FR 3781 (January 25, 2000).

There is simply no support for the AgBCA's ruling that the 45-day time limit operates as a *de facto* statute of limitations barring the Insurance Providers' ARPA claims. Consequently, the Court should reverse the AgBCA ruling.

**2.  *7 C.F.R. § 400.169 Is invalid As It Was Promulgated Without The Requisite Notice and Comment, And No Exception To The Notice and Comment Requirement Applies.***

According to the AgBCA, the 45 day time period in § 400.169 to present a request for a final agency determination was permissive before the FCIC amended the regulation in 2000. *Ace I* at 10-12. Therefore, absent the amendment, all of the Insurance Providers' claims would properly be before the AgBCA.

The FCIC previously stated that it provided no notice and comment period for the regulatory changes because it determined them to be "interpretive," and thus excepted from the notice and requirement of 5 U.S.C. § 553(b). However, the record is clear that the change is not merely interpretive, but was instead advanced in an effort to overturn an adverse decision of the AgBCA that the 45 day time period was not mandatory based on an argument made by one of the Insurance Providers in an earlier, unrelated case. *See American Growers Ins. Co.*, AgBCA No. 99-134-F, 1999 WL 984394 (October 28, 1999) (45 day time period is permissive, not mandatory). *See also American Growers Ins. Co.* (Ruling on Government's Motion for Reconsideration), AgBCA No. 99-134-F, 2000 WL 696063 (May 23, 2000) (regulation amended "with the intended effect of clarifying the timeframe in which all requests for a final agency determination must be submitted") and ("It is also clear that the FCIC amended its regulation in response to the majority decision, ***") (Houry, J., dissenting).

The Administrative Procedures Act requires notice of proposed rulemaking, with the opportunity for comment. 5 U.S.C. § 553(b). It is uncontroverted that no notice was given or comment period allowed for the 2000 amendment to § 400.169. Lack of notice renders the amendment to the rule void. *Sprint Corp v. Fed. Com. Comm'n*, 315 F.3d 369, 377 (D.C. Cir. 2003). The "interpretive" exception to the general requirement for notice and comment does not apply where a rule changes the existing agency position and has a substantial impact on the rights and obligations of the public. *National Retired Teachers Ass'n v. United States Postal Service*, 430 F.Supp 141, 148 (D.D.C. 1977), *aff'd,* 593 F.2d 1360 (D.C. Cir. 1977). On its face, the amended version of § 400.169 is not "interpretive." On one day, the Insurance Providers had viable ARPA claims. On the next, pursuant to "interpretive" change in the regulation, their

claims were barred.  It defies logic and common sense to label a case dispositive change as "interpretive."

Because the amendment to 7 C.F.R. § 400.169 was made without the required notice and comment period, it is void, and the 2000 version of the regulation should not prejudice the Insurance Providers' ARPA claims.  Moreover, as the amended language is the sole reason that the agency and AgBCA declined to address the Insurance Providers' ARPA claims, this Court should order the AgBCA to consider those claims as well, assuming the AgBCA has jurisdiction over any aspect of this litigation.

### 3.    *The Insurance Providers Received No "Determination, Therefore The Time Period Identified In § 400.169 Has Not Run.*

The AgBCA ruled that the Insurance Providers' ARPA claims were time barred because they were not presented to the agency within 45 days.  *Ace I* at 12.  However, it is uncontroverted that the Insurance Providers have yet to receive any documentary notice sufficient to start the clock running on the Insurance Providers' time to request a final agency determination.

### a.    Because The FCIC Never Provided The Insurance Providers With A "Determination," The 45-day Time Period Could Not Have Run.

7 C.F.R. § 400.169, as amended in 2000, states that the "Company [Insurance Providers] *** may request the Deputy Administrator of Insurance Services to make a final administrative determination addressing the disputed action****    All requests for a final administrative determination must be in writing and submitted within 45 days after receipt after the disputed action."  7 C.F.R. § 400.169(a) (2000).

16

There is no evidence in the record that the Insurance Providers received any "determination" from the FCIC regarding either the AREERA or ARPA disputes:[10]

> [t]he use of the word 'determination,' although not defined in the regulation, clearly contemplates a specific documentary notice to the contractor from an official authorized to take the action. Implicitly, to trigger the 45-day response time, the notice must either directly or constructively identify the document being received by Appellant, as a determination requiring a 45-day response.

*See In re American Growers Ins. Co.,* AGBCA No. 98-200-F, 2000 WL 769261 at 21 (Ag.B.C.A. June 15, 2000) (Pollack, J., dissenting).

It appears that the AgBCA simply assumed that the unilateral issuance of Amendments 1 and 3 triggered the 45-day period.  *See Ace I* at 4 (quoting the Acting Director of RMA's statement that issuance of the amendments were the "disputed actions" and that the request for final administrative determination came "long after" the issuance dates). There is no support in § 400.169, or in any previous AgBCA decision, for the proposition that the unilateral issuance of an SRA amendment starts the 45-day clock.  Indeed, as the AgBCA itself has previously held in an analogous situation, rule *publication* does not start the clock running.  *See In re Farmers Alliance Mutual Ins. Co.*, AGBCA No. 2000-163-F, 2002 WL 318262 at 3 (Ag.B.C.A. Feb. 28, 2002)(affirming prior AgBCA decisions holding that rule publication does "not start the running of the 45-day period to ask for a final administrative determination."); *In re Rural Community Ins. Agency, Inc.*, AGBCA No. 2000-154-F, 2002 WL 236693 at 8 (Ag.B.C.A. Feb. 12, 2002) (noting that "[i]f FCIC's intent is to treat the publication of a rule as that initial determination, a clarification to the regulation is the appropriate course. However, we also suggest that such a

---

[10] In its January 2000 rule change, the FCIC noted that the dispute process implemented in 1988 "provide[d] the applicable reinsured company with a copy of initial findings, allowed the company to respond, and then issued a final determination. If the reinsured company disputed the final determination, the reinsured company was required to appeal within 45 days of receipt of the determination to the Deputy Manager of the FCIC." 65 FR 3781 (January 25, 2000).

requirement could unnecessarily hamper the conduct of day-to-day business between the parties."); *see also Ace I* at 11 (noting that "publication of the rule in the Federal Register in *Rural* did not qualify as an initial determination so as to start the running of a 45-day period."). [11]

Absent the Insurance Providers' receipt of an FCIC determination regarding their claims arising as a result of reduced contract payments caused by the passage and implementation of ARPA and AREERA, the 45-day period for seeking a final determination from the Director of Insurance Services could not have run. [12]  Consequently, the AgBCA erred when it ruled that the Insurance Providers' ARPA claims were time-barred.

> **4.    *The AgBCA's Failure To Address The Insurance Providers' Position That They Never Received A "Determination" from the FCIC Requires Remand.***

The 45-day limit in 7 C.F.R. § 400.169, if applicable at all, is triggered by receipt of a "determination" from the FCIC, rather than an FCIC "action," and the Insurance Providers have never received a determination from the FCIC.  The AgBCA never actually considered the Insurance Providers' position, and had it, it could not have barred the Insurance Providers' ARPA claims. However, the simple fact that the AgBCA failed to address the Insurance Providers' position at all in its rulings requires the Court to remand this issue to the AgBCA, as it is an essential element of reasoned decision-making that an agency "engage the arguments before it." *NorAm Gas Transmission Co. v. Federal Energy Regulatory Comm'n*, 148 F.3d 1158, 1165 (D.C. Cir 1990) ("In the present case, the Commission not only failed to provide an adequate response to NorAm's argument, it failed to take seriously its responsibility to respond

---

[11] FCIC has argued in the past, at least informally, that publication of the revisions to § 400.169(a) in January 2000 could start the 45-day period.  As noted above, there is no support for such a conclusion, and the AgBCA has specifically concluded otherwise.

