**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ACE PROPERTY & CASUALTY INSURANCE COMPANY (f/k/a CIGNA PROPERTY & CASUALTY INSURANCE CO.), ET AL., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    Civil Action No. 1:06cv01430 RMU |
| | ) |
| FEDERAL CROP INSURANCE CORPORATION, | ) ) |
| | ) |
| Defendant. | ) ) |
| _____ | ) |

**OPPOSITION TO THE MOTION TO DISMISS
AND/OR FOR SUMMARY JUDGMENT FILED BY DEFENDANT
FEDERAL CROP INSURANCE CORPORATION**

Plaintiffs ACE Property & Casualty Insurance Co., Inc., *et al.* ("Insurance Providers") respectfully oppose the Motion to Dismiss and/or for Summary Judgment filed by defendant Federal Crop Insurance Corporation ("FCIC").

**I.     BACKGROUND.**

On October 3, 2006, the Insurance Providers filed an eleven count amended Complaint alleging breach of contract, regulatory deficiencies, and constitutional violations by the FCIC. The Insurance Providers previously sought resolution of all but their constitutional claims before the Department of Agriculture's Board of Contract Appeals ("AgBCA"). The AgBCA made final adverse determinations with respect to certain claims, held that it had no jurisdiction over some claims, and then assumed jurisdiction over others. The Insurance Providers' Complaint

seeks reversal of the AgBCA's decisions regarding the claims determined and adjudication of those claims which the AgBCA declined to address.

The FCIC requests that the Court dismiss some of the Insurance Providers' claims, grant it summary judgment with respect to other claims, and rule that still other claims are either moot or should not be adjudicated at this time. The FCIC's arguments lack merit.

## II.    INTRODUCTION.

Although the FCIC has raised many discreet issues in this case, *see generally* FCIC Motion for Summary Judgment and Motion for Partial Dismissal (hereinafter "FCIC Memo at ___"), the core issues are readily identifiable.

First, did the AgBCA[1] correctly decide that the Insurance Providers' ARPA[2] claims are time-barred (Counts I-III, VII, and VIII)? In considering this issue, the Court must decide:

- ▪  Whether the 45-day period under the revised, 2000 version of 7 C.F.R. § 400.169 (the "2000 Version") has run and the Insurance Providers failed to assert their claims within the applicable time limit.

- ▪  Whether the 45-day period in the 2000 Version negates or overrides the six year statute of limitations applicable to claims against the government, 28 U.S.C. § 2401, and specifically referenced in the 1998 Standard Reinsurance Agreement ("SRA").

- ▪  Whether the 2000 Version applies to any dispute regarding the 1998 SRA.

- ▪  Whether the 1998 SRA is a series of one year contracts, rather than a continuous contract, and whether subsequent "versions" of the SRA incorporated the 2000 Version.

---

[1] On January 7, 2007, the AgBCA became part of the Civilian Board of Contract Appeals. *See* 41 U.S.C. § 607, as amended by Public Law 109-163, effective January 6, 2007. For convenience, the Insurance Providers continue to refer to that tribunal as the AgBCA.

[2] "ARPA" refers to the Agricultural Risk Protection Act of 2000. This legislation resulted in some of the Insurance Providers' claims under the "Winstar" doctrine. *See* First Amended Complaint, ¶¶ 53-55.

As to these issues, FCIC asks this Court to uphold the AgBCA's decision in some respects, but actually urges this Court to adopt the dissenting Judge's more restrictive view of the matter and rule that all of the Insurance Providers' claims are barred.[3]  *See* FCIC Memo at 33. However, unless the Court decides each of the above issues in favor of FCIC, the Insurance Providers' ARPA claims should be remanded to the AgBCA for determination.

Next, the Insurance Providers' complaint contains two counts (Counts X and XI) reaching the merits of their breach of contract claims.  Although the Insurance Providers have not sought summary judgment on those claims, FCIC has asked that these claims be dismissed or that it be granted summary judgment.  In considering FCIC's arguments, the Court must address:

- Whether the Insurance Providers' merit-based claims are premature and should await a final determination by the AgBCA.

- If the merit-based claims are properly before the Court now, whether the FCIC is entitled to summary judgment.

Essentially, the Court must determine whether it can rule on the Insurance Providers' claims in the absence of a fully developed factual record.

Finally, the FCIC raises a number of related, but ancillary, issues, such as whether the Insurance Providers are time barred from challenging the disputes regulation, whether they have waived their rights to restitution, and whether a particular Insurance Provider is a proper party to this case. As discussed below, FCIC's arguments concerning these ancillary issues are likewise meritless.

---

[3] The AgBCA refused to consider the Insurance Providers' regulatory challenges and the asserted conflict between certain statutes and regulations, concluding that those types of challenges were beyond its jurisdiction.  The parties agree that those issues are ripe for this Court to decide and are subject to this Court's original jurisdiction.

### III.    STANDARD OF REVIEW.

#### A.    The APA Does Not Provide The Standard of Review For This Case.

The FCIC urges this Court to adopt a restrictive Administrative Procedure Act ("APA") review of the AgBCA orders.    In addition to those authorities identified in the Insurance Providers' Motion for Partial Summary Judgment ("Providers' Memo"), there are compelling reasons why APA review is inappropriate in this case.

First, the cases cited by FCIC in support of its proposed standard of review share a common trait: all involve disputes with a fully developed administrative record. Here, however, no administrative record was created because no administrative process ever occurred.[4] Before its rulings in *ACE I*[5] and *ACE II*,[6] the AgBCA held no hearings, took no testimony, and had no evidentiary record to consider. The complete absence of administrative process in this case makes *de novo* review appropriate. *See American Image Corp. v. U. S. Postal Service*, 370 F.Supp. 964, 966 (S.D.N.Y. 1974)(*de novo* review of administrative action is permissible when no hearing was held or testimony taken by agency).

Second, FCIC's Memo makes clear that this case is about contract interpretation, which is the province of the judiciary. *See Electrical Workers Local 47 v. N.L.R.B.*, 927 F.2d 635, 640-

---

[4] The FCIC filed a purported "Administrative Record" with the Court.  It is nothing more than a collection of briefs, transmittal letters, and the SRA Amendments at issue.  This "record" does not even include FCIC's answer to the Insurance Providers' Complaint before the AgBCA, or the appeal record submitted by FCIC after filing its answer.  Of course, the answer and appeal record had not been filed when the AgBCA ruled.  That may be FCIC's reason for not including them.  As this memorandum will develop, the appeal record is inconsistent with some of FCIC's assertions to the Court.

[5] *In re Ace Property & Casualty Ins. Co.*, AgBCA No. 2004-173F, 2005 WL 3485623 (Dec. 21, 2005) (hereinafter "*ACE I*").

[6] *Ace Property & Casualty Ins. Co.,* AGBCA No. 2006-120-R, 2006 WL 1776561 (June 28, 2006) (hereinafter "*ACE II*").

41 (D.C. Cir. 1991)("We accord no special deference *** to ultimate legal conclusions that rest on the Board's interpretation of a collective bargaining contract. Thus we apply a de novo standard of review when interpreting the contract itself."); *County of Suffolk, N.Y. v. United States*, 26 Cl.Ct. 924, 927 (Cl.Ct. 1992) (Court conducts a *de novo* review of agency's determination of breach of contract claim, absent any provision in contract mandating that agency's determination be given particular level of deference).

Finally, additional matters at issue in this case require *de novo* review: challenges to agency jurisdiction, *Lin v. Gonzales*, 473 F.3d 979, 981 (9th Cir. 2007) ("[W]e review questions of law, including an agency's determination of its own jurisdiction, de novo."); matters the AgBCA determined it was incompetent to hear, *see Schmitt v. Maurer*, et al., 451 F.3d 1092, 1095 (10th Cir. 2006) (*de novo* review appropriate where opportunity for administrative review is unavailable); constitutional infirmities, *Western Energy Co. v. U.S. Dept. of Interior*, 932 F.2d 807, 809 (9th Cir. 1991)(noting that Court of Appeals reviews claims that administrative agency violated claimant's constitutional rights *de novo*); and that the Secretary of Agriculture lacked authority to expand the AgBCA's jurisdiction, *see Bonneville Power Admin. v. Federal Energy Reg. Comm'n*, 422 F.3d 908, 914 (9th Cir. 2005)(noting that the question of whether an agency has exceeded its statutory mandate is reviewed *de novo*).

Accordingly, *de novo* review of all issues is appropriate in this matter.

## IV.    ARGUMENT.

### A.    The Insurance Providers' ARPA Claims Were Improperly Dismissed By The AgBCA.

The AgBCA's decision to reject the Insurance Providers' ARPA claims is based on several fundamental errors.

First, the AgBCA assumed that FCIC had fulfilled its procedural obligations under 7 C.F.R. § 400.169(a) ("§ 400.169") such that the Insurance Providers had actually received the documentary notice required to start the 45-day clock under the rule. As demonstrated below, the Insurance Providers have yet to receive any such notice, and therefore any mandated time period could not have even started to run, let alone run its course.

Second, the AgBCA incorrectly resolved the conflict between the six year statute of limitations and the alleged 45-day limitations period under the rule. It also failed to address the Insurance Providers' attacks on the legal sufficiency of this allegedly controlling regulation. In its Motion, FCIC failed to demonstrate that the regulation is valid and failed to explain how a regulatory time limit can override a statutory limitations period expressly identified in the 1998 SRA.

Third, the AgBCA has overlooked the fact that the term "may" in the disputes provision of the 1998 SRA reflects the parties' intent that resorting to § 400.169(a) to resolve disputes is permissive rather than mandatory. Moreover, FCIC's authority does not support its view that the pre-2000 version of § 400.169 is mandatory, even if one disregards the regulation's express use of the term "may" as opposed to "must."

Finally, the AgBCA reversed itself between its original ruling and its ruling on the Insurance Providers' Motion for Reconsideration and concluded that the 1998 SRA was not a continuous contract. It did so expressly to offer a baseless rationale to support its original decision that subsequent changes to the dispute regulation were incorporated into the 1998 SRA. There is absolutely no basis in either law or fact to support the AgBCA's conclusion, reached in response to a motion for reconsideration, that the 1998 SRA was a series of one-year contracts.

**1.    The AgBCA's Application Of § 400.169's 45-day Limit To The Insurance Providers' Claims Is Invalid Because The Insurance Providers Never Received A "Determination" From The FCIC.**

FCIC argues that after it issued Amendment Nos. 1 and 3, the Insurance Providers had a 45-day period to "request a final administrative determination" or risk losing their claims forever. FCIC Memo at 38.[7]  FCIC's argument cannot be reconciled with the history of § 400.169. The history of this provision—which includes language revisions, rulemaking comments by FCIC, and decisions by the AgBCA—demonstrates that the alleged 45-day limitation period only can be triggered by an official FCIC decision or "determination."

According to the Presiding Judge in *ACE I* and *ACE II*, the word "determination"

clearly contemplates a specific documentary notice to the contractor [i.e., Insurance Provider] from an official authorized to take the action. Implicitly, to trigger the 45-day response time, the notice must either directly or constructively identify the document being received by Appellant, as a determination requiring a 45-day response.

*See In re American Growers Ins. Co.,* AGBCA No. 98-200-F (Ag.B.C.A. June 15, 2000) (Pollack, J., dissenting). FCIC does not claim that it ever delivered a determination to the Insurance Providers meeting the criteria described above, and there is no evidence in the record that it did so. Consequently, as the following historical overview of § 400.169 will show, absent receipt of a determination, the Insurance Providers' claims cannot be time-barred.

---

[7] FCIC alternatively argues that publication of the 2000 Version of § 400.169 in 2000 triggered the 45-day period. FCIC Memo at 38. The government has no difficulty denying the Insurance Providers approximately $28 million  in bargained for reimbursements under ARPA, but it cannot state unequivocally when the Insurance Providers lost that right. Because the FCIC also argues that the AREERA claims fail, based on the dissenting Judge's view, its argument puts in jeopardy recovery of the approximately $190 million that the Insurance Providers lost as a result of both AREERA and ARPA.

a.   **Original Language and Meaning of the Disputes Provision: 7 C.F.R. § 400.149.**

Prior to 1988, reinsurance agreement disputes were submitted to the FCIC Manager pursuant to 7 C.F.R. § 400.149, who issued a decision considered final "unless the Company request[ed] reconsideration in writing within forty five days of receipt of the decision." 52 FR 17540 (May 11, 1987).[8] On August 22, 1988, FCIC amended this provision, noting that the old rule "makes no allowance for the [reinsured] Company to review a determination by FCIC which the Company disputes prior to the decision by the Manager." 53 FR 31825 (August 22, 1988). Recognizing the value to a reinsured company of being able to review FCIC findings prior to the issuance of a final determination, *see id.*,[9] FCIC adopted the following provision:

> Initial findings under this Subpart and the Reinsurance Agreement will be made by the Corporation [FCIC]. The Corporation will advise the Company [Insurer] of those findings and request their input within 45 days of the determination. This time may be extended at the request of the Company if the Corporation agrees to the extension.   At the expiration of the time period or, after receipt of the Company's input, the Corporation will issue a final determination denominated as "the determination of the Corporation." That determination will advise the Company of its rights under this section. The Company, if it disputes the Corporation's determination, must appeal that determination in writing, within forty-five days of the receipt of the determination, to the Deputy Manager, Federal Crop Insurance Corporation, U.S. Department of Agriculture, Washington, DC 20250.  The decision of the Deputy Manager will be final.…

---

[8] "§ 400.149 Disputes. All disputes arising under this subpart and the Standard Reinsurance Agreement entered into by the Company and the Corporation must be submitted for decision to the Manager of the Corporation. The decision of the Manager shall be final unless the Company requests reconsideration in writing within 45 days of the receipt of the decision. Any hearing provided by the Corporation will be of an informal nature and the rules of evidence will not apply. Pending final decision of the dispute, the Company will proceed diligently with the performance of the Agreement, as required by the Corporation." 52 FR 17540 (May 11, 1987).

