**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ACE PROPERTY & CASUALTY | ) | |
| INSURANCE COMPANY (f/k/a CIGNA | ) | |
| PROPERTY & CASUALTY INSURANCE CO.), | ) | |
| ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:06cv01430 RMU |
| | ) | |
| FEDERAL CROP INSURANCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs ACE Property & Casualty Insurance Co., Inc., *et al.* ("Insurance Providers") respectfully submit the following reply to the opposition of the Federal Crop Insurance Corporation ("FCIC")[1] to the Insurance Providers' Motion and Memorandum in Support of Partial Summary Judgment.[2]

**I.      INTRODUCTION.**

The Insurance Providers have advanced a series of distinct and alternative arguments for overturning the rulings of the United States Department of Agriculture ("USDA") Board of Contract Appeals (the "AgBCA"). On the merits, the Insurance Providers have established that they had no contractual or other obligation to adhere to a supposedly mandatory 45-day regime for submitting their claims. A ruling in favor of the Insurance Providers on this issue will

---

[1] Referred to herein as FCIC Opp. at __.

[2] Referred to herein as IP Memo at __.

effectively reinstate their ARPA[3] claims.  Alternatively, the Court can determine that the Insurance Providers have in fact complied with the requirements of 7 C.F.R. § 400.169 ("§ 400.169") by submitting reservation of rights letters to the FCIC within the alleged 45-day window.  The Insurance Providers also have a meritorious argument that FCIC failed to deliver a "determination" to them and that, as a result, the supposed 45-day time period could not have run.  Finally, the Insurance Providers have established that the "mandatory" January 2000 version of § 400.169 was adopted without requisite notice and comment, and that a concomitant Due Process violation resulted from the barring of their claims, as well as denial of redress in an Article III court.

In contrast, FCIC has staked out positions incapable of substantiation.  Three examples reveal the weaknesses of its Opposition:

- FCIC asserts the 1998 SRA was not a continuous contract, but a series of one-year agreements. (FCIC Opp. at 3.)  The truth is that the 1998 SRA was a continuous contract.  *See* Declaration of Kenneth D. Ackerman, FCIC's Manager at the relevant time, submitted herewith, and the previously submitted Declarations of Dallas Smith (USDA's Deputy Under Secretary for Farm and Foreign Agricultural Services) and the heads of two Insurance Providers (John Joyce and Ben Latham) at the relevant time.  Instead of relying on real evidence offered through knowledgeable, competent witnesses, FCIC has manufactured an argument out of whole cloth.  *See infra* Part II.B.

- FCIC claims that the "determination" component which appeared in the 1988 predecessor to § 400.169 was omitted when the regulation was reissued in 1995 and then revised in 2000. (FCIC Opp. at 30.)  This assertion is a figment of FCIC's imagination, as both the word and the concept of a "determination" appear explicitly in all relevant versions of § 400.169(a).  *See infra* Part II.C.1.

- In an effort to muster an argument that the 1995 version of § 400.169(a) contained a mandatory 45-day time period, contrary to the AgBCA's explicit rulings on the issue, FCIC claims that two AgBCA Judges have so held.  (FCIC Opp. at 24.)  To make this argument, FCIC erroneously attributes language to Judge Houry when in fact the quoted statement actually was authored by Judge Vergilio.  *See infra* Part II.C.3.

---

[3] "ARPA" is the acronym for the Agricultural Risk Protection Act of 2000.

Besides making factual assertions that strip its Opposition of credibility, FCIC also makes legally incorrect arguments, such as its position on the standard of review to be applied. In the end, FCIC's factual misrepresentations and incorrect legal analysis compel the conclusion that the Insurance Providers' motion for partial summary judgment should be sustained.

## II.    ARGUMENT.

### A.    The Standard of Review Is *De Novo*.

FCIC's Opposition argues that the Court should apply the "arbitrary and capricious" standard of review found in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, to the AgBCA rulings challenged by the Insurance Providers and defer to the AgBCA's expertise. (FCIC Opp. at 3.) Based on the reasons and authority set forth in the Insurance Providers' earlier memoranda, and what follows, *de novo* review is required.

### 1.    The AgBCA's Ruling Regarding Application Of The Six-Year Statute Of Limitations Is Subject To *De Novo* Review.

One of the central issues in this case is whether 28 U.S.C. § 2401(a), which gives contract claimants against the government six years to bring their claims, applies to the Insurance Providers' claims against FCIC. Section 2401(a) is a statute of general applicability, and not within the unique purview of the AgBCA or FCIC. Consequently, the AgBCA's ruling is subject to *de novo* review because no deference is owed to an agency when it interprets a statute outside its designated area of expertise. *Scheduled Airlines Traffic Offices, Inc. v. Department of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996) (Where agency had not been entrusted with administering miscellaneous receipts statute, had no authority to interpret statute, and was not entitled to deference regarding interpretation, *de novo* standard of review was appropriate); *Marathon Oil Co. v. Babbitt*, 938 F.Supp. 575, 577 (D. Alaska 1996) (In determining whether six-year statute of limitations governing federal government actions to collect money damages based on

contracts authorized pursuant to Federal Oil and Gas Royalty Management Act, district court would exercise its independent judgment, give no special deference to agency decision, and review agency determination for conclusions not in accordance with law, as statute of limitations did not apply exclusively to Department of the Interior).

> ### 2.   The AgBCA's Interpretation Of State Case Law Regarding The Continuous vs. Separate Nature Of The 1998 SRA Is Subject To *De Novo* Review.

FCIC maintains that "[i]t was entirely appropriate for the AgBCA to rely upon general contract principles, as well as state insurance law, in reaching its legal conclusion." (FCIC Opp. at 19.) The AgBCA's extensive foray into state case law relating to other types of insurance policies is not entitled to any deference, as the AgBCA was interpreting law outside its own statutory and regulatory scheme. *See National Treasury Employees Union v. Federal Labor Relations Auth.*, 435 F.3d 1049, 1051 (9th Cir. 2006) (Federal Labor Relations Authority was not entitled to deference in its interpretations of banking statutes, where interpretations fell outside agency's application of Federal Service Labor-Management Relations Statute).

> ### 3.   The Jurisdictional Issues Require *De Novo* Review.

The Insurance Providers have acknowledged that "this circuit applies Chevron deference to agencies' jurisdictional decisions." (IP Memo at 9 n.9) (citing *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conference of the U.S.*, 264 F.3d 52, 62 (D.C. Cir. 2001)). However, the Insurance Providers also have submitted that *Chevron* deference is inapplicable in this case "because the AgBCA rulings did not involve an

interpretation of an ambiguous statute." (*Id.* at 9 n.9.) While FCIC argues that the Insurance Providers' "conclusion is in error," (FCIC Opp. at 7) the basis for its belief is unclear.[4]

*Chevron* deference refers to the general principle of administrative law that courts will customarily defer to an administrative agency's reasonable interpretation of a statute when the statute is silent or unclear on a given subject. *See Chevron U.S.A. Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). Here, the AgBCA did not interpret any jurisdictional statute when it responded to the Insurance Providers' jurisdictional arguments. *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 694 (D.C. Cir. 2000) (the "law of this circuit [is] that the deferential standard of [Chevron] … applies to an agency's interpretation of its own *statutory* jurisdiction.") (emphasis added). Instead, the AgBCA simply refused to address the Insurance Providers' position that it lacked statutory or regulatory authority to decide their claims. (IP Memo at 24.)  Moreover, the AgBCA ultimately based its assertion of jurisdiction on its reading of certain contractual provisions—not statutory interpretations—and contractual interpretation is clearly the province of the judiciary, and subject to *de novo* review.  (IP Memo at 9) (citing cases).

> **4.    Assuming No Facts Are In Dispute, *De Novo* Review Is Appropriate For The AgBCA's Rulings on Questions of Law.**

Acknowledging that no factual record was developed in this case, FCIC maintains that "[t]here was no need for any discovery or testimony on any issues." (FCIC Opp. at 12.) The Insurance Providers disagree with this assessment and have identified numerous material factual issues in dispute that were left completely unexamined by the AgBCA.  (*See* IP Memo at 18-24); *see infra* at B.3.

