IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ACE PROPERTY & CASUALTY )
INSURANCE COMPANY (f/k/a CIGNA )
PROPERTY & CASUALTY INSURANCE CO.), )
ET AL. )
 )
v. ) Civil Action No. 1:06cv01430 RMU
 )
FEDERAL CROP INSURANCE )
CORPORATION, A CORPORATION WITHIN )
THE UNITED STATES DEPARTMENT OF )
AGRICULTURE )
 )
Defendant. )
_____ )

### DECLARATION OF KENNETH D. ACKERMAN

I, Kenneth D. Ackerman, do depose and state as follows:

1. My name is Kenneth D. Ackerman. I am over the age of eighteen, have personal knowledge of all matters testified to herein, and am otherwise competent to testify.

2. I currently am counsel to the law firm of Olsson, Frank and Weeda, P.C., in Washington, D.C., and reside in Falls Church, Virginia. Before joining Olsson, Frank and Weeda, P.C., in 2001, I worked at the United States Department of Agriculture ("USDA") from 1993 through 2001. During this period, I served as Manager of the Federal Crop Insurance Corporation ("FCIC") and, in addition, I served as Administrator of USDA's Risk Management Agency ("RMA") from the time it was created as a separate agency in 1997 until the time I left USDA in 2001. Then as now, RMA operated the Federal crop insurance program on behalf of the FCIC. Both agencies, the FCIC and RMA, were created pursuant to the Federal Crop

Insurance Act, as amended, 7 U.S.C. § 1501 *et seq.* ("FCIA"). My government service prior to 1993 includes: Counsel to the U.S. Senate Committee on Governmental Affairs (1975-1981), various senior legal positions at the Commodity Futures Trading Commission (1981-1988), and Special Counsel to the U.S. Senate Committee on Agriculture, Nutrition, and Forestry (1988-1993).

3. My declaration is based on my personal knowledge and experiences as RMA Administrator and Manager of FCIC, and actually running the Federal crop insurance program. Pursuant to the FCIA, FCIC's Manager is that agency's chief executive officer. My duties at RMA and FCIC during 1993-2001 involved administering the Federal crop insurance program subject to the directions of the Secretary of Agriculture, the Under Secretary for Farm and Foreign Agricultural Services, the Deputy Under Secretary for Farm and Foreign Agricultural Services, and the FCIC Board of Directors. My experiences in this role included negotiating Standard Reinsurance Agreements (SRAs) in 1994 and 1997 with approved insurance providers ("Insurance Providers"), their managing general agents, and their representatives. The SRA negotiated in 1994 became known as the " 1995 SRA" because the first reinsurance year it covered ran from July 1, 1994 through June 30, 1995. The SRA negotiated in 1997 became known as the "1998 SRA" because the first reinsurance year it covered ran from July 1, 1997 through June 30, 1998. My experiences also included requiring Insurance Providers either to accept Mandatory Amendment Nos. 1 and 3 to the 1998 SRA or to have their SRAs terminated.

4. I have been asked by the Insurance Providers to review some of the briefs filed in this case, including FCIC's most recent filing entitled "Respondent's Opposition to Petitioner's Motion for Partial Summary Judgment" ("FCIC Opposition") and FCIC's "Motion To Dismiss and/or for Summary Judgment" ("FCIC Motion"). My comments below focus on

the FCIC Opposition; however, in one instance, it is appropriate to relate my comments on the FCIC Opposition to a similar passage in the FCIC Motion.

5.  As a general matter, I observe that the FCIC Opposition presents an inaccurate and incomplete explanation of SRAs in general and the 1998 SRA in particular. Thus, I offer an introductory explanation of federal reinsurance and an overview of SRAs to place my more specific observations in context.

