ATTACHMENTS

## Attachments

A.  Letter, June 30, 1997, from Morrison and Hecker, to Mr. Thomas Lederer, Special Assistant to Under Secretary and Mr. Tim Witt, RMA, Research and Development Division

B.  Handwritten notes, August 21, 1997, written by Kenneth Ackerman, edit by Office of General Counsel and sent to Tim Witt

C.  Manager's Bulletin No.: MGR-98-020, July 30, 1998, From Kenneth Ackerman to All Reinsured Companies, All Risk Management Field Offices, All Other Interested Parties

D.  Fax Transmission, June 26, 1997, from Butch May to Tim Witt, Informational Memorandum for the Secretary, FCIC's 1998 Standard Reinsurance Agreement, with attached Information Memorandum from Dallas R. Smith, Acting Under Secretary for Farm and Foreign Agricultural Services, June 25, 1997, and Draft

E.  Letter, June 10, 1997, from Rain and Hail, Mr. J. H. Joyce, President, to Mr. Tim Witt, Acting Director, Research & Development, RMA

F.  Memorandum, November 4, 1996, from Robert Vancrum, Morrison & Hecker, to Robert Parkerson, President of NCIS, re "Summary of Significant Changes in Industry Draft - 1998 SRA

A

**MORRISON & HECKER** L.L.P.

ATTORNEYS AT LAW

9 Corporate Woods, 9200 Indian Creek Parkway, Suite 450
Overland Park, Kansas 66210-2008
Telephone 816-691-2600
Telefax 913-451-6352

Robert J. Vancrum
Direct Dial: 913-344-8039

June 30, 1997

Mr. Thomas Lederer
Special Assistant to the Under Secretary
United States Department of Agriculture
Administration Building, Room 205-E
14th Street & Independence Avenue, S.W.
Washington, D.C. 20250

Mr. Timothy Witt
Risk Management Agency, Research and
Development Division
Farm Service Agency
United States Department of Agriculture
9435 Holmes
Kansas City, Missouri

Dear Mr. Witt and Mr. Lederer:

I am writing as general counsel of National Crop Insurance Services, Inc. ("NCIS"), which as you know, is a trade association that comprises all of the holders of the 1997 Standard Reinsurance Agreement. As you also know, NCIS' President, Bob Parkerson, wrote to you on June 9, 1997, and indicated that in light of the fact that the new SRA would clearly not be agreed to by the date of the expiration of the current SRA, the companies would, nevertheless, continue to write coverages for periods extending beyond June 30, 1997, and would accept the terms of the 1997 SRA for this gap period until the 1998 SRA has been agreed to by the companies. Your response was that you would agree only to reinsure and provide premium subsidy for periods commencing July 1, 1997, and thereafter on the terms which are eventually agreed to in the 1998 SRA.

I am writing to inform you that is unacceptable to those private insurers that are writing federally reinsured crop insurance. I would remind you that by law, the Crop Insurance Program is a mandatory program which your Agency must provide. Your Agency has no authority to close down the program and certainly has no authority to unilaterally impose any terms and conditions of reinsurance on the private industry. It is NCIS' continuing position that the terms of the most recent 1997 SRA will apply to contracts written between June 30, 1997, and the time



Mr. Thomas Lederer
Mr. Timothy Witt
June 30, 1997
Page 2

the 1998 SRA is accepted by a proposed standard reinsurance agreement holder. Each individual company, of course, has the discretion to decide to accept other terms, but absent such agreement, your Agency is obligated to continue to provide reinsurance on the terms and conditions established in the 1997 SRA, with the sole exception being changes in those terms mandated by federal law.

No response is necessary unless you have reconsidered the position taken in your previous response to Mr. Parkerson.

Very truly yours,

MORRISON & HECKER L.L.P.

Robert J. Vancrum

RJV:jsd

cc:   Robert Parkerson

RJVAN1VK.CWD/jsd

B

**UNITED STATES DEPARTMENT OF AGRICULTURE**
RISK MANAGEMENT AGENCY
1400 INDEPENDENCE AVE., S.W., STOP 0801
WASHINGTON, D.C. 20250-0801

**OFFICE OF THE ADMINISTRATOR**

Export

If the ~~Appropriations of~~ Agricultural and Related Agencies Appropriations Act ~~for first you~~ 1998 provides an amount that would support a level of A—E—R— greater than 26%, then the FCIC ~~will~~ adjust the percentage levels in half-point increments, to a level ~~that~~ reflecting the appropriated amount, not to exceed 27%. In ~~so~~ doing, and ~~because~~ the FCIC would reduce the amount provided under Sec. ____ for EXLAE proportionally such that the ~~total~~ of A—E—R— plus the following EXLAE ~~is a weighted~~ fully average ~~you~~ would not exceed 27% of ~~net~~ book premium.

