## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ACE PROPERTY & CASUALTY INSURANCE        )
COMPANY (f/k/a CIGNA PROPERTY &          )
CASUALTY INSURANCE CO.), ET AL.,         )
                                         )
                                         )
                                         )
                        Petitioners,     )
                                         )
      v.                                 )
                                         )        Civil Action No.
                                         )        1:06CV01430 (RMU)
FEDERAL CROP INSURANCE CORPORATION,      )
                                         )
                        Respondent.      )
_____    )

DECLARATION

I, Timothy B. Witt, Federal Crop Insurance Corporation/Risk Management Agency

(collectively "FCIC"), United States Department of Agriculture, in accordance with 28 U.S.C. §

1746, declare under penalty of perjury as follows:

1.  I have been working for FCIC since July 1976.  My first position was an insurance

loss adjuster, then a trainer and later a quality control reviewer within the Lincoln, Nebraska

field operations region until December 1979.  I then located to the Kansas City, Missouri

national operations office where I was a national trainer, procedure writer, quality control

program specialist, and supervisor of insurance document processing operations.  In 1985, I

transferred to the FCIC Headquarters Office, Washington, D.C. where I was responsible for the

design and implementation of a nationwide quality control program to oversee the activities of

insurance companies delivering Federal crop insurance policies under the terms and conditions

of a Standard Reinsurance Agreement (SRA).  In 1989, I became the Deputy Administrator for

Insurance Services with responsibility for contract administration and management of the SRA

between the USDA/FCIC and approved insurance company providers.  In 1992, I transferred to

the Kansas City Operations Office to my current position as Deputy Administrator for Product

Management, where I am responsible for the actuarial, underwriting, policy development and

data processing/financial operations pertaining to all crop insurance policies written under the

Federal Crop Insurance Act through private insurance companies with a SRA.

     2.  With respect to the negotiation of the SRA for the 1998 reinsurance year:

     a.  FCIC gave the approved insurance providers notice that it was terminating and

renegotiating the SRA for the 1998 reinsurance year on or about December 27, 1996;

     b.  Shortly after providing notice, I was part of a team consisting of several personnel within

FCIC who met to discuss possible changes to the SRA.  Kenneth D. Ackerman, Manager of

FCIC at that time, lead the efforts to draft a proposed SRA.  In the spring of 1997, an initial draft

of the SRA was presented to the approved insurance providers.  Shortly after the initial draft was

presented, I was notified by the Acting Under Secretary, Dallas Smith, that I was assigned to

take over negotiations of the SRA from Mr. Ackerman and lead the government's effort to

negotiate a new SRA;

     c.  The SRA was broken down into four general segments for ease of negotiations – risk

sharing, administrative and operating expense subsidy, operations, and program integrity.  There

were anywhere from 12-15 federal personnel from FCIC offices representing key functional

areas such as the Reinsurance Services Division, Financial Operations Branch, Claims and Field

Underwriting Divisions, Compliance Division, and Actuarial Divisions.  The Office of the

General Counsel also worked on these general segments.  Generally, 2-4 key management

personnel represented each of the approximately 15-20 approved insurance company providers along with various representatives from at least 3 insurance trade associations, of which most, if not all the approved insurance providers were members.  In addition, private re-insurers provided written and verbal comments and attended meetings on occasion;

d.  I do not recall, nor was I aware, that a formal "policy committee" was created or existed with respect to the negotiations of the 1998 SRA during the time I was assigned to be the government's lead negotiator.  Persons within FCIC worked on the various segments of the SRA depending on their area of expertise.  They provided their work and analysis to me and I reported on the progress, pending issues, and other material matters to the Deputy Under Secretary Dallas Smith, or his staff assistant Tom Lederer.  While I did not report to Mr. Ackerman at this stage of the negotiations, I attempted to keep him informed generally and he was invited by Mr. Smith to attend several of the briefings, meetings or teleconferences I provided on the status of the SRA negotiations.  I do not recall whether Mr. Ackerman attended all such meetings, briefings or teleconferences; and