[12] To hold otherwise would mean that the Insurance Providers had to present their claims and ask that those claims be officially determined prior to any adverse financial impact of the congressional enactments.

at all.  As we have said before, '[i]t most emphatically remains the duty of this court to ensure that an agency engage the arguments raised before it – that it conduct a process of *reasoned* decision-making.'") (citation omitted); *Motor Vehicle Mfrs. Ass'n et al. v. State Farm Mutual Automobile Ins. Co., et al.*, 463 U.S. 29, 43 (1983).

The AgBCA's failure to address the Insurance Providers' contention that it has yet to receive a determination triggering the 45 days in either *Ace I* or subsequent *Ace II* requires remand.

**B.    The AgBCA Improperly Ruled That the SRA Was Not a Continuous Contract Without Any Evidence of Contractual Intent.**

The AgBCA decided this case at an extremely early procedural stage—before FCIC had filed an answer, and without any evidentiary record.  Indeed, one of the reasons the Eighth Circuit declined to excuse exhaustion was the need for the AgBCA to develop a factual record regarding contractual intent, contractual consideration, and other matters.  *Ace Property and Cas. Ins. Co.*, 440 F.3d at 1001-1002.  Particularly troubling is the fact that the AgBCA analyzed and decided several issues at the pre-hearing stage that could not be decided absent a factual record. This egregious misstep requires, at the very least, a remand to the AgBCA.  The prime example of the AgBCA's making dispositive rulings without a record is its shifting position on whether the 1998 SRA was a continuous contract or one renewed annually.  The history of its position on this issue, charitably stated, does not pass any version of the "red face" test.

In *Ace I*, the AgBCA determined that the SRA was a "continuous contract" that covered the period from 1998 through 2004.  *Ace I* at 2.  In their Motion for Reconsideration, the Insurance Providers demonstrated that regulations in effect at the time of the execution of the 1998 SRA (1997) are the only regulations that could properly be considered to have been incorporated into the contract.  Since the "permissive" version of § 400.169(a) was what was in

effect at that time, only the permissive version of § 400.169(a) could be deemed incorporated into the contract.

In its ruling on the Insurance Providers' Motion for Reconsideration, the AgBCA waded into an analysis regarding the effects of regulatory changes on "the operation of a contract which continues year-to-year." *Ace II* at 5. Struggling to uphold its earlier decision, the AgBCA contradicted its prior ruling that the SRA was continuous, and decided on reconsideration that the 1998 SRA really was a contract that renewed every year. By deciding the issue as it did, the AgBCA concluded that subsequent yearly renewals of the 1998 SRA had incorporated the revised "mandatory" regulation. *Id.* In doing so, the AgBCA acknowledged it had never addressed this issue, and looked for guidance in

> a body of law that has been developed by various state court decisions, which addresses the renewal of insurance contracts and the effect of laws enacted after the original opening of the policy, but before a renewal. … the cases on insurance provide a clear road map as to what factors go into to determining if an insurance contract, such as the SRA, takes on new provisions or remains with the original provisions at times of renewal.

*Id.* Rather than rely on the wealth of well-settled law of contract interpretation, the AgBCA found as "particularly instructive" an unpublished case from the Western District of Washington in which the court held that "the primary criterion for determining whether an agreement is a single contract or a number of severable contracts is the ***intention of the parties***, as determined by a fair construction of the agreement, by the subject matter to which it has reference and by the circumstances of the particular transaction giving rise to the question." *Id.* at 6-7 (citing *Caterpillar Financial Services, Inc. v. Aleution Chalice v. Assurance Foreningen Skuld*, No. C93-0457R, 1994 WL 46817 (W.D. Wash), 1994 A.M.C. 1767 (USDC, W.D. Wash. 1994))(emphasis added).

In reaching its conclusion, the AgBCA ignored basic principles of contract interpretation. To begin with, "[t]he interpretation of a contract between the United States and another party or parties is a federal issue." *United States v. Jackson County,* 696 F.Supp. 479, 484 (W.D.Mo. 1988). Moreover,

> A contract between a corporation and the United States is to be construed by application of the same principles of law applicable to contracts between private individuals. The principles of general contract law apply to government contracts. The contract itself evidences the intent of the parties unless the contract is ambiguous or confusing.

*Id.* (citations omitted). *See also Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 607-08 (2000); *United States v. Winstar Corp.*, 518 U.S. 839, 895 (plurality opinion). As the following will show, the AgBCA has failed to analyze the facts of the Insurance Providers' argument in terms of these basic principles.

> Section V.M. of the 1998 SRA states:

> This Agreement will continue in effect from year to year with an annual renewal date of July 1 of each succeeding year unless FCIC gives at least 180 days advance notice in writing to the [contracting private insurance provider] that the Agreement will not be renewed. This Agreement will automatically terminate if the [contracting private insurance provider] fails to submit a Plan of Operations by the date such Plan of Operations is due unless such other date is approved by FCIC in writing.

> See Plaintiffs' Facts, Ex. A at 28.

Against this clear and unambiguous provision, the AgBCA "found" that the SRA was a series of annual contracts. Perhaps the best evidence demonstrating the fallacy of the AgBCA's position is found in the language of the actual crop insurance policies reinsured under the SRA. The Standard Crop Insurance Policy can be found at 7 C.F.R. § 457.8, which provides in part:

> 2.      Life of Policy, Cancellation, and Termination

> (a)   *This is a continuous policy* and will remain in effect for each crop year following the acceptance of the original application until canceled by you in

accordance with the terms of the policy or terminated by operation of the terms of the policy or by us.

(Emphasis added.) Because the crop insurance reinsured under the 1998 SRA is written under a continuous policy, it is absurd to suggest that the reinsurance of this insurance is provided under a separate one year contract.

Other provisions of the 1998 SRA also demonstrate that the AgBCA is wrong. The 1998 SRA provides for an "Annual Settlement" process which is inconsistent with a conclusion that it is a one year contract. If the SRA simply were a series of one year contracts, there would be no reason for the concept of an annual squaring of accounts, let alone the language in the SRA related to the process. Instead, the contract simply could provide that within "x" days or months following termination, the parties will settle their respective shares of underwriting gains and losses. The definition of "Annual Settlement" also is instructive.

> "Annual Settlement" means the settlement of accounts between the [Insurer] and FCIC for the reinsurance year, beginning with the February monthly transaction cutoff date *following the reinsurance year* and continuing monthly thereafter as necessary.

Plaintiffs' Facts, Ex. A at 2. Because a reinsurance year runs "from July 1 of any year through June 30 of the following year," this definition unequivocally means that the first "Annual Settlement" under the 1998 SRA (running July 1, 1997, through June 30, 1998) occurred in February of 1999. This, coupled with the fact that this is a recurring process, demonstrates that the SRA continues year-to-year until terminated.

The 1998 SRA's termination provisions (found in Section V.K.), see Plaintiffs' Facts, Ex. A, at 27, are also totally consistent with a continuous agreement (as specified in Section V.M.). The 1998 SRA permits termination "for cause" (subsection 1), a concept important in any contract of any duration. More significantly, it also allows for termination "for convenience of

the government" (subsection 2), a concept certainly not necessary in a contract of only one's duration, but of genuine importance in a continuing agreement. *Id.*

As the foregoing makes clear, the SRA is a continuous contract and not a series of one-year contracts. All of these provisions that demonstrate that the SRA is continuous were ignored by the AgBCA. Under the basic rules of contract construction, the only fair construction of the 1998 SRA is that it was a continuous contract. That the AgBCA held otherwise is patently erroneous.