[9] In its January 2000 rule change, the FCIC noted that the dispute process implemented in 1988 "provide[d] the applicable reinsured company with a copy of initial findings, allowed the company to respond, and then issued a final determination. If the reinsured company disputed the final determination, the reinsured company was required to appeal within 45 days of receipt of the determination to the Deputy Manager of the FCIC." 65 FR 3781 (January 25, 2000).

7 C.F.R. § 400.149. Based on the above, the dispute process set forth in § 400.149 evolved to include the following steps:

(1) FCIC makes initial findings;

(2) FCIC advises the Insurance Providers of its findings and requests input within 45 days;

(3) After receiving input from the Insurance Providers, or after the expiration of 45 days, FCIC issues its final determination; and

(4) If the Insurance Providers dispute the determination, their appeal must be made within 45 days to the Deputy Manager, whose decision is then final within the agency.

Of particular note, under the 1988 rule, both 45-day periods are triggered by official decisions rendered by FCIC (either as "findings" or a "final determination") which then are communicated to the Insurance Providers.

### b.  1995 Dispute Provision: 7 C.F.R. § 400.169.

FCIC again revised the disputes provision (and changed its designation to the current § 400.169) in May 1995. According to the FCIC, the intended effect of the 1995 revision was to "provide reinsured companies with an informal reconsideration process through an administrative officer of FCIC and the right to appeal the administrative officer's administrative determination to the Board of Contract Appeals."[10] 60 FR 21035 (May 1, 1995).

---

[10]  Apparently, the change resulted from the enactment of the Department of Agriculture Reorganization Act of 1994, after which the FCIC no longer had hearing officers to conduct appeals. *See* 60 FR 21035 (May 1, 1995).

In revising this regulation, FCIC created mirror-image provisions in § 400.169 (a) and (b),[11] which read as follows:

> If the company believes that the Corporation has taken an action that is not in accordance with the provisions of the Standard Reinsurance Agreement or any reinsurance agreement with the FCIC, except compliance issues, it may within 45 days after receipt of such determination, request, in writing, the Director of Insurance Services to make a final administrative determination addressing the disputed issue. The Director of Insurance Services will render the final administrative determination of the Corporation with respect to the applicable issues. 7 C.F.R. § 400.169(a).

> If the company believes that the Corporation's compliance review findings are not in accordance with applicable laws, regulations, custom or practice of the insurance industry, or FCIC approved policy and procedure, it may within 45 days after receipt of such determination, request, in writing, the Director of Compliance to make a final administrative determination addressing the disputed issue. The Director of Compliance will render the final administrative determination of the Corporation with respect to these issues. 7 C.F.R. § 400.169(b).

The FCIC explained these mirror-image sections this way:

> If the reinsured company is now dissatisfied with a determination under a reinsurance agreement with FCIC it may now request the Director of Insurance services to render a final administrative determination on the dispute. If the reinsured company is dissatisfied with a determination as a result of a compliance review finding, it may request the Director of Compliance to render a final administrative determination on the dispute. Such final administrative determination by the Director of Insurance Services or Director of Compliance will be appealable to the United States Department of Agriculture Board of Contract Appeals.

60 FR 21035 (May 1, 1995). These comments demonstrate that FCIC was not attempting to revise the basic process set forth in the 1988 version—after receiving an unsatisfactory initial decision/determination, the Insurance Providers could request a final determination within 45 days. *See* 65 FR 3781 (January 25, 2000)("On May 1, 1995, FCIC revised this appeals process

---

[11] The AgBCA has referred to subsections (a) and (b) as "parallel provisions." *ACE I*, 2005 WL 3485623.

and now when a reinsured company disputed the final determination it was required to request a final agency determination from the Director of Compliance.")

Because FCIC did not intend to change the underlying process set forth in 1988, the phrase in subsection (a)--"the Corporation has taken an action"--is simply an awkward reworking of the 1988 requirement that "initial findings are made by the FCIC." Accordingly, the 1995 regulation basically tracks the 1988 version:

> (1) FCIC "take[s] an action" (or it makes "initial findings");
>
> (2) The Insurance Providers then have 45 days from receiving a "determination" (or the "findings") to request a final determination of the issue from the Director of Insurance Services, whose decision is final; and
>
> (3) Final administrative determinations of the Director may be appealed to the AgBCA.

7 C.F.R. § 400.169(a) and (d).

The AgBCA has offered its own view of the 1995 regulation, holding that the 45-day time period is triggered by the Insurance Providers' receipt of a formal "determination" from the FCIC, rather than some vague "action" taken by the FCIC:

> Prior conduct of the parties confirms that they have not interpreted the regulation to require a request for a final administrative determination within 45 days from any action believed not in accordance with the SRA. Moreover, the Board has had jurisdiction of FCIC appeals since 1996. In no case since then, has it interpreted the regulation as the dissent suggests. We are aware of no case, including any stage of the current appeal, in which either party has argued for such an interpretation. Our interpretation is that 7 C.F.R. § 400.169(a) describes three separate events, (1) an action; (2) the receipt of a determination concerning that action and (3) a final administrative determination.

*In re Rural Community Ins. Agency, Inc.*, AGBCA No. 2000-154-F, 2002 WL 236693 (Ag.B.C.A. Feb. 12, 2002). According to the AgBCA, any other interpretation of the rule

essentially "equates the terms 'action' and 'determination' in the regulation and ignores the phrase 'receipt of such determination.'"  Equating "action" and "determination" would lead to the absurd situation where the clock would start running "on the 45-day period in which a final administrative determination may be requested when any action which may later be the subject of a dispute occurs." *Id.*  Under such a scheme, the Insurance Providers would be forced to create a cottage industry filing constant complaints about the slightest "actions" prior to receipt of "determinations" in order to protect their rights. Moreover, because FCIC claims that issuance of the Amendments to the 1998 SRA triggered the 45-day clock, the Insurance Providers would have had to file their complaints even though they would not have suffered any damages during the 45-day time period. *See* Section 2b, *infra*.

> ### c. Because FCIC Never Sent The Insurance Providers A "Determination," The 45-day Time Period Could Not Have Run.

There is no evidence in the record that the Insurance Providers received a "determination" from FCIC regarding either the AREERA[12] or ARPA disputes. As noted above,

> [t]he use of the word 'determination,' although not defined in the regulation, clearly contemplates a specific documentary notice to the [reinsurance] contractor from an official authorized to take the action. Implicitly, to trigger the 45-day response time, the notice must either directly or constructively identify the document being received by Appellant, as a determination requiring a 45-day response.

*See In re American Growers Ins. Co.,* AGBCA No. 98-200-F (Ag.B.C.A. June 15, 2000) (Pollack, J., dissenting).

---

[12]    AREERA refers to the Agricultural Research, Extension, and Education Reform Act of 1998. *See* Amended Complaint, ¶¶ 47.

The AgBCA simply assumed that the unilateral issuance of Amendment Nos. 1 and 3 triggered the 45-day period. *See ACE I*,[13] AR at 7 (quoting the Acting Director of RMA's statement that issuance of the amendments constituted "disputed actions" and that the request for final administrative determination came "long after" the issuance dates). As for the FCIC, it is even less certain about the triggering event, offering the Court two options to choose from:

> The Trigger For The 45-day Limit Was FCIC's Issuance Of The Manager's Bulletins And Amendments No. 1 and 3 To the SRA, And/Or Alternatively, The Date That FCIC Promulgated The Revised Regulation (January 25, 2000).

FCIC Memo at 38 (argument heading). FCIC's admitted uncertainty regarding the actual triggering event for the 45-day period shows the FCIC position for what it is: a post-hoc attempt to concoct a scenario under § 400.169 that would deny the Insurance Providers the ability to present their claims.

More importantly, there is no support in § 400.169, or in any previous AgBCA decision, for the proposition that the unilateral issuance of an SRA amendment, or the issuance of a revision to a regulation, starts the 45-day clock. Indeed, as the AgBCA itself has previously held in an analogous situation, rule *publication* does not start the clock running. *See In re Farmers Alliance Mutual Ins. Co.*, AGBCA No. 2000-163-F, 2002 WL 318262 (Ag.B.C.A. Feb. 28, 2002)(affirming prior AgBCA decisions holding that rule publication does "not start the running of the 45-day period to ask for a final administrative determination."); *In re Rural Community Ins. Agency, Inc.*, AGBCA No. 2000-154-F, 2002 WL 236693 (Ag.B.C.A. Feb. 12, 2002) (noting that "[I]f FCIC's intent is to treat the publication of a rule as that initial determination, a clarification to the regulation is the appropriate course. However, we also suggest that such a

---

[13] As noted above, both *ACE I* and *ACE II* are reported on Westlaw. Unfortunately, the Westlaw citations do not allow for "pincites" because no page numbers are included in the Westlaw version. Accordingly, when quoting from those decisions, the Insurance Providers cite to the "Administrative Record" ("AR") pages as filed by the FCIC.

requirement could unnecessarily hamper the conduct of day-to-day business between the parties."); *see also ACE I*, AR at 16 (noting that "publication of the rule in the Federal Register in *Rural* did not qualify as an initial determination so as to start the running of a 45-day period.").

As the above plainly shows, absent the Insurance Providers' receipt of an official FCIC determination, the 45-day period for seeking a final determination from the Director of Insurance Services could not have run.[14] Consequently, the AgBCA erred when it ruled that the Insurance Providers ARPA claims were time-barred. Its settled interpretations of § 400.169 do not support the ruling, nor does the text of the regulation.

### d. Epilogue: Effect Of January 2000 Revision On The Insurance Providers' ARPA Claims.

In January 2000, FCIC again revised the language of its mirror-image dispute provisions, §§ 400.169 (a) and (b). The stated reason for this revision was to clarify whether the 45-day time frame (following receipt of a determination) for requesting a final determination was mandatory or permissive. 65 FR 3781 (January 25, 2000)(According to FCIC, "Although FCIC has always treated the 45 day time frame as mandatory under both the old and new process, and the reinsured companies have routinely complied with this requirement, FCIC is revising the language to make it clear that the 45 day time frame is a mandatory requirement.").

The revised language is as follows:

---

[14] The Insurance Providers have previously pointed out to the AgBCA that each Insurance Provider executed the 1998 SRA Amendments and sent them back with a letter expressing their disagreement with the unilateral Amendments and the reservation of their rights to seek all available contract-based compensation. To the extent the FCIC believes issuance of the Amendments was its "determination," the Insurance Providers' reservation of rights and letters complaining of the Amendments should be found to be their "request for agency determination," and those letters were all sent within 45 days of receipt of the Amendments. No response was ever received from FCIC to the Insurance Providers' letters.

(a)     If the company believes that the Corporation has taken an action that is not in accordance with the provisions of the Standard Reinsurance Agreement or any reinsurance agreement with FCIC, except compliance issues, it may request the Deputy Administrator of Insurance Services to make a final administrative determination addressing the disputed action. The Deputy Administrator of Insurance Services will render the final administrative determination of the Corporation with respect to the applicable actions. All requests for a final administrative determination must be in writing and submitted within 45 days after receipt after the disputed action. 7 C.F.R. § 400.169(a).

(b)     With respect to compliance matters, the Compliance Field Office renders an initial finding, permits the company to respond, and then issues a final finding. If the company believes that the Compliance Field Office's final finding is not in accordance with the applicable laws, regulations, custom or practice of the insurance industry, or FCIC approved policy and procedure, it may request, the Deputy Administrator of Compliance to make a final administrative determination addressing the disputed final finding. The Deputy Administrator of Compliance will render the final administrative determination of the Corporation with respect to these issues. All requests for a final administrative determination must be in writing and submitted within 45 days after receipt of the final finding. 7 C.F.R. § 400.169(b).

Although the AgBCA used this rule change as the basis for rejecting jurisdiction over the Insurance Providers' ARPA claims, that conclusion is incorrect because the Insurance Providers never received a determination from the FCIC, as the analysis above shows. As for whether the awkwardly worded operative phrase "45 days after receipt after the disputed action"[15] in the revised subsection (a) is meant to change the pre-existing dispute process to require a different result, clearly it is not, as evidenced by the more carefully worded language in "mirror-image" subsection (b): "45 days after receipt of the Final Finding."  Moreover, the FCIC stated that "[t]he changes in this rule do not change current requirements as understood by the reinsured companies and FCIC. This rule is merely interpretative and, therefore, exempt from the

---

[15] In its ruling, the AgBCA misquoted the operative language of § 400.169 in several places, raising serious doubts as to the care taken in its analysis of this provision. *See ACE I*, AR at 17 (referring to the operative language in 400.169(a) as "45 days after receipt of the disputed action" rather than "45 days after receipt *after* the disputed action.") This same mistake was made by the Acting Director of the RMA in his letter to the Insurance Providers rejecting their request for a final determination. See AR at 254.

requirements for notice and comment and the 30 day delay in the effectiveness of this rule." *See* 65 FR 3781 (January 25, 2000). Current requirements and understanding of the parties was that a final determination was required to start the clock running.[16]

In sum, the AgBCA erroneously applied a supposed 45-day rule to the Insurance Providers' ARPA claims, and its decision should be reversed.