---

[4] FCIC admits that it "do[es] not disagree in general with the proposition that the issue of the AgBCA's jurisdiction is a question of law for this Court to decide."  (FCIC Opp. at 8 n.5.)

More importantly, even assuming *arguendo* the validity of FCIC's underlying proposition—that no material facts are in dispute—and the necessary corollary that the AgBCA decided only legal issues (FCIC Opp. at 12), *de novo* review of the AgBCA's rulings is required under the APA. *Wagner v. National Transp. Safety Bd.*, 86 F.3d 928, 930 (9th Cir. 1996) (on review of petition for judicial review pursuant to APA, Court of Appeals reviews purely legal questions *de novo*); *Howard v. FAA*, 17 F.3d 1213, 1215 (9th Cir. 1994) (purely legal questions are reviewed *de novo* under APA); *Rain & Hail Ins. Serv., Inc. v. Federal Crop Ins. Corp.*, 229 F. Supp. 2d 710, 717 (S.D. Tex. 2002) ("Pure questions of law should be reviewed *de novo*."); *Dept. of Wildlife Conservation of State of Miss. v. Jantzen*, 621 F. Supp. 838, 840 (S.D. Miss. 1985) (under the APA, questions of law are freely reviewable by the courts); *Montana Power Co. v. EPA*, 429 F. Supp. 683, 695 (D. Mont. 1977) ([i]n those matters falling within clear purview of the courts such as interpreting the law, court must scrutinize agency decisions from more critical perspective); *Chieppo Bus Co. v. U. S.*, 383 F.Supp 1192, 1197 (D. Conn. 1974) (a reviewing court "do[es] not attach a presumption of correctness to the decisions of administrative agencies on questions of law….").

### 5.  Under The APA Standard Of Review, The AgBCA's Rulings Were Arbitrary And Capricious.

There is no statutory authority requiring application of the APA's "arbitrary and capricious" standard of review to FCIC/AgBCA determinations. *Rain & Hail Ins. Serv., Inc., supra*, 229 F. Supp. 2d at 716. Also, no authority from this Circuit requires application of APA standards to AgBCA appeals.  Two district court decisions from other circuits, however, "appear[] to prescribe" that the "APA scope of review" governs. *Id.* at 716-17; *American Growers Ins. Co. v. Federal Crop Ins. Corp.*, 210 F. Supp. 2d 1088 (S.D. Iowa 2002). Even under an "arbitrary and capricious" standard, the AgBCA's rulings cannot be sustained because

its fact-finding procedures were inadequate, and it failed to consider important arguments and aspects of the claims before it.

a.    <strong>The AgBCA's Fact Finding Procedures Were Inadequate.</strong>

The AgBCA's procedures were inadequate because it made dispositive rulings without any record. It adjudicated the Insurance Providers' ARPA claims without receiving an answer to the complaint from FCIC, without any evidentiary record, and without holding a hearing. FCIC believes this was acceptable "because there were no material facts in genuine dispute." (FCIC Opp. at 12.) The Declarations of Kenneth Ackerman and Dallas Smith, two senior USDA officials at the relevant time, and the Declarations of Ben Latham and John Joyce, two officers of the Insurance Providers, belie this assertion – facts clearly are disputed. In truth, because of this factual vacuum, the AgBCA completely overlooked, ignored, and otherwise failed to consider important aspects of this case.

The declarations noted above establish that the 1998 SRA was intended to be a continuous contract. *See infra* Part II.C. Thus, they prove that the AgBCA acted arbitrarily and capriciously by failing to take any evidence on this central issue. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Soler v. G. & U., Inc.*, 833 F.2d 1104, 1107 (2d Cir. 1987); *Menorah Med. Ctr. v. Heckler*, 768 F.2d 292, 295 (8th Cir. 1985); *Sierra Club v. Hankinson*, 939 F. Supp. 865, 869 (N.D. Ga. 1996); *National Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1201 (D.D.C. 1996) (In determining whether agency's action is arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law, court must consider whether decision was based on consideration of relevant factors); *Glendale Neighborhood Ass'n v. Greensboro Housing Auth.*, 901 F. Supp. 996, 1003 (M.D.N.C. 1995).

It is always an abuse of discretion for an administrative agency to act without collecting the necessary facts. *Xytex Corp. v. Schliemann*, 382 F. Supp. 50, 53 (D. Colo. 1974); *McInnis v. Weinberger*, 388 F. Supp. 381, 389 (D. Mass. 1975) (agency action may be set aside on ground that it is unwarranted by the facts when the agency determination is of an adjudicatory nature and the agency factfinding procedures are inadequate). Moreover, where agency action is adjudicatory in nature and fact-finding procedures are inadequate, *de novo* review is allowed. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *Environmental Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284-85 (D.C. Cir. 1981); *Leefer v. Administrator, NASA*, 543 F.2d 209, 214 (D.C. Cir. 1976). Given the obvious and substantial factual gaps in this case, *de novo* review of the AgBCA's decision is appropriate.

> **b.** **The AgBCA Failed To Consider Important Aspects Of The Insurance Providers' Case.**

As the Insurance Providers' memoranda to this Court have shown, the AgBCA failed to consider or otherwise address important aspects of the Insurance Providers' case, such as whether FCIC provided the Insurance Providers with a "determination" that started the alleged 45-day clock running. Moreover, the AgBCA essentially ignored the Insurance Providers' identification of SRA provisions demonstrating the continuous nature of the SRA in favor of FCIC's state law based arguments to the contrary.

Agency decisions are arbitrary and capricious when they entirely fail to consider important aspects of problems. *Motor Vehicle Mfrs. Ass'n of U.S., Inc., supra*, 463 U.S. at 43; *Menorah Medical Ctr., supra*, 768 F.2d at 295; *Organized Fishermen of Florida v. Hodel*, 775 F.2d 1544, 1550 (11th Cir. 1985); *Glendale Neighborhood Ass'n*, 901 F. Supp. at 1003; *Necketopoulos v. Shalala*, 941 F. Supp. 1382, 1390 (S.D.N.Y. 1996) (agency action may be set aside under arbitrary and capricious standard of APA if agency has entirely failed to consider

important aspect of problem); *Crowley's Yacht Yard, Inc. v. Pena*, 863 F. Supp. 18, 21 (D.D.C. 1994).

Thus, the AgBCA's actions in failing both to consider the "determination" issue and to receive any evidence regarding the continuous nature of the 1998 SRA were arbitrary and capricious.

> **c.    Because No Agency Expertise Was Applied, No Deference Is Due.**

The reason for the limited review of findings of administrative agencies, affording "deference" to their decisions, is to give proper respect to the expertise of the administrative tribunal and to help promote the uniform application of agency rules. *Squaw Transit Co. v. U. S.,* 402 F. Supp. 1278, 1287  (N.D. Okla. 1975).  Certain types of agency decisions, however, are more deserving of deference than others.

For example, the reasons for deference are strongest when an agency is interpreting its own regulations and that interpretation incorporates quasi-technical administrative expertise and familiarity with situations acquired by long experience with intricacies inherent in a comprehensive regulatory scheme. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (broad deference is more warranted when regulation concerns complex and highly technical regulatory program in which identification and classification of relevant criteria necessarily require significant expertise and entail exercise of judgment grounded in policy concerns); *Texas-Capital Contractors, Inc. v. Abdnor*, 933 F.2d 261, 264 (5th Cir. 1990); *National Oilseed Processors Ass'n*, 924 F. Supp. at 1201 (court gives high degree of deference to agency actions based on evaluation of complex scientific data within agency's technical expertise); *Natural Resources Def. Council v. EPA*, 806 F. Supp. 1263, 1272 (E.D. Va. 1992) (agency action is entitled to greater deference by reviewing court if information at issue is highly scientific in

nature). Conversely, the least deference is afforded those agency interpretations that simply parallel the ordinary judicial function of giving meaning to words used in governing statutes or regulations, *Montana Power Co.*, 429 F. Supp. at 695, when there are conflicting interpretations of the same regulations within an agency, *id.* at 697, and when the decisions are not longstanding or of sufficient notoriety. *See Marathon Oil Co. v. Kleppe*, 407 F. Supp. 1301, 1308-09 (D. Wyo. 1975).