6.  Federal crop insurance started in the 1930s. When the FCIA was amended in 1980 to create the modern version of the program, a key feature was introducing private sector participation in selling and servicing Federal crop insurance policies. By the 1990s, a full-fledged public-private partnership had developed. On the public side of the equation, FCIC provided reinsurance to the private sector participants, subsidized administrative and operating costs of Insurance Providers and a portion of premiums paid by farmers, and (along with RMA) regulated and supervised the program. On the private side, the Insurance Providers sold policies to farmers, assumed risks associated with those policies (to the extent not shared with FCIC or reinsured by commercial reinsurers), adjusted loss claims, and paid insured losses. By the time that the 1998 SRA was negotiated, the Insurance Providers wrote virtually all Federal crop insurance sold in the United States, and FCIC acted as their principal reinsurer.

7.  Federal reinsurance is permitted under Section 508(k) of the FCIA, 7 U.S.C. § 1508(k). As Administrator of RMA and FCIC Manager, one of my principal duties was to utilize this authority in establishing the actual terms and conditions of reinsurance, a task we accomplished periodically by developing a draft SRA and then negotiating with Insurance Providers to reach a final, definitive agreement.

8. Negotiating an SRA is far from a simple or easy task. Before determining the final content of a proposed SRA, RMA would convene internal working groups to study key issues and to develop proposed positions. We then would obtain input from other portions of USDA (including departmental officers senior to me) and from outside USDA (especially the Office of Management and Budget). This process was a lengthy one, often consuming several months before we were ready to propose a draft SRA to the private sector Insurance Providers. Once proposed, the negotiating process would begin. That, too, could be lengthy, as illustrated by negotiation of the 1998 SRA. As I recall, we first proposed our version of the 1998 SRA to the Insurance Providers in early spring 1997, and we did not complete negotiations until late summer 1997. Far from a simple or easy task, negotiating a new SRA can be cumbersome, time consuming, and controversial. It certainly is not an endeavor that I would (or did) undertake annually or lightly while running the Federal crop insurance program.

9. Anticipating that any new SRA would remain in effect for several years, we at RMA, in developing each potential SRA proposal, used sophisticated computer models to project gains and losses that would be generated under it for several years into the future, factoring in the impact of terms such as gain and loss-sharing formulae, fee and expense levels, and so on. Participating insurance companies used similar multiyear projections in developing their responses to SRA proposals as an essential part of the negotiating process. During the 1997 process, for instance, we recognized that the prior "1995 SRA" deliberately had been left in place for three full years before cancellation to provide a period of stability for companies to regain their financial footing after large losses associated with the historic 1993 Midwest flood. Both sides anticipated that the new SRA would remain in effect several years as well. There is strong logic behind this multiyear approach. Gains and losses in crop insurance – which

ultimately are driven by annual fortunes of crop production by farmers - can be highly volatile year to year. Several years of good crops can be followed unexpectedly by a single-year catastrophic loss, such as the historic drought of 1988 or the flood of 1993. FCIC consistently uses long, multiyear series of data to build stability into many elements of the program. For instance, it sets premium rates for farmers typically based on twenty years of gain and loss experience. This same logic applies to an SRA negotiated with participating companies, building a multiyear horizon into its basic financial terms to assure financial and operational stability.

10. When the 1998 SRA was being negotiated between the FCIC and the Insurance Providers in 1997, I led the agency's efforts to develop a proposed form of SRA. Once we completed our development of it, I led the agency's presentation of the new SRA to the Insurance Providers. When it became clear that the negotiations would become lengthy and controversial, we decided internally at USDA to designate a lead negotiator from RMA and to establish a policy committee to which he would report for negotiating directives on behalf of the government. We selected Tim Witt, one of our Deputy Administrators, to take the lead interfacing with the private sector. Mr. Witt reported to me and to the policy committee, of which I was a member.