OGC/KA
Washington
Aug. 21

**B**

C



| United States | Risk | Office of | Washington, D. C. |
| Department of | Management | the | 20250 |
| Agriculture | Agency | Administrator | |

file
98 SRA

## BULLETIN NO.: MGR-98-020

TO:       All Reinsured Companies; **OVERNIGHT MAIL**
           All Risk Management Field Offices
           All Other Interested Parties

FROM:     Kenneth D. Ackerman           JUL 30 1998
              Administrator

SUBJECT: Revised Amendment No.1 to the 1998 SRA to Implement the 1998 Research Act

## BACKGROUND:

On June 30, 1998, the Federal Crop Insurance Corporation (FCIC) issued MGR-98-018 and Amendment No. 1 to the 1998 Standard Reinsurance Agreement (1998 SRA) to implement changes required by Subtitle C of the Agricultural Research, Extension, and Education Reform Act of 1998 (1998 Research Act). The crop insurance industry requested additional time to sign and submit the amendment so that several issues regarding the administration of changes under the 1998 Research Act could be clarified. On July 22, 1998, FCIC officials met with the Industry Steering Committee to discuss the outstanding issues and the following was decided:
1) FCIC will collect administrative fees after it is notified that policyholders are indebted for non-payment of administrative fees and declared as such through the Ineligible Tracking System; and
2) Eligible crop insurance contracts for which fees are due shall be terminated due to indebtedness effective for the crop year following the termination date used to determine the policyholder's ineligibility.

## ACTION:

Attached are two copies of the revised Amendment No. 1 to the 1998 SRA which must be executed for FCIC to provide reinsurance and subsidy in the 1999 and subsequent reinsurance years. Each copy must be signed as an original and returned to FCIC at the address shown below via overnight mail within 10 business days after receipt. The amendment should be signed by the person authorized by the reinsured company's Board of Directors to enter into the SRA.

OVERNIGHT MAIL:         USDA/Risk Management Agency
                        Reinsurance Services Division
                        E. Heyward Baker, Director
                        1400 Independence Avenue, SW
                        Stop Code: 0804; Room 6727-S
                        Washington, DC 20250
                        Phone: (202) 720-4232

Failure to execute the amendment will terminate your Standard Reinsurance Agreement as of the end of the 1998 reinsurance year (June 30, 1998)

Attachments (2)



1998 Standard Reinsurance Agreement
(Rev. 7/29/98)

# AMENDMENT NO. 1 TO THE
# 1998 STANDARD REINSURANCE AGREEMENT

The Standard Reinsurance Agreement between the Federal Crop Insurance Corporation and the undersigned Company is hereby amended for the 1999 and subsequent reinsurance years, as follows:

(I) Section III.A.2. is amended to read as follows:

2.    A&O subsidy for eligible crop insurance contracts will be determined as set forth below and will be paid to the Company on the monthly summary report after the Company submits, and FCIC accepts, the information needed to accurately establish the premium for such eligible crop insurance contracts.  Notwithstanding the provisions of this section, under no circumstances will A&O subsidy be paid in excess of the amount authorized by statute.

   a.    For any eligible CAT crop insurance contract, zero percent of net book premium.

   b.    For eligible crop insurance contracts that provide coverage under GRP, 22.7 percent of the net book premium attributed to such eligible crop insurance contracts.

   c.    For revenue insurance plans that can increase liability whenever the market price at the time of harvest exceeds the market price at the time of planting, 21.1 percent of the net book premium attributed to such eligible crop insurance contracts; and

   d.    For revenue insurance plans that can not increase liability whenever the market price at harvest exceeds the market price at the time of planting, 24.5 percent of the net book premium attributed to such eligible crop insurance contracts, not to exceed the amount that would have been paid had each eligible producer purchased limited or additional coverage under an insurance plan that insures loss of individual yield; and

   e.    For all other eligible crop insurance contracts, 24.5 percent of the net book premium attributed to such eligible crop insurance contracts.

(II) Section III.B. is amended to read as follows:

B.    The Company shall remit to FCIC, in accordance with Manual 13, the following administrative fees collected from eligible producers:

   1.    For CAT:

      a.    Basic fee:  the greater of $50 or 10 percent of the net book premium for each eligible crop insurance contract; and

      b.    Additional fee:  $10 for each eligible crop insurance contract.

      c.    In the event the eligible producer is a limited resource farmer as defined in 7 C.F.R. 400.651, the Company shall submit the required information to FCIC in

accordance with Manual 13 and FCIC shall waive the appropriate fee on the monthly summary report.

2.     For limited coverage:

    a.     $50 per eligible crop insurance contract, not to exceed $200 per county and $600 for all counties combined for each eligible producer.

    b.     In the event the eligible producer is a limited resource farmer as defined 7 C.F.R. 400.651, the Company shall submit the required information to FCIC in accordance with Manual 13 and FCIC shall waive the appropriate fee on the monthly summary report.

3.     For additional coverage, an additional fee of $20 per eligible crop insurance contract.

(III) Section IV is amended to read in its entirety as follows:

FCIC will pay to the Company an amount equal to 11.0 percent of the total net book premium for eligible CAT crop insurance contracts. The loss adjustment expense specified in this section will be included in the monthly summary report containing the data obtained from acreage reports that have met the processing provisions specified in Manual 13.

(IV) Section V.B.4. is amended to read as follows:

4.     Producer premiums and administrative fees collected by the company must be reported as follows:

    For CAT crop insurance contracts, all administrative fees must be reported on the monthly summary report following the month containing the termination date.

    For all other crop insurance contracts, producer premiums and all administrative fees must be reported on the monthly summary report for the earlier of the month following the date of collection or the month following the month containing the billing date if uncollected.