e.  To the best of my knowledge, all of the approved insurance providers, private re-insurers, public, and FCIC written comments and changes regarding the various drafts of the SRA would have been provided to me.  In addition, I most likely sat in on all of the major or overall general negotiating sessions with the approved insurance providers.  When discussions or negotiations took place among the four general breakout segments, I tried to spend time in each segment but did not attend each session in its entirety.  The significant issues stemming from each individual segment were elevated to the overall negotiations.

3.  I have reviewed the declaration of Kenneth D. Ackerman, Dallas R. Smith, John H. Joyce, Troy Brady and Ben Latham.

4. I have been involved in various capacities with the negotiations of the SRA since 1991.

5. I have no personal recollection that the specific issue of whether the SRA was a continuous contract that renewed annually, or a single contract that remained in operation under the same financial terms and conditions until terminated, ever came up in the negotiations of the 1998 SRA.

6. Based on my experience, understanding and program administration, the SRA is a continuous contract except that certain terms and conditions may be changed through Congressional legislation or appropriations as long as such occurs prior to the start of the reinsurance year of July 1. I disagree with Mr. Ackerman's implication that the SRA would always continue under the same financial terms until it was terminated, since I, and others within FCIC, have known that Congress could change the terms of the SRA. For example, in the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1994 (Pub. Law 103-111), Congress reduced the approved insurance providers administrative and operating expense reimbursement rate from 32.5 to 31.0 percent of premium. This change was enacted on October 21, 1993, in the middle of the reinsurance year and the SRA had not been terminated prior to the change taking effect.

7. From my prior experience and understanding, appropriations law does not allow for multiple year contracts unless specifically allowed by law. I am not aware of any authority that would allow FCIC to enter into multiple year contracts. Historically, the Federal crop insurance program has faced funding scrutiny and uncertainty such that no financial commitments were made for more than one year at a time. For this reason, FCIC included language requiring the SRA to renew annually on July 1, and included language making the obligations of FCIC contingent on appropriations.

8. Each year FCIC receives an appropriation of such sums as necessary to cover the cost associated with losses, premium subsidy, and administrative and operating expense reimbursement. The appropriations may vary based on the actions of Congress. These funds are then apportioned by the Office of Management and Budget. Therefore, while the funds can be used each fiscal year until expended, the funds for the next fiscal year for FCIC to operate the Federal crop insurance program are annually appropriated subject to the decisions of Congress.

9. The reinsurance year (July 1 through June 30) does not correspond with the government's fiscal year (October 1 through September 30). To avoid an Anti-Deficiency Act problem of making obligations in advance of appropriations, FCIC has routinely included language in the SRA that states that all obligations under the SRA are subject to the availability of appropriations. If appropriations are not sufficient to cover all obligations, the SRA provides that the obligations are reduced on a pro rata basis as FCIC determines fair and equitable.

10. Although FCIC's funding is mandatory, meaning that such appropriated sums as may be necessary to administer the program will be available, the specific amount of the appropriations is often unknown. Historically, the Congress has considered differing amounts of funding for administering the Federal crop insurance program, changing either the dollars to be spent on the program, or more specifically, the percentage numbers used in reimbursement calculations to determine the money available to be appropriated and spent on the program.