But the AgBCA's problems worsen from this point. To make a decision relying on the parties' intent, as occurred in *Ace II*, a necessary predicate is developing an evidentiary record of intent (*e.g.*, affidavits, depositions, or interrogatory answers). This matter has no such record. Rather than acknowledging the obvious evidentiary deficit before it and ordering the parties to present evidence as to intent, the AgBCA instead did something outrageous: it attempted a factual analysis based on its own reading of some, but not all, provisions of the SRA. In effect, it believed it could divine the parties' intent and interpret the contract by simply reviewing selected provisions of the SRA, and ignoring others, notwithstanding the parties stated disagreement as to the meaning of the provisions at issue and other unambiguous contractual language demonstrating that the contract is continuous. Because it was completely improper for the AgBCA to engage in a fact-based analysis on the record before it (that is, no factual record), the Court should remand this matter to the AgBCA with directions to take evidence and develop a record on this issue.

**C.     The AgBCA has no jurisdiction to grant the relief to which the Insurance Providers are entitled.**

The AgBCA refused to address the Insurance Providers' claims that it lacked statutory or regulatory authority to hear and decide the Insurance Providers' claims.  The AgBCA concluded that it lacked the authority to adjudicate the Insurance Providers' challenge to the validity of statutes and regulations.  Thus, the validity of those statutes and regulations is now ripe for review under 7 U.S.C. § 1506(d).  Upon review, it is patently clear that the AgBCA is without jurisdiction to hear any of the Insurance Providers' claims.

**1.     *The AgBCA Lacks Jurisdiction To Hear SRA Claims Because 7 C.F.R. § 24.4 Is An Invalid Grant of Jurisdiction over SRA Disputes to the AgBCA.***

Boards of contract appeals are authorized pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 607.  Specifically, 41 U.S.C. § 607(A) provides:

> Except as provided in paragraph (2), an agency board of contract appeals may be established within an executive agency when the agency head determines…that the volume of contract claims justifies the establishment of a full-time agency board….

41 U.S.C. § 607 (A)(1).

Once established, these boards are empowered by statute to hear appeals from contracting officers involving ***contracts*** which are defined in the CDA as:

> any express or implied contract…entered into by an executive agency for
>
> (1)     The procurement of property, other than real property in being;
>
> (2)     The procurement of services;
>
> (3)     The procurement of construction, alterations, repairs or maintenance of real property; or
>
> (4)     The disposal of personal property.

24

41 U.S.C. § 602(a).  Congress further defined these boards' jurisdiction in cases involving <u>contracts</u> subject to the CDA:

> Each Agency Board shall have jurisdiction to decide any appeal from a decision of a contracting officer (1) relative to a contract made by its Agency, and (2) relative to a contract made by any other agency when such agency or the Administration has designated the Agency board to decide the Appeal.  In exercising this jurisdiction, the Agency board is authorized to grant any relief that would be available to a litigant asserting a contract claim in the United States Court of Federal Claims.

41 U.S.C. § 607(d).

The 1998 SRA is not a "contract" under the express terms of the CDA.  The SRA is not a procurement contract.  Indeed, FCIC has admitted that the SRA is not governed by the CDA.[13] Courts considering the issue agree. *Rain and Hail Ins. Service Inc. v. Honor*, 32 Fed. Appx. 544, 544-45 (Fed. Cir. 2002) ("the SRA is not a procurement contract subject to the CDA"); *Ace Property*, 60 Fed. Cl. at 177, n.1 ("the SRA is not a standard government procurement contract and so is not governed by the Contract Dispute Act"); *American Growers Ins. Co. v. Federal Crop Ins. Corp.*, 210 F.Supp.2d 1088, 1093 (S.D. Iowa 2002) (CDA does not apply to SRA).  It is also uncontroverted that the AgBCA has no statutory authorization to hear appeals involving the SRA.

Despite the lack of statutory authority, the Secretary of Agriculture ostensibly "granted" jurisdiction to the AgBCA to hear SRA appeals.  In addition to the language that was added to 7 C.F.R. § 400.169 specifying appeals to the AgBCA from agency determinations, the Secretary promulgated 7 C.F.R. 24.4 which provides:

> § 24.4 Jurisdiction.

---

[13] *See e.g.* Defendant's Motion to Dismiss, or Alternatively Motion for Summary Judgment and Resistance to Plaintiff's Motion for Partial Summary Judgment, Case No. 1:04-cv-40036, USDC S.D. Iowa filed September 15, 2004, page 8, n4.  "The SRA is not governed by the Contract Disputes Act****"

(a) *Contract Disputes Act*.  Pursuant to the Contract Disputes Act of 1978 (41 U.S.C. 601-613), the Board shall consider and determine appeals from decisions of contracting officers relating to contracts entered into on or after March 1, 1979, and, at the contractor's election, contracts entered into prior to March 1, 1979, with respect to claims pending before the contracting officer on March 1, 1979, or initiated thereafter.  For purposes of this paragraph (a) the term "contracts" shall mean express or implied contracts made by the Department of Agriculture, agencies of the Department, or by any other executive agency when such agency or the Administrator for Federal Procurement Policy has designated the Board to decide the appeal, for:

    (1) The procurement of property, other than real property in being;

    (2) The procurement of services;

    (3) The procurement of construction, alternation, repair, or maintenance of real property; or

    (4) The disposal of personal property.

(b) *Federal Crop Insurance Corporation*.  The Board shall have jurisdiction of appeals of final administrative determinations of the Corporation pertaining to standard reinsurance agreements under 7 CFR 400.169(d).  Decisions of the Board shall be final within the Corporation and the Department.

Of course, the Secretary is powerless to expand the jurisdiction of the AgBCA by way of these two regulations as the AgBCA is a creature of Congress with its jurisdiction limited and defined by Congress.  Because the AgBCA "is a creature of statute," it has no "constitutional or common law existence or authority, but only the authority conferred upon it by Congress." *Michigan v. Environmental Protection Agency*, 268 F.3d. 1075, 1081 (D.C. Cir. 2001); *see Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 374 ("An agency has no power to act…unless and until Congress confers power upon it.").  Most importantly, an agency has no authority to expand its jurisdiction beyond that established by Congress. *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 373 (1986) (agency is not permitted to expand its jurisdiction beyond the boundaries established by Congress); *Railway Labor Executive Ass. v. National Mediation Board*, 29 F.3d 655, 670 (D.C. Cir. 1994)

("Agencies owe their capacity to act to the delegation of authority, express or implied, from the Legislature."); *see also American Library Ass'n v. FCC*, 406 F.3d 689, 691 (D.C. Cir. 2005).

As the foregoing makes clear, the Secretary of Agriculture had no authority to delegate SRA disputes to the AgBCA under 7 CFR § 400.169 and the AgBCA has no jurisdiction to hear such disputes and render a decision with the force of law. Accordingly, the proper forum for all of the Insurance Providers' claims is an Article III court.

## 2. *The 1998 SRA Does Not, Nor Can It, Confer Jurisdiction On The AgBCA.*

The parties cannot confer jurisdiction on the AgBCA by agreement. Only Congress can do so. *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 652 (1973). As a statutory entity, the AgBCA must derive its jurisdiction from Congress and not any agreement of the parties or absence of objection to the assertion of jurisdiction. *See American Mail Line, Ltd. v. FMC*, 503 F.2d 157, 170 (D.C. Cir. 1974); *California Indep. Sys. Operator Corp. v. Federal Energy Regulatory Comm'n*, 372 F.3d 395, 398 (D.C. Cir 2004).