> **2.    The Insurance Providers Did Not Agree To Shorten The Applicable Six-Year Statute Of Limitations Set Forth In 28 U.S.C. § 2401 And Expressly Recognized In Section V.H Of The 1998 SRA. Accordingly, Their Claims Are Not Time-Barred.**

Apart from the fact that the Insurance Providers have yet to receive an actual determination that would start the 45-day clock running, the 45-day time period is inapplicable to the Insurance Providers' ARPA claims.

One of the more confusing aspects of the AgBCA's ruling was its attempt to "harmonize" its commitment to the purported 45-day limitation period in § 400.169 with the six-year statutory limitation period in 28 U.S.C. § 2401, which is the same six-year contractual limitation period noted in Section V.H of the SRA.

In its motion, FCIC claims to have identified a case "directly on point, with respect to [Insurance Providers'] claim that the six-year statute of limitations in the SRAs or in Title 28 controls over the 45-day rule in the regulation." FCIC Memo at 39. According to FCIC, the lesson from *Do-Well Machine Shop v. United States*, 870 F.2d 637 (Fed. Cir. 1989), is twofold:

---

[16]   Of course, if the 2000 language changed the permissive nature of the regulation or what triggered the start of the 45-day period, then the change was not "merely interpretative" and, therefore, would not be exempt from the requirements for notice and comment. *See* Providers' Memo at 14. And since there was no "notice and comment" associated with this material change, it would be invalid, and pose no bar to the Insurance Providers' ARPA claims. *Sprint Corp. v. Federal Com. Comm'n*, 315 F.3d 369, 377 (D.C. Cir. 2003). In essence, the FCIC cannot have it both ways, i.e. change the regulation to bar the Insurance Providers' claims yet characterize the change as "merely interpretative."

(1) parties can agree to shorten a limitations period; and (2) the Insurance Providers *agreed* to shorten the limitations period from six years to 45 days when they executed the SRA that contained the disputes provision.[17]

The Supreme Court has stated the fundamental rule for contractually shortened limitations periods:

> [I]t is well established that, in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period.

*Order of United Commercial Travelers v. Wolfe*, 331 U.S. 586, 608, 67 S.Ct. 1355, 1365, 91 L.Ed 1687 (1947); *Hunter-Boykin v. George Washington University*, 132 F.3d 77, 79 n.1 (D.C. Cir. 1998). The Insurance Providers demonstrate below that the parties did not agree to reduce the limitations period from six years to 45 days, and that if a 45-day limitation period was intended, it is inherently unreasonable.

### a. The Insurance Providers Did Not Agree To Shorten The Six Year Statute Of Limitations.

Fundamentally, while "'[c]ontractual stipulations which limit the right to sue to a period shorter than that granted by statute'" are allowed, they "'are not looked upon with favor because they are in derogation of the statutory limitation. Hence, they should be construed with strictness against the party invoking them.'" *Herring v. Teradyne, Inc.,* 256 F.Supp.2d 1118, 1126 (S.D.Cal. 2002)(citation omitted). Moreover, to be valid and enforceable, such limitation provisions "must be 'distinctly declared and deliberately accepted,'" *Turoff v. Eastern Airlines*, 129 F.Supp. 319, 321 (D.C.Ill. 1955), and must "explicitly state such limitations." *Van-Go*

---

[17] An important admission that goes hand-in-hand with FCIC's position is that, absent an alleged agreement to shorten the limitations period to 45 days, FCIC implicitly recognizes that the six year limitation period applies.

*Transport Co., Inc. v. New York City Bd. of Educ.,* 53 F.Supp.2d 278, 284 (E.D.N.Y. 1999); *see also Wright v. Universal Maritime Service Corp.,* 525 U.S. 70, 80 (1998) ("[W]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.' More succinctly, the waiver must be clear and unmistakable.") (citation omitted). They will be upheld if "voluntarily agreed upon, but only if the intention to establish a shorter period is clearly set forth." *Van-Go Transport Co., Inc.,* 53 F.Supp.2d at 283-84; *Oil and Gas Ventures-First 1958 Fund, Limited v. Kung,* 250 F.Supp. 744, 753 (S.D.N.Y. 1966) (holding that parties may agree to reasonable shorter periods of limitation, but such agreements are strictly construed, and the intention to provide a shorter than usual period of limitation must be clear). Thus, the first question is whether the disputes provision in the 1998 SRA distinctly and explicitly sets forth the parties' intention to waive the six year limitation period and, instead, to be governed by a 45-day limitation period.

The disputes provision, Section V.L. of the 1998 SRA, states, in relevant part, as follows:

> 1.  The Company [Insurance Providers] may appeal any actions, finding, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169.

AR at 299.  Obviously, there is nothing in the language of the disputes provision itself that clearly, distinctly, explicitly, and unmistakably sets forth a 45-day limitation period.[18] In fact, the only provision in the SRA that actually mentions "statute of limitations" is Section V.H of the SRA, which states:

---

[18] Under *ACE I* and *ACE II*, the 45-day period in § 400.169 was not mandatory at the time the 1998 SRA was executed. Moreover, even if it were mandatory, there is nothing in § 400.169 or its history that suggests it was meant to operate as a permanent bar to claims. *See* Providers' Memo at 34-36.

> The [Insurance Provider] should be aware that the statute of limitations for bringing suit for any breach of this Agreement is 6 years.

AR at 296. In short, rather than demonstrate the parties' intention to agree to a 45-day limitations period, the only evidence in the 1998 SRA (disputes provision or otherwise) is that the parties recognized the applicability of the federal six year limitations period set forth in 28 U.S.C. § 2401.

In contrast to the facts at issue here, the case cited by FCIC, *Do-Well Machine Shop*, identified the type of contractual provision that does satisfy the rule. *Do-Well* involved a contract that contained the following "Termination For Convenience" clause:

> (c) After receipt of a Notice of Termination, the Contractor shall submit to the Contracting Officer its termination claim, in the form and with the certification prescribed by the Contracting Officer. Such claim shall be submitted promptly but in no event later than one year from the effective date of termination.

*Appeal of Do-Well Mach. Shop, Inc.,* 88-3 BCA P 20994, ASBCA No. 36090, 1988 WL 81109 (A.S.B.C.A.). Based on this provision, the Federal Circuit was able to conclude that "absent the one-year time bar agreed to by Do-Well, Do-Well would have had an indefinite time period in which to present its termination claim * * * Do-Well agreed, however, to curtail this right * * *" *Do-Well Mach. Shop, Inc. v. U.S.,* 870 F.2d at 640.

In sum, FCIC cannot show that the disputes provision, or any other provision in the 1998 SRA for that matter, specifically, explicitly, and intentionally sets forth a 45-day limitation period. This deficiency also highlights the complete absence of evidence that the Insurance Providers knowingly and voluntarily waived their right to the six-year limitation period in 28

U.S.C. § 2401.[19] *See Seaboard Lumber Co. v. U.S.,* 903 F.2d 1560, 1563 (Fed. Cir. 1990) ("Waiver requires that the party waiving such right do so 'voluntarily' and 'knowingly' based on the facts of the case."); *McCall v. U.S. Postal Service*, 839 F.2d 664, 667 (Fed. Cir. 1988)(upholding waiver of right to appeal where agreement was knowingly and voluntarily entered into). For the reasons set forth above, the six-year limitation period governs the claims at issue in this case.

### b.  A 45-day Limitation Period Is Not Reasonable.

The second issue pertinent to a contractually shortened limitations period is its reasonableness.  An abbreviated 45-day limitation period is fundamentally unreasonable.

"[T]he reasonableness of a contractual limitations period is determined 'in light of the provisions of the contract and the circumstances of its performance and enforcement.'" *Furleigh v. Allied Group Inc.,* 281 F.Supp.2d 952, 968 (N.D.Iowa 2003). More specifically, an abbreviated period of limitations will only be considered reasonable if "'(1) the claimant has sufficient opportunity to investigate and file an action, (2) the time is not so short as to work a practical abrogation of the right of action, and (3) the action is not barred before the loss or damage can be ascertained.'" *Wineman v. Durkee Lakes Hunting & Fishing Club, Inc.*, 352 F.Supp.2d 815, 820 (E.D.Mich. 2005) (citations omitted).  Here, the AgBCA has accepted the proposition that the limitations period began to run when the 1998 and 2000 Amendments were delivered to the Insurance Providers.  Under the terms of the 1998 SRA, the Insurance Providers

---

[19] The fact that no evidence of voluntary waiver exists is consistent with the complete absurdity of the suggestion that any Insurance Provider would agree to such an abbreviated limitation period. In addition, the AgBCA has determined that the 45-day period does not apply to claims that arose prior to the 2000 amendment (and, by extension, that the six-year period does). To the extent FCIC believes the 45-day period applies to post-2000 claims through some sort of constructive or implied consent by the Insurance Providers, the question becomes: What was the consideration received by them for such a radical constraint on their rights to bring claims? They received nothing, of course.

would not have been able to show they were damaged within 45 days after receiving each Amendment, because the reduced reimbursements under the Amendments were not due to be paid until much later than 45 days thereafter; some, indeed, were not due to be paid for a year or more after the Amendments.

The attached Declaration of Troy Brady ("Brady Decl.") illustrates how funds flow among farmers, the Insurance Providers, and FCIC under the Federal Crop Insurance Program. *See* Brady Decl., Exhibit A ¶¶ 6-17.  Mr. Brady illustrates payments on account of CAT Administrative Fees and Loss Adjustment Expenses ("LAE") with respect to two crops, raisins and soybeans.  *Id*.  Raisins were selected because they are the earliest reporting crop and thus the crop that would be relevant for determining the earliest loss to the Insurance Providers.  *Id*. at ¶15.  Soybeans were selected because they are a major crop of significant economic value.  *Id*. Mr. Brady explained in detail that the earliest date of potential losses regarding raisins would be no earlier than October of a particular reinsurance year.  *Id*. at ¶ 16.  Thus, for example, no loss could be sustained as a result of the AREERA amendment, effective July 1, 1998, until October 1998, at least ninety days after the Amendment.  With respect to soybeans, no loss could be sustained until at least July 1999, a full year after the AREERA changes.  *Id*. at ¶ 17.  The results under ARPA are the same.  *Id*. at ¶ ¶ 9 and 14.

Thus, under a 45-day limitation period, the Insurance Providers' claims would be barred before their losses or damages could be ascertained, a situation which is *per se* unreasonable. *Furleigh,* 281 F.Supp.2d at 968 ("a limitations provision that requires the plaintiff to bring an action before any loss can be ascertained is per se unreasonable.").  Accordingly, the 45-day limitation is *per se* unreasonable.

3. **The AgBCA Was Correct In Its Prior Decisions That "May" Is Permissive; Because FCIC Chose Not To Appeal Those Decisions, It Cannot Now Attack Them.**

  a. **FCIC's Inclusion Of The Word "May" In The Disputes Provision Of The SRA Reflects The Parties' Intent That Use Of § 400.169 Was Not Mandatory.**

There are two "may" versus "must" issues in this case. As noted above, the first relates to § 400.169, and concerns whether this *regulation* requires an Insurance Provider to request a final administrative determination from the Director of Insurance Services within 45 days after receipt of a determination. The second issue relates to the disputes provision of the 1998 SRA, Section V.L., and concerns whether the *contract* requires an Insurance Provider to appeal FCIC findings in accordance with the provisions of § 400.169. FCIC has focused its attention on the language in the regulation, and essentially ignored the contract language in Section V.L. That is a mistake.

Section V.L. has a special role in the SRA in that it serves as a "doorway" through which § 400.169 becomes a part of the contract.[20] In addition, unlike the language in § 400.169, the contract language in Section V.L. has stayed constant throughout the term of the 1998 SRA, so its effect is uniform throughout the relevant time period. Section V.L. provides that an Insurance Provider "**may** appeal any actions, finding, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169." (Emphasis added). While FCIC has myopically focused on the phrase "in accordance with the provisions of 7 C.F.R. 400.169," which it argues imports the terms of § 400.169 into this section, the real work is done by one

---

[20] The FCIC's Motion for Summary Judgment contains several references to the "doorway" function served by Section V.L.: "The AGBCA's Interpretation Of The Contractual Provision Governing Disputes, Section V.L., Which Incorporated Expressly The Terms of 7 C.F.R. § 400.169, Was Correct" FCIC Memo at 27; "The Terms of the 1995 Regulation were Incorporated Into The SRAs Section V.L., And provided For A 45-day Limit" FCIC Memo at 32; "[A]s the board correctly held, the insurance companies agreed, in each successive SRA in section V.L., to a 45-day limitations period …." FCIC Memo at 39.

word: __*may*__. That is, irrespective of whether FCIC changed § 400.169 to be mandatory or permissive, the parties' contract demonstrates their agreement that the word __*may*__ controls.