Here, of course, even if there were a fully developed factual record to review, none of the AgBCA's rulings involved the type of scientific or quasi-technical expertise that supports giving it broad deference. Indeed, even the AgBCA's interpretation of the SRA does not fall into this category, as it simply involves the interpretation of a contract, activity routinely undertaken by the judiciary. Moreover, the AgBCA issued conflicting rulings in this case—ruling in *ACE I*[5] that the SRA was a continuous contract, and then later ruling in *ACE II*[6] that it was a series of separate contracts.[7] FCIC has even added its own conflicting interpretation into the mix by arguing that this Court should adopt the opinion of a dissenting Judge over that of the majority with respect to the "may vs. must" issue. Finally, in several instances this was the first time that the AgBCA had addressed the specific issue before it:

---

[5] *In re Ace Prop. & Casualty Ins. Co.*, AGBCA No. 2004-173-F (2005 WL 3485623) (Dec. 21, 2005) (hereinafter "*ACE I*".).

[6] *Ace Prop. & Casualty Ins. Co.*, AGBCA No. 2006-120-R (2006 WL 1776561) (June 28, 2006) (hereinafter "*ACE II*").

[7] If deference is to be applied, to which of the two contradictory AgBCA decisions does this Court defer? Picking either demonstrates the impropriety of a deferential review standard, thereby demonstrating the point that *de novo* review is appropriate.

- According to the AgBCA, "[t]he issues before us here as to the operation of a contract which continues year-to-year through renewal, have not previously been addressed by this Board." *ACE II*, AR at 313.[8]

- In addition, the AgBCA stated that "[t]his is the first time we are being specifically asked to rule on the matter of whether the language in" the SRA disputes provision, section V.L., requires the use of § 400.169. *ACE II*, AR at 311.

- The AgBCA never before addressed the interplay between the six-year statute of limitation in 28 U.S.C. § 2401(a) and the 45-day limitation in 400.169.

Clearly, the AgBCA was in uncharted territory when it ruled on each of these issues, the antithesis of interpreting long-standing agency policies. Thus, the AgBCA's decisions are due little, if any, deference.

### B.     Because The 1998 SRA Was A Single, Continuous Contract, The Insurance Providers' ARPA Claims Are Not Time-Barred.

The AgBCA and the FCIC both "agree that a contract normally applies the substantive law in effect at the time it is entered." *ACE II*, AR at 313. This principle is important to the resolution of this case: If the Court determines that the 1998 SRA is a single, continuous contract, the Insurance Providers can proceed with their ARPA claims because the permissive version of § 400.169 was in effect when the 1998 SRA was executed.[9]

When the AgBCA initially addressed the continuous contract issue, it correctly concluded that the 1998 SRA was continuous.  *ACE I*, AR at 4-5. Then in *ACE II*, the AgBCA did a "180" and concluded that the SRA is a series of separate, one-year contracts rather than a continuous

---

[8] Administrative Record filed by FCIC, January 25, 2007.

[9] FCIC contends that the SRA is a series of separate, one-year contracts, and thus the Insurance Providers' ARPA claims are time-barred because the mandatory version of § 400.169 would have been incorporated into the single-year SRA that arose after FCIC adopted the new version of the regulation in 2000. However, for the reasons set forth in Parts II C & D, *infra*, the Insurance Providers' ARPA claims are not time barred even if the mandatory version was incorporated into the SRA after the 2000 amendment.

contract covering multiple years. *ACE II*, AR at 313.  In abandoning its earlier and correct conclusion, the AgBCA denigrated the express text of SRA Section V.M. ("This Agreement will continue in effect from year to year. . . .").

In doing its "180," the AgBCA failed to follow universally accepted contract interpretation principles.  That the AgBCA reached conflicting decisions on the same issue clearly suggests that it considered the 1998 SRA to be ambiguous.  But it then failed to follow a cardinal rule regarding ambiguous contracts which requires an investigation into the parties' intent. *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 682 (D.C. Cir. 1985) ("[I]f the court determines as a matter of law that the agreement is ambiguous [it] will . . . look to extrinsic evidence of intent to guide the interpretive process."). Instead, the AgBCA ostensibly looked to state insurance law for guidance,[10] yet even here it chose to ignore the "primary criterion"—

---

[10] The automobile insurance policy case law cited by the AgBCA in *Ace II* is inapplicable because, among other things, the SRA is not an automobile insurance policy. (IP Opp. at 36-37.) If any insurance policies are important to the determination of the continuous nature of the 1998 SRA, it is those policies that are reinsured under the SRA, not policies that are foreign and totally unrelated.  Further, the continuous nature of the 1998 SRA should be analyzed in the context of the Federal crop insurance program, not some other insurance scheme with totally different facts and circumstances. However, to the extent this Court looks to insurance policy case law for guidance, several decisions from this Circuit set forth important rules to consider:

- "The construction and effect of [insurance] contracts is a matter of law to be determined by the Court." *Harbor Ins. Co. v. Omni Const., Inc.,* 912 F.2d 1520, 1522 (D.C. Cir.1990); *American Red Cross v. Travelers Indem. Co. of Rhode Island*, 816 F. Supp. 755, 758 (D.D.C. 1993).  As applied here, this rule means that no deference would be afforded the AgBCA.

- "If the policy is ambiguous … the Court may consider evidence of usages and customs affecting the agreement to determine the parties' intent." *American Red Cross*, 816 F. Supp. at 758; *id* at n. 7.  This rule renders the Insurance Providers' declarations and exhibits admissible.

- "Any 'ambiguity in an insurance contract must be construed in favor of the insured.'" *Harbor Ins. Co.,* 912 F.2d at 1522 (citations omitted); *American Red Cross*, 816 F. Supp. at 758.  Because the SRA is a reinsurance agreement, this rule means that any ambiguity is to be resolved in favor of the Insurance Providers as the reinsured parties.

intent—set forth in the case law. *ACE II*, AR at 314 ("[T]he primary criterion for determining whether an agreement is a single contract or a number of severable contracts is the **intention of the parties**, as determined by a fair construction of the agreement, by the subject matter to which it has reference and by the circumstances of the particular transaction giving rise to the questions.") (emphasis added) (citing *Redwood Empire Prod. Credit Ass'n v. Fishing Vessel Owners Marine Ways, Inc.*, 530 F. Supp. 75 (W.D. Wash 1981)).

As the following will show, application of fundamental contract interpretation principles conclusively demonstrates that the 1998 SRA is a continuous contract and, as a result, that the Insurance Providers' ARPA claims are not time-barred. In addition, all parties to the SRA agree that it was intended to be continuous, as evidenced by the declaration testimony of key players with contemporaneous knowledge. Thus, summary judgment in favor of the Insurance Providers is required.

### 1. The Text Of The 1998 SRA Demonstrates That It Was A Continuous Contract.

The Insurance Providers have consistently maintained that the AgBCA was correct in *ACE I* in finding the 1998 SRA to be a continuous contract. The text of the contract supports this conclusion. (IP Opp. at 29 -31.)

This reply deals with the reality of two contradictory positions of the AgBCA affecting this dispute – its first holding that the 1998 SRA was a single, continuous contract and then its *ACE II* holding that there was a series of one-year reinsurance agreements. One cannot get to the second holding unless the 1998 SRA is ambiguous on the continuity issue. Thus, the Insurance Providers now assume, solely for purposes of argument, that there is ambiguity and establish that, applying the relevant legal standards, the 1998 SRA was a single, continuous contract.