11. It is fair to say that every word of the 1998 SRA was negotiated carefully and deliberately between the RMA and the Insurance Providers, particularly when it involved creating rights or obligations for one side or the other. For example, when the 1998 SRA used mandatory language (such as the use of the word "must" in Sections V.B.1, V.B.2, V.B.5, and V.F.), it was intended that such actions be mandatory. Where the 1998 SRA used permissive

language (such as "may" in Section V.I.6, V.J., V.Q.3, and V.L.), it was intended that such actions be optional.

12. I understand the attorneys for FCIC are now arguing that the 1998 SRA is not a continuous contract, but instead is a series of one year contracts. In my view, that argument is without any basis in fact and contradicts the nature of the document. As explained below, as a government official intimately involved in the negotiation of the 1998 SRA on behalf of the FCIC, it was clearly intended and understood that the 1998 SRA be a continuous contract that could be used as a basis for planning both by participating companies and FCIC, as well as by USDA budget officials, until cancelled through the normal 180-day pre-notification process.

13. FCIC's position in this suit that the 1998 SRA was not a continuous contract is flawed on many levels. To explain this, I start with our general intent, then turn to the SRA's terms and structure, and finally explain the inaccuracy of undocumented assertions made in the FCIC Opposition.

14. The fact that the 1998 SRA was intended to be a continuous contract, not a series of one year contracts, was addressed specifically in the negotiations, and both the government and the Insurance Providers unequivocally required that the 1998 SRA be continuous to protect their interests. The text of SRA Section V.M. was agreeable to both sides without any controversy, stating specifically: "This Agreement will continue in effect from year to year with an annual renewal date of July 1 of each succeeding year unless FCIC gives at least 180 days advance notice in writing to the Company that the Agreement will not be renewed." Without a multiyear agreement, the government itself felt that it could be exposed to greater risk, such as, for instance, if the Insurance Providers experienced large losses in a particular year and then refused to execute a new SRA for the following year without first renegotiating

the financial terms in Section II. Similarly, because the underlying individual crop insurance policies sold to farmers (and reinsured under the SRA) are themselves continuous contracts, the Insurance Providers faced disruption without continuous reinsurance to support them. Not only does the financial exposure of these policies roll over automatically from year to year, but operational necessities also overlap from one reinsurance year into the next. Policies are sold across the country and have widely different terms and cycles based on local conditions -- geographic, climate, and crop plantings. For instance, crops planted in the summer or fall have drastically different renewal, planting, reporting, and cash flow timetables from crops planted in the spring. Failure to have a continuous SRA would create annual gaps and uncertainties throughout this system.

15. The 1998 SRA's terms reinforce this point by structuring many of its operational procedures on a cross-year and multi-year basis that is incompatible with a series of one year contracts. I already have referenced Section V.M., which provided for a continuous contract. Other examples of 1998 SRA terms indicating that it was a multi-year contract are: the annual settlement process and gain/loss allocations based on successive reinsurance years (Sections II.B., C., and D.); the requiring of Insurance Providers to meet continuing financial covenants (Section II.A.8.a.) and to update operating plans for FCIC review (Section V.G.1.); and the provisions providing for termination for cause and convenience of the government that are very important in a continuous contract, but relatively unimportant for one of a year's duration (Section V.K.).

16. I view the "continuous contract" issue now disputed by FCIC in a direct and personal context. I was the RMA Administrator and FCIC Manager with authority to give 180 days written notice of termination of the 1998 SRA in accordance with Section V.M. Whether

directed to terminate the SRA by a superior at USDA (such as the Under Secretary) or terminating it on my own initiative, I would have been, from 1993 to 2001, the person to effect termination by giving notice. The only SRAs I ever terminated while at RMA were the predecessor to the 1995 SRA (with notice given in December 1993) and the 1995 SRA negotiated in 1994 (with notice given in December 1996). I never terminated the 1998 SRA from its inception on July 1, 1997, through my departure from RMA on January 20, 2001. Bluntly put, as RMA Administrator and FCIC Manager, I would know when we changed from one SRA to another. That only happened twice in my nearly eight years in office, and it never occurred with respect to the 1998 SRA. I have continued to follow the Federal crop insurance program since leaving government service, and I can state the SRA we negotiated in 1997 was not terminated until December 2003. Thus, the 1998 SRA was a single continuous contract in existence from July 1, 1997 through June 30, 2004.