(V) Section V.B.9. and 10. are added to read as follows:

9.     Policyholders who do not pay administrative fees on or before the applicable termination date are ineligible because of indebtedness and the Company shall report such via the Ineligible File Tracking System. Administrative fees payable by such policyholders will offset the total fees reported in accordance with Section V.B.4. Crop insurance contracts shall be reported as terminated for indebtedness effective for the crop year immediately following the termination date used to determine the policyholder's status of eligibility.

10.     If the Company terminates the policy due to the non-payment of administrative fees and reports such to FCIC through Ineligible Tracking System, FCIC will perform debt collection activities for administrative fees which are due from indebted policyholders.

2

The undersigned Company representative acknowledges that the Company's Board of Directors has authorized the Company to enter into this Amendment of the 1998 Standard Reinsurance Agreement.

## APPROVED AND ACCEPTED

### for

**FEDERAL CROP INSURANCE CORPORATION**　　　**THE COMPANY**

_____　　　_____
*Signature*　　　　　　　　　　　　　　　　　　*Signature*

_____　　　_____
*Name*　　　　　　　　　　　　　　　　　　　　*Name*

_____　　　_____
*Title*　　　　　　　　　　　　　　　　　　　　*Title*

_____　　　_____
**Date**　　　　　　　　　　　　　　　　　　　**Date**

D

_ Pow/Fco/Nu/Dit/Tot — RVI
_ Pile              2 6/26

# FAX TRANSMISSION

### U. S. DEPARTMENT OF AGRICULTURE
### FARM AND FOREIGN AGRICULTURAL SERVICES
14TH AND INDEPENDENCE AVE., S.W.
JAMIE L. WHITTEN OFFICE BUILDING
ROOM 205-E
WASHINGTON, DC 20250-0105
(202) 720-3111
FAX: (202) 720-8254

| | | | |
|---|---|---|---|
| **To:** | Tim Witt | **Date:** | June 26, 1997 |
| **Fax #:** | 816-926-1803 | **Pages:** | 3, including this cover sheet. |
| **From:** | Butch May (202) 690-4653 | | |
| **Subject:** | Informational Memorandum for the Secretary FCIC's 1998 Standard Reinsurance Agreement | | |

**COMMENTS:** FYI



06/28/97   THU 12:13 FAX 202 720 8254        USDA-FFAS                                    ☑002



**DEPARTMENT OF AGRICULTURE**
OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20250

## INFORMATION MEMORANDUM FOR THE SECRETARY

FROM:          Dallas R. Smith                               JUN 25 1997
               Acting Under Secretary for Farm and
               Foreign Agricultural Services

SUBJECT:       FCIC's 1998 Standard Reinsurance Agreement

### ISSUE:

The status of the Federal Crop Insurance Corporation's (FCIC) 1998 Standard Reinsurance
Agreement (SRA) currently being negotiated with the private insurance companies.

### DISCUSSION:

A new draft SRA will be sent to companies on June 26 with the understanding that they will have
2 weeks to review and respond. The draft recognizes responses to comments received directly
from crop insurers and other interested parties as well as comments made during various meetings
of crop insurance industry workgroups attended by Risk Management Agency (RMA) and other
USDA personnel. SRA issues break down into the four following areas:

  1. Risk sharing;
  2. Administrative and operating (A&O) subsidy;
  3. Operations; and
  4. Program integrity.

Most operational issues have been resolved. Reasonable proposals are being presented in the
draft on two key monetary issues, risk sharing and A&O subsidy. These issues are expected to
require additional discussions before finalization of the SRA.

**Risk Sharing**

The draft SRA provides three Commercial and Developmental Funds in each State--one of each
for Catastrophic Risk Protection (CAT), revenue insurance, and all other limited and additional
coverage policies. It also provides one Assigned Risk Fund in each State, which will be used to
accommodate all types of policies.

AN EQUAL OPPORTUNITY EMPLOYER

INFORMATIONAL MEMORANDUM                                                              2

The three groups of funds play the following roles in creating an orderly marketplace for crop insurance products:

- The Commercial Funds require the companies to take large risks in order to earn comparable gains.  These Funds assure that companies take risk to the maximum extent practicable.

- The Developmental Funds allow the companies to reduce the risks that they take, but also reduce their chance for gains proportionately.  These funds provide a relief valve so that companies writing in higher risk, or marginal areas of the country can continue to participate in the FCIC program.

- The Assigned Risk Fund substantially limits the risk imposed on companies and also limits the chance for gain proportionately.  This Fund assures that FCIC's social mission of serving all farmers, all crops, and all areas can be achieved.

The actual risk sharing parameters used for each of these funds will be specified in the draft, but it is expected that these numbers will be among the last items to be settled in the negotiations. Greater risk sharing parameters for revenue products, such as Crop Revenue Coverage (CRC), are also under discussion.  Under the above scenarios, the draft reflects a significant reduction in gains from those paid to companies in prior years.

## A&O Subsidy

A&O subsidy payments are proposed, consistent with the President's budget, to be a percentage of premium as follows:

| | |
|---|---|
| Crop Revenue Coverage (CRC) | 21 percent of total CRC premium |
| Revenue Assurance (RA) | 24.5 percent, not to exceed MPCI comparable |
| Group Risk Plan (GRP) | 22.5 percent |
| All others (except CAT) | 24.5 percent |

The 24.5 percent reimbursement rate shown for "all others" is the benchmark used to set the A&O subsidy rate for other policies.  For certain revenue products (CRC) or the Group Risk Plan, this continues to be an item of some contention and is expected to be one of the last items agreed upon.