11. Throughout the negotiations of the 1998 SRA, it was my understanding, as well I believe, those who were participating in the SRA negotiations, that the terms of the SRA could be changed by Congress. That understanding and belief is based on my experience during the negotiations highlighted as follows:

a. National Crop Insurance Services, Inc. (NCIS), a trade association representing approved insurance providers which held a 1997 SRA, wrote a letter dated June 30, 1997 sent to myself and Mr. Thomas Lederer, Special Assistant to the Deputy Under Secretary, who at the time was Mr. Dallas Smith, also the Acting Under Secretary (see attachment A). The NCIS letter stated that the terms and conditions of the 1997 SRA should continue during the period of negotiation into the 1998 reinsurance year "with the sole exception being changes in those terms mandated by federal law."

b. It was also my understanding that Mr. Ackerman was aware that the SRA was subject to annual appropriations, and was also aware of the effect of the Anti-Deficiency Act since there was a potential violation while he was Manager involving the obligation of more funds for premium discounts (subsidies) than had been appropriated by Congress.

c. During the negotiation process on or about August 21, I received a hand written note prepared by Mr. Ackerman with edits incorporated by the USDA Office of General Counsel. The written note stated if Congress appropriates an amount that would support an administrative and operating expense reimbursement in excess of 26 percent, FCIC will adjust the percentage level and reduce the excess loss adjustment proportionately so that the total administrative and operating expense reimbursement and excess loss adjustment expense does not exceed 27 percent (see attachment B). This note was sent to me by Mr. Ackerman for the purpose of incorporating such language into the final draft SRA to address the impending appropriations decisions of the Congress.

d. On July 30, 1998, Mr. Ackerman also signed Manager's Bulletin No.: MGR-98-020 issuing Amendment No. 1 to the 1998 SRA (see attachment C). In the background section he states that he met with the industry on July 22, 1998 to discuss outstanding issues regarding

administration of changes under the 1998 Research Act, and it was decided how FCIC would collect catastrophic risk protection administrative fees and when policies would terminate for indebtedness. Amendment No. 1 reflected these decisions and it is my understanding that all approved insurance providers signed Amendment No. 1.

e. It was also my understanding that Mr. Dallas Smith also was aware that the terms of the SRA were subject to annual appropriations. I received a copy of a fax transmission on June 26, 1997, with a subject of "Informational Memorandum for the Secretary FCIC's 1998 Standard Reinsurance Agreement." That memorandum was signed by Mr. Smith in which he states to the Secretary of Agriculture that the proposed terms of the SRA "remain subject to appropriations action on the part of the Congress" (see attachment D). Personnel on the negotiation team under my direction and review prepared the draft of this same memorandum, and this specific language was not in the draft originally sent to Mr. Smith.

f. I also received a letter dated June 10, 1997, from Mr. John Joyce, who was the President of Rain and Hail, L.L.C., one of the largest approved insurance providers at the time (see attachment E). In that letter, Mr. Joyce explicitly states that he understands that "Congress has the final say on appropriated funds and statutory caps. When Congress has finished the appropriations process, we will then be faced with the issue of whether or not the program can be properly managed at the amount appropriated. . ."

12. In various sections of Mr. Brady's declaration, he attempts to explain the timing of premium and fee collections from the insured, and in turn describes the timing and process for payment to RMA. Specifically concerning sections 9(h), 10, and 12, Mr. Brady's explanation does not denote the differences between the timing of CAT fee collections and similar fee collections associated with buy-up or "additional" coverage level policies. Mr. Brady's

statement of the timing of fee payments to RMA is true only in relation to the fees for buy-up or

"additional" coverage level policies. In accordance with SRA Section V.B.4., for CAT crop

insurance contracts, all administrative fees are paid to RMA on the monthly summary report

following the month containing the crop termination date. Thus, in Mr. Brady's example of the

timing for payment of raisin CAT administrative fees, such CAT administrative fees would not

have been paid to RMA following the April 1, 1999 raisin billing date. Rather, the CAT

administrative fees would have been paid to RMA coinciding with the August 1999 monthly

summary accounting report, the first monthly accounting report following the July 31, 1999

raisin termination date.