In spite of the fact that the parties cannot confer jurisdiction on the AgBCA, it improperly relied on the disputes clause in the SRA to claim jurisdiction. *Ace I* at 9 (concluding that the AgBCA had "jurisdiction to address the contract-related matters, including the matter of timeliness and compliance with the administrative process and to address those within the framework set out in the regulations incorporated into the contract."). The AgBCA completely misread the disputes provision in the 1998 SRA when it concluded that the Insurance Providers and FCIC agreed to be "bound contractually to the terms of the regulation [§ 400.169] as to dispute resolution." *Id.* at 9. The disputes provision, Section V.L. of the 1998 SRA, states, in part, as follows:

L. Disputes and Appeals

1. The Company [Insurance Providers] <u>may</u> appeal any actions, finding, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169.

(Emphasis added). The actual language of this provision is straightforward. Rather than mandating jurisdiction, the provision clearly states that the Insurance Providers **_may_** appeal any actions of the FCIC in accordance with § 400.169, not that they **_shall_** or **_must_** appeal FCIC actions pursuant to this scheme.

Case law confirms the obvious: that the term "may" is permissive, in contrast with the term "shall," which is mandatory in nature. *Lopez v. Davis*, 531 U.S. 230, 231 (2001); *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) (noting "may" is permissive and "shall" is mandatory); *Primary Care Investors, Seven, Inc. v. PHP Healthcare Corp.*, 986 F.2d 1208, 1213 (8th Circuit 1993) ("may" is permissive, "shall" is mandatory); *Ace I* at 11 (stating that "we still see no explanation as to why 'may' is to mean 'must,' when FCIC chose to use the word 'must' in a number of instances in 400.169"). Similarly, FCIC—the drafter of the 1998 SRA—also chose to use the word "must" in numerous instances, so there is no reason to read "may" as "must" under the SRA.[14]

The AgBCA predicated its jurisdiction, and its ruling, on the mistaken conclusion that the disputes provision in the 1998 SRA bound the parties to utilize § 400.169 as their dispute resolution procedure. However, as noted above, because the AgBCA's jurisdiction is defined by Congress, the parties have no authority to confer jurisdiction on the AgBCA. Even if the parties were to designate that the AgBCA could hear disputes, the permissive language used in the

---

[14]  Examples of the 1998 SRA's use of "must" appear in Sections V.B.1. ("must submit accurate and detailed contract data"), V.B.2. ("reports must be certified"), V.B.5. ("any amount due FCIC must be deposited"), and V.F. ("must submit"). In fact, Sections V.B., E., F., G., H., and I., are replete with such mandatory language. Examples of its use of "may" appear in Sections V.I.6. ("FCIC may… waive"), V.J. ("FCIC may suspend") and V.Q.3. ("the Company may request") in addition to Section V.L.1. See Plaintiffs' Facts, Ex. A.

disputes provision did not mandate AgBCA jurisdiction. Consequently, the Court should vacate the AgBCA's decision, and allow the Insurance Providers to prosecute their claims in their chosen forum, on Article III court.

> **3.** ***Because the Insurance Providers' Claims Result from a Congressionally Mandated Breach of Contract, FCIC Was Powerless To Do Anything But Breach, and The AgBCA Cannot Redress That Wrong.***

The uncontroverted facts established that by passing AREERA and ARPA, Congress mandated that the negotiated terms of the SRA be breached by FCIC. Those breaches were occasioned by Congress' passage of AREERA and ARPA, which mandated the changes in the law that precluded the FCIC from honoring CAT administrative fees and the LAE provisions in the 1998 SRA. Because FCIC has no authority to disregard a federal statute, FCIC had no choice but to breach those provisions. *See Winstar v. United States*, 518 U.S. at 843, 870 (1996). Having been precluded by two acts of Congress from paying the Insurance Providers the compensation to which they are contractually entitled under the 1998 SRA, FCIC could not simply ignore the statute by paying that compensation to them in the form of damages without an order from an Article III court. Thus, any attempt to obtain relief from the FCIC and subsequent appeal to the AgBCA is meaningless.

FCIC apparently contends that it could disregard congressional enactments and that its administrative adjunct could order payment of damages to the Insurance Providers. This is an indefensible proposition. Congress directed the agency to breach the contracts by not allowing the Insurance Providers to retain the very compensation to which they were expressly contractually entitled. In short, the government advocated, and the AgBCA adopted, the irresponsible position that an executive agency can nullify acts of Congress signed by the President and unenjoined by any court order.

FCIC had no discretion, and was required by Congress, to reduce the contractually-agreed upon compensation in the 1998 SRA. Section 532 of AREERA provided for the deposit of CAT administrative fees into the crop insurance fund maintained by FCIC at the United States Treasury and stated that "no funds so deposited…may be used to compensate an approved insurance provider [Insurance Providers] or agent for the delivery of services under this Section." This section also specified that CAT loss adjustment expense payments "shall not exceed 11%" of the imputed premium.  Section 103 of ARPA was no less specific: "By striking 11% and inserting 8%."  In implementing AREERA and ARPA, the FCIC had no choice regarding the manner, timing, or extent to which it forced amendments to the 1998 SRA.  Indeed, not only did Congress mandate specific contractual changes in the statute, but the AREERA Conference Report made it abundantly clear that such changes were to be implemented immediately and included a section entitled "Required Terms and Conditions of Standard Reinsurance Agreements" providing that "the corporation [FCIC] shall insure that each Standard Reinsurance Agreement between an approved insurance provider and an corporation reflects the amendments to the Federal Crop Insurance Act (7 U.S.C. § 1501 et seq.) that are made by this subtitle."  H.R. Conference Report 105-492 (1998) USCCAN 233.  Accordingly, the changes to the 1998 SRA required by AREERA and ARPA were mandated by Congress.  FCIC was powerless to do anything but implement those changes, and the AgBCA is similarly powerless to compensate the Insurance Providers for their losses associated with those changes.  Only an Article III court can do that.  Therefore, the Insurance Providers' claims belong in this Court in their entirety.

Not only is the AgBCA powerless to disregard congressional acts, it is clear that it lacks the legal authority to award damages for the government's breach of the 1998 SRA.  *See Appeal of J.M. Hopkins Co.*, 1980 WL 2342 at 2 (Ag.B.C.A. May 13, 1980)("The Board in a case under

the Disputes clause [of a contract] and 7 CFR Part 24 regulations lacks jurisdiction to consider breach of contract claims****  This case is not subject to the provisions of the Contract Disputes Act*** under which the jurisdiction of the Board includes consideration of breach of contract damage claims."); *Appeal of Chartwell Associates*, 1986 WL 20228 at 7 (Ag.B.C.A. Oct. 8, 1986)("Nor does this Board have jurisdiction over damages for breach * * *, since the Board's jurisdiction in this appeal is based upon the Disputes clause of the contract and not the Contract Disputes Act.").  Because the AgBCA is powerless to award the relief the Insurance Providers seek, the Insurance Providers' claims should go forward solely in an Article III court.

Indeed, the AgBCA has acknowledged in numerous cases that, prior to the CDA, BCAs had no authority to award breach of contract damages.  Consequently, the AgBCA's current authority to award such damages extends only to cases within the jurisdiction bestowed by the CDA.  *See, e.g., Appeal of Boise Cascade Corp.*, 1981 WL 6980 (AgBCA Jan. 28, 1981); *Appeal of DeBarros*, 1980 WL 2326 (AgBCA Jan. 3, 1980); *Appeal of Champion Intern. Corp.*, 1979 WL 2141 (AgBCA June 4, 1979); *Appeal of Sierra Pacific Industries*, 1979 WL 2129 (AgBCA Apr. 9, 1979); *Appeal of Southwest Forest Industries*, 1979 WL 2130 (AgBCA Apr. 9, 1979).