If the provision was intended to be mandatory, surely it would have been written differently. It could have been drafted to provide "Insurance Providers must appeal FCIC actions" pursuant to this scheme, or, "The parties hereby adopt the provisions of 7 C.F.R. § 400.169 as their dispute resolution mechanism." In fact, the parties' reasoned and distinct use of the words "may" and "must" is reflected throughout the SRA.[21]   In the end, the disputes provision says "may" instead of "must."[22]

It is axiomatic that where the provisions of a contract with the government are phrased in "clear and unambiguous language, they must be given their plain and ordinary meaning, and [courts] may not resort to extrinsic evidence to interpret them." *Coast Federal Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003). Case law confirms the obvious: that the term "may" is permissive, in contrast with the term "shall," which is mandatory in nature. *Lopez v. Davis*, 531 U.S. 230, 231 (2001); *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) (noting

---

[21]  Examples of the 1998 SRA's use of "must" appear in Sections V.B.1. ("must submit accurate and detailed contract data"), V.B.2. ("reports must be certified"), V.B.5. ("any amount due FCIC must be deposited"), and V.F. ("must submit").  In fact, Sections V.B., E., F., G., H., and I., are replete with such mandatory language. Examples of its use of "may" appear in Sections V.I.6. ("FCIC may… waive"), V.J. ("FCIC may suspend") and V.Q.3. ("the Company may request") in addition to Section V.L.1.  *See* Plaintiffs' Facts, Ex. A.

[22]  It is important to note that FCIC also could have omitted the disputes provision entirely from the SRA. In the absence of this contract provision, § 400.169 itself would govern because of the administrative exhaustion requirement codified in 7 U.S.C. § 6912(e). Thus, including the term "may" in the disputes provision suggests that FCIC intended the use of § 400.169 to be discretionary. Just as parties can agree to keep disputes out of courts through arbitration provisions, so too with administrative dispute proceedings.  The insurance contract terms mandated by FCIC for the Insurance Providers' use with policyholders provide an excellent example – the voluntary mediation and mandatory arbitration provisions.  7 C.F.R. § 457.8, Model Policy ¶20(a) (for Reinsured Policies) which courts have upheld with virtually unanimity. *Noble v. Rural Community Ins. Serv.*, 122 F.Supp. 2d 1290, 1295-96 (M.D. Ala. 2000); *In re Sugar Beet Crop Ins. Litigation*, 228 F. Supp. 2d 992, 995-96 (D. Minn. 2002).

"may" is permissive and "shall" is mandatory); *Primary Care Investors, Seven, Inc. v. PHP Healthcare Corp.*, 986 F.2d 1208, 1213 (8th Circuit 1993) ("may" is permissive, "shall" is mandatory); *ACE I*, AR at 12 (stating that "we still see no explanation as to why 'may' is to mean 'must,' when FCIC chose to use the word 'must' in a number of instances in 400.169.").

### b. The Federal Circuit's Decision in *Kentucky v. United States* Supports The Conclusion Reached By The AgBCA That "May" Means "May."

The Federal Circuit's decision in *Kentucky, Educ. Cabinet, Dept. for the Blind v. United States*, 421 F.3d 1222 (Fed. Cir. 2005), provides no support for FCIC's efforts to overturn the AgBCA's decision that "may" means "may." FCIC's effort is its way of asking this Court to adjudicate the Insurance Providers' AREERA claims, which remain with the AgBCA. In short, FCIC wants a supposedly mandatory version of § 400.169 dating back to 1995 even though the AgBCA has held there is none.

In *Kentucky*, the Federal Circuit construed the appeal procedures available to blind vendors under the Randolph Shepherd Act and found that its arbitration provision was mandatory despite the use of the word "may" in the statute. The court based its decision on several factors, including: that the act explicitly stated that such an arbitration would be final and binding; that the arbitration decisions would be reviewable by a court as the final agency action; and that the arbitration decision, if reviewed by a court, would be reviewed under the standards set forth in the APA. *See Id.* at 1228. The court also emphasized that it was a statutory arbitration requirement and that the legislative history indicated a congressional intent to provide "the means by which aggrieved vendors and state agencies may obtain a final and satisfactory resolution of disputes." *Id.* (quoting Senate Report No. 93-937 at 20).

In contrast to the Randolph Shepherd Act, the originally adopted version of § 400.169 contains none of the provisions that the Federal Circuit found important to its determination that Congress intended to create a mandatory appeal process. There is no statute and no legislative history indicating an intention to create a final remedy, and none of the language the court found important in *Kentucky* appears in § 400.169. Indeed, what little regulatory history there is clearly indicates an intention that the originally enacted version of § 400.169 was not intended to be mandatory. In enacting § 400.169, the FCIC described it as an "informal reconsideration process through an administrative officer of FCIC…." 61 Fed. Reg. 39268 (July 18, 1996). Obviously, "informal reconsideration" is wholly inconsistent with the notion of a mandatory appeal process affecting substantive rights. Furthermore, if, as FCIC now urges, the originally enacted version of § 400.169 was mandatory, there was no need for FCIC to amend it in 2000, to change the word "may" to "must." Given the foregoing, the argument that the prior version of § 400.169 is mandatory is entirely without merit.

### c.  The AgBCA Decisions Under The Prior Version Of § 400.169 Held That The 45-Day Time Limit Was Permissive.

FCIC's efforts to convince this Court to adopt the AgBCA dissent's view of the 1995 regulation should be rejected. Rather than appealing to any court after the AgBCA rendered its prior decisions that the 45-day period is permissive, FCIC instead chose to amend the regulation. To allow FCIC now to attack the very decisions it chose not to appeal amounts to a *de facto* retroactive application of the changed regulation.

Consistent with its decisions in this case, prior decisions of the AgBCA held that the version of § 400.169 in effect prior to January 25, 2000, was permissive and did not require a request for final agency determination within 45 days. In *In re American Growers Insurance Company*, AgBCA No. 99-134-F (October 28, 1999), the AgBCA determined that the appellant

was not barred from asserting its appeal despite the fact that it had failed to request a final agency determination within 45 days. In so ruling, the AgBCA noted that the use of the word "may" indicated that the request was permissive, especially when viewed in the context of other parts of the regulation that employed the word "must." *Id.*

FCIC did not appeal the *American Growers*' decision. Instead, it chose to amend the regulation in an effort to overturn the decision. On January 25, 2000, the Department of Agriculture promulgated the 2000 Version of § 400.169(a) which, among other things, changed the wording of the regulation to remove the word "may" and insert the word "must" into the text. After amending the regulation, FCIC moved for reconsideration in the *American Growers* case. The AgBCA denied FCIC's motion, noting that it had amended the regulation. *In re American Growers Insurance Company*, AgBCA No. 99-134-F (May 23, 2000).

In a subsequent appeal involving claims resulting from Prevented Planting regulations issued in 1995,[23] Judge Vergillio, the dissenting judge in *ACE I* and *ACE II*, expressly recognized the AgBCA's holding that the prior version of § 400.169 was permissive. *See In re American Growers Insurance Company*, AgBCA No. 98-200-F (June 15, 2000) at p. 10. Indeed, Judge Vergillio acknowledged that the Board's conclusion was controlling, even though he disagreed with it. *Id.* at n.2. Judge Pollack dissented in that case and reiterated the AgBCA's controlling holding that failure to file a request for a final determination within 45 days does not automatically bar an insurer's appeal. *Id.* at 31-33 (Pollack, J., dissenting). Thus, all AgBCA decisions addressing this issue have concluded that the 45-day period in the 1995 version of the

---

[23] Prevented Planting coverage under the federal crop insurance program offers protection for farmers whenever a crop cannot be planted by the final planting date due to excessively wet weather or drought. 7 C.F.R. § 457.8, Model Policy ¶17.

regulation is permissive and not mandatory.  FCIC chose not to appeal these decisions and instead chose to create a new rule through an amendment to the regulation.

Against this backdrop, FCIC now argues that this Court should adopt a position contrary to the AgBCA's settled precedent despite the fact that FCIC failed to seek judicial review of any of the controlling decisions, including the AgBCA ruling in this case.  FCIC is estopped from collaterally attacking the AgBCA decisions at this juncture. *Astoria Federal Savings and Loan Ass'n v. Solimino*, 501 U.S. 104, 107-108 (1991)("We have long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality. … Such repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise.")

The 2000 Version of § 400.169, promulgated in January of 2000, has a ***prospective*** effect only, at most, such that actions adjudicated pursuant to the 1995 regulation are governed by existing AgBCA precedent.  If the FCIC disagreed with the AgBCA's conclusions regarding the permissive nature of the prior version of § 400.169, it could have appealed those decisions.  Urging this Court to adopt a position contrary to the settled AgBCA precedent is a precluded collateral attack on those decisions.

> **4.    The 1998 SRA Unambiguously States That It Is A Continuous Contract By Its Express Terms, And Even If A Contract Ambiguity Could Be Established, All Evidence Demonstrates That The Parties Intended The 1998 SRA To Be A Continuous Contract.**

Both the FCIC and the AgBCA agree that if the 1998 SRA is a continuous contract, it could incorporate only those regulations in effect at the time of its execution. AR at 229 (FCIC Opposition to Motion for Reconsideration); *ACE II*, AR at 313.  Accordingly, if the 1998 SRA is

continuous, only the "permissive" version of § 400.169 would have been incorporated into the 1998 SRA, and the Insurance Providers' ARPA claims could not be barred by the 45-day limit.

In its original ruling, the AgBCA correctly concluded that the 1998 SRA was continuous. *ACE I*, AR at 4. In doing so, it relied on provisions of the agreement expressly stating that the contract was a continuous contract. *Id.* at 4-5. In its ruling on the Insurance Providers' Motion for Reconsideration, the AgBCA contradicted itself at the request of FCIC. It did so without finding any ambiguity in the contract or sufficiently explaining why it had reversed its earlier conclusion. *ACE II*, AR at 313. In essence, the AgBCA switched positions 180 degrees, first finding the 1998 SRA unambiguously continuous in its original ruling and then finding it unambiguously a series of one year contracts in its ruling on reconsideration.

The inadequately explained 180 degree shift by the AgBCA was both wrong as a matter of law and contrary to long established rules of contract interpretation. For example, had the AgBCA, on reconsideration, concluded the contract was ambiguous, it was incumbent upon the AgBCA to resolve that ambiguity through traditional principles of contract interpretation – the foremost of which is to determine the parties' intent. *United States v. Insurance Co. of North America*, 131 F.3d 1037, 1042 (D.C. Cir. 1997). That the AgBCA failed to do so is one of its most egregious errors.

Evidence of the parties' intent regarding the continuous nature of the contract, which should have been considered by the AgBCA, conclusively demonstrates that both sides of the contract intended for it to be continuous and not a series of one year contracts. Further, the factual predicates relied upon by the AgBCA and urged by FCIC are simply wrong. Once those errors are corrected, FCIC's argument fails, and the AgBCA's conclusion is exposed as patently erroneous. Finally, legal propositions relating to insurance *policies* relied on by FCIC are

inapposite, as the 1998 SRA is not an insurance policy, but a contract of reinsurance. Applying the law applicable to reinsurance agreements, and doing so in the context of the applicable facts and the actual crop insurance policies that were reinsured under the 1998 SRA, demonstrates that the 1998 SRA was continuous.

### a. The 1998 SRA Was Executed Once By Each Insurance Provider And Covered Six Years.

FCIC egregiously misrepresents, in several places in its Motion, that a new SRA was executed annually by the Insurance Providers: "[B]efore the start of each reinsurance year, petitioners executed each successive SRA ….," FCIC Memo at 28, "[w]hen executing the SRA each year …." FCIC Memo at 39, "petitioner insurance companies executed an SRA for each successive reinsurance year with FCIC, beginning in 1997 ….," FCIC Memo at 49, and "In any event, by executing each successive SRA in each reinsurance year …." FCIC Memo at 60 n.30.

The FCIC's statements, however they arose, are false. The Insurance Providers did not execute an SRA each year. Each Insurance Provider executed one 1998 SRA (all in 1997 with the exception of Farmer's Mutual Hail of Iowa, which executed it in 1999) and that single document covered the relationship between the parties until it was replaced in 2004 with the 2005 SRA. *See* Declaration of John Joyce ("Joyce Decl."), Exhibit B at ¶¶ 6, 9; Declaration of Ben Latham ("Latham Decl."), Exhibit C at ¶ 3. There simply were not annually executed 1998 SRAs.

### b. The Express Language Of The 1998 SRA Demonstrates That It Was A Continuous Contract.

Many provisions of the 1998 SRA show that it was a continuous contract. To start, Section V.M. of the SRA states:

> *This Agreement will continue in effect from year to year with an annual renewal date of July 1 of each succeeding year* unless FCIC gives at least 180 days advance

notice in writing to the [contracting private insurance provider] that the Agreement will not be renewed. This Agreement will automatically terminate if the [contracting private insurance provider] fails to submit a Plan of Operations by the date such Plan of Operations is due unless such other date is approved by FCIC in writing.