**2.** **Assuming That The 1998 SRA Is Ambiguous, The Correct Conclusion Is That It Was A Continuous Contract.**

The standard used by American courts for determining ambiguity in a contract is whether the contract is "reasonably susceptible of different constructions or interpretations." *U.S. v. Sears, Roebuck & Co.*, 623 F. Supp. 7, 9 (D.D.C. 1984) (citations omitted); *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 57 n.14 (D.D.C. 2006); *Gryce v. Lavine*, 675 A.2d 67, 69 (D.C. 1996) (citations omitted). The AgBCA's decision in *ACE II* can be employed to argue that there were annual SRAs as a theoretically plausible position, although an erroneous one. Similarly, the following points demonstrate the reasonableness of the single contract interpretation:

- In *ACE I* the AgBCA stated that the SRA was a continuous contract.[11]

- The declarations of Kenneth Ackerman,[12] Dallas Smith,[13] Ben Latham,[14] and John Joyce[15] clearly and unequivocally state that the SRA was and was intended to be a "continuous contract."

- There are numerous SRA provisions consistent with the "continuous contract" interpretation. (Ackerman Decl., ¶ 15.)

- The SRA was executed only once by each Insurance Provider. (Joyce Decl., ¶ 10; Latham Decl., ¶ 3.) This unassailable fact evidences that the SRA was a single, continuous contract.

Under the insurance policy case law in this Circuit, the foregoing are sufficient to establish that the 1998 SRA was a continuous contract. *See supra* note 8.

---

[11] "The majority earlier stated that the SRA is a continuous contract … it now amends that conclusion." *ACE II*, AR at 319 (Virgilio, in dissent)

[12] *Infra*, at 18-22.

[13] (IP Opp. at Ex. D.)

[14] (IP Opp. at Ex. C.)

[15] (IP Opp. at Ex. B.)

Four documents included in the Insurance Providers' Statement of Undisputed Facts ("IPSOF") also make the case that the 1998 SRA was a single, continuous contract. First, when the FCIC amended the SRA, it did so by issuing consecutively numbered amendments—No. 1 through No. 3—to the 1998 SRA. That is, there is no "Amendment No. 1 to the 2000 SRA," which one would expect to see if the SRA was in fact a series of separate one-year contracts. For example, Bulletin No. MGR-00-017, dated June 22, 2000, from Kenneth D. Ackerman, RMA Administrator, contains the following language:

- The Agriculture Risk Protection Act of 2000 and Mandatory Amendment No. 3 to the 1998 Standard Reinsurance Agreement (SRA) ("Subject" line text)

- The Agriculture Risk Protection Act of 2000 . . . requires the . . . [FCIC] . . . to amend current provisions of the 1998 Standard Reinsurance Agreement . . . . ("Background" section)

- To implement the 2000 Act, the 1998 SRA is amended as follows. . . . ("Action" section)

(IPSOF, Ex. C.) In fact, the amendment itself is titled "AMENDMENT NO. 3 TO THE 1998 STANDARD REINSURANCE AGREEMENT" and states the following:

- The 1998 Standard Reinsurance Agreement, between the Federal Crop Insurance Corporation and the undersigned Company, is hereby amended for the 2001 and, if applicable, subsequent reinsurance years. . . .

- The undersigned Company representative acknowledges that the Company's Board of Directors has authorized the Company to enter into this Amendment of the 1998 Standard Reinsurance Agreement.

(IPSOF, Ex. C.) Moreover, the Insurance Providers' reservation of rights letters following receipt of the Manager's Bulletin and Amendment No. 3 typically state:

- Reservation of Rights to Amendment No. 3 to the Standard Reinsurance Agreement of 1998

- The Company recognizes that RMA believes Amendment No. 3 to the Standard Reinsurance Agreement of 1998 implements the regulations required from the Agricultural Risk Protection Act of 2000.

(IPSOF, Ex. E. Country Mutual Insurance Company)   Finally, even the letter from David C. Hatch, Acting Deputy Administrator, which denied the Insurance Providers' claims as untimely, indicated that only a single SRA, rather than multiple separate SRAs, was at issue:

- Re: Amendments No. 1 and No. 3 to *the* Standard Reinsurance Agreement

- You have alleged that Amendment Nos. 1 and 3 constitute a breach of *the* SRA . . . .

- Amendment Nos. 1 and 3 to *the* SRA, the disputed actions . . . .

- FCIC is unable to issue a final administrative determination regarding Amendment Nos. 1 and 3 to *the* SRA, effective for the 1999 and 2001 reinsurance years, respectively.

(IPSOF, Ex. F. (emphasis added)).

Taking the two AgBCA decisions at face value, the 1998 SRA theoretically is ambiguous on the issue of whether or not it was a single, continuous contract.   Although the Insurance Providers believe otherwise, the Court needs to decide whether, when faced with an ambiguous contract on this issue, the AgBCA dealt with it correctly.   As next demonstrated, it did not.

> **3.     The AgBCA Failed To Solicit And Consider Evidence Regarding Whether The SRA Was A Continuous Contract, And It Failed To Give The Insurance Providers Their Required Evidentiary Inferences.**

Once a contract is found to be ambiguous, extrinsic evidence regarding the intent of the parties must be considered to resolve the ambiguity. *NRM Corp.*, 758 F.2d at 682; *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990)("When the meaning of a contract provision is facially uncertain, a court may resort to an examination of extrinsic evidence, such as statements, course of conduct, and contemporaneous correspondence, aimed at

discerning the intent of the parties . . . ."); *Ameren Serv. Co. v. FERC*, 330 F.3d 494, 498 n.7 (D.C. Cir. 2003).

The parties' memoranda have made clear that, when the AgBCA ruled, the Insurance Providers' complaint had not been answered by FCIC, there had been no discovery, and no hearing was held. Quite simply, the AgBCA neither solicited nor considered any evidence relating to whether the parties intended the 1998 SRA to be a continuous contract or series of separate contracts.

Moreover, although the "AgBCA decided the case on summary judgment and/or a motion to dismiss . . ." (FCIC Opp. at 12), it is wholly unclear what evidentiary standard the AgBCA used in rendering its decision. However, it is absolutely clear that no factual/evidentiary inferences were afforded the Insurance Providers as required under either a motion to dismiss or motion for summary judgment standard. *Flynn v. Dick Corp.*, 481 F.3d 824, 828-29 (D.C. Cir. 2007) (noting that on summary judgment, courts must "draw[] all inferences from the evidence in favor of the non-movant."); *In re Rural Cmty. Ins. Agency, Inc.*, AGBCA No. 2000-154-F (2002 WL 236693) (Feb. 12, 2002) ("When considering and assessing facts to determine if there is a genuine issue of material fact, we are obligated to apply to the evidence presented by the non-moving party all reasonable inferences in its favor . . . . We are not permitted to asses the moving party's evidence in that same favorable light.") (citations omitted).

These flaws have several consequences. They establish errors by the AgBCA. They negate any deference due the AgBCA. And, they fully permit this Court to conduct a *de novo* review and then hold, as the AgBCA did in *ACE I*, that the 1998 SRA was a single continuous contract.