17. With the foregoing paragraphs in mind, I now turn to specific assertions at pages 4-5 of the FCIC Opposition, where one paragraph caught my attention:

> Petitioners' arguments concede one important point – they characterize the SRAs as "negotiated" – which is accurate in many, but not all, respects. Each annual SRA is a separate contract, effective for one reinsurance year (July 1 through June 30). However, the SRA does not become effective until FCIC approves the company's annual Plan of Operations ("Plan"). The company can change its Plan of Operations each reinsurance year, substantially affecting the financial terms of the SRA. For example, each reinsurance year, the company can change its insurance fund designations and risk allocations, the states in which it intends to write business, and whether it will offer privately submitted and approved plans of insurance. FCIC must agree to accept the company's terms in the Plan of Operations that affect the relative risk borne by the parties.

I first note that FCIC has not cited any documentation for its assertions in these two paragraphs. Nor does this argument reflect the reality of the process for reviewing and adjusting Plans of Operation year by year. There should be no support of any nature available for most of its

assertions since I can state, based on my personal knowledge and experience, that key assertions are factually erroneous.

18.  The 1998 SRA was a thoroughly negotiated agreement. I do not believe that there were any exceptions, although FCIC suggests there were. *See* ¶ 17.

19.  FCIC erroneously states: "Each annual SRA is a separate contract, effective for one reinsurance year (July 1 through June 30.") *See* ¶ 17. This is untrue, as only a single SRA existed from July 1, 1997 through June 30, 2004. *See* ¶ 16. Rather, with specific regard to the process for annual Plans of Operation (section G.1.a.), the SRA states: "This Agreement [that is, the original 33-page "1998 SRA" signed in 1997] becomes effective with respect to any reinsurance year upon approval of the Company's Plan of Operation by FCIC." As a factual matter not in dispute, the Plans of Operations for each company involved in the present litigation were, in fact, approved by FCIC for each year during this period, making the "1998 SRA" effective for each of those years. Similarly, I note the definition of "Agreement" in Section I of the SRA document:

> "Agreement" means this Standard Reinsurance Agreement, all Appendices, [and] all referenced documents including Manual 13 and the approved Manual 14.

This language denotes a single document executed by the parties for the duration of the SRA (*i.e.*, the 33 pages of SRA text followed by signature lines) and components for annual updating. One of these annual components is the annual Plan of Operations ("Plan") required under SRA Section V.G.1 which, by the SRA's own terms, "is incorporated in this Agreement by reference." *See* Section V.G.1.d. The Plan, therefore, does not and cannot constitute a new, separate SRA.

20.     FCIC claims: "The company can change its Plan of Operations each reinsurance year, substantially affecting the financial terms of the SRA." This is simply wrong. No annual Plan can alter the SRA's financial terms. In fact, the contrary proposition is true – Plans do not change the SRA's financial terms. Those terms were established in the 1997 negotiations, were standard, and did not differ on a company-by-company basis. The 1998 SRA's key financial terms include: allocations of underwriting risks (Sections II.B. and II.C.), allocations of underwriting gains (Section II.D.), subsidies for administrative and operating expenses (Section III.), and payment of loss adjustment expenses (Section IV.). These terms did not change from year to year (excepting the congressionally mandated changes effected through Mandatory Amendment Nos. 1 and 3 in 1998 and 2000).