Companies will continue to receive loss adjustment allowances for CAT policies as in the past and all limited and additional coverage policies, except GRP, may be paid up to 3 percent for excess loss adjustment expenses if loss ratios exceed certain specified thresholds.

Although, our expectations are for funding levels as found in the President's budget, the above remains subject to appropriations action on the part of the Congress.

## INFORMATIONAL MEMORANDUM                                                    3

### Operations

The SRA addresses several detailed issues as well as several others of more general interest.  For example, it defines the companies' obligations under USDA's non-discrimination policy.  It also requires companies to write all plans of insurance, except those approved under section 508(h) of the FCIC Act, in any State in which they operate and to insure all applicants for all crops in such States.

### Program Integrity

Companies are required to perform certain duties under the SRA and comply with the rules and regulations of the FCIC.  The proposed liquidated damages section contained in the first draft was a lightening rod for company complaints.  It has been replaced with a "failure to perform or comply" approach that allows FCIC to terminate or suspend an SRA in the most serious cases and/or to charge the companies specified amounts for failure to perform at agreed upon levels.  We believe these requirements will now not likely be a serious obstacle to completing negotiations.

### Summary

Discussions will continue after the issuance of the new draft, with the objective of coming to closure by mid-July.



| United States | Risk | Research | P.O. Box 419293 |
| Department of | Management | and | Kansas City |
| Agriculture | Agency | Development | Missouri 64141 |

## INFORMATION MEMORANDUM FOR THE SECRETARY

FROM:     Dallas R. Smith
          Acting Under Secretary for
          Farm and Foreign Agricultural Services

**DRAFT**

SUBJECT:     FCIC's 1998 Standard Reinsurance Agreement

## ISSUE:

The status of the Federal Crop Insurance Corporation's (FCIC) 1998 Standard Reinsurance Agreement (SRA), which is currently being negotiated with the private insurance companies.

## DISCUSSION:

A new draft SRA will be sent to companies during the week of June 23. The draft recognizes responses to comments received directly from crop insurers and other interested parties as well as comments made during various meetings of crop insurance industry workgroups, at which Risk Management Agency (RMA) and other USDA personnel attended. The SRA issues break down into four areas, which are:

1. Risk sharing;
2. Administrative and operating (A&O) subsidy;
3. Operations; and
4. Program integrity.

Most operational issues have been resolved. Reasonable proposals are being presented in the draft on two key monetary issues, but these are expected to require additional discussions before the SRA is finalized.

### Risk Sharing

The draft SRA provides three Commercial and Developmental Funds in each State--one of each for Catastrophic coverage policies (CAT), revenue insurance policies, and all other limited and additional coverage policies. It provides one Assigned Risk Fund in each State, which will be used to accommodate all types of policies.

The three groups of funds play the following roles in creating an orderly marketplace for crop insurance products:

• The Commercial Funds require the companies to take large risks in order to earn comparable gains. These Funds assure that companies take risk to the maximum extent practicable.

**AN EQUAL OPPORTUNITY EMPLOYER**

INFORMATIONAL MEMORANDUM  2

- The Developmental Funds allow the companies to reduce the risks that they take, but also reduce their chance for gains proportionately. These funds provide a relief valve so that companies writing in higher risk, or marginal areas of the country can continue to participate in the FCIC program.

- The Assigned Risk Fund substantially limits the risk imposed on companies and also limits the chance for gain proportionately. This Fund assures that FCIC's social mission of serving all farmers, all crops, and all areas can be achieved.

The actual risk sharing parameters used for these funds will be specified in the draft, but it is expected that these numbers will be one of the final items in the negotiations. Also, greater risk sharing parameters for certain revenue products (CRC) has remained controversial.

**A&O Subsidy**

A&O subsidy payments are proposed, consistent with the President's budget, to be a percentage of premium as follows:

| | |
|---|---|
| Crop Revenue Coverage (CRC) | 21 percent of total CRC premium |
| Revenue Assurance | 24.5 percent, not to exceed MPCI comparable |
| Group Risk Plan (GRP) | 22.5 percent |
| All others (except CAT) | 24.5 percent |

CAT policies will continue to be paid loss adjustment allowances as in the past and all limited and additional coverage policies, except GRP, may be paid up to 3 percent for excess loss adjustment expenses if loss ratios exceed certain thresholds.

The 24.5 percent reimbursement rate shown for "all others" is the benchmark used to set the A&O subsidy rate for the other policies. For certain revenue products (CRC) or the Group Risk Plan, this continues to be an item of some contention and is expected to be one of the last items agreed upon.

In addition, the actions or inactions of Appropriators in the coming weeks will significantly impact this issue.

**Operations**

The SRA addresses several detailed "nuts and bolts" issues as well as several others of more general interest. For example, it defines the companies' obligations under USDA's non-discrimination policy. It also requires companies to write all plans of insurance, except those approved under section 508(h) of the FCIC Act, in any State in which they operate and to insure all applicants for all crops in such States.