13. At no time prior to my reading of Mr. Ackerman's declaration of July 17, 2007, has he or

anyone else within USDA questioned or raised the issue that Congress did not have the authority

to legislate changes or revisions to the SRA, provided such changes or revisions were

implemented prior to the beginning of the next reinsurance year, unless the SRA was formally

terminated in accordance with section V.M. of the SRA. At all times during the implementation

of Mandatory Amendment Nos. 1 and 3, I and other appropriate FCIC personnel responsible for

administering the reinsurance program, operated under the assumption and past practices that as

long as the revisions to the SRA were completed before the July 1 start of the reinsurance year,

FCIC had the authority to make revisions and changes as required by an act of Congress. This is

supported by Mr. Ackerman's declaration where he states in paragraph 20 that the financial

terms of the 1998 SRA did not change from year to year "(excepting the congressionally

mandated changes effected through Mandatory Amendment Nos. 1 and 3 in 1998 and 2000)."

14. NCIS' letter referenced in 8(a) above also supports the position that each reinsurance

year creates a new contract, because NCIS referenced the 1997 SRA in much of their

correspondence relating to the negotiations for the 1998 reinsurance year. The 1997 SRA would have been originally negotiated in 1994 and first in effect for the 1995 reinsurance year.

15. During the negotiation process, NCIS provided FCIC with a Memorandum dated November 4, 1996 prepared by NCIS counsel Robert Vancrum, with the subject title "Summary of Significant Changes in Industry Draft – 1998 SRA" (attachment F). The Memorandum contained an attached draft of a proposed SRA. On page 26 of the draft proposed SRA, and highlighted by the authors, suggested language was proposed as follows, "This Agreement is not effective with respect to the Reinsurance Year commencing July 1, 1997, or for any subsequent Reinsurance Year unless and until FCIC has approved the Company's Plan of Operation (Plan) with respect to such Reinsurance Year." Based on NCIS' own proposed draft SRA, it was clear to me that they, and the approved insurance providers they represented, were aware that each reinsurance year stood independent of another and created a new contract subject to FCIC approval each reinsurance year.

16. I disagree with Mr. Ackerman that the Plan of Operation is merely "a functional tool" or "annual operational adjustment in authorized premium volume". While Mr. Ackerman is correct that the written terms of the SRA do not change from year to year, except as amended by Mandatory Amendment Nos. 1 and 3, the designations in the Plan of Operations can have a significant effect on the potential amounts of money that approved insurance providers may earn under the SRA. For example, the approved insurance providers designate an amount of premium each year to be at risk in the Assigned Risk, Developmental, and Commercial Funds. The Assigned Risk Fund provides the least potential underwriting gain and risk of loss to an approved insurance provider, while the Commercial Fund provides the greatest potential underwriting gain and risk of loss to an approved insurance provider. Therefore, the approved

insurance providers' ability to change the amount of premium placed in each fund can have a significant impact on the gains and losses an approved insurance provider may earn or experience in any given reinsurance year.

17. I agree with Mr. Ackerman that the wording of the SRA was carefully negotiated but I disagree in part with his interpretation regarding the use of "must" and "may." In drafting and editing the final SRA document, I was very cognizant and aware of when the term "must" was used, meaning that such actions are required to be completed or performed, or mandatory performance demonstrated, to be within compliance of the SRA's terms and conditions. However, there are instances where the use of the term "may" is used because it was not practical or necessary to require the approved insurance providers to take a certain action, or other actions or options existed that may be equally acceptable to FCIC. For example, section V.L. states "The Company may appeal any actions, findings, or decision of FCIC under this Agreement in accordance with the provisions of 7 C.F.R. 400.169." If the term "must" was used in this provision, it would have required the approved insurance providers to appeal every action, finding or decision of FCIC. Therefore, the decision of whether to appeal a particular action, finding or decision was at the discretion of the approved insurance provider. However, in the final drafting of the SRA it was always intended that any such appeal be conducted under section 400.169.

Date ___August 16, 2007_____


_____
Timothy B. Witt
Deputy Administrator for Product Management
Risk Management Agency