The AgBCA's recent statement that it "'has [the] authority and has authorized [the] award of monetary damages'" in cases involving the SRA, *Ace I* at 9, is incorrect as a matter of law, and of contract.  The <u>only</u> statutory authority to award breach-of-contract damages is bestowed by the CDA.  *See* 41 U.S.C. § 607(d).  The Insurance Providers are aware of <u>no</u> case in which the AgBCA has *ever* awarded breach-of-contract damages for breach of an SRA, and the AgBCA cited no such case in support of its *ipse dixit* statement.[15]  Because the AgBCA is

---

[15] In its brief to the Eighth Circuit Court of Appeals, the FCIC argued in a footnote that the AgBCA has already ruled, in other cases, that it possesses the authority to decide the type of issue raised by appellants.  However, neither of the two cases cited in support of that proposition

incapable of providing a remedy in this dispute, this Court must exercise plenary jurisdiction over the Insurance Providers' claims.

### D.    The Regulatory Scheme Adopted by the AgBCA Violates the Constitution.

#### 1.    *The Application of § 400.169 as Advanced by the FCIC and AgBCA Violates Due Process.*

The AgBCA's rulings ostensibly extinguished common law contract causes of action by application of the regulatory scheme contained in 7 C.F.R. § 400.169. This regulatory scheme, or at least its application to the Insurance Providers' in the manner advocated by FCIC and adopted by the AgBCA, is unconstitutional, as two fundamental precepts of due process—notice and an opportunity to be heard—were not afforded.

In *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976), the Supreme Court set forth three factors that normally determine whether an individual has received the "process" that the Constitution finds "due":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* When these factors are weighed in the context of the AgBCA's application of § 400.169 to the Insurance Providers' ARPA claims, the process afforded them clearly did not provide "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at 333.

---

held that the AgBCA has the legal authority to award contract damages in a non-CDA case.  One of those cases was settled without a final decision.  *See In re Rural Community Ins. Co.*, 2003 WL 22077597 (AgBCA Sept. 5, 2003).  In the other, the FCIC was granted summary judgment on other grounds.  *See In re American Growers Ins. Co.*, 2000 WL 769261 (AgBCA June 15, 2000), *reconsideration denied*, 2000 WL 1268142 (AgBCA Sept. 7, 2000).

It is indisputable that the Insurance Providers' breach of contract claims related to the passage of ARPA are protected property interests. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)(holding that a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428-29 (1982). It is also undisputed that these property interests are highly valuable, worth potentially tens of millions of dollars. Thus, there is a substantial private interest that will be affected if the decision of AgBCA is allowed to stand.

Second, the "procedures" employed in the Insurance Providers' case were simply farcical, and clearly contain a "serious risk of an erroneous deprivation" of their rights to pursue their ARPA claims. To begin with, "it has become a truism that '*some* form of hearing' is required before the owner is finally deprived of a protected property interest," *Logan*, 455 U.S. at 433. To date, however, no hearing of any type or form has been afforded the Insurance Providers on the merits of their claims.

Moreover, the Insurance Providers never received notice that their claims might be time-barred. As noted above, under § 400.169, the Insurance Providers were entitled to receive a "determination" from the FCIC, the receipt of which would trigger the 45-day period for response. This determination is "a specific documentary notice … from an official authorized to take the action. … [T]he notice must either directly or constructively identify the document being received by Appellant, as a determination requiring a 45-day response." *In re American Growers Ins. Co.,* AGBCA No. 98-200-F, 2000 WL 769261 at 21 (Ag.B.C.A. June 15, 2000) (Pollack, J., dissenting). Instead of receiving a notice of this type, which *would* have satisfied due process considerations, the Insurance Providers received <u>nothing</u> from FCIC that would have alerted them that the 45-day clock was running, and that their right to sue was in jeopardy.

As noted above, the AgBCA, following FCIC's lead, posits that the unilateral issuance of a contract amendment constituted the "determination" that triggered the 45-day period, even though there is no legal support for this proposition. That is, in contrast to the constitutionally effective notice associated with delivering a "determination document" to the Insurance Providers, under the AgBCA's view, FCIC is allowed simply to designate, unilaterally and without notice, that it has done so. Thus, _any_ _event_ that might arguably be the subject of some dispute between the Insurance Providers and FCIC can become the 45-day trigger. The inherent randomness, not to mention *post hoc* nature of this "procedure" is constitutionally unacceptable. As the Supreme Court noted in *Logan*, "[a] system or procedure that deprives persons of their claims in a random manner … necessarily presents an unjustifiably high risk that meritorious claims will be terminated." *Logan*, 455 U.S. at 434-35.

As for the government's interest, there simply is no fiscal or administrative burden that could possibly be associated with requiring FCIC to follow its own procedures, or institute some basic notice requirement.

Weighing the *Mathews* factors, the AgBCA's application of the regulatory scheme contained in 7 C.F.R. § 400.169 to the Insurance Providers is clearly unconstitutional, as they did not receive due process. *See Logan*, 455 U.S. at 433 ("To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner the opportunity to present his claim."). No hearing on the merits was afforded the Insurance Providers; no notice of their right to administrative review of any determination was provided; and no one ever pointed out that important legal rights would be lost after the passage of 45 days. It is hard to imagine a scheme more lacking in the tenets of fundamental fairness. *See Hannah v. Larche*, 363 U.S. 420, 442 (1960)("[W]hen governmental agencies adjudicate or make binding

determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process."). For these reasons, the Court should reverse the AgBCA's rulings with respect to the Insurance Providers' ARPA claims.

### 2. *Application of § 400.169 Violates Article III of the Constitution.*

Assuming that the FCIC procedure is not constitutionally deficient, it is substantively unlawful. The doctrine of separation of powers requires that the Insurance Providers' claims be heard and determined by an Article III court.[16]

As noted above, the Insurance Providers possess common law causes of action against the government as a result of the breach of the SRA. In the FCIA, Congress specifically granted federal district courts jurisdiction to hear such claims. 7 U.S.C. § 1506(d). The operation of § 400.169 adopted by the AgBCA purportedly terminated those rights (regarding the ARPA claims) because the Insurance Providers allegedly failed to present their breach of contract claims within the 45 day time limit argued to be applicable by FCIC. The termination of those common law rights cannot be finally determined by FCIC or AgBCA, creatures of the executive branch, but must be subjected to a judicial determination.

Article III protects the role of the independent judiciary and safeguards a litigant's "right to have claims decided before judges who are free from potential domination by other branches of government." *United States v. Will*, 449 U.S. 200, 218 (1980). Here, the Executive Branch – the Secretary of Agriculture – has implemented a regulatory scheme that allegedly deprives the Insurance Providers of common law causes of action and has delegated to an administrative body

---

[16] Despite a dubious jurisdictional footing, the FCIC has advocated, and the AgBCA has accepted, the proposition that it can award money damages against the United States for breach of contract occasioned by a congressional enactment. The Insurance Providers believe that only an Article III court can order such relief.

– the AgBCA – the alleged right to uphold the administrative determination and preclude common law breach of contract claims. The actions of the Secretary and AgBCA are clearly judicial functions, and those functions must be performed by the judiciary. The Constitution requires the judicial power of the government to be vested exclusively in Article III courts. This power is at the core of the judicial function in matters involving the adjudication of private rights.[17] *Crowell v. Benson*, 285 U.S. 22, 59-60 (1932); *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 585 (1985).