(Emphasis added.)

AR at 300. Other provisions of the 1998 SRA show that it was continuous, including provisions relating to the "reinsurance year." The concept of the reinsurance year is an important feature of the SRA because it has financial and operational significance for the 1998 SRA and provides, for instance:

- a frame of reference for settling accounts for allocating underwriting gain and loss (Section II.B., C., and D.), AR at 280-282.

- by requiring the Insurance Providers to meet financial covenants (Section II.A.8.a.), *Id.* at 280; and

- for requiring the Insurance Providers to update operating plans to be reviewed by FCIC (Section V.G.1.), *Id.* at 294.

The concept of reinsurance year has no impact on whether the SRA is continuous or not.

Similarly, FCIC's argument that the SRA is a one year agreement is inconsistent with the "Annual Settlement" process in the SRA. If the SRA simply were a series of one year contracts, there would be no reason for the concept of an annual squaring of accounts, let alone the language in the SRA related to the process.[24] Instead, the contract simply could provide that within "x" days or months following termination, the parties will settle their respective shares of underwriting gains and losses. The definition of "Annual Settlement" also is instructive:

"Annual Settlement" means the settlement of accounts between the [Insurer] and FCIC for the reinsurance year, beginning with the February monthly transaction cutoff date *following the reinsurance year* and continuing monthly thereafter as necessary.

---

[24] *See also* Brady Decl., Exhibit A at ¶ 17. Some payments with respect to soybeans would not be due until fifteen months after the start of a reinsurance year, thus necessitating a mechanism to settle accounts.

*Id.* at 274 (emphasis added). Because a reinsurance year runs "from July 1 of any year through June 30 of the following year," as the government has argued, this definition unequivocally means that the first "Annual Settlement" under the 1998 SRA (running July 1, 1997, through June 30, 1998) occurred in February of 1999. This, coupled with the fact that this is a recurring process, demonstrates that the 1998 SRA continued year-to-year until terminated.

The 1998 SRA's termination provisions (found in Section V.K.) are also totally consistent with an agreement that "will continue in effect from year to year" (as specified in Section V.M.). *Id.* at 299. The SRA permits termination "for cause" (subsection 1), a concept important in any contract of any duration. More significantly, it also allows for termination "for convenience of the government" (subsection 2), a concept relatively insignificant in a contract of one year's duration, but of genuine importance in a continuing agreement. *Id.*

### c. Both FCIC And The Insurance Providers Intended The 1998 SRA To Be Continuous.

As noted above, the contract language unambiguously demonstrates that the 1998 SRA was continuous. However, if the AgBCA had determined that there was an ambiguity in the 1998 SRA, its first obligation was to determine the intent of the parties. That determination required testimony from the individuals with personal knowledge concerning the circumstances under which the 1998 SRA was negotiated and executed. The AgBCA failed to seek or consider any such testimony prior to its ruling. Participants' testimony would have demonstrated that both parties intended the 1998 SRA to be a continuous contract.

Prior to his retirement, Dallas Smith was Deputy Under Secretary of Agriculture. In 1997, when the 1998 SRA was under negotiation, Mr. Smith headed the Policy Committee that was in charge of negotiating the 1998 SRA on behalf of the FCIC. Accompanying this Memorandum is the Declaration of Dallas Smith ("Smith Decl.") in which he unequivocally

states "[t]he 1998 SRA was intended to be a continuous contract, not a series of one-year contracts." *See* Smith Decl., Exhibit D at ¶ 5. Accordingly, the government official in charge of the negotiation of the 1998 SRA intended that it be a continuous contract.

Prior to his retirement, John Joyce was the Chairman of Rain and Hail, LLC, the managing general agent for Plaintiff ACE Property and Casualty Insurance Company ("ACE"). Joyce Decl., Exhibit B at ¶ 2. In 1997, ACE was one of the largest crop insurers. *Id.* at ¶ 4. As a result, Mr. Joyce often served as an industry spokesperson in negotiating with the FCIC regarding SRAs, and he fulfilled that role regarding the 1998 SRA. *Id.* at ¶ 4, 5. From his vantage point as a principal industry spokesperson and negotiator of the 1998 SRA's terms, Mr. Joyce is able to state, unequivocally on behalf of the Insurance Providers, the following:

- "ACE and the other Insurance Providers intended the 1998 SRA to be a continuous contract in force until replaced, and all industry participants believed in fact that the 1998 SRA was a continuous contract, and we understood RMA/FCIC to have the same position since no contrary position ever was asserted by the government in negotiations." *Id.* at ¶ 7.

- "As a practical matter, it made no economic sense for ACE and the other Insurance Providers to enter into an SRA of only one year's duration in 1997." *Id.* at ¶ 8.

- "[T]here is no question in my mind that the 1998 SRA was both intended to be and was in fact a continuous contract, in effect until it was replaced by a new SRA on July 1, 2004. Contrary to what I understand has been asserted by the government, the 1998 SRA was not entered into on a yearly basis, but was executed in 1997 with the intent that it would cover multiple reinsurance years until replaced by a new SRA." *Id.* at ¶ 9.

- "I understand FCIC now to be arguing that submission by the Insurance Providers of annual Plans of Operation means that the 1998 SRA was not a continuous contract. No negotiator for the FCIC ever expressed that position to me when the proposed terms and conditions of the 1998 SRA were being discussed." *Id.* at ¶ 10.

Clearly, the Insurance Providers both intended and believed that the 1998 SRA was a continuous contract, not a series of one-year contracts.

Against this backdrop of unequivocal testimony from principals from both sides, which the AgBCA neither requested nor received when ruling the Insurance Providers' motion seeking reconsideration of the jurisdictional ruling, the 1998 SRA suddenly became a series of one-year contracts. If the contract was ambiguous, it was incumbent on the AgBCA to solicit the intent of the parties. As demonstrated herein, that intent unequivocally demonstrates that the 1998 SRA was continuous. In any event, with the Smith and Joyce declarations before it, this Court cannot grant summary in favor of FCIC on the basis that the 1998 SRA was <u>not</u> a continuous contract.

### d. The Analysis Of The Actual Facts And Applicable Law Show That FCIC And AgBCA Are Wrong.

The 1998 SRA is a reinsurance agreement providing for risk sharing involving crop insurance policies. Common sense suggests that if the language and construction of any insurance policy would be relevant to this Court's analysis, it would be those policies that are actually reinsured under the SRA – not insurance policies that have nothing to do with the SRA or crop insurance.[25] The reason FCIC fails to discuss crop insurance policies is obvious – the provisions of the policies reinsured under the 1998 SRA completely undermine the FCIC's arguments, as do the relevant portions of the SRA detailed above, and the workings of the federal crop insurance program.

Treating the 1998 SRA as a series of annual contracts is nonsensical under the federal crop insurance program. There are two fundamental reasons that the 1998 SRA had to be continuous from the Insurance Providers' perspective.

First, federal crop insurance, unlike typical property-casualty insurance, is continuous in nature. The basic provisions of the common crop insurance policy, which apply to individual

---

[25] All of the cases and treatises cited by FCIC involve auto or other types of property/casualty policies, and legal treatises explaining those policies.

plans of insurance, start with the notation: "This is a continuous policy. Refer to section 2."
*See, e.g.,* 7 C.F.R. § 457.8, Preamble (2003).[26] Section 2 is more explicit:

> This is a continuous policy and will remain in effect for each crop year
> following the acceptance of the original application until cancelled by you [the
> farmer] in accordance with the terms of the policy * * *.

Id., ¶2(a); *see also, id.,* ¶2(c). That farmers' policies are continuous is underscored by another

FCIC regulation, which states in part: "Changes made in the contract shall not affect its

continuity from year to year." 7 C.F.R. § 457.7 (2003). Furthermore, the Insurance Providers

are specifically forbidden under the SRA from cancelling a farmer's policy except under certain

express conditions. *See* Section II.A.2. of the SRA, "The Company [Insurance Provider] may

not cancel the crop insurance contract [policy] held by any policyholder so long as the

policyholder remains an eligible producer * * *" AR at 279. Thus, to accept FCIC's argument

means that the Insurance Providers could remain obligated to farmers, but lack reinsurance for

that liability, because reinsurance is available only under a yearly contract although the

underlying insurance is continuous. It simply defies any rational contracting concept to bind the

Insurance Providers to provide continuous coverage to policyholders, yet deny continuous

reinsurance to them. To avoid such an absurd legal result, Section V.M. of 1998 SRA provided,

"This Agreement will continue in effect from year to year with an annual renewal date of July 1

* * *." AR at 299. These material facts distinguish crop insurance from the policies at issue in

FCIC's cited authorities.

    The second reason for continuity is financial. FCIC focuses on the annual filing by each

Insurance Provider of a Plan of Operations "by April 1 preceding the reinsurance year," AR at

294, (SRA § V.G.1.a.) to argue that reinsurance under the 1998 SRA was provided in successive

---

[26] Group risk is another form of federal crop insurance, and it too is continuous. *See, e.g.,* 7
C.F.R. § 407.9, Preamble and ¶18 (2003).

one-year agreements instead of a continuous one.[27]  In making this argument, FCIC conveniently forgets that its own regulations, with a single exception, establish that all policyholders' cancellation dates <u>precede</u> April 1 and renew automatically under their terms from July 31 through March 15 following the July 1 date for starting a new reinsurance year.  The sole exception is Florida citrus, which renews on April 30.  *See* Joyce Decl., Ex. B at ¶ 14.  As noted above, federal crop insurance is continuous unless cancelled by the policyholder.  Addendum 1 to the Joyce Declaration lists the cancellation dates for <u>all</u> crops insured under the federal program through expiration of the 1998 SRA on June 30, 2004.  Exhibit B, Addendum 1.  But for one exception, the Insurance Providers collectively had obligated themselves to billions of dollars in potential liability prior to the filing of their Plan of Operations.[28]  Although that is an important filing, it certainly does not serve the purpose argued by FCIC, *i.e.*, giving the Insurance Providers an easy "out" for exiting the program.  For FCIC's argument to possess even minimal credibility, automatic policy renewals, as a matter of legal logic, would need to occur uniformly between April 1 and June 30 of each reinsurance year.  Plainly, they do not, as fifty-eight of the fifty-nine coverages listed in Addendum 1 fall outside this period.  This array of pre-

---

[27] The "Plan of Operations" is a document that FCIC requires each Insurance Provider to submit every April 1.  The Plan is nothing more than the mechanism used by the Insurance Providers to update certain financial and operational information on a yearly basis.  Most of that information is required by regulation.  *See* 7 C.F.R. § 400.170.  The Plan is simply the vehicle for transmitting it to FCIC.  In addition, the Plan typically was not approved by FCIC until long after it had been submitted by the Insurance Providers. *See* Joyce Decl. at 12.  A true and correct copy of a form Plan of Operations is attached hereto as Exhibit E.

[28] RMA annually reports on its website total premiums paid, liabilities assumed, and indemnities paid on a nationwide basis. For instance, for the 1999 and 2001 reinsurance years, when FCIC forced amendments to the 1998 SRA on the  Insurance Providers, the liabilities assumed, respectively, were $30.9 billion and $36.7 billion.  *See* FCIC Summary of Business Report for 1994-2003 (May 7, 2007).

April 1 cancellation dates demonstrates the enormous financial significance of treating the 1998 SRA as a continuous contract.

As noted above, the policyholder has the right to cancel if timely notice is given. The Insurance Provider's right to cancel must be exercised prior to the cancellation date. *See, e.g.,* 7 C.F.R. §§ 457.8, ¶2(d) (for individual plans) and 407.9, ¶18(d) (for group risk plans) (2003). Of course, this "right" provides no meaningful protection in relation to filing a Plan of Operations, as fifty-eight of fifty-nine crops have cancellation dates prior to the April 1 date for filing the Plan. *See* Joyce Decl., Ex. B at ¶ 14.[29]

For all of the foregoing reasons, and those detailed in the Insurance Providers' Motion, the 1998 SRA was a continuous contract in effect from July 1, 1997 through June 30, 2004. Because it was a continuous contract, the revised "mandatory" regulation could not have been incorporated into the SRA. *Vollmar v. CSX Transp., Inc.*, 705 F.Supp. 1154, 1175 (E.D.Va. 1989), aff'd 898 F.2d 413 (4th Cir. 1990) ("It has long been settled that contracts are made with currently applicable laws in mind"); *Florida East Coast Ry Co. v. CSX Transp. Inc.*, 42 F.3d 1125, 1130 (7th Cir. 1994) ([T]he legal framework that existed at the time of the contract's execution must bear on its construction. Contracts are presumed to be written in contemplation of the existing applicable law."). Therefore, the Insurance Providers' claims resulting from the passage of ARPA are not time barred.

### e. The 1998 SRA Is Not An Insurance Policy.

In its Memorandum, FCIC erroneously describes the 1998 SRA as an insurance policy. *See e.g.* FCIC Memo at 28 ("[E]ach reinsurance year, was a separate and distinct policy."). After

---

[29] Federal crop insurance also terminates automatically if the policyholder becomes ineligible to participate in the program; dies, disappears, or is adjudicated incompetent; or no premium is earned for three consecutive years. *See, e.g., id.,* at §§ 457.8 ¶2(e) – (g) (for individual plans) and 407.9, ¶18 (e) – (g) (for group risk plans).

misdescribing the SRA as an insurance policy, FCIC goes on to support its arguments with reference to case law construing unrelated and dissimilar property and casualty insurance policies. FCIC's characterization of the 1998 SRA is inaccurate and its reference to liability policy case law and treatises is unavailing.