### 4.    The 1998 SRA Was A Single, Continuous Contract.

Based on the plain text of the 1998 SRA, the parties' intent, and the extrinsic evidence offered by the Insurance Providers, this Court should hold the 1998 SRA was a single, continuous contract.[16]

To respond to misleading and inaccurate statements made by FCIC in its Motion for Partial Summary Judgment, the Insurance Providers previously submitted to the Court declaration testimony from Messrs. Smith, Joyce, and Latham. (IP Opp. at Exs. D, B, and C.) In its Opposition, FCIC introduces another misleading and factually incorrect argument, claiming that the annual submission of a Plan of Operations ("Plan") creates a new, separate, and distinct SRA each year. (FCIC Opp. at 3-5.) Apparently recognizing that its previous assertion—that the SRA itself was executed every year—was factually wrong, FCIC has created out of whole cloth a new argument based on the Plan submission process. Of course, this argument itself relies on extrinsic evidence (the parties' conduct following execution of the 1998 SRA). Thus,

---

[16] FCIC served its Reply to Petitioner's Opposition, etc. ("FCIC Reply") on July 19, 2007. It raised, for the first time in any forum, arguments based on Section V.N. of the 1998 SRA (the "Appropriation Contingency") and the Anti-Deficiency Act to substantiate its argument that the agreement was not a continuous contract. (FCIC Reply at 7-8.) Because these arguments never were presented to the AgBCA or to this Court in any earlier pleadings, the Insurance Providers will be filing a motion to strike them. For present purposes, they simply note the following brief points. First, Section V.N. had no relevance to the 1999 and subsequent reinsurance years (i.e., the years at issue in this case) because Congress changed the Federal Crop Insurance Act in 1998 to provide that funds payable to the Insurance Providers and premium subsidies are appropriated on a mandatory basis. 7 U.S.C. § 1516(a)(2), added by Pub. Law 105-185 (June 23, 1998). Second, any applicability of Section V.N. hinged on the absence of any "other source of funds for each payments" as its text plainly shows. FCIC has not informed the Court that there was and remains such a source, namely the Insurance Fund that has long existed under 7 U.S.C. § 1516(c). These points obviously render references to the Anti-Deficiency Act irrelevant.

flawed as it is factually, this argument is nothing more than improper *post hoc* rationalization of counsel.[17]

In what seems to be a recurring theme in these proceedings, the people who actually managed the Federal crop insurance program have very different views of how the program worked and was intended to work, as opposed to the government lawyers trying to defeat the Insurance Providers' claims. Kenneth D. Ackerman was the Manager of the FCIC from 1993 until January 2001. In his declaration, attached hereto as Exhibit A, Mr. Ackerman provides certain background information about the 1998 SRA and discusses in detail why the SRA was structured as a continuous contract, as well as how the Plan fits into the overall SRA contractual scheme.

> ### a. The FCIC Intended The 1998 SRA To Be A Continuous Contract.

The previously submitted declaration of Dallas Smith, the Deputy Under Secretary of USDA when the 1998 SRA was negotiated, makes clear that the 1998 SRA was intended by the government to be a continuous reinsurance agreement. Mr. Ackerman's declaration underscores the same point:

- I understand the attorneys for FCIC are now arguing that the 1998 SRA is not a continuous contract, but instead is a series of one year contracts. In

---

[17] The FCIC's shifting arguments with respect to continuity of the 1998 SRA are nothing more than an improper *post hoc* rationalization of counsel attempting to uphold the AgBCA's decision. Its arguments cannot even be treated as admissible "considered views" of the agency within the meaning of *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. ___, ___ (2007). First, FCIC's arguments are at odds with the declaration testimony of Kenneth D. Ackerman, FCIC's Manager at the time of the events in question, and of Dallas R. Smith, Mr. Ackerman's immediate superior at USDA, as the text makes clear. Second, FCIC has altered its arguments befor this Court. It initially argued that the SRA was executed on a yearly basis, a proposition that was totally untrue, and now, after apparently realizing that its assertion was untrue, has shifted to the argument that the submission of the annual Plan constitutes a new SRA for each reinsurance year.

my view, that argument is without any basis in fact and contradicts the nature of the document. (Ex. A, Ackerman Decl. at ¶ 12.)

- The fact that the 1998 SRA was intended to be a continuous contract, not a series of one year contracts, was addressed specifically in the negotiations, and both the government and the Insurance Providers unequivocally required that the 1998 SRA be continuous to protect their interests. (*Id.* at ¶ 14.)

- Without a multi-year agreement, the government itself felt that it could be exposed to greater risk, such as, for instance, if the Insurance Providers experienced large losses in a particular year and then refused to execute a new SRA for the following year without first renegotiating the financial terms in Section II. (*Id.*)

- Similarly, because the underlying crop insurance contracts sold to farmers (and reinsured by the SRA) are themselves continuous contracts, the Insurance Providers faced disruption without continuous reinsurance to support them. (*Id.*)

- [A]s RMA Administrator and FCIC Manager, I would know when we changed from one SRA to another. That only happened twice in my nearly eight years in office, and it never occurred with respect to the 1998 SRA. I have continued to follow the Federal crop insurance program since leaving government service, and I can state the SRA we negotiated in 1997 was not terminated until December 2003. Thus, the 1998 SRA was a single continuous contract in existence from July 1, 1997 through June 30, 2004. (*Id.* at ¶ 16.)

Mr. Ackerman's observations above comport with how the FCIC actually treated the 1998 SRA in the seven years of its existence  The separate "one year contract" argument, therefore, is only a figment of counsel's imagination and without basis in reality.

The very structure of the 1998 SRA demonstrates both that it was continuous and that the Plan (Appendix 2) is simply a component part.  The definition of "Agreement" in Section I states:

"Agreement" means this Standard Reinsurance Agreement, all Appendices, [and] all referenced documents including Manual 13 and the approved Manual 14.

Clearly, "[t]his language denotes a single document executed by the parties for the duration of the SRA (*i.e.*, the 33 pages of SRA text followed by signature lines) and components for annual updating. One of these annual components is the annual Plan of Operations ("Plan") submitted in accordance with Section V.G.1. which, by the SRA's own terms 'is incorporated in this Agreement by reference.' *See* Section V.G.1.d. The Plan, therefore, does not and cannot constitute a new SRA." (Ex. A, Ackerman Decl. at ¶ 19.)

> **b. The Insurance Providers Intended the 1998 SRA To Be A Continuous Contract.**

The previously submitted declaration of Mr. Joyce persuasively establishes that the Insurance Providers intended the 1998 SRA to be a continuous reinsurance agreement. (Joyce Decl., ¶¶ 7-9, Ex. B to IP Opp.) Messrs. Joyce and Latham both attested to the fact that only one SRA was executed for the period July 1, 1997, through June 30, 2003. (*Id.*, ¶ 10; Latham Decl., ¶ 3, Ex. C to IP Opp.)

Faced with the problem that both sides considered the 1998 SRA to be continuous when they negotiated it, FCIC looks elsewhere to defeat the clear meaning of SRA § V.M. In doing so, it offers extrinsic evidence relating to the annual submission of operating Plans by the Insurance Providers.

> **c. The Submission Of An Annual Plan of Operations Did Not Make The 1998 SRA An "Annual" Contract.**

As the Insurance Providers demonstrated in their Opposition, the Plan is merely a transmittal of certain information to the FCIC, most of it required by regulation, on a yearly basis. (*See* IP. Opp. at 35 n. 27 and 7 C.F.R. § 400.170.)[18] Paragraph 23 of Mr. Ackerman's

---

[18] Additionally, the FCIC regulations define Plan of Operations as a "<u>statement</u> submitted to FCIC each year in which a reinsured or prospective reinsured specifies the reinsurance options it

declaration describes the nature of the information submitted as part of the annual Plan and its

significance to FCIC. In paragraphs 19, 20, 21, and 22, he explains the errors in FCIC's factual

assertions about the Plan.

Mr. Ackerman makes the following observations regarding the Plan and the errors in

FCIC's argument:

- FCIC claims: "The company can change its Plan of Operations each reinsurance year, substantially affecting the financial terms of the SRA." This is simply wrong. In fact, the contrary proposition is true – Plans do not change the SRA's financial terms. Those terms were established in the 1997 negotiations, were standard, and did not differ on a company-by-company basis. (Ex. A at ¶ 20.)

- [F]und designations are not a function accomplished by the Plan at all. Rather, fund designations are made on an insurance policy-by-policy basis at various times throughout a reinsurance year as policyholders either renew their coverage or book new coverage. *See, e.g.*, SRA Sections II.B.1.b. and II.B.2.c. What the Plan does accomplish on this subject is to memorialize each Insurance Provider's intent regarding aggregate designations to funds on a state-by-state basis, which may or may not be made as it proceeds to book business during the year. (*Id.* at ¶ 21.)