21.     The FCIC, in the paragraph quoted above from the FCIC Opposition, cites three examples of items covered in a Plan: the individual company's choices of (a) states in which to write business, (b) funds in which to place risk allocations, and (c) whether to offer privately submitted plans of insurance. All three of these, however, are points on which the SRA, in its text, has granted flexibility to the companies under its express contractual terms. The Plan itself does not change any of those underlying SRA contractual terms. In fact, fund designations are not a function accomplished by the Plan at all. Rather, fund designations are made on an insurance policy-by-policy basis at various times throughout a reinsurance year as policyholders either renew their coverage or book new coverage. *See, e.g.*, SRA Sections II.B.1.b. and II.B.2.c. What the Plan does accomplish on this subject is to memorialize each Insurance Provider's intent regarding aggregate designations to funds on a state-by-state basis, which may or may not be made as it proceeds to book business during the year. By contrast, the SRA itself establishes overall caps for designations to the Assigned Risk and Developmental Funds, creating limits

within which each company must operate in using these funds. *See, e.g.*, SRA Sections II.B.1.d. and II.B.2.d. As a factual matter, risk allocation limits are not made in the Plan, but are specified for all Insurance Providers in the text of the SRA. Finally, FCIC is simply incorrect in its assertion that a Plan must state whether an Insurance Provider "will offer privately submitted and approved plans of insurance." That is a topic not covered by the Plan. *See* Appendix 2 to 1998 SRA. Instead, it is addressed in Section II.A.2. of the SRA.

22. The Plan of Operations is a series of reports, certifications, and informational material provided through a transmittal letter from an Insurance Provider. Once RMA has completed its review of a proposed Plan, it generally sends a letter to the Insurance Provider stating that the Plan is approved with conditions or without conditions. If RMA determines that a company, in its proposed Plan, has not justified its proposed level of business (usually stated in terms of dollars of premium to be written and reinsured), RMA typically will adjust that level, usually in consultation with the company. This is not a renegotiation of the underlying SRA, all of whose terms remain in effect. It is simply an annual operational adjustment in authorized premium volume.

23. To reiterate the fundamental point, it is an incorrect statement that a Plan of Operation can change the terms of the underlying SRA. The Plan simply implements the previously negotiated SRA for a given year. To underscore this point, I have summarized my review of the 1998 SRA's Appendix 2, which sets forth the required parameters of the annual Plan. Appendix 2 requires that, as its Plan of Operations, each company must provide RMA with twenty-eight items of information in a specified order and format. Items 1 – 8 focus on names, addresses, contract information, and identification of key company offices and officials. Items 9 – 16 are financial in nature, designed to provide RMA with the data it needs to determine

whether the Insurance Provider is financially capable of writing as much premium volume as it proposes, given the fund designations, in the aggregate, it expects to make. Items 17 – 19 concern payment mechanisms for monetary transfers, including identification of banking accounts to facilitate payment of indemnities to insureds. Item 20 requires various reports on the Insurance Providers' reportable expenses. Item 21 requires information with respect to an Insurance Provider's plans to reinsure any portion of its retained risk in the commercial reinsurance market. Items 22 – 24 require the Insurance Providers to update its plans that relate to servicing of policies and maintaining quality control. Items 25 – 28, the final matters covered by the Plan, require the Insurance Providers to submit assurances or certifications regarding procurement integrity, the maintenance of a drug free workplace, compliance with lobbying restrictions, and enforcement of anti-discrimination rules. Both the SRA text and Appendix 2 make it clear that the Plan is not the reinsurance agreement, but is a separate functional tool for assisting RMA in overseeing and managing the reinsurance program on a continuing basis.

24. In making the foregoing statements, I have not disclosed any legal advice or counsel provided to RMA or FCIC in negotiating the 1998 SRA, or internal deliberations of the policy committee referred in paragraph 10. Instead, I have stated factual matters and the ultimate position of RMA based on my dual roles in 1997 as Administrator of RMA and FCIC Manager.

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing statements are true and correct pursuant to 28 U.S.C. § 1746.

*[signature]*  July 17, 2007

Kenneth D. Ackerman