AN EQUAL OPPORTUNITY EMPLOYER

INFORMATIONAL MEMORANDUM                    DRAFT                    3

**Program Integrity**

Companies are required to perform certain duties under the SRA and comply with the rules and regulations of FCIC.  Failure to perform duties or comply with regulations may trigger a termination or suspension of the SRA and/or the payment of specified amounts.

The litigated damages section contained in the first draft were a lightening rod for company complaints.  They have been replaced with the "failure to perform or comply" sections mentioned above.  They still allow FCIC to terminate or suspend an SRA and/or to charge the companies specified amounts.   They have, however, been sufficiently rewritten such that they will probably not be a serious obstacle to completing negotiations.

**Summary**

Discussions will continue after the issuance of the new draft, with the objective of coming to closure in July as early as possible.  The two primary money issues, risk sharing and A&O subsidy, will be most controversial as we near closure.

E

**RAIN AND HAIL L.L.C.**



**Corporate Office**
1501 50th Street, Suite 200
West Des Moines, IA 50266-5925
Tel: (515) 224-3070
Fax: (515) 224-3089

**URGENT - DELIVER IMMEDIATELY TO SANDY
FACSIMILE TRANSMISSION
816-926-1857        Page 1 of 5**

June 10, 1997

Mr. Tim Witt
Acting Director, Research & Development
Office of Risk Management
CFSA
P.O. Box 419293
Kansas City, MO 64131

Re:    1998 SRA Draft

Dear Mr. Witt:

Per the joint meeting in Kansas City on June 4-5, 1997, Rain and Hail is providing the following comments for your consideration:

I.    Plan of Operation and M-14/Liquidated Damages Work Group

Based upon the reports given to the General Session, there apparently was significant progress made in resolving the most contentious issues. Since these areas are so sensitive, we will reserve comment until we see the June 20, 1997 RMA draft.

II.    Expense Reimbursement Work Group

A.    Congressional Appropriations

We all understand that Congress has the final say on appropriated funds and statutory caps. When Congress has finished the appropriation process, we will then be faced with the issue of whether or not the program can be properly managed at the amount appropriated and what options can and should be considered. In the interim, it is critical that USDA and everyone who believes in the program work together to achieve adequate funding and we request USDA and RMA to reconsider the current offer of 24.5% plus XS LAE up to 3.0% for BUY-UP. USDA support for the necessary funding is critical to the long-term viability of the only remaining safety net for agriculture.

1.)    GAO Findings

On page 8 of the April 1997 "Opportunities Exist to Reduce Government Costs for Private Sector Delivery" GAO states that 27.0% is the average amount for expenses reasonably associated with program delivery for 1994-1995. What GAO does not say is that commodity prices and acres during that time period were above historical

1

Mr. Tim Witt
June 10, 1997
Page 2

averages nor did they account for the long-term increases in fixed costs that follow any rapid increase in business. GAO also did not factor in that overall (except 1995 prevented planting which was compensated) 1994 and 1995 were exceptional production years.

Probably the biggest factor to be considered in the GAO cost analysis is the influx of business. Any time a business has a major increase in income, the costs per policy are reduced as the personnel costs, space, and benefits lag the increased income, but catch up in the next 2-3 years.

2.) <u>Considerations</u>

A.) Has anyone assessed the impact of RMA's proposed reduction in A&O Subsidy on participation levels? What is the expected or acceptable participation level given the RMA's proposal?

B.) Given the reduction from 31% to 27.0%, it seems RMA 's budget for RSO, etc. can be reviewed to get a proportional reduction of $12.0 million (1.0% of $1.2 billion of BUY-UP).

C.) Transfer some or all LAE costs to the premium account as has been done historically (pre-1980).

D.) Remove the SRA language eliminating the prohibition of a company charging the farmer for services.

E.) Mandated simplification has not occurred. Incremental A&O Subsidy reductions can only occur <u>after</u> simplification is implemented.

B. <u>Expense Summary</u>

1.) To deliver the program at 24.5% will require efficiencies and cost reductions that will cause a decline in agencies and companies participating in the program. Agents will not deliver a significant volume given the complexity and work involved when income is so far below cost. Participation and convenience to farmers could suffer, particularly for the areas with a lower number of commercial growers. Voluntary insurance still has to be explained, sold, and takes time. Time has a cost.

2.) GAO future assumptions of high prices and rate increases are invalid for a fixed rate agreement without some indexing. The financial risk to agents and companies is too high to attempt business as usual.

III. <u>Risk Sharing Evaluation</u>

A.) <u>Considerations for Developing the Target Formulae</u>

1.) The budget assumption is that underwriting gains will be about $100-120 million annual cost to RMA (excluding the XS loss resulting from the 107.5 target L/R.)

2.) The proposed underwriting cap established at 17.5% annually (40% of the XS be paid to cover taxes) with balance payable 3 years from annual settlement.

2

Mr. Tim Witt
June 10, 1997
Page 3

3.) That reasonable profit levels would be maintained in good years and loss side expanded to reasonable levels to marginally reduce overall long-term gain.

4.) Assume $1.2 billion of BUY-UP at 65% retention and $350 million of CAT at 75% retention.

5.) The assumed frequency for losses over 5 years is: 1 year XS 200% L/R, 1 year 75% L/R, and 3 years at 107.5% target L/R.