Four exceptions to the general rule requiring judicial determination of private rights have evolved over the years: territorial courts; courts – martial; and courts adjudicating certain disputes involving public rights were recognized long ago, *see generally, Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 64-65 (1982) (Brennan, J.), and this list was subsequently expanded to include permissive counterclaims in the context of Commodity Futures Trading Commission reparations proceedings. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986). In each case, the Supreme Court found delegation to a non-Article III tribunal acceptable because each dealt with "a particularized area of law," *id.* at 852, involved limited incursion into the judiciary's province, or the insistence on an Article III court adjudication had been waived. *Id.* at 850. In contrast, the Secretary of Agriculture delegated all SRA disputes – common law breach of contract claims seeking monetary damages – to be heard by the AgBCA under the regulatory scheme. As noted above, breach of contract claims, such as the ones advanced by the Insurance Providers, are matters within the province of the courts and involve no "particularized" expertise on the part of FCIC or the AgBCA. In effect, the Secretary

---

[17] Although a federal agency is party to this action, the matter involves purely private rights, in that the government's presence in the dispute is solely as a result of its position as a party to the contract. As a result, the government is treated no differently than any other private party.

and AgBCA have "withdrawn from judicial cognizance" the determination of the Insurance Providers' right to compensation for breach of the SRA occasioned by congressional action. *Id.* at 852. As was recognized in *Northern Pipeline*, neither Congress nor the Executive Branch is empowered to control the manner in which private rights are adjudicated in such cases. *Northern Pipeline*, 458 U.S. at 84 (Rehnquist, J. concurring in judgment). But that is precisely what FCIC and the AgBCA have attempted to do by dismissing the Insurance Providers' ARPA claims. FCIC and AgBCA have allegedly finally precluded the Insurance Providers from prosecuting their common law claims through the application of an Executive Branch administrative process upheld by the AgBCA. That violates constitutionally-mandated separation of powers.

Dismissal of the Insurance Providers' ARPA claims violates the procedural due process requirements of the Fifth Amendment to the Constitution and the Separation of Powers doctrine by sanctioning Executive Branch determination and elimination of private contractual rights.

## VI. CONCLUSION.

To rectify past errors by the AgBCA and to nullify its assertion of jurisdiction, this Court should take plenary jurisdiction of all SRA breach claims asserted by the Insurance Providers based on passage of AREERA and ARPA. Alternatively, it should grant partial summary judgment on the Insurance Providers' claims for relief herein and remand the Insurance Providers' ARPA claims for consideration by the AgBCA on the merits.

Respectively submitted this 25th day of January, 2007.

STINSON MORRISON HECKER LLP


By: /s/ Michael E. Tucci
    Michael Tucci (Bar # 430470)
    1150 18th Street, N.W., Suite 800
    Washington, D.C. 20036
    (202) 785-9100
    Fax: (202) 785-9163


P. JOHN OWEN


By: /s/ P. John Owen by Michael E. Tucci
    P. John Owen (KS Bar #11835; MO Bar #22523)
     (Pro Hac Vice)
    National Crop Insurance Services, Inc.
    8900 Indian Creek Parkway, Suite 600
    Overland Park, KS 66210
    (913) 685-2767
    Fax: (913) 685-3080

Counsel for All Plaintiffs


MICHAEL J. DAVENPORT


By: /s/ Michael J. Davenport by Michael E. Tucci
    Michael J. Davenport (IA Bar # 45345)
    Rain and Hail L.L.C.
    9200 Northpark Drive, Suite 300
    Johnston, IA 50131-3006
    (515) 559-1000
    Fax: (515) 559-1001

Additional Counsel for Plaintiff ACE Property & Casualty Insurance Company

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of January, 2007, a copy of the foregoing Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment was sent via the Court's Electronic Filing Case notification system to the following:

Jane W. Vanneman, Esq.
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Room 12010
Washington, D.C. 20005

Peter Smith
Assistant U.S. Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4224
Washington, D.C. 20530


/s/ Michael E. Tucci

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ACE PROPERTY & CASUALTY | ) | |
| INSURANCE COMPANY (f/k/a CIGNA | ) | |
| PROPERTY & CASUALTY INSURANCE CO.), | ) | |
| ET AL. | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06cv01430 RMU |
| | ) | |
| FEDERAL CROP INSURANCE | ) | |
| CORPORATION, A CORPORATION WITHIN | ) | |
| THE UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**STATEMENT OF UNDISPUTED FACTS**

Pursuant to LCvR 56.1, Plaintiffs Ace Property and Casualty Insurance Company, *et al.* ("Insurance Providers") hereby file this Statement of Undisputed Facts in conjunction with the Motion for Partial Summary Judgment.

1.     The Insurance Providers sell and service crop insurance under the federal crop insurance program and insure hundreds of thousands of agricultural producers across the nation against various potential losses associated with their respective crops.

2.     In 1938, the United States Congress passed the Federal Crop Insurance Act, 7 U.S.C. § 1501 et seq. ("FCIA"), "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance."  7 U.S.C. § 1502(a).

3.    The Federal Crop Insurance Corporation ("FCIC") was created as an agency of and within the United States Department of Agriculture to carry out the purposes of the FCIA.  7 U.S.C. § 1503.

4.    FCIC is required to offer catastrophic risk protection insurance ("CAT") in order to protect agricultural producers from statutorily defined portions of their losses when drought, flood, or other natural disasters cause losses in yield to insured crops.  7 U.S.C. §§ 1508(b)(1) and 1508(b)(4).

5.    FCIC did not write CAT coverage as a direct insurer for the 1998 through 2004 reinsurance years.  Instead, it reinsured approved insurance providers, such as the Insurance Providers, who wrote CAT coverage and serviced all CAT policies.

6.    Each Insurance Provider is an approved provider as defined by the FCIA, 7 U.S.C. § 1502(b)(2), and each writes CAT and other federal crop insurance coverages approved by FCIC.

7.    Pursuant to regulations promulgated in 1987, FCIC enters into a contract, called the Standard Reinsurance Agreement ("SRA"), with eligible insurance companies to reinsure the policies which those companies issue to producers of agricultural commodities.  7 C.F.R. § 400.164.

8.    The 1998 SRA is a written contract which became effective as of July 1, 1997 between FCIC and each Insurance Provider except Farmers Mutual Hail Insurance Company of Iowa.  Farmers Mutual Hail Insurance Company of Iowa executed the 1998 SRA in 1999.  A true and correct copy of the 1998 SRA is attached hereto as Exhibit A.

### RELEVANT SRA PROVISIONS

9.     The 1998 SRA specifically provides:

> This Agreement will continue in effect from year to year with an annual renewal date of July 1 of each succeeding year unless FCIC gives at least 180 days advance notice in writing to [Insurer] that the Agreement will not be renewed.  This Agreement will automatically terminate if the [Insurer] fails to submit a Plan of Operations by the date such Plan of Operations is due unless such other date is approved by FCIC in writing.

Accordingly, the 1998 SRA was subject to cancellation once per year at the election of FCIC as provided for in Section V.M.  Exhibit A, p. 28.

10.     FCIC did not give written notice to any Insurance Provider that it was terminating the 1998 SRA in any of the reinsurance years covered by the period July 1, 1997 through June 30, 2004.

11.     Pursuant to the FCIA, policyholders who purchased CAT coverage were required to pay certain administrative fees (unless those fees were waived due to their economic status).  7 U.S.C. § 1508(b).

12.     Section III.B.1. of the 1998 SRA authorized the Insurance Providers to retain up to $100 of the administrative fees per county paid by each eligible CAT policy holder as compensation for the costs of selling and servicing eligible CAT crop insurance contracts. Exhibit A, p. 17.