The 1998 SRA is a contract of reinsurance; it is not an insurance policy. Accordingly, the law applicable to insurance policies and the rules of construction normally applied to the construction of insurance policies have no relevance in construing the 1998 SRA. The 1998 SRA is simply a contract to allocate potential underwriting risks and gains in exchange for an allocated portion of premium income between two sophisticated entities: the government on one hand and the Insurance Providers on the other. The general rules of contract construction apply, not rules specific to insurance agreements. *See Bruckner-Mitchell v. Sun Indemnity Co. of New York*, 82 F.2d 434, 444 (D.C. Cir. 1936); *Albemarle Fire Ins. Co. of Pittsburgh v. Fireman's Ins. Co. of Baltimore*, 28 D.C. App. 330, 335 (1906); *North River Ins. Co. v. American Reinsurance Co.*, 361 F.3d 134, 142 (2nd Cir. 2004); *British Ins. Of Cayman v. Safety Nat'l. Cas Comp.*, 335 F.3d 205, 213 (3rd Cir. 2003); *Liberty Mut. Ins. Co., v. Gibbs*, 773 F.2d 15, 18 (1st Cir. 1985). Therefore, case law and treatises involving conventional property/casualty insurance policies relied upon by the FCIC are inapposite and do not apply to the construction of a reinsurance agreement such as the 1998 SRA.

**B.    The Insurance Providers Are Not Time Barred from Challenging 7 C.F.R. § 400.169.**

FCIC argues that the Insurance Providers are "time barred by the six year statute of limitations" from challenging the 1995 version of § 400.169, citing *Wind River Mining Corp. v. United States*, 946 F.2d 710, 714-15 (9th Cir. 1991), and other cases. FCIC Memo at 40. According to FCIC, because the Insurance Providers failed to challenge this regulation within six

years of its effective date, May 1, 1995, they are barred from doing so now.[30] *Id.* FCIC's position has two flaws.

First, FCIC incorrectly assumes that the Insurance Providers are challenging the 1995 version of § 400.169. They are not. The AgBCA used the 1995 version to rule in favor of the Insurance Providers' position that their AREERA claims are not barred by any mandatory 45-day rule. Instead, the Insurance Providers' are challenging the 2000 Version, which the AgBCA employed to reject their ARPA claims based on a supposedly mandatory 45-day rule adopted January 25, 2000, and applied against them on December 21, 2005.

Second, even if the Insurance Providers were challenging the 1995 version of § 400.169, FCIC's argument is legally and factually incorrect. FCIC simply misunderstands the *Wind River* holding: "We hold that a substantive challenge to an agency decision alleging lack of agency authority may be brought within six years of the ***agency's application of that decision to the specific challenger***." *Wind River Mining Corp.*, 946 F.2d at 716 (emphasis added); *see also Terran v. Sec'y of Health & Human Services*, 195 F.3d 1302, 1311 (Fed. Cir. 1999) ("when a party seeks to challenge a regulation on substantive grounds of invalidity, such as that the regulation was not authorized by legislation, review may still be had" notwithstanding the expiration of a statutory time period for challenging adoption of regulation)(citations omitted); *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Service*, 112 F.3d 1283, 1287 (5th Cir. 1997) (where agency regulation is alleged to be unconstitutional or inconsistent with statute, regulation may be challenged within six years of its application to plaintiff; "an agency's

---

[30] The Insurance Providers mainly challenge the revised § 400.169, adopted in 2000. The challenge to the revised regulation is obviously not time-barred, and the FCIC does not argue that it is. To the extent this Court adopts the FCIC's argument that the 1995 version of § 400.169 contains a mandatory time limit, the Insurance Providers also challenge the validity of that regulation as applied to them.

application of a rule to a party creates a new, six-year cause of action to challenge *** the agency's constitutional or statutory authority" to adopt that rule); *Independent Community Bankers of America v. Board of Governors of Federal Reserve System*, 195 F.3d 28, 34 (D.C. Cir. 1999) (distinguishing between "procedural attacks on a rule's adoption" vs. "substantive challenges" to "the application of a regulation"; "a party against whom a rule is applied may, at the time of application, pursue substantive objections to the rule, including claims that an agency lacked the statutory authority to adopt the rule") (citations omitted); *Graceba Total Communications, Inc. v. Federal Comm. Comm'n*, 115 F.3d 1038, 1040 (D.C. Cir. 1997)(courts "permit both constitutional and statutory challenges to an agency's application or reconsideration of a previously promulgated rule, even if the period for review of the initial rulemaking has expired") (citations omitted); *Nat'l Labor Relations Board v. Federal Labor Relations Authority*, 834 F.2d 191. 195-96 (D.C. Cir. 1987) (distinguishing between "indirect attacks on the substantive validity of regulations initiated more than sixty days after their promulgation from like attacks on their procedural lineage"; "a petitioner's contention that a regulation should be amended or rescinded because it *conflicts with the statute* from which its authority derives is reviewable outside of [the] statutory limitations period" that runs from the date of promulgation of the regulation) (citation omitted).

Here, the first application of § 400.169 to Insurance Providers occurred on June 9, 2004, when the Deputy Administrator rejected the Insurance Providers' claims as untimely under § 400.169. They appealed that determination to the AgBCA within two months. Indeed, barely two years elapsed since the 2000 version of § 400.169 was first applied to the Insurance Providers before they filed an action in this Court. Accordingly, the Insurance Providers are not time barred from bringing this challenge.

### C.    Prior Judicial Determinations Do Not Preclude Any Arguments Or Claims Made By The Insurance Providers.

#### 1.    The Insurance Providers Have Not Engaged In Forum Shopping.

FCIC omits certain important points in its discussion of the tortured history of the Insurance Providers' efforts to adjudicate their AREERA and ARPA claims.  These omissions undermine its meritless forum shopping allegation.  The reality is that the Insurance Providers' forum selections have been driven by two considerations – actually seeking to avoid disputes over forum selection and then advancing their argument that 7 U.S.C. § 6912(e) is not jurisdictional while protecting their rights to litigate the merits.

FCIC fails to inform the Court that the Insurance Providers originally filed in the Court of Federal Claims only because the FCIC had contended in prior proceedings that exclusive jurisdiction over SRA disputes resided in the Court of Federal Claims.  *See Rain and Hail Ins. Services, Inc. v. Federal Crop Ins. Corp.*, 229 F.Supp 2d 710, 712 (S.D. Tex. 2002); *American Growers Ins. Co. v. Federal Crop Ins. Corp.*, 210 F.Supp. 2d 1088, 1093 (S.D. Iowa 2002).  Indeed, in reaching its decision that it lacked jurisdiction, the Court of Federal Claims chastised "the Government's disingenuous and theoretically-bankrupt practice of moving for dismissal for lack of subject matter jurisdiction in various courts based upon inconsistent and contradictory statutory arguments, which are in effect attempts to whipsaw plaintiffs.…" *Ace Property & Cas. Ins. Co. v. U.S.*, 60 Fed.Cl. 175, 185 n.10  (Ct.Cl. 2004).

After the Court of Federal Claims decided that jurisdiction over SRA disputes between the FCIC and the Insurance Providers were properly brought in the Federal District Courts, the Insurance Providers immediately took two parallel and protective actions.  They began a

painfully slow administrative process.[31]    The Insurance Providers also sued FCIC in the Southern District of Iowa.  The Iowa District Court determined that it lacked subject matter jurisdiction under 7 U.S.C. § 6912(e) to hear the matter because the Insurance Providers had failed to exhaust administrative remedies.

## 2.    The Eighth Circuit's Decision Does Not Preclude The Insurance Providers' Arguments Here.

The Eighth Circuit reversed the Southern District of Iowa's holding that 7 U.S.C. § 6912(e) is jurisdictional, but then affirmed dismissal on an alternative basis, holding that § 6912(e) is a codification of prudential exhaustion and that the Insurance Providers had failed to prove that any of the exceptions to prudential exhaustion applied.

Under either the Southern District's or Eighth Circuit's reasoning, the dismissal was without prejudice to the Insurance Providers' subsequent action.  *See Oppenheim v. Sterling*, 368 F.2d 516, 520-321 (10th Cir. 1966); *cert. denied* 386 U.S. 1011 (1966) (lack of subject matter jurisdiction mandates dismissal without prejudice); *Durham v. Mason & Dixon Lines, Inc.*, 404 F.2d 864 (6th Cir. 1968) (*cert. denied* 394 U.S. 998 (1968) (failure to exhaust results in dismissal without prejudice); *Lebron-Rios v. U.S. Marshall Service*, 307 F. Supp. 2d 335 (D.P.R. 2004) (same).  A dismissal without prejudice means that the initial suit never happened, and that a party is not barred from seeking relief on all claims once jurisdiction is established.  *See Iserstead v. Watson*, 157 F. Supp. 7 (D.C. 1957); *Bomer v. Ribicoff*, 304 F.2d 427 (6th Cir. 1962).  Indeed, that is clearly the correct result in this case.

---

[31] It took the AgBCA nearly two years to determine that it could hear some, but not all, of the Insurance Providers' claims.  In the ten months since its ruling on the Insurance Providers' Motion for Reconsideration, nothing of substance has occurred before the AgBCA.  In early Fall 2006, the Insurance Providers requested that the AgBCA order the FCIC to answer their Complaint and file the "Appeal File" and further requested that the AgBCA set a scheduling conference.  The AgBCA ordered the filings, but has yet to set a scheduling conference.

The Eighth Circuit only reviewed the Insurance Providers' arguments in order to determine whether they had demonstrated that the AgBCA lacked jurisdiction or could not award money damages.[32]  For example, in addressing the jurisdiction of the AgBCA under the regulatory authority provided it by the Secretary of Agriculture, the Eighth Circuit relied on the very regulation challenged by the Insurance Providers as authority for the AgBCA to hear the matter. *Ace Property and Cas. Ins. Co. v. Fed. Crop. Ins. Corp.*, 440 F.3d 992, 1001 (8th Cir. 2006).  In doing so, the Eighth Circuit did not engage in any legal analysis of the power of the Secretary to expand by regulation the congressionally based authority of a board of contract appeals.[33]  *Id.* at 1000-1001.  Similarly, responding to the assertion that the AgBCA lacked authority to award any damages, the Eighth Circuit cited the AgBCA's own statements claiming that it had such authority and did not conduct a legal analysis of that authority.  *Id.* at 1001.  In essence, the Eighth Circuit simply took the AgBCA at its word, finding that if it said it had jurisdiction and said it could award relief, that was good enough for it.  Those rulings cannot and should not preclude a full adjudication of those issues or the merits in this Court.

### D.     The Court Should Rule On The Proper Forum For The Insurance Providers' Various Claims Before Considering The Merits.

FCIC has moved for summary judgment on the merits of the Insurance Providers' claims. At this juncture, the Court should reserve consideration of the merits for a later date. This will allow for development of the factual record.

---

[32] The arguments demonstrating the lack of jurisdiction of the AgBCA and the lack of authority to award money damages are found in Providers' Memo at pp. 24-32.

[33] Indeed, all of the Insurance Providers' arguments in the Southern District of Iowa and Eighth Circuit either challenged the subject matter jurisdiction of the AgBCA over this dispute or the futility of proceeding before it.  Challenges to subject matter jurisdiction are appropriate at any time.  *See, e.g.*, Fed. R. Civ. P. 12(h)(3).

FCIC's argument seeking summary judgment on the Insurance Providers' Counts X and XI certainly suffers from more than a little irony. For example, when asserting allegedly pertinent facts in note 26, FCIC Memo at 54, FCIC offers no evidentiary support by affidavit, declaration, self-authenticating document, or otherwise. It simply refers to "evidence" submitted to another court without giving this Court any clue about the content, nature, or source of the supposed "evidence." Nor does FCIC explain the relevance of the asserted facts, a point the Insurance Providers most assuredly would contest if and when competent evidence reflecting such facts ever is offered.

The Insurance Providers respectfully submit that FCIC's own brief, on its face, demonstrates the impropriety of summary judgment. Even without the brief's internal failings, summary judgment in favor of FCIC is inappropriate for the reasons advanced below.[34]

> **1.    Material Facts Are In Dispute Precluding Summary Judgment For the Government, And No Factual Record Has Been Developed Fully On Key Issues.**

Material facts remain in dispute regarding the merits, thus precluding summary judgment in favor of FCIC. Indeed, the Iowa District Court identified a list of issues that precluded summary judgment for the government, including:

> whether the SRA was a continuous contract with terms that did not vary, or a renewable contract with terms that varied from year to year, what type of consideration was given for the contract, and whether the insurers were under duress when they accepted Amendments 1 and 3 or whether they consented to the Amendments voluntarily.