- [R]isk allocations are not made in the Plan, but are specified for all Insurance Providers in the text of the SRA. (*Id.*)

- FCIC is simply incorrect in its assertion that the Plan must state whether an Insurance Provider "will offer privately submitted and approved plans of insurance." That is a topic not covered by the Plan . . . . Instead, it is addressed in Section II.A.2. of the SRA. (*Id.* at ¶ 22.)

- The Plan of Operations is a series of reports, certifications, and informational material provided through a transmittal letter from an Insurance Provider. (*Id.*)

- [I]t is an incorrect statement that a Plan of Operation can change the terms of an underlying SRA. The Plan simply implements a previously negotiated SRA for any given year. (*Id.* at ¶ 23.)

---

wishes to use, its marketing plan, and similar information as required by the [FCIC]." 7 C.F.R. § 400.161(j).

- Both the SRA text and Appendix 2 make it clear that the Plan is not the reinsurance agreement, but is a separate functional tool for assisting RMA in overseeing and managing the reinsurance program on a continuing basis. (*Id*.)

As Mr. Ackerman's declaration makes clear, the FCIC has both factually mischaracterized what is accomplished through the annual submission of the annual operating Plan and distorted the legal effect the submission has on the 1998 SRA. (*Id*.)

FCIC's Reply at 7 n. 4, repeats briefly its factually erroneous comments regarding what the Plan may change annually. Paragraph 21 of Mr. Ackerman's declaration provides the evidentiary rebuttal. Without any record citation, FCIC also suggests in this footnote that "annual" SRAs might vary "premium rates; coverages for various programs, crops in different areas of the country; . . . ." This undocumented assertion is false for two reasons. First, these are not subjects dealt with in the SRA. Second, these are subjects of separate regulations issued by FCIC. *See* 7 C.F.R. § 457.101 *et seq*. In short, FCIC's arguments about its own programs continue to be divorced from the reality of how they are documented and operate.

### 5. The Declarations Submitted By The Insurance Providers Are Appropriate Evidentiary Submissions.

FCIC has moved to strike the declaration testimony submitted by the Insurance Providers. (Doc. 37, filed July 19, 2007.) Insurance Providers will timely respond to the motion pursuant to this Court's rules. However, the Insurance Providers simply note two points here. First, courts review contract ambiguity questions *de novo*, *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1048 (5th Cir. 1998); *Gryce*, 675 A.2d at 69, and the declaration testimony is the very evidence that should have been solicited and considered by the AgBCA during its decision-making process given the arguable ambiguity associated with the SRA. *See Ross v. 1301 Connecticut Ave. Assoc.*, 99 F.3d 444, 446 (D.C. Cir. 1996); *America First Inv. Corp. v. Goland*,

925 F.2d 1518, 1522 (D.C. Cir. 1991)(holding that because certain contract terms were not free from ambiguity, "the contract cannot be interpreted as a matter of law and the case must be remanded so that the fact-finder can determine the parties' true intent."). Second, FCIC's erroneous and unsubstantiated statements that the SRA was executed each year, and that submission of the Plan created a new SRA each year, "opened the door" to the declarations which rebut these assertions. *See Reilly v. NatWest Mkt. Group, Inc.*, 181 F.3d 253, 266 (2d Cir. 1999).

### 6. Summary Judgment For FCIC Is Improper.

FCIC is seeking summary judgment from this Court on the issue of whether the SRA is a single, continuous contract, or a series of separate one-year contracts. (FCIC Opp. at 12.) However, summary judgment is inappropriate where a contract has been determined to be ambiguous. *NRM Corp.*, 758 F.2d at 682 ("When, however, the language is unclear and the search for intent extends beyond the four corners of the agreement, the intended meaning of the contract is a disputed and, necessarily, material question of fact . . . and summary judgment is improper."); *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d at 57 n.14 ; *Gryce*, 675 A.2d at 69 ("In the area of contract interpretation, the existence of a genuine issue of material fact generally turns on whether or not the contract is ambiguous . . . .  Summary judgment is appropriate 'when the agreement is unambiguous and where there is no question as to the parties' intent.'") (citations omitted).

Notwithstanding the above, if the Court finds that the only reasonable view of the SRA is that it is a single, continuous contract, the Court may rule summarily in favor of the Insurance Providers. *Farmland Industries, supra*, 904 F.2d at 736.  ("To be sure, if extrinsic evidence supports more than one reasonable interpretation of the contract, local law calls for the trier of

fact to resolve the dispute. But if that evidence demonstrates that only one view is reasonable-notwithstanding the facial ambiguity-the court must decide the contract interpretation question as a matter of law.") (citations omitted).

### C.       7 C.F.R. § 400.169 Does Not Bar The Insurance Providers' Claims.

Even assuming that the 2000 version of § 400.169 applies to the Insurance Providers' ARPA claims, the administrative claim process set forth in § 400.169 does not bar these claims. Regrettably, FCIC misrepresents material facts in urging a contrary position.

### 1.       FCIC Inaccurately Represents That § 400.169 Does Not Require An Administrative "Determination" for SRA Breach Claims.

Whether there is a permissive or mandatory 45-day period for asserting claims, an indispensable element of the administrative process relating to SRA breach of contract claims is receipt of a final administrative determination. 7 C.F.R. § 400.169(a) (as published May 1, 1995) (1995 WL 248207); (as published January 25, 2000) (65 FR 3782) (2000 WL 51156).  *See also* (IP Memo at 16-19; IP Opp. at 7-16.)

The Insurance Providers never received a determination satisfying the criteria of § 400.169(a). Nor has FCIC claimed it delivered a determination or offered any evidence in the record that it did so. (IP Opp. at 7.)  Thus, the triggering event for application of any version of the 45-day period has never occurred, and the existence of a mandatory 45-day deadline is immaterial.

To argue that it has no obligation to issue a determination, FCIC now claims that determinations only relate to compliance proceedings, and it even posits: "Neither the SRA nor the regulations make any specific reference to FCIC issuing a 'determination' before the company can begin the appeal process. In fact, only the provisions regarding compliance

specifically refer to the issuance of findings." (FCIC Opp. at 28.); *see also* (FCIC Opp. at 29-30.) FCIC not only is wrong, but is asserting an argument at odds with prior AgBCA authority.

### a. FCIC's Obligation To Issue A "Determination" Has Not Been Removed From § 400.169(a).

When FCIC first launched the administrative dispute resolution process in the 1980s, there is no disagreement that it obligated itself to issue administrative determinations. And, there was no dichotomy between contract breach and compliance issues. *See* 7 C.F.R. § 400.149, 53 FR 31825, 1988 WL 26571 (Aug. 22, 1988), AR at 22; *cf.* 52 FR 17540, 1987 WL 134600 (May 11, 1987) (referring to a "decision of the Manager").

The evolution of the disputes regulation shows that § 400.149 was revised and re-issued as 7 C.F.R. § 400.169 in 1995 and then revised further in 2000. The new regulation does have separate paragraphs for contract and compliance disputes, but does ***not*** dispense with FCIC's obligation to issue a determination on contract disputes.

The Insurance Providers believe that FCIC has manufactured the argument that determinations are not required for contract disputes because the Insurance Providers' claims are not compliance actions, which would fall under paragraph (b) of the regulation and as to which FCIC admits determinations are required. Supposedly, it then can avoid the consequences of not having provided a determination to the Insurance Providers in this matter.

In advocating that determinations are not part of the administrative process for contract disputes, FCIC falsely asserts that the term "determination" was removed from § 400.169(a):

> [T]he term 'determination' was removed from the regulation when it was amended in 1995. All that remains is the reference to the compliance review findings in 7 C.F.R. § 400.169(b), which is consistent with the regulatory intent from 1987. However, the addition of 7 C.F.R. § 400.169(a), with its reference to 'actions' of FCIC, make it clear that the regulatory scheme in effect in 1987 is no longer applicable.