6.) Assume in a 5 year period the distribution on retained BUY-UP premium is: 1 year at 40.0% net loss, 1 year at 25% profit and 3 years at 5-8% profit.

7.) Assume in a 5 year period the distribution on retained CAT Commercial premium is: 1 year at 25% loss, 1 year at 25% profit and 3 years at 10.0% profit.

B.) Analysis of Existing and Proposed Formulae

1.) For the budget of about $120 million per year over a 5-year period and estimating retained premium of $780 million of BUY-UP and $262.5 million of CAT totaling $1.042.5 billion, the average gain should be in the 11% range vs. the 4.7% in the latest RMA proposal (including program improvement factors).

2.) For example:

a. In a good year (1996), the gross L/R was 81% combined. The gross underwriting income to RMA was $307.8 million. The company underwriting profit on retained was $218.9 million (21%) leaving RMA a positive balance of $88.9 million in underwriting profit.

b. In a high loss ratio year (XS 200), the industry could sustain a 40% loss on retained premium for a loss of $417 million.

c. If three remaining years were to average 6.5% (medium of 5-8% range), gain on retained 5-year result is at best a break even.

3.) The proposed model places too much risk in the working layers on the loss side. The increased volatility could force a significant amount of business from Commercial Fund to Assigned Risk or to minimum Developmental retentions. The volatility in the working layers of the stop-loss as proposed by RMA could cause a company to re-evaluate their exposure in high-risk, high loss ratio crops and areas due to the potential underwriting loss impact to the overall book of business. This extreme loading of the working layer also has a major impact on commercial stop loss costs which could easily double or triple the current cost to the risk bearing companies.

4.) We also see no basis for a CRC underwriting charge since our limited analysis and short history given Freedom To Farm and CRC does not predict high historical underwriting returns. In fact, we foresee more volatility, particularly when we have a good production year and see a significant decline in harvest prices as yield and price do not correlate in many states. Until more is known about CRC in the new environment, we see no reason for any change.

3

Mr. Tim Witt
June 10, 1997
Page 4

      5.) At a $120 million annual budget target, the profit could average about 11.0% on retained premium and still meet overall budget objectives.

C.) <u>Proposals</u>

      1.) To achieve everyone's objectives, one method may be to rearrange the loss ratio ranges and formulae to emphasize the profit objective by fund to encourage lower loss ratios.

      2.) RMA rates and products need continuous scrutiny to assure they achieve the 107.5 L/R target in all states and on all crops.

      3.) CAT rates must remain stable during the SRA period.

      4.) Allow Developmental Fund selection by crop contract the same as Assigned Risk. Evaluation of policy and rate changes will be available by then to minimize significant discussion over the impact of the changes as the company has the final choice.

      5.) Attached is a proposed model which we suggest hits most of the targets expressed by RMA during the recent meetings. Based on our model (81-95) the proposed formulae will produce a 20% reduction in the long term underwriting gain using the 1997 formulae as a base.

IV. <u>Summary</u>

The balance between expense and underwriting within the program to produce a manageable bottom line is critical to maintain both the agency force and company participation. While we concur with additional risk/reward, it must be manageable. The RMA proposed formulae in the Commercial Fund is so punitive it could cause the companies to retain less risk and that has not been the goal.

We would appreciate the opportunity for further discussions at your earliest convenience.

Please advise that you received the fax. Hard copy to follow.

Sincerely,

J. H. Joyce
President

JHJ/so/nl

cc  Bob Parkerson
    John Sheeley

Encl.

M:\SUPPORT\FCIC\SRA\TIM_WITT.WPD

4

Comparison of Risk Sharing Formulas of Standard Reinsurance Agreements

**Company Share of Retained Ultimate Net Gain or Loss — 1995, 1996 & 1997**

| Loss Ratio | Com | Dev | Assign Risk |
|---|---|---|---|
| 0 - 55 | 11.000 | 6.000 | 2.000 |
| 55 - 65 | 65.000 | 30.000 | 9.000 |
| 65 - 100 | 94.000 | 45.000 | 15.000 |
| 100 - 160 | 30.000 | 14.000 | 5.000 |
| 160 - 220 | 25.000 | 10.000 | 3.000 |
| 220 - 500 | 15.000 | 7.000 | 2.000 |
| 500 - Up | 0.000 | 0.000 | 0.000 |

**Company Share of Retained Ultimate Net Gain or Loss — 1998-A (RMA 3/20)**

| Loss Ratio | Com | Dev | Assign Risk |
|---|---|---|---|
| 0 - 60 | 11.000 | 6.000 | 2.000 |
| 60 - 75 | 50.000 | 35.000 | 10.000 |
| 75 - 100 | 85.000 | 50.000 | 25.000 |
| 100 - 160 | 40.000 | 20.000 | 7.000 |
| 160 - 220 | 30.000 | 15.000 | 5.000 |
| 220 - 500 | 15.000 | 10.000 | 4.000 |
| 500 - Up | 0.000 | 0.000 | 0.000 |