13.     When FCIC and the Insurance Providers executed the 1998 SRA, FCIC agreed to pay the Insurance Providers CAT loss adjustment expenses ("LAE") pursuant to the provisions of Section IV.A., which provides in pertinent part

> For eligible CAT crop insurance contracts, FCIC will pay to the Company [Insurance Providers] an amount equal to 4.7 percent of the total net book premium for eligible CAT crop insurance contracts computed at 65 percent of the recorded or appraised average yield indemnified at 100

3

percent of the projected market price, all equivalent coverage, for loss adjustment expense.

This formula resulted in approximately 14 percent of the imputed premium for CAT coverage being payable to the Insurance Providers.  Exhibit A, p. 18.

14.    Section V.L. of the 1998 SRA, states, in part, as follows:

L. Disputes and Appeals

The Company [Insurance Providers] may appeal any actions, finding, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169.

Exhibit A, p. 27.

15.    Section V.H. of the 1998 SRA, states, in part, as follows:

The Company [Insurer] should be aware that the statute of limitations for bringing suit for any breach of this Agreement is 6 years.

Exhibit A, p. 24.

16.    The definition of "Annual Settlement" in the 1998 SRA is:

"Annual Settlement" means the settlement of accounts between the [Insurer] and FCIC for the reinsurance year, beginning with the February monthly transaction cutoff date following *the reinsurance year* and continuing monthly thereafter as necessary.

Exhibit A, p. 2 (emphasis added).  Because a reinsurance year runs "from July 1 of any year through June 30 of the following year," this definition means that the first "Annual Settlement" under the 1998 SRA (running July 1, 1997, through June 30, 1998) occurred in February of 1999.

## PASSAGE OF AREERA AND ARPA

17.    The United States Congress passed the Agricultural Research, Extension, Education, and Reform Act of 1998, Public Law No. 105-185 (June 23, 1998), ("AREERA"), which the President signed into law on June 23, 1998.

4

18.     Section 532 of AREERA amended 7 U.S.C. § 1508(b) by striking paragraph (5), which had granted the Insurance Providers and other approved insurance providers the right to retain CAT administrative fees as compensation for selling and servicing CAT policies, and substituted a new paragraph (5) in 7 U.S.C. § 1508(b) which explicitly deprived the Insurance Providers of this compensation and instead directed deposit of all CAT administrative fees into FCIC's fund.

SEC. 532.  BUDGETARY OFFSETS

(a)     Administrative Fee for Catastrophic Risk Protection.  Section 508(b) of the Federal Crop Insurance Act (7 U.S.C. 1508(b)) is amended by striking paragraph (5) and inserting the following:

(5)  Administrative Fee.

(A)  Basic fee.  Each producer shall pay an administrative fee for catastrophic risk protection in an amount equal to 10 percent of the premium for catastrophic risk protection or $50 per crop per county, whichever is greater, as determined by [FCIC].

(B)  * * *

(C)  * * *

(D)  Use of fees.

(i)     In general.  The amounts paid under this paragraph shall be deposited in the crop insurance fund established under section 516(c) to be available for the programs and activities of the [FCIC].

(ii)    Limitation.  No funds deposited in the crop insurance fund under this subparagraph may be used to compensate an approved insurance provider or agent for the delivery of services under this section.

112 Stat. 581-82.

19.     The foregoing amendment eliminated the Insurance Providers' contractual right to retain the CAT administrative fees.

5

20.    Section 532 of AREERA also amended 7 U.S.C. § 1508(b) by adding a new

paragraph (11), providing as follows:

> The rate for reimbursing an approved insurance provider or agent for
> expenses incurred by the approved insurance provider or agent for loss
> adjustment in connection with a policy of catastrophic risk protection shall
> not exceed 11 percent of the premium for catastrophic risk protection that
> is used to define loss ratio.

112 Stat. 582-83.

21.    The effect of the foregoing amendment to the FCIA was to reduce the level of

CAT LAE payable to approved insurance providers from approximately fourteen percent to

eleven percent of an imputed CAT premium.

22.    The United States Congress passed the Agricultural Risk Protection Act of 2000,

Public Law No. 106-224 (June 20, 2000) ("ARPA"), which the President signed into law on June

20, 2000.

23.    ARPA amended the recently added 7 U.S.C. § 1508(b)(11), to reduce further the

level of CAT LAE payable to approved insurance providers under the FCIA from 11% to 8%:

SEC. 103. CATASTROPHIC RISK PROTECTION.

* * *

(d)    Reimbursement Rate Change. – Section 508(b)(11) of the Federal Crop Insurance
       Act (7 U.S.C. 1508(b)(11)) is amended by striking "11 percent" and inserting "8
       percent."

114 Stat. 366.

24.    FCIC attempted unilaterally to amend the 1998 SRA to conform it to the

provisions of AREERA and ARPA with Amendment No. 1 and Amendment No. 3, respectively,

to the 1998 SRA.  The Insurance Providers executed the unilaterally imposed amendments with a

reservation of rights to seek compensation provided for in the 1998 SRA.  True and correct

6

copies of the Amendments (Exhibits B & C) and representative samples of the reservation of rights letters (Exhibits D & E) are attached hereto as Exhibits B through E.

25.    FCIC has and continues to refuse to pay to the Insurance Providers the amounts to which they are entitled pursuant to the express terms of the 1998 SRA.

## INSURANCE PROVIDERS' EFFORTS TO BE COMPENSATED

26.    On May 11, 2004, the Insurance Providers sent a letter to the FCIC seeking a determination of their breach of contract claims. The Deputy Administrator of RMA replied that their request was not timely and relief was therefore denied. A true and correct copy of the Deputy Administrator's letter is attached hereto as Exhibit F.

27.    FCIC never sent a "determination" to any of the Insurance Providers regarding their claims as required by 7 C.F.R. § 400.169.

28.    After receiving the letter from RMA, the Insurance Providers filed an appeal of the RMA's denial of their claims with the USDA Board of Contract Appeals ("AgBCA").

29.    In a decision dated December 21, 2005, the AgBCA asserted jurisdiction over the Insurance Providers' AREERA claims, but denied jurisdiction over the Insurance Providers' ARPA claims.

30.    The AgBCA decided this case before the FCIC had filed an answer, and without any evidentiary record or hearing.

## REGULATIONS, STATUTES AND AGENCY COMMENTS
## RELATING TO INSURANCE PROVIDER'S CLAIMS

31.    Prior to 1988, disputes regarding reinsurance agreements were submitted to the FCIC Manager pursuant to procedures established under 7 C.F.R. § 400.149. 52 FR 17540 (May 11, 1987).

§ 400.149 Disputes.   All disputes arising under this subpart and the Standard Reinsurance Agreement entered into by the Company and the Corporation must be submitted for decision to the Manager of the Corporation.   The decision of the Manager shall be final unless the Company requests reconsideration in writing within 45 days of the receipt of the decision.   Any hearing provided by the Corporation will be of an informal nature and the rules of evidence will not apply.   Pending final decision of the dispute, the Company will proceed diligently with the performance of the Agreement, as required by the Corporation.

32.    In the comments to the proposed 1987 version of 7 C.F.R. § 400.149, FCIC stated:

2. Section 400.149 NAUI takes issue with the determination that the Manager's decision is final in matters arising under this Subpart and the Reinsurance Agreement between the Company and takes the position that FCC is denying a Company redress in the courts. FCIC, by this determination, does not abrogate the rights of any Company to seek redress in litigation, it merely exercises it rights under the Agreement and will not change this section.