357 F. Supp 2d, 1151 n. 6. FCIC has put forth no evidence, by affidavit or otherwise, regarding any of these issues. Accordingly, the record as it stands precludes summary judgment for the

---

[34] Indeed, should this Court determine that the Insurance Providers' claims are properly before it and not the AgBCA, the Insurance Providers then would move for summary judgment as to liability for breach of contract. As explained herein, the Insurance Providers can satisfy all of the elements of a *prima facie* case for breach of contract against the government.

government.[35]    Taken together, the Insurance Providers' evidence on the continuous contract

issue (the Joyce, Latham, and Smith Declarations) and the insufficiency of the factual record on

other issues establish that development of a factual record is required before addressing the

merits of the Insurance Providers' claims, whether by summary judgment or by trial.[36]

> **2.    If The Court Decides To Address FCIC's Motion For Summary
> Judgment On The Merits, It Should Deny the Motion And Rule In
> Favor Of The Insurance Providers Because They Can Show A Prima
> Facie Breach Of The SRA For Which FCIC Has No Valid Defense.**

The Court should deny FCIC's Motion for Summary Judgment on the merits.  There is no

dispute that the SRA is a binding contract between the Insurance Providers and the FCIC.  The

general rule regarding government contracts is that "when the United States enters into contract

relations, its rights and duties therein are governed generally by the law applicable to contracts

between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 (1934). Following the

basic principles set forth in *United States v. Winstar Corp.*, 518 U.S. 829, 898 (1996), and its

progeny, in order to establish the government's liability, the Insurance Providers must

demonstrate a breach of SRA, and then the Court must determine whether the government has a

valid defense under the sovereign acts doctrine. *See General Dynamics Corp. v. United States,* 47

Fed. Cl. 514, 533-34 (2000).

> **a.    FCIC's Actions Constitute A Prima Facie Breach Of Contract.**

Each Insurance Provider entered into a reinsurance agreement with FCIC in the form of

the 1998 SRA, which specifically provides in Section V.M. that it "will continue in effect from

---

[35]    Additionally, the Insurance Providers note that Rule 56(f) of the Federal Rules of Civil
Procedure would provide them the opportunity to conduct discovery to set forth contrary facts if
FCIC actually had offered any evidence in support of its request for summary judgment.

[36] The conclusions of the Iowa District Court also undermined the FCIC's claims that the
Insurance Providers are forum shopping.  That Court has already determined that summary
judgment on the merits in favor of FCIC is inappropriate.

year to year * * * unless FCIC gives at least 180 days advance notice in writing to the [contracting private insurance provider] that the Agreement will not be renewed."  AR at 300. FCIC did not give written notice to any Insurance Provider pursuant to this section that it was terminating the 1998 SRA in any of the discreet reinsurance years from July 1, 1998 through June 30, 2003. Amended Complaint ¶¶ 36-40.  Consequently, under the SRA's explicit terms, the contract between FCIC and each Insurance Provider automatically renewed and was in effect during each of these years.

FCIC's failure to give timely written notice of non-renewal coupled with AREERA's mandated implementation[37] forced FCIC to implement unilaterally AREERA's provisions. This attempted unilateral implementation—via a "take it or leave it" amendment—breached the SRA in two respects. First, with respect to 7 U.S.C. § 1508(b), "old" paragraph (5), which granted the Insurance Providers the right to retain certain CAT administrative fees, was replaced with "new" paragraph (5), which removed this compensation. In addition, a new paragraph (11) was added to 7 U.S.C. § 1508(b), which had the effect of reducing the level of certain CAT loss adjustment expenses payable to the Insurance Providers from approximately fourteen percent to eleven percent.

Two years later, FCIC attempted another unilateral amendment to the 1998 SRA in its effort to implement ARPA. There FCIC again failed to terminate the SRA and instead sent another "take it or leave it" amendment. FCIC's attempted unilateral implementation of ARPA further breached the SRA by reducing the CAT loss adjustment expenses from 11% to 8%.

---

[37] "[T]he Corporation shall ensure that each Standard Reinsurance Agreement between an approved insurance provider and the Corporation reflects the amendments to the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.) that are made by this subtitle …. " H.R. Conf. Rep. 105-492, 1998 U.S.C.C.A.N. 233.

It is worth noting here that FCIC has been a bit selective in urging that the Eighth Circuit's decision is dispositive.  FCIC apparently has forgotten that the Eighth Circuit concluded "* * * the FCIC was required by Congress to implement AREERA and ARPA and thus breach the SRA * * *" *Ace Property*, 440 F.3d at 1001.  This Court should be reluctant to find no prima facie breach in light of this passage.

Changes to coverage and reimbursements under the Federal Crop Insurance Act ("FCIA") are not new to the federal courts. The United States District Court for the Eastern District of North Carolina faced a strikingly similar matter, a case where Congress changed the terms of insurance coverage for peanut farmers after the insurance contract was in place. *See Barnhill v. Davidson*, Order, Case No. 4:02-CV-159-H (4). (Slip opinion attached.)

The plaintiffs in *Barnhill* had purchased federal crop insurance reinsured by FCIC pursuant to the provisions of the FCIA. Pursuant to their contract, the peanut growers expected to receive insurance coverage at the quota price rate of $0.31 per pound of peanuts grown, with the quota amount allocated by the Farm Service Agency ("FSA") to individual farms. However, in May 2002, after the contract change date had passed, Congress enacted the Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134, which eliminated the quota system for peanuts. As a result of this statutory change, the FSA did not set quotas for 2002, and all peanuts were treated as non-quota, at the price rate of $0.1775 per pound.

The court's characterization of the peanut farmers' claim, as well as its resolution, is instructive. According to the court, by enacting the Farm Security Act, "the government caused the FSA to refuse to assign the quotas." In other words, "the government breached its contract by

refusing to pay the farmers' insurance claims at the rate of $0.31 per pound." *Barnhill*, at 37-38.[38] Similarly, Congress, in enacting AREERA and ARPA, caused FCIC to alter the terms of the SRA, thereby breaching its contract with the Insurers. *See e.g., Winstar*, 518 U.S. at 898; *Cuyahoga Metropolitan Housing Authority v. United States*, 57 Fed.Cl. 751, 762 (2003)(finding a prima facie breach in a case involving legislative changes to HUD contracts).

Based on the above, unless the Government has a "sovereign acts" defense, its failure to cancel the SRA pursuant to the explicit requirements of Section V.M., coupled with its unilateral implementation of AREERA and ARPA, constitutes a prima facie breach of contract for which the Court should find liability.

### b. The Government Has No Sovereign Acts Defense.

 The sovereign acts doctrine "excuses the government from performing a contractual obligation if performance is rendered impossible by a public and general sovereign act." *General Dynamics Corp.*, 47 Fed. Cl. at 533-34. Thus, if the governmental action in question was not a "public and general" act, then the sovereign acts doctrine would not constitute a valid defense to the breach of contract claim. *Id.* at 541. The application of the sovereign acts doctrine is "not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." *Yankee Atomic Elec. Comp. v. United States,* 112 F.3d 1569, 1575 (Fed.Cir. 1997). As noted in *Winstar*, 518 U.S. at 898, "a governmental act will not be public and general if it has the substantial effect of releasing the Government from its contractual obligations."

---

[38] [I]t was fundamentally wrong for the government to tell the farmers that they would have insurance coverage at $0.31 per pound for as many peanuts as the FSA declared to be quota peanuts, and then, after the farmers had planted their crops, to tell the FSA not to declare any quota peanuts." *Id.* at 38.

Here, it could not be more plain that the government specifically targeted the Insurance Providers' 1998 SRAs in passing both AREERA and ARPA. For example, the AREERA conference committee report included a section entitled "REQUIRED TERMS AND CONDITIONS OF STANDARD REINSURANCE AGREEMENTS." H.R. Conf. Rep. 105-492, 1998 U.S.C.C.A.N. 233. A subsection stated the following: "the [FCIC] shall ensure that each Standard Reinsurance Agreement between an approved insurance provider and the Corporation reflects the amendments to the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.) that are made by this subtitle to the extent the amendments are applicable to approved insurance providers." *Id.* This language confirms that the changes to the 1998 SRA were direct, and "not 'merely incidental to the accomplishment of a broader governmental objective.'" *See Barnhill*, at 44 (noting other cases in which "Congress specifically targeted pre-exiting contracts in order to save money."); *Cuyahoga*, 57 Fed.Cl. at 762 (noting that "[e]very indication is that Congress knew it was fundamentally altering the process for determining adjustments in preexisting contracts and was doing so to reduce outlays."); *General Dynamics Corp.*, 47 Fed.Cl. at 541 (finding that legislation capping senior executive compensation in a contract between General Dynamics and the government "was not a 'public and general' act, since a major purpose of the executive compensation cap was to pare federal expenses by applying it to pre-existing federal contracts.")

Additional evidence that the legislation specifically targeted the 1998 SRA is that the language in AREERA, and later ARPA, that reduced the level of CAT loss adjustment expenses payable to the Insurance Providers is the same language recited in the SRA Amendments forced

on the Insurance Providers by FCIC. Thus, because the provisions of both AREERA and ARPA were "designed to target" the 1998 SRA, they were not "public and general" acts.[39]

That both congressional enactments dealt with issues beyond the specific SRA provisions highlighted here does not transform either into a "public and general" act. *Winstar*, 518 U.S. at 903 n.52 (noting that "any act of repudiation can be buried in a larger piece of legislation, and if that is enough to save it then the Government's contracting power will not count for much."). Consequently, the sovereign acts defense is inapplicable here, and FCIC has no defense to the Insurance Providers' *prima facie* breach of contract claim.

### c. The Insurance Providers Did Not Waive Any Rights To Restitution By Continuing To Perform under the 1998 SRA.

Finally, FCIC claims that the Insurance Providers "waived any right to restitution, pursuant to a theory of unjust enrichment, by continuing to perform and receive all of the Government's performance in return for the years at issue." FCIC Memo at 60. FCIC conveniently omits the key facts that the Insurance Providers were under duress when FCIC presented its "take it or leave it" amendments, and that the Insurance Providers continued their performance under a reservation of rights. As noted above, at the time the Amendments were presented to the Insurance Providers, they were obligated to farmers for billions of dollars in potential liability. *See* Footnote 28, *supra*. In a recent Supreme Court case, *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. ___ (2007), the Court noted that "… the involuntary or coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim." Accordingly, FCIC's waiver argument is wrong as a matter of law.

---

[39] The "unmistakability doctrine," which is often associated with a sovereign acts analysis, is inapplicable when, as here, the governmental act at issue is not "public and general." *General Dynamics*, 47 Fed. Cl. at 541.

**E.    The Court Should Deny The FCIC's Motion To Dismiss Farmer's Mutual's Claims.**

FCIC seeks to dismiss Farmers Mutual Hail Insurance Company of Iowa ("FMH") as a plaintiff in this suit. For the reasons that follow, FCIC's motion should be denied.

FMH was a party in the litigation before the United States District Court for the Southern District of Iowa as well as the appeal to the Eighth Circuit.[40] Although FMH did not file an administrative claim with the other Insurance Providers originally, FMH occupies the same factual and legal positions as all other Insurance Providers, with one exception.[41] Consequently, on January 25, 2007, when FMH sought to be included in the administrative proceedings, it agreed to be bound by all existing rulings and any future decisions.  As FMH noted to the AgBCA, adding it as a plaintiff would save judicial and administrative resources by avoiding the wasteful exercise of initiating a separate claim with the FCIC and, thereafter, the AgBCA, only to achieve the same result requested.

On April 5, 2007 the Civilian Board of Contract Appeals declined FMH's request for procedural reasons—the Deputy Administrator of Insurance Services had yet to deny officially FMH's claim. USCBCA Ruling, April 5, 2007, at 5 ("[I]f FMH requires a decision from the Board, it will need to go through the process mandated by the regulation."). More than three months have elapsed since FMH submitted its claim to the Deputy Administrator, and FMH has yet to receive a response. The pointlessness of this procedural run-around is demonstrated by the

---

[40] In its Memo, FCIC states that "Farmers Mutual was also not named in the actions captioned <u>Ace Property</u> filed in the Court of Federal Claims, Federal Circuit, Southern District of Iowa, or the Eighth Circuit." Memo at n.34. FCIC's statement is incorrect.  *See Ace Property & Cas. Ins. Co. v. FCIC*, 440 F.3d 992 (8th Cir. 2006); *Ace Property & Cas. Ins. Co. v. FCIC*, 357 F.Supp 2d 1140, 1141 n.1 (S.D. Iowa 2005).

[41] FMH executed the 1998 SRA in 1999 and therefore only asserts claims accruing after that date.

Board's statement: "The Board does not disagree with FMH's statements that if the matter comes before the Board, the Board will apply the same rationale to FMH, regarding the 2000 reinsurance year changes, as the AGBCA applied to appellants [Insurance Providers] in the earlier *Ace Property* cases." *Id.*

FCIC's primary argument for dismissing FMH is that its claims are untimely and therefore barred. However, as FMH occupies the same position as the other Insurance Providers, all arguments set forth in the pleadings before this Court apply to FMH with equal force. In other words, if the Court rules in favor of the Insurance Providers, the ruling necessarily will apply to FMH as well. Consequently, for reasons of judicial economy and clarity, the Court should deny FCIC's motion and allow FMH to remain a plaintiff in this case.

## V.    CONCLUSION.

For all of the foregoing reasons, the FCIC's Motion to Dismiss and/or for Summary Judgment should be denied in its entirety.