(FCIC Opp. at 30.)  The reality, of course, is that the determination concept remains a feature of both contract and compliance disputes, as the text of the regulation demonstrates:  "receipt of such **determination"** appears in both paragraphs (a) and (b) of § 400.196 (emphasis added). The primary reason for this is that the FCIC created "parallel provisions," *ACE I*, AR at 20. That these provisions are designed to operate similarly is made clear by the FCIC's own explanation of the 1995 version of the regulation:

> If the reinsured company is now dissatisfied with a ***determination*** under a reinsurance agreement with FCIC, it may now request the Director of Insurance services to render a final administrative determination on the dispute.[Referring to 400.169(a)]. If the reinsured company is dissatisfied with a ***determination*** as a result of a compliance review finding, it may request the Director of Compliance to render a final administrative determination on the dispute. [Referring to 400.169(b)].

60 FR 21035-01, 1995 WL 248207 (May 1, 1995), AR at 25 (emphasis added).

Based on this history, it is difficult to understand how FCIC can make the following statement in good faith: "Given the difference in the terms between 7 C.F.R. § 400.169(a) and (b), it would be inappropriate to interpret both subsections to require FCIC [to] issue a determination or findings before the appeal process becomes applicable." (FCIC Opp. at 28.) The opposite is true.  It would be inappropriate to overlook FCIC's obligation to issue a determination in an SRA breach case.

> **b.    The AgBCA Agrees That § 400.169(a) Requires FCIC To Provide The Insurance Providers With A Determination.**

The AgBCA has offered its own view of § 400.169(a), as well as what is required of FCIC in delivering a determination to the Insurance Providers. In 2002, the AgBCA stated explicitly that § 400.169(a) required the receipt of a formal "determination" from FCIC:

> Our interpretation is that 7 C.F.R. § 400.169(a) describes three separate events, (1) an action; (2) the ***receipt of a determination*** concerning that action and (3) a final administrative determination.

*In re Rural Cmty. Ins. Agency, Inc.*, AGBCA No. 2000-154-F, 2002 WL 236693 (Feb. 12, 2002) (emphasis added). The AgBCA went on to explain that any other interpretation of the rule essentially "equates the terms 'action' and 'determination' in the regulation and ignores the phrase 'receipt of such determination.'" *Id.* Moreover, in an earlier dissenting opinion Judge Pollack confirmed the basic premise behind a "determination" first seen in the 1988 version of the dispute regulation:

> [t]he use of the word 'determination,' although not defined in the regulation, clearly contemplates a ***specific documentary notice*** to the [reinsurance] contractor from an official authorized to take the action. Implicitly, to trigger the 45-day response time, the notice must either directly or constructively identify the document being received by Appellant, as a determination requiring a 45-day response.

*See In re Am. Growers Ins. Co.*, AGBCA No. 98-200-F (June 15, 2000) (Pollack, J., dissenting).

In short, FCIC's position, that administrative determinations are not required for contract disputes, completely lacks merit. The plain text of the regulation belies this contention, and the AgBCA agrees with the Insurance Providers that determinations are required. Because FCIC never delivered a "determination" as required by the dispute regulation, the Insurance Providers' ARPA claims cannot be time-barred.

### 2.    The Insurance Providers Complied With § 400.169(a) Under FCIC's Analysis.

The Insurance Providers established that the alleged 45-day limit to present a claim would run in nearly all circumstances long before an Insurance Provider knew that it truly had an actual loss. (IP Opp. at 20-21.) FCIC now argues that the Insurance Providers could have submitted a claim prior to knowing the financial effects of Amendment Nos. 1 and 3 to the 1998 SRA. (FCIC Opp. at 39.) The FCIC seems to suggest that a legal "claim" is not required – that the Insurance Providers need not have incurred actual financial harm or know the extent of that

harm prior to submitting the dispute for a final determination.  In short, FCIC seems to suggest that all the Insurance Providers needed to do was to send a letter disagreeing with the implementation of Amendment Nos. 1 and 3 and that would have satisfied the requirement under § 400.169(a).

The FCIC fails to see the irony in its argument when it blithely states that "[t]he 2000 regulation places the burden upon the reinsured company to raise a dispute, if it 'believes' that FCIC has taken an action inconsistent with the SRA." (FCIC Opp. at 38.)  As the undisputed facts show, the Insurance Providers submitted written letters to the FCIC at the time they returned executed Amendment Nos. 1 and 3 to the FCIC, explicitly stating that each believed the amendments to be contrary to the SRA and unlawful and that each reserved its rights to pursue all contract based remedies. (*See* IPSOF Exs. D & E.)  If the process is as informal as the FCIC would lead this Court to believe,[19] clearly those reservation of rights letters qualify as asserting a dispute under § 400.169(a).[20]  It is undisputed that the FCIC did nothing with those letters.  It

---

[19] According to the FCIC, the intended effect of the 1995 revision to § 400.169 was to "provide reinsured companies with an ***informal reconsideration process*** through an administrative officer of FCIC and the right to appeal the administrative officer's administrative determination to the Board of Contract Appeals." 60 FR 21035-01, 1995 WL 248207 (May 1, 1995) (emphasis added), AR at 24.

[20] In *Am. Growers*, Judge Virgilio (the dissenting Judge in *ACE I* and *ACE II*) justified his conclusion that an insurance company had failed to comply with the requirements of § 400.169(a) on the basis of the company's alleged failure to object, in any way, to certain regulatory changes. *In re Am. Growers Ins. Co.,* AGBCA No. 98-200-F, at 6-7 (June 15, 2000) (noting that the insurer had not "notif[ied] the FCIC that such policies were outside of the terms and conditions of the SRA, . . . [had not] object[ed] to any payments received from the FCIC, and . . . [had not] reserv[ed] any right to seek additional compensation . . . .  The insurance company provided no indication that it believed the FCIC's actions were not in accordance with the provisions of the SRA.").  Had the reinsured company objected in writing, one can infer that Judge Virgilio would not have ruled as he did.  Moreover, in a subsequent decision dealing with the same regulatory change, Judge Westerbrook of the AgBCA refused to apply § 400.169(a) as a bar, noting that in this case the insurance company had "stated its objections in writing expressing the expectation of being held harmless for all underwriting losses suffered as a result

---

never responded. It never sought further information, and, most importantly, it never issued a determination. It did absolutely nothing.

FCIC's view of the process that the Insurance Providers should have pursued under § 400.169(a) is internally inconsistent.  On one hand, it insists a strict 45-day time limit applies. On the other, its commentary on the regulation's impact describes the process as an informal one. *See supra* n.18.  In any event, the Insurance Providers' submission of reservation of rights letters with Amendment Nos. 1 and 3 satisfies the regulatory requirements, however they are viewed.  And, FCIC cannot escape the fact that the Insurance Providers complained about the illegality of Amendment Nos. 1 and 3 when they timely returned executed versions as part of their reservations of rights.

### 3.    The AgBCA Concluded That § 400.169(a) Was Permissive And Then FCIC Amended The Regulation In An Effort To Overturn The AgBCA's Rules, Without Required Notice and Comment.

A significant complaint of the Insurance Providers is that FCIC amended § 400.169 in 2000 without providing notice and opportunity to comment, contrary to the APA.  (IP Memo at 14-16.)  FCIC's opposition argues that, since it believed the 1995 version was mandatory and the Insurance Providers should have felt the same, the 2000 revision was merely interpretive and a clarification, thus obviating the need to follow the APA.

Several of the FCIC's supporting arguments hinge on the assertion that "two" judges of the AgBCA interpreted § 400.169(a) as mandatory under the 1995 version of the regulation, the version the majority concluded was permissive.  Because of this – so the argument goes – the Insurance Providers would have been "prudent" to have filed a claim under § 400.169(a) within

---

of the rule's effect." *In re Rural Cmty. Ins. Agency, Inc.*, AGBCA No. 2000-154-F, at 5 (Feb. 12, 2002). Clearly, the Insurance Providers' reservation of rights letters meet the AgBCA's standard for registering a written objection.

forty-five days. (FCIC Opp. at 23-24.) Additionally, FCIC argues that because "two judges" of the AgBCA found the time limit in § 400.169(a) to be mandatory, its revision to the regulation in 2000 did not change anything. The FCIC's arguments are wrong.