**Company Share of Retained Ultimate Net Gain or Loss — 1998-AB (RMA 6/5)**

| Loss Ratio | CAT Com | Com | Dev | Assign Risk |
|---|---|---|---|---|
| 0 - 50 | 8.000 | 11.000 | 6.000 | 2.000 |
| 50 - 65 | 50.000 | 65.000 | 35.000 | 9.000 |
| 65 - 100 | 65.000 | 94.000 | 55.000 | 15.000 |
| 100 - 150 | 60.000 | 60.000 | 25.000 | 5.000 |
| 150 - 220 | 60.000 | 60.000 | 25.000 | 5.000 |
| 220 - 500 | 15.000 | 15.000 | 10.000 | 2.000 |
| 500 - Up | 0.000 | 0.000 | 0.000 | 0.000 |

**Company Share of Retained Ultimate Net Gain or Loss — 1998-AH (R&H 6/10)**

| Loss Ratio | CAT Com | Com | Dev | Assign Risk |
|---|---|---|---|---|
| 0 - 45 | 10.000 | 11.000 | 6.000 | 2.000 |
| 45 - 65 | 55.000 | 75.000 | 45.000 | 9.000 |
| 65 - 100 | 60.000 | 94.000 | 55.000 | 15.000 |
| 100 - 150 | 60.000 | 55.000 | 25.000 | 5.000 |
| 150 - 200 | 50.000 | 40.000 | 20.000 | 3.000 |
| 200 - 500 | 17.000 | 18.000 | 12.000 | 2.000 |
| 500 - Up | 0.000 | 0.000 | 0.000 | 0.000 |

**Company Ultimate Net Gain or Loss — 1995, 1996 & 1997**

| Loss Ratio | Com | Dev | Assign Risk |
|---|---|---|---|
| 0 - 55 | 6.050 | 3.300 | 1.100 |
| 55 - 65 | 6.500 | 3.000 | 0.900 |
| 65 - 100 | 32.900 | 15.750 | 5.250 |
| **Max Gain** | 45.450 | 22.050 | 7.250 |
| 100 - 160 | 18.000 | 8.400 | 3.000 |
| 160 - 220 | 15.000 | 6.000 | 1.800 |
| 220 - 500 | 42.000 | 19.600 | 5.600 |
| 500 - Up | 0.000 | 0.000 | 0.000 |
| **Max Loss** | 75.000 | 34.000 | 10.400 |

**Company Ultimate Net Gain or Loss — 1998-A (RMA 3/20)**

| Loss Ratio | Com | Dev | Assign Risk |
|---|---|---|---|
| 0 - 60 | 6.600 | 3.600 | 1.200 |
| 60 - 75 | 7.500 | 5.250 | 1.500 |
| 75 - 100 | 21.250 | 12.500 | 6.250 |
| **Max Gain** | 35.350 | 21.350 | 8.950 |
| 100 - 160 | 24.000 | 12.000 | 4.200 |
| 160 - 220 | 18.000 | 9.000 | 3.000 |
| 220 - 500 | 42.000 | 28.000 | 11.200 |
| 500 - Up | 0.000 | 0.000 | 0.000 |
| **Max Loss** | 84.000 | 49.000 | 18.400 |

**Company Ultimate Net Gain or Loss — 1998-AB (RMA 6/5)**

| Loss Ratio | CAT Com | Com | Dev | Assign Risk |
|---|---|---|---|---|
| 0 - 50 | 4.000 | 5.500 | 3.000 | 1.000 |
| 50 - 65 | 7.500 | 9.750 | 5.250 | 1.350 |
| 65 - 100 | 22.750 | 32.900 | 19.250 | 5.250 |
| **Max Gain** | 34.250 | 48.150 | 27.500 | 7.600 |
| 100 - 150 | 30.000 | 30.000 | 12.500 | 2.500 |
| 150 - 220 | 42.000 | 42.000 | 17.500 | 3.500 |
| 220 - 500 | 42.000 | 42.000 | 28.000 | 5.600 |
| 500 - Up | 0.000 | 0.000 | 0.000 | 0.000 |
| **Max Loss** | 114.000 | 114.000 | 58.000 | 11.600 |

**Company Ultimate Net Gain or Loss — 1998-AH (R&H 6/10)**

| Loss Ratio | CAT Com | Com | Dev | Assign Risk |
|---|---|---|---|---|
| 0 - 45 | 4.500 | 4.950 | 2.700 | 0.900 |
| 45 - 65 | 11.000 | 15.000 | 9.000 | 1.800 |
| 65 - 100 | 21.000 | 32.900 | 19.250 | 5.250 |
| **Max Gain** | 36.500 | 52.850 | 30.950 | 7.950 |
| 100 - 150 | 30.000 | 27.500 | 12.500 | 2.500 |
| 150 - 200 | 25.000 | 20.000 | 10.000 | 1.500 |
| 200 - 500 | 51.000 | 54.000 | 36.000 | 6.000 |
| 500 - Up | 0.000 | 0.000 | 0.000 | 0.000 |
| **Max Loss** | 106.000 | 101.500 | 58.500 | 10.000 |

FILE:   98SRA13.WK4

06/10/97

F

# MEMORANDUM

**TO:**    Robert W. Parkerson         *VIA FAX: 685-3082*
President of NCIS

**FROM:**    Robert J. Vancrum
Morrison & Hecker L.L.P.

**DATE:**    November 4, 1996

**RE:**    SUMMARY OF SIGNIFICANT CHANGES IN
INDUSTRY DRAFT - 1998 SRA

---

1.    "Approved Insurance Provider" - page 2

> This definition together with provisions in Section V, subsection O, paragraph 2, page 34 allows FCIC to terminate an SRA holder if they cease to be an approved insurance provider.