52 FR 17540 (May 11, 1987).

33.    On August 22, 1988, FCIC amended this regulation, adding a provision allowing for insurer review and comment on FCIC findings prior to a final decision by the Deputy Manager of FCIC.  The amended regulation read:

Initial findings under this Subpart and the Reinsurance Agreement will be made by the Corporation.   The Corporation will advise the Company [Insurance Providers] of those findings and request their input within 45 days of the determination.   This time may be extended at the request of the Company if the Corporation agrees to the extension.   At the expiration of the time period or, after receipt of the Company's input, the Corporation will issue a final determination denominated as "the determination of the Corporation."   That determination will advise the Company of its rights under this section.   The Company, if it disputes the Corporation's determination, must appeal that determination in writing, within forty-five days of the receipt of the determination, to the Deputy Manager, Federal Crop Insurance Corporation, U.S. Department of Agriculture, Washington, DC 20250.   The decision of the Deputy Manager will be final….

7 C.F.R. § 400.149.

34.    In 1995, the FCIC again amended the "disputes" regulation and published it as renumbered 7 C.F.R. § 400.169.  Subsection (a) of the regulation stated:

> (a) If the company [Insurance Providers] believes that the corporation [FCIC] has taken an action that is not in accordance with the provisions of the Standard Reinsurance Agreement or any reinsurance agreement with FCIC, except compliance issues, it may within 45 days after receipt of such determination, request, in writing, the director of insurance services to make the final administrative determination addressing the disputed issue.  The Director of Insurance Services will render the final administrative determination of the corporation with respect to the applicable issues.

35.    Comments to the proposed 1995 version show that section 400.169 was intended to be an informal dispute mechanism:

> Comment: All three commentors expressed concern with respect to the propriety of permitting the Director of Compliance and the Director of Insurance Services to render final administrative decisions.

> Response: Section 400.169 provides an informal mechanism for companies to challenge decisions rendered by FCIC. Reconsideration of these decisions allows the division that rendered the decision the opportunity to correct any error prior to an appeal to the BCA. The Directors of Compliance and Insurance Services are persons with the most knowledge of the programs they administer and are most qualified to render final determinations. Therefore, there is no need to amend the rule to have the Deputy Manager make final determinations.

36.    Comments to the 1995 version establish the Insurance Providers' rights to bring suit in federal court following the culmination of the administrative process:

> Comment: One comment suggested that the rule be amended to specify the forum for an appeal of a BCA decision.

> Response: An amendment to the rule is not necessary. The administrative appeals process ends with a BCA decision. The Department of Agriculture Reorganization Act provided that once the administrative appeals process is complete, persons may bring suit. Section 506(d) of the Federal Crop Insurance Act, as amended, states that the Federal district court has exclusive original jurisdiction over any suit brought against FCIC.

61 FR 39268 (July 29, 1996); 61 FR 40952 (August 7, 1996).

9

37.    In 1999, as a result of litigation between one of the plaintiff Insurance Providers and FCIC, on an unrelated issue, the AgBCA determined that 7 C.F.R. § 400.169(a) did not impose a mandatory 45 day time limit for an Insurer to bring an administrative claim against FCIC.  Rather, the AgBCA held that the 45 days was permissive.  *In re American Growers*, AgBCA No. 99-134-F, 1999 WL 984394 (October 28, 1999).  FCIC did not seek judicial review of that decision of the AgBCA.

38.    In January 2000, FCIC further amended 7 C.F.R. § 400.169(a).  The new regulation – the one currently in effect – reads:

> § 400.169  Disputes.
>
> (a) If the company believes that the Corporation has taken an action that is not in accordance with the provisions of the Standard Reinsurance Agreement or any reinsurance agreement with FCIC, except compliance issues, it may request the Deputy Administrator of Insurance Services to make a final administrative determination addressing the disputed action.  The Deputy Administrator of Insurance Services will render the final administrative determination of the Corporation with respect to the applicable actions.  All requests for a final administrative determination must be in writing and submitted within 45 days after receipt after the disputed action.

39.    FCIC did not publish notice of the 2000 amendment to § 400.169(a) or seek comments on the proposed amendment.  See 65 F.R. 3781 (January 25, 2000).

40.    On November 7, 1995, the Secretary of Agriculture published 7 C.F.R. § 24.4 ostensibly granting the AgBCA jurisdiction to hear appeals from agency determinations regarding standard reinsurance agreements.  7 C.F.R. § 24.4 reads:

> (b)    *Federal Crop Insurance Corporation.*  The Board shall have jurisdiction of appeals of final administrative determinations of the Corporation pertaining to standard reinsurance agreements under 7 CFR 400.169(d).  Decisions of the Board shall be final within the Corporation and the Department.

41.     The Contract Disputes Act, 41 U.S.C. § 601 *et. seq.* ("CDA"), established agency Boards of contract appeals.[1]   The jurisdiction of the Boards of Contract Appeals is defined by the CDA to include:

> jurisdiction to decide any appeal from a decision of a contracting officer (1) relative to any contract made by its agency, and (2) relative to a contract made by any other agency when such agency or the Administrator has designated the agency board to decide the appeal.

41 U.S.C. § 607(d).

42.     A contract, for purposes of the CDA, is defined as:

> "Any express or implied contract…entered into by an executive agency for –

> (1)     the procurement of property, other than real property in being;

> (2)     the procurement of services;

> (3)     the procurement of construction, alterations, repair or maintenance of real property; or

> (4)     the disposal of personal property."

41 U.S.C. § 602(a).

43.     FCIC has admitted in several pleadings filed in related cases that the 1998 SRA is not a contract within the meaning of the CDA.  *See, e.g.,* Defendant's Motion to Dismiss or Alternatively Motion for Summary Judgment, Case No. 1:04-cv-40036, USDC S.D. Iowa filed September 15, 2004, p. 8 n. 4.

44.     28 U.S.C. § 2401(a) gives claimants against the government, such as the Insurance Providers, six years to bring claims against FCIC.  That section provides:

---

[1] These boards were largely abolished effective January 6, 2007, and will be replaced by the new Civilian Board of Contract Appeals.  See Pub. Law No. 109-163, 119 Stat. 3136.

(a)  Except as provided in the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

45.    The Standard Crop Insurance Policy can be found at 7 C.F.R. § 457.8; it provides in part:

2.    Life of Policy, Cancellation, and Termination

(a)  *This is a continuous policy* and will remain in effect for each crop year following the acceptance of the original application until canceled by you in accordance with the terms of the policy or terminated by operation of the terms of the policy or by us.

Respectfully submitted this 25th day of January, 2007.

STINSON MORRISON HECKER LLP

By: /s/ Michael E. Tucci
    Michael Tucci (Bar # 430470)
    1150 18th Street, N.W., Suite 800
    Washington, D.C. 20036
    (202) 785-9100
    Fax: (202) 785-9163

P. JOHN OWEN

By: /s/ P. John Owen by Michael E. Tucci
    P. John Owen (KS Bar #11835; MO Bar #22523)
    (Pro Hac Vice)
    National Crop Insurance Services, Inc.
    8900 Indian Creek Parkway, Suite 600
    Overland Park, KS  66210
    (913) 685-2767
    Fax:  (913) 685-3080

Counsel for All Plaintiffs

MICHAEL J. DAVENPORT


By: /s/ Michael J. Davenport by Michael E. Tucci
    Michael J. Davenport (IA Bar # 45345)
    Rain and Hail L.L.C.
    9200 Northpark Drive, Suite 300
    Johnston, IA  50131-3006
    (515) 559-1000
    Fax:  (515) 559-1001

Additional Counsel for Plaintiff ACE Property & Casualty Insurance Company

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of January, 2007, a copy of the foregoing Statement of Undisputed Facts was sent via the Court's Electronic Case Filing notification system to the following:


Jane W. Vanneman, Esq.
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Room 12010
Washington, D.C. 20005

Peter Smith
Assistant U.S. Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4224
Washington, D.C. 20530


/s/ Michael E. Tucci