Respectfully submitted this 10th day of May, 2007.

STINSON MORRISON HECKER LLP

By: /s/ Michael E. Tucci
    Michael E. Tucci (Bar # 430470)
    1150 18th Street, N.W., Suite 800
    Washington, D.C. 20036
    (202) 785-9100; Fax: (202) 785-9163

P. JOHN OWEN


By: <u>/s/ P. John Owen by Michael E. Tucci</u>
    P. John Owen (KS Bar #11835; MO Bar #22523)
     (Pro Hac Vice)
    National Crop Insurance Services, Inc.
    8900 Indian Creek Parkway, Suite 600
    Overland Park, KS  66210
    (913) 685-2767; Fax: (913) 685-3080


Counsel for All Plaintiffs


MICHAEL J. DAVENPORT


By: <u>/s/ Michael J. Davenport by Michael E. Tucci</u>
    Michael J. Davenport (IA Bar # 45345)
    Rain and Hail L.L.C.
    9200 Northpark Drive, Suite 300
    Johnston, IA  50131-3006
    (515) 559-1000; Fax: (515) 559-1001


Additional Counsel for Plaintiff ACE Property &
Casualty Insurance Company

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of May, 2007, a copy of the foregoing Opposition To The Motion To Dismiss And/Or For Summary Judgment Filed By Defendant Federal Crop Insurance Corporation was sent via the Court's Electronic Case Filing notification system to the following:

Jane W. Vanneman, Esq.
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Room 12010
Washington, D.C. 20005

Peter Smith
Assistant U.S. Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4224
Washington, D.C. 20530

/s/ Michael E. Tucci
Michael E. Tucci

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ACE PROPERTY & CASUALTY INSURANCE COMPANY (f/k/a CIGNA PROPERTY & CASUALTY INSURANCE CO.), ET AL., | ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | Civil Action No. 1:06cv01430 RMU |
| FEDERAL CROP INSURANCE CORPORATION, A CORPORATION WITHIN THE UNITED STATES DEPARTMENT OF AGRICULTURE | ) ) ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS
AND RESPONSE TO DEFENDANT'S STATEMENT OF
UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 7(h) and 56.1, United States District Court for the District of Columbia, plaintiffs Ace Property & Casualty Insurance Company, *et al.* ("Insurance Providers") submit the following Statement of Disputed Material Facts and Response to Defendant's Proposed Statement of Material Undisputed Facts, and address certain related factual claims contained in the Motion to Dismiss and/or for Summary Judgment filed by defendant Federal Crop Insurance Corporation ("FCIC").

The Insurance Providers respectfully observe that many of FCIC's allegedly factual statements are either legal conclusions or mixed questions of law and fact. Consequently, many of the Insurance Providers' responses are framed to address this situation. Further, FCIC seeks to characterize certain portions of pleadings and orders, all of which speak for themselves. As a

general matter, the Insurance Providers dispute such characterizations and then identify for the Court the underlying pleadings, orders, or portions thereof.

<u>**Response to Defendant's Proposed Statement of Material Undisputed Facts**</u>

The following responses are limited to, and made solely for the purposes of, FCIC's Motion, and they do not constitute admissions for any other purpose.

1.       Agreed.

1.a.     Agreed.

1.b.     Agreed.

2.       Disputed. The Standard Reinsurance Agreement (SRA) effective beginning on July 1, 1997, was applicable not only to the reinsurance year running from July 1, 1997, through June 30, 1998, but also to all subsequent reinsurance years identified in the Insurance Providers' First Amended Complaint because the SRA was a continuous contract. Insurance Providers' Opposition to the Motion to Dismiss and/or for Summary Judgment Filed by Defendant Federal Crop Insurance Corporation at Exhibit B, Declaration of John Joyce, Exhibit C, Declaration of Ben Latham, and Exhibit D, Declaration of Dallas Smith. ("Opposition at _____").

2.a.     Agreed. However, FCIC incorrectly refers to "contracts sold or reinsured by" the Insurance Providers; in fact, the reference should be to such contracts "sold and serviced" by the Insurance Providers. *See* Administrative Record filed by Federal Crop Insurance Corporation at 273 (1998 SRA) (hereinafter, "AR at ___").

2.b.     Disputed. The 1998 SRA incorporated only those regulations in effect when the parties executed it as of July 1, 1997. *See* Opposition at section IV.A.4.

3.      Disputed.  The Insurance Providers alleged that FCIC breached the 1998 SRA, which was in continuous effect from July 1, 1997 through June 30, 2004, as a result of enactment of AREERA and ARPA. First Amended Complaint at ¶ 2.

3a.     Disputed.  In paragraphs 41-56 of the First Amended Complaint the Insurance Providers set forth the relevant facts regarding the effect of enactment of AREERA and ARPA on the 1998 SRA.

4.      Agreed.

5.      Disputed. The Insurance Providers' claims were not untimely submitted under the contract and the regulation. The RMA Deputy Administrator's conclusions to the contrary were incorrect. *See* Opposition at section IV.A.1.

5.a.    Disputed. The RMA Deputy Administrator misunderstood, misquoted and misconstrued the requirements of 7 C.F.R. § 400.169(a). Consequently, the conclusions of the Deputy Administrator that the issuance of Amendments 1 and 3 triggered the 45-day period, conclusions adopted uncritically by the FCIC and AgBCA, are erroneous. The actual requirements of § 400.169(a), and their implications for the Insurance Providers' claims, are discussed in the Insurance Providers' Opposition at section IV.A.1.

6.      Agreed.

6.a.    Disputed. The principal issues identified in the Insurance Providers' Notice of Appeal and Complaint to the AgBCA are clear from the documents themselves. *See* AR at 247.

7.      Disputed. FCIC has not identified any allegation in the Insurance Providers' Complaint to this Court that was raised in, and ruled on by, any other court.

8.      Agreed.

3

8.a.    Disputed. The issues addressed, and conclusions reached, by the AgBCA are set forth in the AgBCA's December 21, 2005 Order. *See* AR at 2.

9.a.-h. Disputed. The issues addressed, and conclusions reached, by the AgBCA are set forth in the AgBCA's December 21, 2005 Order. *See* AR at 2.

10.a.-h.    Disputed. The issues addressed, and conclusions reached, by the dissenting judge are set forth in the AgBCA's December 21, 2005 Order. *See* AR at 2.

11.    Agreed.

11.a.-c. Disputed. The issues addressed, and conclusions reached, by the AgBCA in its consideration of the Insurance Providers' Motion for Reconsideration are set forth in the AgBCA's June 28, 2006 Order. *See* AR at 308.

## Factual Claims In Defendant's Motion For Summary Judgment
## Disputed by the Insurance Providers

In addition to the statements made in its Proposed Statement of Material Undisputed Facts, FCIC makes certain allegedly factual statements in its Motion to Dismiss and/or for Summary Judgment ("FCIC Memo") that the Insurance Providers address below.

1.    In its Memo, FCIC makes several assertions regarding the content, meaning, and application of 7 C.F.R. § 400.169 to the facts of this case:

- "[T]he regulation required that any claim be submitted in writing within 45 days afer [sic] receipt of the disputed action." FCIC Memo at 10.

- "Because the disputed Amendments 1 and 3 were issued to the companies on June 30, 1998, and June 30, 2000, respectively, the companies' administrative request dated May 11, 2004, was submitted long after the 45-day period had expired, and thus, were time-barred." FCIC Memo at 10.

- "[R]egulatory requirements mandated that, if petitioners wished to pursue their claims, they were required to submit a written request to the Deputy Administrator of RMA within 45 days of the disputed action." FCIC Memo at 17.

4

- "The disputed actions were FCIC's amendments to the SRAs, or alternatively, promulgation on January 25, 2000 of the 2000 regulation." FCIC Memo at 17.

- "[P]etitioners knowingly undertook the risk that, because they had only 45 days in which to bring the disputed actions (Amendments 1 and 3) to the Deputy Administrator, their claims could be time-barred if they missed the 45-day window." FCIC Memo at 33.

As noted in Response No. 5a. above, the actual requirements of § 400.169(a), and their implications for the Insurance Providers' claims, are discussed in Insurance Providers' Opposition at section IV.A.1. In addition, Defendant has misquoted the language in 7 C.F.R. § 400.169. *See* Opposition at 15 n. 15. Finally, because the AgBCA had previously ruled that § 400.169 was not mandatory, there is no way the Insurance Providers could have knowingly undertaken any risk that a mandatory 45 day period applied to their claims.

2.    In its Memo, FCIC states: "The Standard Reinsurance Agreement, first executed for the 1998 reinsurance year, is an annual contract, renewable each year, with possible amendments to its terms each year.  The SRA is not a 'continuous' contract that renewed each year on all of the same terms that were contained in the initial 1998 SRA." FCIC Memo at 17. Defendant is wrong; the 1998 SRA is continuous contract. See Opposition at section IV.A.4 and Exhibits B, C, and D to the Opposition.

3.    In its Memo, FCIC states: "This is a legal issue, fundamental to virtually all of the jurisdictional and other issues in this case." FCIC Memo at 17. The issue of whether the 1998 SRA is continuous contract  or a series of separate contracts is a mixed question of law and fact.

4.    In its Memo, FCIC states: "The first time that this company [Farmers Mutual] was named in any related proceeding was in the October 2, 2006, Amended and Substituted Complaint filed in this Court." FCIC Memo at 19; *see also* FCIC Memo at 63 n.34 This

statement is incorrect. Farmers Mutual was named as a Plaintiff in the proceedings before the United States District Court for the Southern District of Iowa and the United States Court of Appeals for the Eighth Circuit. Opposition at IV.E.

5. In its Memo, FCIC states: "To the extent that the AgBCA left open two issues involving 'intent' relating to mandatory nature of pre-2000 regulation, and 'intent' of the parties relating to the duration of the 1998 SRA – these are legal, not factual, issues that this Court may now decide." FCIC Memo at 23 n.10. The issue of whether the 1998 SRA is continuous contract or a series of separate contracts is a mixed question of law and fact. Ascertaining the intent of the parties is a factual issue. The intent of the parties is discussed in Exhibits B, C and D to the Opposition.

6. In its Memo, FCIC states: "[B]efore the start of each reinsurance year, petitioners executed each successive SRA ….," FCIC Memo at 28, "[w]hen executing the SRA each year …." FCIC Memo at 39, "petitioner insurance companies executed and SRA for each successive reinsurance year with FCIC, beginning in 1997 ….," FCIC Memo at 49, and "In any event, by executing each successive SRA in each reinsurance year …." FCIC Memo at 60 n.30. The Insurance Providers did not execute the 1998 SRA each year it was in effect. Rather, because the 1998 SRA is a continuous contract, each Insurance Provider executed the 1998 SRA only once. Opposition at Exhibits B and C. The "Appeal File" filed with the AgBCA by FCIC, which contains one executed SRA for each Insurance Provider, confirms this.

7. In its Memo, FCIC makes numerous unsubstantiated factual assertions in footnote 26, FCIC Memo at 54, none of which are properly before the Court and, therefore, do not require a response from the Insurance Providers.

8. In its Memo, FCIC states: "The changes to the administrative fee and loss adjustment provisions were minimal …." FCIC Memo at 58. The damages to the Insurance Providers caused by these changes were not minimal and approach $200 million at this time. First Amended Complaint at ¶ 66. Opposition at p.7, n.7.

9. The earliest date a loss could occur as a result of Amendment 1 or Amendment 3 to the 1998 SRA was October 1998 in the case of Amendment 1 and October 2000 in the case of Amendment 3. Both dates are more than 90 days after the effective date of the Amendments. Declaration of Troy Brady, Exhibit A to Opposition at ¶ 16.

Respectfully submitted this 10th day of May, 2007.

STINSON MORRISON HECKER LLP


By: /s/ Michael E. Tucci
  Michael E. Tucci (Bar # 430470)
  1150 18th Street, N.W., Suite 800
  Washington, D.C. 20036
  (202) 785-9100
  Fax: (202) 785-9163


P. JOHN OWEN


By: /s/ P. John Owen by Michael E. Tucci
  P. John Owen (KS Bar #11835; MO Bar #22523)
   (Pro Hac Vice)
  National Crop Insurance Services, Inc.
  8900 Indian Creek Parkway, Suite 600
  Overland Park, KS 66210
  (913) 685-2767
  Fax: (913) 685-3080

Counsel for All Plaintiffs

MICHAEL J. DAVENPORT


By: /s/ Michael J. Davenport by Michael E. Tucci
    Michael J. Davenport (IA Bar # 45345)
    Rain and Hail L.L.C.
    9200 Northpark Drive, Suite 300
    Johnston, IA  50131-3006
    (515) 559-1000
    Fax:  (515) 559-1001

Additional Counsel for Plaintiff ACE Property &
Casualty Insurance Company

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of May, 2007, a copy of the foregoing Plaintiffs' Statement of Disputed Material Facts and Response to Defendant's Statement of Undisputed Material Facts was sent via the Court's Electronic Case Filing notification system  to the following:


Jane W. Vanneman, Esq.
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Room 12010
Washington, D.C. 20005

Peter Smith
Assistant U.S. Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4224
Washington, D.C. 20530


/s/ Michael E. Tucci
Michael E. Tucci