First, FCIC misidentifies the authors of the various AgBCA opinions. It purports to "quote" Judge Houry in an opinion in the *American Growers Ins. Co.* matter, AgBCA No. 98-200-F. (FCIC Opp. at 23.) However, the quotation is actually from Judge Vergilio's opinion in that case. In his concurring opinion in *American Growers Ins. Co.*, Judge Houry merely mentions § 400.169(a) and offers no conclusion as to whether the time limit is mandatory or not. *American Growers Ins. Co.* at 22 n.2, (Houry concurring). As noted next, the majority of every AgBCA panel addressing the permissive/mandatory issue under the 1995 version of § 400.169 has held this version to be permissive, right down to *ACE I*, regardless of what individual dissenting or concurring opinions may have expressed in various cases.

Second, FCIC's argument is nothing more than a poor attempt to spin the facts to its ends. As noted in the Insurance Providers' Opposition, (IP Opp. at 25-27) the AgBCA majority had expressly held in *American Growers Ins. Co.*, Docket 99-134-F, that the 45-day time limit under the 1995 version of the regulation was not mandatory. The FCIC then scurried about and amended the regulation, changing the word "may" to "must" (among other changes).[21] It then

---

[21] In its opposition, FCIC again overlooks the other "may vs. must" issue in this case: the use of the word "may" in the dispute provision of the 1998 SRA "[t]he Company *may* appeal any actions, findings, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169." (SRA § V.L.) Mr. Ackerman had the following to say about the language the parties chose to use in the SRA: "It is fair to say that every word of the 1998 SRA was negotiated between the RMA and the Insurance Providers, particularly when it involved creating rights or obligations for one side or the other. For example, when the 1998 SRA used mandatory language (such as the use of the word 'must' in Sections V.B.1, V.B.2, V.B.5 and V.F.), it was intended that such actions be mandatory. Where the 1998 SRA used permissive language (such as 'may' in Section V.I.6, V.J., V.L., and V.Q.3), it was intended that such actions be optional." (Ackerman Decl. at ¶ 11.)

requested reconsideration in Docket 99-134-F after the regulation was hastily amended, without the required notice and comment, based on its alleged "clarification." The AgBCA fully understood what the FCIC had done, and denied the motion to reconsider. In doing so, one judge expressly recognized that the FCIC had not "clarified" the rule, but had enacted a new rule in order to overturn the AgBCA majority's decision. *See American Growers Ins. Co.* (Houry, J., dissenting). No amount of spinning and misquoting can change those facts. The revisions to the regulation in 2000 were substantive, as is demonstrated by the AgBCA's jurisdictional decision in *ACE I*. The Insurance Providers have been denied the opportunity to present their ARPA claims based solely on the language change (without notice and comment) to the regulation occurring in 2000. "Clarifications and interpretations" cannot support the denial of breach of contract claims with estimated damages of approximately $190 million.

> **D.    The Regulatory Scheme Advocated By FCIC And Partially Adopted By The AgBCA Violates The Constitution.[22]**

> **1.    The Insurance Providers Were Deprived Of Their ARPA Based Claims Without Due Process.**

In January 2000, the FCIC amended § 400.169, changing it from "permissive" to "mandatory" without notice and comment. The AgBCA's ruling effectively held that this regulatory change barred the Insurance Providers from pursuing their ARPA-based claims, thereby vitiating breach of contract claims worth an estimated $190 million.

The United States Constitution requires that due process be provided prior to a deprivation of private rights. In this case, the Insurance Providers claims were eliminated by:

- The erroneous application of a regulatory time limit made mandatory by a regulatory change that occurred without notice and comment;

---

[22] The Insurance Providers addressed this issue in greater depth earlier. (IP Memo at 32–37.)

- An erroneous conclusion, reached without a hearing or opportunity to present evidence, that Amendment Nos. 1 and 3 triggered the 45-day time period in section 400.169 and important rights could be lost;

- An erroneous contractual finding, reached without a hearing or opportunity to present evidence, that ultimately resulted in the application of a claim-barring regulatory time limit; and

- The erroneous application of a regulatory time limit without requiring strict adherence by the agency to the regulation's requirement that the time started to run upon receipt of a "determination."

The Insurance Providers had no notice of the above acts and no opportunity to be heard with respect to any of the findings.

As the United States' Supreme Court noted in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428-29 (1982), "[t]o put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner the opportunity to present his claim . . . ." Because the FCIC failed completely in this regard, the Insurance Providers were deprived of their property rights without due process, in violation of the United States Constitution.

### 2.   The Insurance Providers Were Deprived Of Their Right To An Article III Adjudication Of Their Claims.

FCIC argues that the Insurance Providers have only "public" rights, which administrative agencies can lawfully adjudicate, rather than "private" rights, which are confined to Article III adjudication. (FCIC Opp. at 55-56.)

It has long been recognized that when "the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (plurality opinion). Indeed, "when the government enters into a contract with an individual or corporation, it divests itself of its sovereign character as to that particular transaction and takes that of an

ordinary citizen and subjects itself to the same law as governs individuals under like circumstances." *United States v. A. Bently & Sons*, 293 F. 229, 235 (S.D. Ohio 1923).

Here, there is no question that the government entered into a contact, the 1998 SRA, and that it should be treated like any other private party. Accordingly, because private contract rights are at issue rather than public rights, the AgBCA's application of the FCIC's regulatory scheme to the Insurance Providers deprived them of an Article III adjudication of their ARPA-based breach of contract claims, in violation of the United States Constitution.

Finally, FCIC defends its and the AgBCA's adjudication of the Insurance Providers' ARPA claims with reference to provisions of the Contracts Disputes Act ("CDA") and its applicability to government contract claims. However, here again, the FCIC fails to appreciate significant distinctions between CDA cases and the Insurance Providers' claims. The CDA applies to a congressionally defined contract – a procurement contract – which all parties agree the 1998 SRA is not. Accordingly, the CDA has no applicability to this case and, as previously argued by the Insurance Providers, cannot provide a jurisdictional basis for AgBCA jurisdiction over the Insurance Providers' claims or authority for the AgBCA to award money damages to the Insurance Providers.

## III.    CONCLUSION.

For all of the foregoing reasons, and those contained in the Insurance Providers previously filed memoranda in this case, the FCIC's motion to dismiss or for summary judgment should be denied in its entirety and the Insurance Providers' motion for partial summary judgment should be granted.

Respectfully submitted this 20th day of July, 2007.

STINSON MORRISON HECKER LLP

By: /s/ Michael E. Tucci
    Michael E. Tucci (Bar # 430470)
    1150 18th Street, N.W., Suite 800
    Washington, D.C. 20036
    (202) 785-9100
    Fax: (202) 785-9163


P. JOHN OWEN

By: /s/ P. John Owen by Michael E. Tucci
    P. John Owen (KS Bar #11835; MO Bar #22523)
     (Pro Hac Vice)
    National Crop Insurance Services, Inc.
    8900 Indian Creek Parkway, Suite 600
    Overland Park, KS  66210
    (913) 685-2767
    Fax:  (913) 685-3080

Counsel for All Plaintiffs


MICHAEL J. DAVENPORT

By: /s/ Michael J. Davenport by Michael E. Tucci
    Michael J. Davenport (IA Bar # 45345)
    Rain and Hail L.L.C.
    9200 Northpark Drive, Suite 300
    Johnston, IA  50131-3006
    (515) 559-1000
    Fax:  (515) 559-1001

Additional Counsel for Plaintiff ACE Property &
Casualty Insurance Company

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July, 2007, a copy of the foregoing Reply to Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment was sent via the Court's Electronic Case Filing notification system to the following:


Jane W. Vanneman, Esq.
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Room 12010
Washington, D.C. 20005

Peter Smith
Assistant U.S. Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4224
Washington, D.C. 20530


/s/ Michael E. Tucci
Michael E. Tucci