2.    New definition of "Approved Manuals 13 and 14" - page 4

> Require the manuals to be specified thirty days prior to date the Plan of Operation is due or any subsequent modification to be binding on the Company only with the Company's consent.

3.    "Sales Supervisor", Subsection AE, P. 5, ties in with Section V, Subsection F, Paragraph 3, p. 27 (Conflicts). Put in SRA the policy we think now applies concerning sales personnel involved in loss adjustment.

4.    Section II, subsection B, paragraph 1(f) - page 9

> Allows designation to the Assigned Risk Fund no longer tied to the 30th day after acreage reporting date.

5.    Section II, subsection D, paragraph 4(f) and (g) - page 14

> Accrual of interest on the Company's Reinsurance Account and also provides that no funds may be held more than three years in the Fund.

6.    Section III, subsection M - page 20

> Prohibits reductions being made to premium subsidy for processing delays caused by the FCIC.

7.    Section V, subsection A "Program Changes" - page 22

This section for the first time clearly allows FCIC to make program changes after the commencement of the reinsurance year but clearly provides that if there is a material increase/decrease in the cost performance there will be an adjustment to the reimbursement or rate of compensation.

8.    Section V, subsection B, paragraph 6 - page 24

Clearly states that payments will not be withheld from amounts due the Company until the month following written explanation as to why the amounts are due.

9.    Section V, subsection C - page 24

Provides for interest rate on overpayments due from FCIC to the Company at the same rate used by the IRS on overpayments of tax. The Company remains obligated to pay interest at 15%.

10.    Section V, subsection F, paragraph 1 - page 26

The Plan of Operation will be deemed approved for purposes of selling insurance contracts on an interim basis if not acted upon by June 1st preceding the reinsurance year. Also see policy & form approval - p. 25

11.    Section V, subsection F, paragraph 6 - page 28

Changes in the program must be distributed to the Company 30 days before the proposed effective date except if there is mutual agreement.

12.    Section V, subsection H, paragraph 4 - page 30

In the event of refund or forfeiture for noncompliance, the FCIC shall only be entitled to a setoff of subsidy or reinsurance of that portion of the insurance directly related to the violation and will receive no refund if its acts or errors cause the noncompliance.

13.    Section V, new subsection N - page 33

Requires reimbursement of litigation or arbitration expenses arising in four specified circumstances, all of which involve the integrity of the program not as limited as the current FCIC policy.

14.  Section V, subsection R "Disputes and Appeals" - page 35

Clarifies that appeals may be taken either to the Board of Contract Appeals in accordance with current regulations or commence in the U.S. District Court after a review by first the director of the applicable division and then the manager.

15.  Section V, subsection W - page 39

This new section for the first time establishes when a final close-out audit must be completed for all purposes and that except in the case of pending litigation or arbitration, no adjustments will be made after such date.

16.  p. 21 - Excess LAE.

OGC has said need statutory authority to pay. Is agency drafting amendments? Will you support ammendments?

There are other changes within the draft, but for the most part they are either made to correspond with the above numbered changes or are of no substantive significance. I will, of course, be happy to provide further explanation of the changes upon request.

RJVAN1JU.CWD/rlm

3

Industry Draft 1998 SRA

3. The Company must maintain Records of policy numbers and underwriting information pertaining to any additional risk policies written in conjunction with Eligible Crop        Insurance Contracts reinsured under this Agreement, and a cross reference to the        Eligible Crop Insurance Contract.

4. The Company must utilize insurance contracts, loss adjustment standards, procedures,
   forms, methods, and instructions approved by FCIC.

**F.    Insurance Operations**

    *1.    Plan of Operations*

        a.    This Agreement is not effective with respect to the Reinsurance Year commencing July 1, 1997, or for any subsequent Reinsurance Year unless and until FCIC has approved the Company's Plan of Operation (Plan) with respect to such Reinsurance Year.  The Plan must be submitted to FCIC by April 1st preceding the Reinsurance Year,  FCIC will not renew the Agreement if a Plan is not received by April 1st unless other arrangements are mutually agreed upon. Notwithstanding the foregoing, if the Plan is not approved by June 1 immediately preceding the Reinsurance Year the Plan shall be deemed approved on an interim basis unless the Plan is rejected in writing, giving all reasons for rejection. Any otherwise eligible insurance contracts written by Company during such interim period prior to notification of final approval will be reinsured hereunder. If the Plan is not approved by July 1st of the Reinsurance Year, eligible crop insurance contracts written or renewed with Sales Closing Dates between July 1st and the date the Plan is approved will not be reinsured unless specifically accepted by FCIC.

        b.    The Plan must meet the requirements and be in the format as contained in Appendix 2.

        c.    The Company may submit a request to amend an approved Plan at any time to reflect changing business considerations and sales expectations.  Such amendments must be approved by FCIC before implementation by the Company. The request will be evaluated following the procedures applicable to a timely filed original Plan of Operation, except that FCIC will consider, in addition, the potential of adverse

26